```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,         .
                                        .  Case Number 21-cr-40
 4              Plaintiff,              .
                                        .
 5         vs.                          .
                                        .
 6    PATRICK EDWARD MCCAUGHEY, III, .
      TRISTAN CHANDLER STEVENS,         .
 7    DAVID LEE JUDD, CHRISTOPHER       .
      JOSEPH QUAGLIN, ROBERT MORSS,     .
 8    GEOFFREY WILLIAM SILLS, DAVID     .
      MEHAFFIE, STEVEN CAPPUCCIO,       .  Washington, D.C.
 9    FEDERICO GUILLERMO KLEIN,         .  March 4, 2022
                                        .  4:06 p.m.
10              Defendants.             .
      - - - - - - - - - - - - - - - - -

11

12                   TRANSCRIPT OF STATUS CONFERENCE
                   BEFORE THE HONORABLE TREVOR N. MCFADDEN
13                    UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For the United States:      KIMBERLY PASCHALL, AUSA
                                  JOCELYN BOND, AUSA
16                                KIMBERLEY NIELSEN, AUSA
                                  United States Attorney's Office
17                                555 Fourth Street Northwest
                                  Washington, D.C. 20530
18
      For Defendant McCaughey:    LINDY URSO, ESQ.
19                                810 Bedford Street, Suite 3
                                  Stamford, Connecticut 06901
20
      For Defendant Stevens:      LAUREN COBB, AFPD
21                                Federal Public Defender's Office
                                  3 West Garden Street, Suite 200
22                                Pensacola, Florida 32502

23

24                        -- continued --

25
```

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant Judd:          ELIZABETH MULLIN, AFPD
                                   Federal Public Defender's Office
 3                                 1650 King Street, Suite 500
                                   Alexandria, Virginia 22314
 4
      For Defendants Quaglin,
 5    Morss, and Sills:            JOHN KIYONAGA, ESQ.
                                   John C. Kiyonaga Law Office
 6                                 600 Cameron Street
                                   Alexandria, Virginia 22314
 7
      For Defendant Mehaffie:      JOHN PIERCE, ESQ.
 8                                 John Pierce Law
                                   21550 Oxnard Street, Third Floor
 9                                 Woodland Hills, California 91367

10    For Defendant Cappuccio:     MARINA DOUENAT, AFPD
                                   Federal Public Defender's Office
11                                 727 East Cesar E. Chavez Boulevard
                                   Suite B-207
12                                 San Antonio, Texas 78206

13    For Defendant Klein:         STANLEY WOODWARD, JR., ESQ.
                                   Brand Woodward Law
14                                 1808 Park Road Northwest
                                   Washington, D.C. 20010
15

16

17

18

19

20    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   United States District Court
21                                     for the District of Columbia
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
1                        P R O C E E D I N G S
2             (Call to order of the court.)
3                 COURTROOM DEPUTY:  This is Criminal Case 21-40, United
4      States of America versus McCaughey, III, et al.
5             Counsel, please come forward to identify yourselves for the
6      record, starting with the government.
7                 MS. PASCHALL:  Good afternoon, Your Honor.  Kimberly
8      Paschall for the United States.
9                 THE COURT:  Good afternoon, Ms. Paschall.
10                MS. BOND:  Jocelyn Bond on behalf of the United
11     States.
12                THE COURT:  Good afternoon, Ms. Bond.
13                MS. NIELSEN:  Kimberley Nielsen for the United States.
14     Good afternoon, Your Honor.
15                THE COURT:  Good afternoon, Ms. Nielsen.
16                MR. KIYONAGA:  Good afternoon, Your Honor.  John
17     Kiyonaga here for Jeffrey Sills, who is present, as well as
18     Robert Morss, and I'm also standing in for Joe McBride, who
19     represents Mr. Quaglin, who is also present.
20                THE COURT:  All right.  Good afternoon, Mr. Kiyonaga.
21     Good afternoon, Mr. Quaglin.  Good afternoon, Mr. Morss.  And
22     Good afternoon, Mr. Sills.
23                MR. URSO:  Good afternoon, Your Honor.  Lindy Urso for
24     Mr. McCaughey, who has filed a waiver of appearance.
25                THE COURT:  Good afternoon, Mr. Urso.
```

1    MR. PIERCE:  Good afternoon, Your Honor.  John Pierce

2  on behalf of Mr. David Mehaffie, who has waived his appearance.

3    THE COURT:  Good afternoon, Mr. Pierce.

4    MS. MULLIN:  Good afternoon.  Elizabeth Mullin on

5  behalf of David Judd, who is present.

6    THE COURT:  Good afternoon, Ms. Mullin.

7    MS. DOUENAT:  Good afternoon, Your Honor.  Marina

8  Douenat on behalf of Steven Cappuccio, who has waived his

9  appearance.

10    THE COURT:  Good afternoon, Ms. Douenat.

11    MS. COBB:  Lauren Cobb on behalf of Tristan Stevens,

12  who waives his appearance.

13    THE COURT:  Good afternoon, Ms. Cobb.

14    MR. WOODWARD:  Good afternoon, Your Honor.  Stanley

15  Woodward on behalf of Federico Klein, who is present in the

16  gallery with us.

17    THE COURT:  Good afternoon, Mr. Woodward.  Good

18  afternoon, Mr. Klein.

19    All right.  We are here for a status conference.

20    I should state, in light of the CDC's recent guidance and

21  the fact that D.C. is considered a low-risk area, I don't

22  require people to wear masks in my courtroom.  You're welcome to

23  if you would like to, but you're certainly not required to do

24  so.

25    So I wanted to talk about a few things today.  I appreciate

1    the parties' filings.  I wanted to talk about status of

2    discovery.  I've read the -- kind of joint defense memo on the

3    status of discovery, and I'm hoping that one of the attorneys,

4    perhaps whoever drafted this, could address the group's

5    concerns.  And I will certainly -- I want to hear from the

6    government on that.  I wanted to address Mr. Cappuccio's motion

7    to compel, the government's motion for a scheduling order, and

8    hear from Mr. Mehaffie's counsel on concerns about that, and

9    then deal with Mr. Klein's motion to modify.

10             So going to the first issue, is there an attorney for the

11   defense who can address the defendants' discovery concerns?

12             MR. WOODWARD:  I'm happy to, Your Honor.  I will admit

13   that I drafted the report, although it was signed by all of the

14   defense counsel in the case.  I can go through sort of in detail

15   what was in the status report.  I can start by breaking this

16   down into buckets.

17             As the Court is well aware, with respect to global

18   discovery, the government has made that discovery available to

19   us through two databases.  Evidence.com is, frankly, unworkable.

20   I suspect that you're hearing that from defense counsel in all

21   of the cases.

22             THE COURT:  Actually, I haven't.

23             MR. WOODWARD:  Well, then I'm happy to stand

24   corrected, but it is a massive database of video, and it is

25   difficult for defense counsel to go through and parse that video

1   and identify in our case, for example, the particular videos

2   that we are interested in reviewing for the very specific area

3   where our clients are alleged to have been on January 6.

4        But that's --

5            THE COURT:  Now, my impression is that the government

6   has been sending, quote unquote, defendant-specific discovery --

7            MR. WOODWARD:  Yes, Your Honor.

8            THE COURT:  -- to you all for some time --

9            MR. WOODWARD:  Yes, Your Honor.

10           THE COURT:  -- and that this is -- what we're

11  discussing now is kind of these databases where the government

12  is trying to dump kind of all the discovery for everyone.

13       Is that accurate?

14           MR. WOODWARD:  That is accurate, Your Honor.  In this

15  case the government has provided us with a tremendous amount of

16  case-specific video.  Indeed, they've provided us with body-worn

17  camera video from every officer who is alleged to have been in

18  the position that might have even captured any of the conduct

19  occurring in the so-called tunnel.  So they have been very

20  diligent in providing us with so-called case-specific video.

21       However, obviously, our clients did not -- assuming they

22  were there, did not allegedly materialize in the so-called

23  tunnel.  So there is value, I hope the Court would agree, in

24  looking at the video and understanding where the people alleged

25  to be our clients may have traveled on that day, how it is that

1    they may have come to find themselves in that tunnel.

2         So although the government has provided us with a

3    tremendous amount of video, the video of the day is nevertheless

4    relevant to this case in particular.

5              THE COURT:  Yeah, I understand that.  I guess I'm

6    under the impression that where the government is aware of your

7    clients turning up even, you know, apart from the tunnel, that

8    that's also being provided.

9         Is that not your impression?

10             MR. WOODWARD:  That is my impression, although I think

11   we need to be careful about -- I don't want to speak for the

12   government, but who we define as the government for practicality

13   purposes is going to vary.

14        So do I expect that the team assigned to these cases is

15   providing us with every video where they believe that our

16   clients are depicted?  Yes, I do.

17        Does that mean that there aren't other agents of the

18   government reviewing video that may or may not be aware that

19   someone depicted in that video, because it's on the other side

20   of the Capitol building, has been charged with a crime in this

21   case?  I think that is entirely possible.  I think that when you

22   look at the tools that the government has provided, it's clear

23   that this is not a perfect science.

24        And so yes, I believe the government when it says that it

25   has invested a tremendous amount of resources into compiling

1  data for us.  I would also observe that the nature of this case

2  is that it is an investigation that is occurring after the

3  charges were brought.

4      And so the focus of the government has understandably been

5  prosecuting its cases and not necessarily focused on *Brady*,

6  *Giglio*, and their progeny so as to help us understand exactly

7  where the people alleged to be our clients were on that day and

8  whether there might be mitigating evidence, say they're helping

9  officers, helping others, or otherwise video that would be

10  relevant to a trial in this case.

11      THE COURT:  So -- well, what do you want me to do?

12      MR. WOODWARD:  It's a discovery status report, Your

13  Honor.  It's not a request for relief.  I am confident that

14  defense counsel and the government will continue to negotiate

15  these issues.

16      What I don't want is to come before Your Honor in two

17  months and have Your Honor say, "Why didn't you say something

18  about this before?"  We, as defense counsel, very much

19  appreciate that the Court does not like surprises.

20      But we also felt that it was time to put our own

21  perspective in writing, because the rosy picture that has been

22  painted of discovery in these cases, it's not as clean-cut as

23  has been stated.

24      THE COURT:  It certainly has not looked rosy to me.

25  I will tell -- I mean, this is my instinct, Mr. Woodward.

1    I'm trying to balance the need for everybody to prepare for

2    trial against the need to have speedy trials, and obviously,

3    some of the clients here, perhaps not yours but some of the

4    defendants are understandably anxious to get to trial as soon as

5    possible.  And I think the public has an interest in having

6    swift resolution of these cases, regardless of one party's view

7    or not.

8        I'm sure the government would probably just as soon prefer

9    these to wait longer than -- I've been pushing the government in

10   all of these cases to move.  There's just -- my sense is there's

11   just this tremendous kind of universe of discovery out there

12   that it's hard to imagine any single defense attorney kind of

13   completely reviewing.

14       So while the government is turning over this mass of

15   information, I think we also need to be somewhat realistic about

16   what can happen, what you all can realistically get.  And if

17   that means, you know, at the end of the day that something gets

18   missed before trial, then we might have to deal with that

19   afterwards.  And maybe that's a *Brady* issue; maybe that's a new

20   trial issue.  I don't know.

21       But, you know, I appreciate you raising this, and I

22   certainly do want to be hearing from defense.  I think this is

23   going to be just kind of a messy process.  And it sounds to

24   me -- and I appreciate your candor, but what I think I'm hearing

25   from you is the government is producing everything that at least

1    the attorneys are aware of that is directly relevant to your

2    clients.  And if you're having a hard time kind of confirming

3    whether or not there are other things out there, that's

4    frustrating.  I'm not sure there's going to be a great solution

5    to that.

6            MR. WOODWARD:  Well, Your Honor, if I may, we know

7    that there are other things out there.  So yet another example

8    of discovery that has yet to be produced but that the government

9    acknowledges existed are video and other materials that were

10   created by those that were there that day.

11       I recently was afforded the opportunity to go and see the

12   Capitol building and to see the so-called tunnel.  It's a very

13   unique place at the Capitol, because it only looks the way it

14   did on the day of inauguration.  There's a stage that is built

15   on Inauguration Day, and that stage creates the tunnel.

16       Why is that relevant to Your Honor?  Because the only

17   cameras that capture footage are on the inside of the Capitol

18   building.  There aren't obviously cameras floating in midair.

19   And so the only -- the only individuals who could have captured

20   video of the people alleged to be our clients facing the police

21   officers are going to have been the private citizens that were

22   there that day.

23       And as the government acknowledged in its global status

24   report, it has not begun producing that video.  We don't have

25   any information about whether it is cataloging that video in the

1    same way that it was for the Capitol Police video and the

2    body-worn camera that have been produced.

3         And so that's a -- again, not here asking the Court --

4              THE COURT:  Sir, you haven't been getting the video

5    from the tunnel?

6              MR. WOODWARD:  We have been given video from the

7    tunnel as created by either the security cameras that were in

8    the tunnel, which face outward, or by the Metropolitan Police

9    Department or other law enforcement officers who were wearing

10   body camera that day.  We have also been given limited video

11   that has been collected by the government from its search and

12   seizure of various private devices.

13        But I don't believe the government would represent today

14   that it has gone through all of the devices that it has seized

15   from the outside of the Capitol building facing down the tunnel,

16   such that there could be video that the government has in its

17   possession, custody, or control, not these prosecutors but the

18   government generally, that has not been produced.

19        The government's status report only vaguely alludes to that

20   private citizen video that's being uploaded.  And it's not clear

21   whether it's going to evidence.com or to Relativity.  And so

22   that's a massive amount of information that would be relevant to

23   these particular cases.

24        I understand, and I think defense counsel would agree, and

25   the government has now taken this position in several cases,

1    that this investigation, quote unquote, may not be completed by

2    the time of any certain trials.  Mr. Graves was quoted in The

3    Washington Post this past weekend as only being halfway done,

4    the investigation.

5           However, I would also observe that there are cases in

6    history that are significant and that change the way that

7    discovery is treated.  This, I think, might be one of them,

8    because the government has produced discovery in this case and

9    in all the other cases in which I'm involved in very different

10   ways.

11          And so getting a handle on discovery is not something

12   that's going to be a trivial task.

13              THE COURT:  Yeah, I certainly understand that.

14       Okay.  So I appreciate that.  Anything else you want to

15   highlight, I'm happy to hear from you.

16              MR. WOODWARD:  I think that the discovery status

17   report speaks for itself.  I'm happy to elucidate any of the

18   issues that were raised in there, but I also would acknowledge

19   that the government does continue to be collaborative.  And so

20   we are working with the government, and to the extent that there

21   are other disputes, as you've seen today, you can -- we will

22   bring them to the Court's attention.

23              THE COURT:  All right.  Great.

24              MR. WOODWARD:  Thank you, Your Honor.

25              THE COURT:  Solvable things, I would love to help on

1    those, but yeah, I think there's a certain amount that's just --

2    heaven help us all.

3        All right.  Ms. Paschall?

4            MS. PASCHALL:  I think Mr. Woodward is exactly right,

5    that this case is going to change the way discovery is done by

6    the government wholesale.  That's incredibly clear.

7        What I think is not entirely clear is the efforts that have

8    been made by the government up until this point to identify

9    things for these defendants versus what's happening in the

10   global discovery.

11       And I don't want to lose sight of that thread, because

12   obviously I just joined this case yesterday, but my colleagues

13   for over a year have been identifying information that is

14   relevant to these defendants, to include videos that have been

15   identified of other defendants in the tunnel that we have access

16   to, body-worn camera video specific to the Lower West Terrace,

17   that AUSA Jackson created a spreadsheet of videos just for Lower

18   West Terrace defendants specific to this case.

19       So I don't want there to be this idea that the government

20   is losing its Rule 16 and *Brady* obligations with respect to

21   these nine defendants, because I think the exact opposite is

22   true, that we have been incredibly diligent in turning over

23   case-specific information.

24           THE COURT:  Yeah, I didn't hear Mr. Woodward to say

25   anything to the contrary.  So he raised concerns about all these

1    public sources that could have and probably do have images that

2    would be relevant here that are not in the databases or

3    certainly not in the defendant-specific databases.

4        Do you have a sense of where we are on those?

5            MS. PASCHALL:  I do, Your Honor.  So each AUSA that

6    has defendants where search warrants have been done of social

7    media, of phones, of laptops, things of that nature on Monday

8    are going to be receiving an e-mail from the discovery team

9    asking them to review those items as they are uploaded to our

10   instance of Relativity and clear them to go to the plumb

11   instance, which is what we're calling the defense version --

12   ours is the apricot version; theirs is the plumb version -- next

13   week.

14       So how long it takes to get those hundreds, probably

15   thousands of social media and device downloads and things of

16   that nature out, I can't give Your Honor an exact date on that.

17   But the AUSAs have five days next week to clear everything that

18   we have loaded into the database so far for production.  So it's

19   coming if it isn't already there.

20       As of today, every global production that has been made

21   through USAfx is now in Relativity.  That's huge, because

22   Relativity is so much easier to work than USAfx.  USAfx is

23   basically a drop box where all defense can do is download that

24   information and then have to digest it on their own.

25       Relativity works basically like Westlaw where they will

have the ability to do essentially bullion-type searches that
will pull all of the useful information that they look for.  And
that includes even audio and video, to the extent that
technology allows it.  But there are machine transcriptions of
all audio and video that gets loaded into Relativity.

So for instance, if there's a video from a defendant on the
Lower West Terrace that has good machine transcription and one
of these defendants' names is mentioned on that video, in
theory, a Relativity bullion search is going to be able to pull
that down and deliver it directly to the defense.

So once those videos get uploaded, that's one way we're
going to be able to find all of this.

In addition, there's a group of AUSAs that are tagging all
of the information that's going into Relativity that will be
pushed as work product to the plumb instance, to the defense
instance.  So they will have the ability to know if this is
tagged to their specific defendant, if it's tagged to one of
their co-defendants, if it's tagged to another defendant who
isn't even charged in this indictment but is perhaps a
well-known defendant who is also charged in the tunnel case.  So
it's going to be tagged with location.  So Lower West Terrace is
going to be a tag that's particularly relevant to these
attorneys.

So as the government is reviewing everything that's being
uploaded to our instance of Relativity and it's being pushed

over there, that work product will go with it.  So it should be
immensely easier for all of the defense's concerns to be
addressed by the morass that's in there.  That's one thing.

Evidence.com, it's not the easiest thing on the planet, we
can concede that.  But we've created analytical tools that have
gone over in the USAfx productions that should help with that,
including spreadsheets that help with GPS location and locating
cameras, both from body-worn and from the tunnel itself, U.S.
Capitol Police CCTV cameras.  That should narrow the huge morass
that they're discussing pretty significantly, especially for
this case because it's a Lower West Terrace case.

I emphasize with Mr. Woodward about being curious whether
his defendant is on the east side of the Capitol.  I'm curious
about that, too.  And it is a problem.  But I think what we
would like to set up going forward is a more collaborative
environment between the government and defense with addressing
specific requests like that.

If Mr. Woodward is concerned that his client is at the East
Columbus Doors and can point that out to the government, the
government can go look for it.  That's part of the reason that
we've created a whole cache of AUSAs who are only going to be
working on Capitol cases, so that we can address these specific
issues.

I think those that were filed in the motion to compel today
are actually pretty low-hanging fruit.  We should be able to

1    address those issues.  And one of the ways the government is

2    going to propose today to deal with that is to ask all of the

3    defense counsel to join us for a discovery conference and tell

4    us, what are the issues?  Are you having problems in

5    evidence.com?  How can we help you with that?  Are you having

6    trouble finding things in Relativity?  Where can I point you to

7    make sure that you're finding everything that's necessary?  And

8    then make sure that all the case-specific discovery is clearly

9    outlined so that we all know that we're working from a similar

10   universe of information.

11        Is there anything that I missed?

12             THE COURT:  Not for me.

13        All right.  I had a couple questions.  My understanding

14   from last time I got one of the discovery updates from your

15   office, perhaps not in this case, was that we're now looking at

16   April possibly for everything or substantially everything to be

17   turned over?

18             MS. PASCHALL:  So I want to push back on the idea of

19   substantially everything, because I don't even know what that

20   means.  I think part of the problem is information is constantly

21   being fed into the FBI.  So getting -- if we were to stop the

22   clock today on information, then we kind of know, okay, there's

23   about 400,000 documents in Sentinel, there's about 1,100 devices

24   that we're looking at.  But that's going to be a moving target.

25        So with respect to when, you know, today's number gets

1    uploaded, I don't have an exact number from the discovery team.

2    I don't think April sounds unreasonable, but I also don't want

3    to tie them to that, because I don't have that information from

4    speaking with them.  I know that the 1,100 devices are starting

5    to get uploaded tomorrow.  There were -- almost 34,000 documents

6    of the 400,000 were uploaded today.  So it's caching out.  I'm

7    just not certain how long they expect that to take.

8            THE COURT:  Right.  I get that there's kind of new

9    information that is coming in now with an ongoing investigation

10   and that that may go on indefinitely.  I guess I'm more

11   concerned about ensuring that everything that you all have had,

12   that you had as of December 2021, when is that going to be over?

13           MS. PASCHALL:  I think -- again, they haven't given me

14   an exact date.  I can try to nail that down for Your Honor.

15       What I would focus on instead is whether we believe we've

16   covered the universe of what is Rule 16, *Brady*, and discoverable

17   information for these nine.  And as Your Honor and, I'm sure,

18   these defense attorneys are aware, we started with a trial this

19   week, and there is a system in place for people who are starting

20   trials before the end, quote unquote, of the global discovery to

21   make sure that the government is meeting those obligations.

22       It's imperfect.  And so the reason that we have the

23   Relativity database set up is so that we can use the tools that

24   Relativity provides to create a more perfect universe of what

25   would be captured as Rule 16 and *Brady* and discoverable

1    information.

2        But the Reffitt trial team was able to understand, okay,

3    here is the universe, here are the buckets of information that

4    is in the government's possession, custody, and control, and

5    let's go through with respect to this defendant each of those

6    buckets to make sure that we've captured it in this specific

7    case.

8        So that is doable, and I think, in fact, most people who

9    are going to trial in the next month or two are going through

10   that exact process.

11       So to the extent that this case were set for trial in that

12   manner, I think that's the approach the government would be

13   taking to make sure that we're meeting those obligations.  It's

14   just that we have taken the position that it is better for us to

15   go beyond our case-specific Rule 16 and *Brady* obligations and

16   make disclosures in this larger manner, if that makes sense.

17               THE COURT:  It does.  Okay.  Thank you.

18       So what's your suggestion on Mr. Cappuccio's motion to

19   compel?  Do you want a chance to respond in writing, or are you

20   going to try to speak to his attorney on that?

21               MS. PASCHALL:  I think both, Your Honor.  So if we

22   could have a week both to have discussions with counsel but also

23   respond in writing if needed.

24               THE COURT:  How long do you need to respond to that?

25               MS. PASCHALL:  Maybe a week.

1          THE COURT:  A week?

2          MS. PASCHALL:  I will take two if you're willing.

3          THE COURT:  I think two is fair.  All right.  I will

4    ask the government to respond by March 18th.  Obviously, if the

5    parties are able to reach a resolution on that, you can just let

6    me know jointly by then.  But otherwise, I will ask for a

7    response by March 18th.

8       So I appreciate the updated suggested scheduling order.

9    Obviously, I want to hear from Mr. Mehaffie's counsel on that.

10   I guess my instinct is to go ahead and add in -- back in the

11   kind of deadline for all motions, expert notices, what have you.

12   The government had originally suggested, I think, a June 3rd

13   start date for that.  I realize that the defense may have had

14   concerns about that.

15      But are you still comfortable with that schedule that you

16   had originally proposed?

17          MS. PASCHALL:  The government is, yes.

18          THE COURT:  Okay.  What are you requesting at this

19   point in terms of next hearing?

20          MS. PASCHALL:  I was actually a little bit prepared to

21   punt to defense counsel on that.  Perhaps it would be useful, as

22   I've just laid out and never said to any of them about this kind

23   of idea of being more collaborative about discovery, to give us

24   maybe 45 days or 60 days to execute said discovery conference,

25   make sure that we're addressing their concerns.  And then if I

1   don't address them, then they can address them with you in the

2   next 45 to 60 days.

3              THE COURT:  Okay.  How about 1:00 p.m. on Friday,

4   April 22nd?  Does that work for the government?

5              MS. PASCHALL:  April 22nd is fine.

6              THE COURT:  Let's do the hands.  Is anyone not

7   available on Friday, April 22nd, at 1:00 p.m.?

8              MR. PIERCE:  I just have a 2:30 status hearing in

9   another January 6 case, Your Honor.

10             THE COURT:  Here?  Heaven help us if we're not done by

11  2:30.

12       All right.  So we're setting -- well, I will tentatively

13  set this for Friday, April 22nd.

14       Do you have a motion regarding speedy trial, ma'am?

15             MS. PASCHALL:  Yes, Your Honor.  The government would

16  ask for exclusion of time under the Speedy Trial Act given the

17  continuing discovery concerns, the new plan going forward for

18  how to address some of those concerns, and for updated

19  information about how to work the Relativity database as we have

20  now made pretty extensive disclosures as of about two hours ago

21  to that database.  The government thinks the ends of justice are

22  served by an exclusion of that time.

23             THE COURT:  Okay.  Anything else you wanted to address

24  before I hear from defense counsel?

25             MS. PASCHALL:  Unless Your Honor wants to take up the

1  motion to modify conditions, no.

2         THE COURT:  You are taking no position on that?

3         MS. PASCHALL:  Not really.  We're mostly deferring to

4  Pretrial Services.

5         THE COURT:  All right.  Is there something you wanted

6  to say on that?

7         MS. PASCHALL:  Not really.

8         THE COURT:  Okay.  Thank you, Ms. Paschall.

9      All right.  Mr. Urso?

10         MR. URSO:  Your Honor, just following up briefly on

11  Attorney Woodward's comments, specifically in terms of *Brady*

12  material, I think what pops into my mind is if we -- a needle in

13  a haystack situation for us is video that would show our clients

14  when they actually enter the premise.  I think they're all

15  charged with illegally entering.  Did they climb over a barrier,

16  or was it wide open?  Was there a welcome sign?  And that sort

17  of video, I think, is really important, pertinent for the trial,

18  and that's the sort of stuff that's getting dumped into that

19  massive.  So that's the sort of thing we're sort of hampered by.

20     Again, I think I said this previously, but the reason we're

21  in the situation we're in is because the government forewent

22  their normal process of investigating a crime, doing all their

23  work, and then indicting.  Here, they chose to just indict and

24  arrest everybody quickly, and now they're trying to catch up.

25  So I think the reason we're here is because of the government's

choice of operating that way.

And in terms of -- I think Your Honor mentioned, you know, it could be that we have to go to trial and there could still be some potential *Brady* issues that are missed with discovery.

And I would suggest, and I don't know if I said this before, but perhaps at least for the defendants who are not pressing their speedy trial rights, that they not be compelled necessarily to go forward with a summer trial, try the people that are willing to take that chance you're talking about because they're locked up and they want their speedy trial.  But for the people that are out, rather than risk that sort of *Brady* issue popping up, if they're willing to wait, that we should maybe wait on those people.

THE COURT:  All right.  I understand your position.

Do you have a position on waiving the speedy trial clock?

MR. URSO:  We have no objection to waiving.

THE COURT:  And I don't know if you looked at -- as I suggested.  I think it makes sense to go ahead and set a motions schedule for all motions.  The government had originally proposed all pretrial motions not covered by what you've already agreed to would be filed no later than June 3rd, and then keying off whether you're group 1 or group 2, we would have responses from there.

Do you have any objection to that schedule?

MR. URSO:  I would probably have an objection at this

1    point just because I'm just so behind in trying to have the

2    discovery done.

3          THE COURT:  Well, we're talking about almost exactly

4    three months from now.

5          MR. URSO:  I mean, I had reviewed the government's

6    proposal.  I thought that was good.  I didn't put a whole lot of

7    thought into that, but I would say I'm inclined not to want to

8    do it that soon.

9          THE COURT:  Okay.  I'll take that under advisement.

10         MR. URSO:  Thank you, Judge.

11      Mr. Pierce, why don't we go to you, since I know you did

12   have a concern with what everybody else has agreed to.

13         MR. PIERCE:  Sure, Your Honor.  So there's really

14   nothing magic to wanting a little bit more time for the Rule 12

15   motions.  It's really just, as Your Honor may know, we have a

16   lot going on in a lot of these cases.  So we're kind of

17   perpetually trying to gain as much time as we can.  It seems

18   like I'm probably outvoted on that since other defense counsel,

19   you know, are fine with it.  If we need to, we, you know, will

20   make that work.  We're just trying to create as much time and

21   space to review everything and to get all the work done in all

22   the cases.  That's really it.

23         THE COURT:  I understand.  So on the suggestion that

24   all other pretrial motions be due by June 3rd, any reason you

25   don't think you could abide by that?

1          MR. PIERCE:  I mean, we will certainly abide by it if

2    we have to.  Similar to prior defense counsel, generally

3    speaking, you know, we would prefer not to that soon.  And

4    Mr. Mehaffie being out and he's not going to object to speedy

5    trial, you know, we would rather have as much time as we can to

6    see everything that we can.  But, you know, if that's the date,

7    we will make it work.  But just for formality purposes, we would

8    object to that.

9          THE COURT:  Okay.  Anything else that you wish to

10   address, sir?

11         MR. PIERCE:  No, Your Honor.  That's it.  Thank you.

12         THE COURT:  Thank you, sir.

13      Ms. Cobb?

14         MS. COBB:  Yes, sir.

15         THE COURT:  So first, the June 3rd deadline for all

16   motions, any reason that would not work for you?

17         MS. COBB:  Well, I mean, I'm sort of in the same boat

18   as some of my colleagues.  I'm concerned that all this discovery

19   is being poured on us and only more is going to happen and sort

20   of juggling reviewing that and also doing the motions.  So I'm

21   in the same boat as they are.  I can make it work if I need to.

22      But I think the reason we ended up with this sort of

23   revised proposal of just scheduling the motion to sever and the

24   Rule 12 was to try to just give a little breathing room.  But if

25   you want them done by June 3rd, I can do it.

```
 1                THE COURT:  Okay.

 2                MS. COBB:  Yes, no problem.

 3                THE COURT:  And your view on the speedy trial clock?

 4                MS. COBB:  We have no objection.

 5                THE COURT:  Okay.  Anything else you wish to address,

 6      ma'am?

 7                MS. COBB:  No.  Thank you.

 8                THE COURT:  Thank you.

 9           Ms. Mullin?

10                MS. MULLIN:  Your Honor, with respect to the June 3rd

11      deadline, a point of clarification.  Would that include motions

12      in limine?

13                THE COURT:  Yes.

14                MS. MULLIN:  Okay.  I think, Your Honor, I share the

15      concern of my colleagues in that I'm having a difficult time

16      accessing and utilizing evidence.com.  I would be the first to

17      blame my own technological deficiencies, but it is an incredibly

18      difficult database to work.  And so I join my colleagues'

19      concerns on that.  So it's very difficult to try to, you know,

20      review discovery, both related to Mr. Judd and the

21      co-defendants.

22                THE COURT:  And so is that -- evidence.com has

23      everything, including your client-specific evidence?

24                MS. MULLIN:  My understanding is that evidence.com

25      does not yet include cell phone footage of private citizens.
```

1         THE COURT:  But you're saying you're even having

2    trouble viewing your case-specific evidence?

3         MS. MULLIN:  Yes, although I have been provided

4    case-specific videos.  I just don't know if there's other ones

5    out there because of the way that evidence.com works or it

6    doesn't work.

7         So I would be concerned about motions in limine being due

8    in early June in that we're not necessarily going to know the

9    world of evidence that's out there.  So if we wanted to admit

10   something or seek to preclude something, we may not have a

11   handle of what those items of evidence are.

12        I have no problem with other motions being due, but I would

13   ask for additional time on the motions in limine.

14        THE COURT:  Okay.  And what's your view on speedy

15   trial clock?

16        MS. MULLIN:  Your Honor, no objection.

17        I did have one request for the Court, and I don't know -- I

18   haven't been before Your Honor.  But I have a number of

19   January 6 trials back-to-back in addition to --

20        THE COURT:  Me too.

21        MS. MULLIN:  Yes, I understand.  We all do.  And I'm

22   wondering if the Court would appoint CJA counsel to join me as

23   co-counsel in Mr. Judd's case.  I have someone in mind, if the

24   Court would appoint him.  I'm not CJA.  I'm with the Office of

25   Federal Public Defender.

1          THE COURT:  Right.  I remember that.  I think I can.
2    I haven't done this before.
3          MS. MULLIN:  Neither have I.
4          THE COURT:  Yeah, let me -- I will make a note to
5    myself.  Can you file something?
6          MS. MULLIN:  Certainly.  His name is -- he's admitted.
7    His name is Edward Ungvarsky.  He's a former colleague of mine.
8          THE COURT:  Okay.  If you could just file something,
9    that would remind me to follow up and make sure.  I certainly
10   don't have a problem with that in theory.  I just need to make
11   sure that's appropriate.
12         MS. MULLIN:  Okay.  Thank you, Your Honor.
13       I just wanted to put one more kind of issue on the record
14   for Mr. Judd.  Mr. Judd has been attempting to negotiate in good
15   faith in an effort to resolve this case short of a trial.  And I
16   would put on the record that he remains willing to negotiate.
17   He has no prior criminal history or history of violence.  And he
18   was willing to accept the consequences of even a felony
19   conviction, which would be devastating to someone like him who
20   has no prior record.
21       I just wanted to state this.  I think the government --
22   it's not anything against these individual prosecutors, but the
23   government appears to be taking sort of a draconian cookie-
24   cutter approach to all of these cases, offering plea deals which
25   would force a wide range of clients to agree to enhancements

1    that are debatable, significantly increase their exposure, and

2    not lead to any certainty.

3         And so I think that the government's approach here, the

4    sort of cookie-cutter approach to all of these cases is running

5    the risk of preventing cases that could otherwise be resolved in

6    a timely fashion from being resolved and forcing us to litigate.

7         So I just wanted to put that on the record.  Mr. Judd, he

8    remains open to negotiating and to accepting responsibility for

9    some conduct, but the government's approach has been somewhat --

10   again, I say this word, I've now said it three times, but cookie

11   cutter and not sort of taking into -- it appears not taking into

12   account his individual culpability and his conduct that day.

13        THE COURT:  Okay.  Thank you, Ms. Mullin.  Obviously,

14   I don't get involved in plea negotiations, but also obviously,

15   in the post-*Booker* world, sentencing guidelines are not binding

16   on me.

17        MS. MULLIN:  I understand.  I just wanted to put that

18   on the record for Mr. Judd.

19        THE COURT:  Thank you, ma'am.

20      Mr. Kiyonaga?

21        MR. KIYONAGA:  Your Honor, 3 June is a day we can live

22   with.

23        In terms of the -- in terms of the three defendants that

24   are at the Northern Neck, they're experiencing a problem gaining

25   access to discovery, which is that they're not getting it at

all.  The Northern Neck apparently has no laptops or tablets to enable them to review digital discovery.

I've dealt with the Northern Neck for years.  I have absolutely no confidence that they would listen to me. Ms. Paschall has kindly offered to assist.  I think that will dramatically change the nature of my dialogue with the Northern Neck, but in the spirit of avoiding surprises, I wanted to mention to the Court that issue.

Lastly, Your Honor, all three of the defendants that I'm speaking for today, Sills, Morss, and Quaglin, oppose the exclusion of the time for speedy trial.

But I wanted to point something out that struck me as I was sitting in the courtroom listening.  This is the first case in my 30 years of being a criminal defense attorney, 31, where I've actually heard acknowledged expressly in open court that people are going to be undertaking their trials before the universe of discovery is complete.  And that, of course, implies an acknowledgment that people are very likely going to be left to rely on collateral relief if *Brady* violations are subsequently discovered.

I understand that this is an unprecedented case in terms of volume and many other things.  But the clients I'm speaking for are all confined pretrial, and that creates, I would just note for the Court, the circumstance which I consider very notable of proceeding before the universe of discovery is fully known.

1    That creates an immutable and, I would submit, illegitimate

2    pressure on them to go to trial prematurely, which they would

3    not otherwise feel, of course, if they were at liberty.

4         I just point that out for the record to Your Honor.

5              THE COURT:  Okay.  Thank you, sir.  This is certainly

6    a unprecedented case in many ways.

7         Mr. Woodward?

8              MR. WOODWARD:  Well, you might imagine I have a few

9    things to say.

10        I agree -- I think it was Mr. Pierce or maybe Mr. Urso who

11   mentioned that there are trials that are ongoing now, and

12   certainly, Ms. Paschall mentioned that they were able to get the

13   discovery ready for that case.

14        But Bill Welch, the defense counsel in that case, has

15   acknowledged that his advice was not to go to trial.  So I don't

16   think it's fair to categorize these cases with those that have

17   chosen to forego the opportunity to get full discovery.

18        To that end, you know, the issue here is that there are two

19   buckets of discovery.  There's the case-specific discovery, and

20   then there's the global discovery.  And I appreciate that Your

21   Honor has placed the focus on the case-specific discovery.  But

22   I have not heard the government in this case or in any other

23   case to agree that the case-specific discovery satisfies their

24   obligations under Rule 16, *Brady*, or otherwise.

25        Were that acknowledgment to be on the record, I think that

1   does change the posture of the case.  But the reality is that

2   what our clients are entitled to is going to include that global

3   discovery.  It's in the government's possession, custody, or

4   control.  The U.S. Attorney's Office is working collaboratively

5   on these cases.

6       And so despite the best efforts of these prosecutors to

7   identify material that is exculpatory for our clients, we cannot

8   be certain that they won't have missed something.  Not

9   intentionally, but it's going to be out there, and because the

10  government knows about it, because other agents of the U.S.

11  Attorney's Office know about it, it must be disclosed.

12      And so while I appreciate hearing that by April these

13  global databases will be created, I can't help but observe that

14  the government will then have had 16 months to create these

15  databases for our access, a database that I will note that these

16  things take time, but because of technology, I'm able to log

17  into Relativity from the courtroom and observe that the 30,000

18  documents that Ms. Paschall referenced are not in fact in

19  Relativity.  Now, maybe they will be available tonight or

20  tomorrow or over the weekend, but these things take time.

21      And so our concern with a June 1st deadline to identify all

22  pretrial issues that may be raised is that it gives us but two

23  months to work with that database, and the government will have

24  had 16 months by that time.

25      I would also observe that two of the government's

observations -- I haven't spoken to defense counsel yet, but we take issue with.  I think the Court can appreciate why we don't want to call the government and tell the government to look at specific video and identify who we think might be our clients.  That's not a workable solution for us.

Secondly, I'm very experienced with Relativity.  I've used it for my entire legal career.  Relativity is not going to be conducive for searching this citizen data.  If the Court has seen any video from January 6, the Court knows that we're not going to get machine-translated video that identifies our client by name.

I mean, this case is a perfect example.  These individuals had never met each other before that day.  In fact, to this day, the only time they see each other is in the courtroom.  So it's unlikely you will see video where they're calling each other by name.

And in addition, Relativity is not going to allow us to search for location.  So once this citizen data is loaded into Relativity, we can't go in and plug in "Lower West Terrace" and all of a sudden everybody's phone who was at the Lower West Terrace is going to tell us that here is the video that you want to look at.  It has to be manually reviewed.

And I appreciate that the government is undertaking a massive operation to manually review it.  But with all due respect, in this case and in every other case, defense counsel

1    isn't simply going to trust the government.  They have to do

2    their own due diligence.

3         And so for us to agree to a June 1st deadline to identify

4    all the issues that we think need to be raised with the Court

5    before trial, it seems to prejudice defense counsel, because it

6    gives us just two months with what is purported to be the

7    discovery in this case, and we don't know that.

8         Now, I hear the Court, and with all prior defense counsel

9    the Court seems inclined to set that deadline, but I hope the

10   Court won't mind that we intend to keep the Court apprised of

11   where discovery is going and what progress we're making.

12        I think another point of fact is that we don't know what

13   case we'll be trying.  I don't think it will surprise the Court

14   to hear that there are a number of us who intend to join in the

15   motions to sever.  It may be that the Court changes the scope of

16   the indictment after seeing our Rule 12 motions.

17        And so that's a second reason why preparing this case for

18   trial through motions in limine seems an unreasonable ask of the

19   government from us, given the posture of this case could change

20   dramatically between now and April 1st -- excuse me, June 1st.

21        Otherwise, we don't have any objection to tolling speedy

22   trial.

23        Thank you for the Court's time.

24             THE COURT:  All right.  Thank you, Mr. Woodward.

25        Ms. Douenat?

1      MS. DOUENAT:  You Honor, first thing is I don't object

2  to the speedy trial tolling.

3      I do object to June 3rd being the deadline on the motions

4  in limine.  Just to piggyback on what Mr. Woodward said, we

5  don't know how the Court is going to rule on the Rule 12

6  motions, specifically because our deadline, at least for group

7  2, is on June the 10th, which would be after the fact, and we

8  don't know how the Court is going to rule on the motions to

9  sever, which would definitely change the landscape of who and

10  what kind of case we have in front of us.

11      As far as the specific discovery in Relativity, yes, this

12  morning Relativity at 11:00 had 33,000 documents.  I understand

13  there's going to be over 100,000 documents being uploaded in the

14  next week.

15      My concern on the specific discovery as well as what's on

16  the global discovery, Relativity, is there's a lot of -- we did

17  sign a protective order back in October of this year, which was

18  granted, and a lot of the footage we've been given in specific

19  discovery -- for example, we have an Officer Gonell who was

20  interviewed, and he is viewing a video and talking about that

21  video and discussing who is there assaulting individuals.  Well,

22  that's redacted to the sense that we can't see what he's seeing.

23  We don't know what video he's seeing.  So it's just an audio of

24  his interview, but we can't see at all the video that he is

25  talking about or where he's pointing.  That kind of redaction

1    shouldn't be happening right now because we have a protective

2    order.

3         Same thing with Relativity.  I looked at Lower West

4    Terrace, and it pulled up 15 files.  So right now there's only

5    15 files under Lower West Terrace.  And all of those, about five

6    of them are OIG reports, and in those OIG reports, there are

7    interviews with officers, and their names are redacted.  They're

8    there at the Lower West Terrace.  They're talking about the use

9    of force at the Lower West Terrace and why they had to use that,

10   and they're describing other individuals with them, and those

11   names are redacted as well.  Their interview also is blacked

12   out.  All it is is an audio, and they're looking at video

13   footage, and we can't see what they're seeing.  So that

14   complicates things.

15        Also on Lower West Terrace on Relativity, I was able to

16   find through one of the searches it popped up that Officer

17   Hodges had a body cam that was torn off during an assault, and

18   there's video footage of him on his body cam being assaulted.

19   Well, I can't find that body cam anywhere on evidence.com

20   through the government's tags.

21        I know the government is going to get with me and is going

22   to respond and try to address some of these issues that I

23   addressed in my motion to compel, Your Honor.  But it's really

24   difficult, even on specific and global discovery, when their

25   information is redacted for us to actually make sense of it.

1    So that's one other concern I have.  So if we have a

2    protective order, those matters shouldn't be redacted.  They

3    should just be tabbed as highly sensitive, and that's that.

4            THE COURT:  Have you talked with the government about

5    this?

6            MS. DOUENAT:  Not yet, that specifically I have not,

7    and I do want to address that with the government, and I am

8    going to.  But I have asked specifically for video footage of

9    this assault with the baton that I haven't been able to locate

10   anywhere.

11           THE COURT:  Okay.  Thank you.  And I'll just encourage

12   you, as you suggest, to talk with the government.  I think that

13   should be your first line of attack, is see if you can work with

14   them.  I hear your concerns, and frankly, I expect that they

15   would try to address them, and if they don't, then by all means,

16   let me know.

17           MS. DOUENAT:  Sure, Your Honor.  Thank you.

18       And January 3rd, I do have an issue with that being so

19   close to the Court's rulings or the Court wouldn't have ruled on

20   any of the Rule 12 motions by that time.  So my concern is not

21   knowing what the landscape of my trial will look like on

22   June 3rd.  So I have a hard time filing the rest of the pretrial

23   motions, including questions for the jury and voir dire and all

24   of that.

25           THE COURT:  Okay.  Thank you.

1          MS. DOUENAT:  You're welcome, Your Honor.

2          THE COURT:  Do we have anyone in here from Pretrial

3    Services?  No.  Okay.

4       So I'm going to go ahead and grant Ms. Douenat's motion on

5    behalf of Mr. Cappuccio for a -- I'm sorry, no, Mr. Woodward's

6    motion on behalf of Mr. Klein to modify his conditions of

7    release.  I'm going to direct that he be authorized -- or that

8    Pretrial Services is authorized to allow him to visit his

9    family.

10      Mr. Woodward, there's a specific date that he needs to go

11   get mulch; is that correct?

12         MR. WOODWARD:  March 10.

13         THE COURT:  Okay.  Yes, he can go get mulch on

14   March 10th.

15      I'm going to grant the largely joint motion for scheduling

16   order as to Rule 12 motions and timeline for motions to join the

17   motions to sever.  That's ECF 232.  I'm going to grant that over

18   the objection of Mr. Mehaffie.

19      I'm also going to order that all other pretrial motions and

20   notices by any party, including but not limited to motions in

21   limine, motions to dismiss on any ground, and expert notice, be

22   filed no later than June 3rd, 2022.  Responses to motions and

23   notices related to group 1 defendants are due by July 1st.

24   Replies related to group 1 defendants are due by July 15th.

25   Responses to motions and notices related to group 2 defendants

1    are due by July 15th, and replies related to group 2 defendants

2    are due by July 29th.

3        I recognize there are defense concerns about that, and

4    obviously, if there's information that was not available at the

5    time that subsequently becomes available, I realize that there

6    may be some motions filed out of time, but I certainly want and

7    expect an explanation for any motions filed out of time that --

8    for why it could not have been filed at the time.

9        I want to make clear, that's not a -- that's not the

10   timeline for voir dire or final jury instructions.  I think

11   Ms. Douenat mentioned that.  We will deal with that later.  I'm

12   not looking for that on that timeline.

13       Ms. Paschall, in light of that, what I'm thinking and what

14   I've ordered in other cases is a deadline for the government to

15   have provided defendants with any evidence the government

16   intends to use in its case-in-chief.  I'm thinking April 22nd

17   for that.  And so any videos or what have you that you intend to

18   play or show in your case-in-chief, I think, should be provided

19   to the defendants -- and I don't just mean somewhere in the

20   universe but specifically highlighted for them -- by April 22nd.

21   And I think the government would have to kind of overcome a

22   presumption that any evidence provided after then should be

23   excluded.

24       Any questions or concerns about that timeline,

25   Ms. Paschall?

1        MS. PASCHALL:  No.  Would Your Honor want me to

2    provide like an exhibit list like I've done for trials before

3    Your Honor before, or do you not care about the form, as long as

4    the substance is correct?

5        THE COURT:  Yeah, I just -- I don't want the defense

6    to come and tell me that they didn't know about these things.

7        MS. PASCHALL:  Fine.

8        THE COURT:  I think if you're going to be showing

9    videos, that type of thing, it should have been provided by

10    April 22nd and kind of flagged to them as that.

11        MS. PASCHALL:  Fine.

12        THE COURT:  I hope that that ameliorates some of the

13    concerns defense have raised about timing.  I realize, as

14    various counsel have pointed out, there could be other things

15    that come out later that they would have wanted to know about,

16    and we will have to deal with that as that comes.  But I think

17    at least hopefully that will help guide the defendants' motions.

18        All is to say, I certainly do not mean to prejudge any

19    motions to sever here or partial motions to dismiss, but I think

20    it probably makes sense for the defendants, in preparing their

21    motions for June 3rd, to assume that motions to sever are going

22    to be denied.

23        I am going to toll the speedy trial clock between now and

24    April 22nd in light of the substantial discovery that is going

25    over and the need for all parties to prepare for trial.  I do

1   think the interests of justice outweigh the interests of the

2   public and the defendants to the extent that I'm going to toll

3   between now and April 22nd.

4        All right.  I'm also otherwise denying as moot the

5   government's ECF 22 -- I'm sorry, 208 -- that was the

6   government's initial motion for a pretrial scheduling order --

7   in light of my granting of ECF number 232.

8        All right.  Anything else that we should be discussing

9   today?  Ms. Paschall?

10            MS. PASCHALL:  Not for the government, Your Honor.

11   Thank you.

12            THE COURT:  Any defense counsel wish to be heard?

13       Thanks, folks.  Have a good weekend.  I will see you in

14   April.

15       Ms. Paschall, I think the idea of a joint conference

16   between you all is a great idea, and I certainly encourage you

17   to do that between now and then.

18       Thank you.

19       (Proceedings adjourned at 5:04 p.m.)

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick                    March 17, 2022

9    SIGNATURE OF COURT REPORTER          DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```