IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) )  ) **Criminal No. 1:21-cr-00040-TNM** |
| v. | ) ) |
| **FREDERICO GUILLERMO KLEIN,** | ) ) |
| **Defendant.** | ) ) ) |

## MOTION FOR TRANSFER OF VENUE

Federico Guillermo Klein, by and through undersigned counsel, and pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, hereby respectfully requests this Court move any jury trial outside the District of Columbia.

Concomitantly with the filing of the instant Motion, Mr. Klein filed a Motion to Adopt and Join (ECF No. 307) Mr. Judd's Motion for Transfer of Venue (ECF No. 257) and therefore will not repeat the arguments contained therein.  Mr. Klein nevertheless files the instant Motion to:  (i) specifically propose the Court transfer any jury trial of Mr. Klein to the Eastern District of Virginia; (ii) articulate the prejudice of a trial in the District of Columbia in the shadow of the public prime-time hearings now scheduled by the Select Committee to Investigate the January 6th Attack on the United States Capitol of the U.S. House of Representatives; (iii) to specifically address the four (4) factors set forth by the Supreme Court in *Skilling v. United States*, 561 U.S. 358, 381-382 (2010), which require the Court to presume juror prejudice; and (iv) to highlight additional media coverage of the events of January 6 not identified in Mr. Judd's motion.

**I.     PROCEDURAL HISTORY**

On March 2, 2021, Defendant Frederico (a/k/a Freddie) Guillermo Klein was charged by complaint with various offenses related to the allegation that he was present at the Capitol Building and/or its grounds during the events that occurred there on January 6, 2021. Complaint, *United States v. Frederico Guillermo Klein*, No. 1:21-cr-00236-TNM-1 (D.D.C. March 2, 2021) (ECF No. 1). On March 4, 2021, Mr. Klein was arrested and detained until on or about April 12, 2021, when he was released to home detention (ECF No. 30). On March 25, 2021, Mr. Klein was arraigned and entered a plea of Not Guilty as to all counts. On August 4, 2021, the government filed a Fourth Superseding Indictment in this case, in which the government joined Mr. Klein as a defendant in the instant action. (ECF No. 102). On October 4, 2021, the defendants were arraigned and Mr. Klein again entered a plea of Not Guilty to all counts. On December 1, 2021, the government filed its Fifth Superseding and Operative Indictment, and on December 17, 2021, the defendants were arraigned and Mr. Klein again entered a plea of Not Guilty to all counts.

**II.    LEGAL STANDARD**

The Fifth and Sixth Amendment of the United States Constitution entitle criminal defendants to a fair trial by an impartial jury. *See In re Murchison*, 349 U.S. 133, 136 (1955). "The theory in our system of law is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence[.]" *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). Justice Hugo Black observed that the American justice system "has always endeavored to prevent even the probability of unfairness." *Id.* Accordingly, Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

### III. ARGUMENT

In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996). Indeed, the court in *McVeigh* summarily concluded that a trial of the Oklahoma City bombing suspects in federal court in Oklahoma City would be fundamentally constitutionally unfair. *Id. See also Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during voir dire] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."). "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966).

When the threatened harm is prejudice to a fair trial, a number of alternatives less restrictive of expression may be available, which include:

> (a) change of trial venue to a place less exposed to . . . intense publicity . . . ;
> (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court(;)
> (e) sequestration of jurors (to) . . . enhance() the likelihood of dissipating the impact of pretrial publicity and emphasize() the elements of the jurors' oaths.

*In re Halkin*, 598 F.2d 176, 195, (D.C. Cir. 1979) (*citing Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563-64 (1976). In *Irving v. Dowd*, the Supreme Court presciently observed:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." His verdict must be based upon the evidence developed at the trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.

366 U.S. 717, 722 (1961) (citations omitted).

Nor are juror declarations of impartiality during *voir dire* absolute. Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012). *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429-430 (1991) ("Under the constitutional standard, on the other hand, 'the relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.'" (citing *Patton v. Yount*, 467 U.S. 1025, 1035 (1984))).

When examining a Rule 21 motion to transfer venue, a court should consider (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010). Thus, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally. *Id*. at 727. A review of the *Skilling* factors makes clear that the pre-trial publicity of the events of January 6, 2021, including the public prime-time hearings scheduled by the House Select Committee require the court to presume juror prejudice.

A. *Size and Characteristics of the Community*

The first *Skilling* factor to consider is the size of the population eligible for jury duty. *Skilling*, 561 U.S. at 382 (comparing Houston's 4.5 million potential jury pool with a smaller Louisiana parish with 150,000 residents). The District of Columbia has less than 700,000 in total

population,[1] but because of its more transient population, the potential jury pool is likely much smaller than a comparable federal district.[2]

Among other surveys to be conducted, a Multi-District Survey was conducted by In Lux Research. (Attached hereto as Ex. A and hereinafter referred to as "Multi-District Study.") The extensive survey was conducted in four regions: the District of Columbia, the Middle District of Florida (Ocala Division), the Eastern District of North Carolina, and the Eastern District of Virginia. (*Id*. at p.1, n. 2.) While the non-D.C. test areas registered remarkably similar results to each other, the survey found that D.C. respondents were an outlier and had a "decidedly negative" towards J6 defendants. (*Id*. at 2.)

Shockingly, "91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%." (*Id.*) An incredible 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area. (*Id.*)

---

[1] This total is not broken down to those eligible for jury duty.

[2] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade*, DC.GOV (Apr. 26, 2021), https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decade (DC population recorded by census as 689,545); *Quick Facts - District of Columbia*, UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/DC (last visited March 28, 2022).



A significant finding in the survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of the events of January 6, 2021. Respondents were asked: "Have you experienced increased concern about your own safety or the safety of people important to you due to the Events of January 6th?" Again, the difference between D.C. and the other areas is remarkable:



The survey included four questions as to the personal impact the events of January 6, 2021, had on respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia. (Ex. A at 4.)

As the Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four months after the events of January 6, 2021.[3] Mayor Bowser declared a state of emergency and implemented a 6pm curfew for weeks following the events of January 6, 2021.[4] The District implemented significant road and public space closures in direct response to the events of January 6, 2021.[5] The Department of Homeland Security declared that government offices were

---

[3] *See National Guard troops leave US Capitol more than 4 months after January 6th riot,* FOX5 WASHINGTON DC (May 24, 2021, 9:51 A.M.), https://www.fox5dc.com/news/national-guard-troops-leave-us-capitol-more-than-4-months-after-january-6th-riot.

[4] *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, EXECUTIVE OFFICE OF THE MAYOR (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today's-public-emergency-15-days-a1.

[5] *DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed*; NBC4 WASHINGTON (Jan. 15, 2021), https://www.nbcwashington.com/news/local/dc-inauguration-updates-friday-closures-threats-national-mall/2542719/.

potential targets of violent domestic extremists who were allegedly emboldened by the "mob assault" on the Capitol.[6] Additionally, nearly 15,000 individuals work for Congress directly, and many more D.C. residents have friends and family who work on The Hill.[7] Finally, many D.C. residents have friends and family employed by law enforcement groups who took part in responding to the events of January 6, 2021.[8]

The majority of potential jurors in the District of Columbia were personally impacted in some way by the events on Capitol Hill on J6. (Exh. A at 4.) This factor weighs heavily in favor of transferring the instant cases to the Eastern District of Virginia. D.C. is a city that, as a whole, feels that it has been the victim of a crime. The events of January 6 were substantially more impactful event than Enron's collapse, which personally affected only a few hundred families, and only financially, in city of 4.5 million residents, who could easily be stricken from the jury pool.

B. *Nature and Extent of Pretrial Publicity*

The next *Skilling* factor pertains to the adverse publicity against the former Enron executive. *Skilling*, 561 U.S. at 382 ("Second, although news stories about Skilling were not

---

[6] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR (Jan. 28, 2021, 5:07 A.M.), https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent-domestic-extremists.

[7] Brookings Institute, *Congressional Staff and Operating Expenses*, VITAL STATISTICS ON CONGRESS, https://www.brookings.edu/wp-content/uploads/2019/03/Chpt-5.pdf (last visited Jun. 2, 2022).

[8] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*, U.S.CAPITOL POLICE, https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf (last visited Jun. 2, 2022).

In addition, 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, DC.GOV, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf (last visited Jun. 2, 2022).

kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.). The nature and extent of pretrial publicity related to the events of January 6, 2021, weigh heavily in favor of transferring venue. District residents have been exposed to thousands of prejudgment opinions from local and national leaders regarding the events of January 6, 2021, and the related arrests, criminal charges and, more recently, prosecutorial outcomes. Unlike the Enron prosecution, the prosecution of conduct related to the events of January 6, 2021, is ongoing. The negative publicity loop shows no sign of slowing, whereas in *Skilling*, four years went by before the trial took place, with little negative publicity.

To that end, the House Select Committee has released a number of public statements about the alleged "insurrectionists," "white supremacists," and "domestic terrorists"[9] believed to have participated in the events of January 6, 2021. Speaker Pelosi went so far as to declare that Donald Trump was an accessory to murder.[10] On the other hand, the Multi-District Study asked respondents four questions related to news coverage in the tested areas. The survey revealed that D.C. is an outlier when it comes to the saturation of media coverage. Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia. (Ex. A, fig. 6.) D.C. residents have been inundated with one-sided coverage of the events surrounding the events of January 6, 2021, are surrounded by residents who feel personally impacted by the events of January 6, 2021, and cannot be faulted for harboring a predetermined impression of those events. The survey

---

[9] *See* Press Release, *Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol,* NANCY PELOSI, SPEAKER, HOUSE OF REPRESENTATIVES (July 21, 2021), https://www.speaker.gov/newsroom/72121-2.

[10] *Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder*, MSNBC.COM (Jan. 19, 2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-the-capitol-hill-insurrection-trump-was-an-accessory-to-the-crime-of-murder-99705925960.

demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in the events of January 6, 2021, as compared to their D.C. counterparts many of whom, according to the study, are closely following this coverage.

      C.      *Proximity of Publicity to Trial*

The next *Skilling* factor is the closeness to trial of the events giving rise to the prosecution. The *Skilling* Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. Again, this factor weighs heavily in favor of relocating the trial from D.C.

Ongoing negative publicity generated by congressional committees creates presumed prejudice for defendants. In fact, requiring a trial by jury in the District of Columbia in the shadow of public prime-time hearings scheduled by the House Select Committee would be hifhly prejudicial. The Court of Appeals for the First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952). There, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. *Id*. at 114. On appeal, the First Circuit held that the trial judge abused its discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial

publicity instigated by the United States through its legislative arm.

*Id*. at 114.  The Court of Appeals for the District of Columbia dealt with a similar issue during Watergate.  Former Nixon Administration official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge.  Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because a full year had passed since the hearings:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney* . . ., where legislative hearings were held concerning the criminal activity to be tried.  In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity here requires the Court to either grant a lengthy continuance or transfer venue to a federal district that is not as impacted by the House Select Committee's public disclosures.  For example, on January 7, 2021, Rep. Bennie Thompson (D-MS), now the House Select Committee Chairman, released a statement noting that:

> [w]hat occurred yesterday at our nation's Capitol was – pure and simple – domestic terrorism incited by President Trump, his enablers, and those seeking to overturn the results of a legitimate election. January 6, 2021 will go down in history as the date that an angry mob of domestic terrorists and insurrectionists illegally tried to prevent our elected representatives from fulfilling their constitutional duty in the orderly transfer of power. It was a sad day for our democracy[.][11]

Similarly, on July 21, 2021, U.S. House of Representatives Speaker Nancy Pelosi released a statement on U.S. House of Representatives Minority Leader Kevin McCarthy's

---

[11] *CHAIRMAN THOMPSON STATEMENT ON DOMESTIC TERRORIST ATTACK ON CAPITOL*, COMMITTEE ON HOMELAND SECURITY (Jan. 7, 2021), https://homeland.house.gov/news/press-releases/chairman-thompson-statement-on-domestic-terrorist-attack-on-capitol.

recommendation of Minority Members to serve on the House Select Committee noting that: "January 6th [was an] Insurrection" and implored the Select Committee to "investigate and report upon the facts and causes of the *terrorist mob attack*."[12]   More recently, on April 8, 2022 it was reported that:

> The House Select Committee Investigating the violent breach of the U.S. Capitol building on January 6, 2021, has reportedly uncovered evidence that shows that there was coordination between two white supremacist militias during that event — and that those militias may have also coordinated with organizers of the "Stop the Steal" rally that proceeded the attack on Congress.[13]

And the *New York Times* has reported that "[t]he House committee investigating the Jan. 6 attack on the Capitol said on Wednesday that there was enough evidence to conclude that former President Donald J. Trump and some of his allies might have conspired to commit fraud and obstruction by misleading Americans about the outcome of the 2020 election and attempting to overturn the result." [14]   The Select Committee's one-sided perspective on the events of January 6, 2021, has caused significant prejudice to any defendant to be tried by a jury in the District.

Likewise, incendiary statements made by Attorney General Merrick Garland have tainted the District of Columbia's jury pool.  General Garland, for instance, has repeatedly compared the events of January 6, 2021, to the Oklahoma City bombing case, alleging at his confirmation hearing that "there was a line that connected the January insurrection to the Oklahoma City bombing and back to the battles of the original Justice Department against the Ku Klux Klan."[15]

---

[12] *See* Press Release, *supra* note 9.

[13] Chris Walker, *Report: Jan. 6 Committee Finds Connections Between Militias & Rally Organizers*, TRUTHOUT.COM (Apr. 8, 2022), https://truthout.org/articles/report-jan-6-committee-finds-connections-between-militias-rally-organizers/.

[14] Luke Broadwater and Alan Feuer, *Jan. 6 Committee Lays Out Potential Criminal Charges Against Trump*, NEW YORK TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/us/politics/trump-criminal-charges-jan-6.html.

[15] Zoe Tillman, *Merrick Garland pledged to investigate the Capitol insurrection*, BUZZFEED (Jun. 15, 2021), https://www.buzzfeednews.com/article/zoetillman/merrick-garland-investigate-capitol-riots-attorney-general.

In a June speech to DOJ officials, the Attorney General "compared the 1995 Oklahoma City bombing to the Capitol riot of January 6 when unveiling the Justice Department's response to the Biden Administration's new anti-domestic terrorism strategy."[16]

The Attorney General's repeated comparisons of the Oklahoma City bombing to the events of January 6, 2021, is particularly relevant to this motion as the Attorney General, a senior DOJ official at the time, supervised the prosecution of Timothy McVeigh and his co-conspirators. In that trial, the government agreed with defense counsel that the local District could not provide the Oklahoma City bombing defendants a fair trial, and consented to a transfer of venue. *McVeigh*, 918 F. Supp. 1467 at 1470 ("There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary."). *A priori*, if the events of January 6, 2021, are comparable to the Oklahoma City case in the opinion of the Attorney General, who in 1995 agreed to a transfer of venue in the latter case, logically a comparable transfer of venue in the instant case would comport with consistent treatment of defendants.

### D. *Presumed Prejudice*

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was lacking there:

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In *Rideau*, *Estes*, and *Sheppard*, in marked contrast, the jury's verdict did not undermine in any way the supposition

---

*See also Attorney General Merrick B. Garland Remarks: Domestic Terrorism Policy Address,* U.S. DEPARTMENT OF JUSTICE (Jun. 15, 2021), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-remarks-domestic-terrorism-policy-address.

[16] Jerry Dunleavy, *Merrick Garland ties Oklahoma City bombing to Capitol Riot*, WASH. EXAMINER (Jun. 15, 2021), https://www.washingtonexaminer.com/news/garland-oklahoma-city-bombing-capitol-riot.

of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383. There, unlike here, every trial of a January 6 defendant has resulted in unanimous jury verdicts promptly returned: The first trial, according to the *N.Y. Post* was described as follows: "[T]he first jury trial for a Capitol protestor from January 6, 2021 led to Guy Reffitt, a 49-year-old member of the far-right 'Texas Three Percenters' militia group, was found guilty on all five of the felony charges he faced, including bringing a gun onto the Capitol grounds and obstructing an official proceeding. A federal jury in Washington, DC, handed down the unanimous verdict against Reffitt after just two hours of deliberation."[17] Most recently, on April 14, 2022, "[a]fter less than three hours of deliberations, a Washington, D.C., jury found Dustin Thompson guilty of multiple charges stemming from his participation in the January 6, 2021, Capitol assault, including obstructing Congress' certification of the Electoral College votes and stealing liquor and a coat rack from the Capitol building. He likely faces a maximum sentence of 20 years in prison."[18]

\* \* \*

In light of the four (4) *Skilling* factors it is clear that Mr. Klein cannot obtain a trial by an impartial jury in the District of Columbia. Rather, an impartial jury is more likely to be obtained in the adjacent District Court of the Eastern District of Virginia, just eight (8) miles from this Court. Despite that short distance, the Eastern District of Virginia offers potential jurors shown to be significantly less biased concerning the events of January 6, 2021. Moreover, such a venue change would result in little inconvenience to the Court and would obviate the potential of

---

[17] Emily Crane and Jorge Fitz-Gibbon , *Guy Reffitt found guilty in first Capitol riot trial*, NEW YORK POST (Mar. 8, 2022), https://nypost.com/2022/03/08/guy-reffitt-found-guilty-in-first-capitol-riot-trial/.

[18] Robert Legare, *Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts*, CBSNEWS (Apr. 14, 2022), https://www.cbsnews.com/news/dustin-thompson-trump-january-6-guilty/.

having to try the case again should a sworn jury be determined to have been prejudicial to Mr. Klein, in no small part because of the anticipated public prime-time congressional hearings anticipated by the House Select Committee.

While pretrial publicity with respect to the events of January 6, 2021, may be pervasive throughout the country, a survey of District of Columbia residents confirms that 66% of residents reported being personally impacted by a "fear of personal safety."

## CONCLUSION

For the foregoing reasons, Mr. Klein respectfully requests that this Court Order any Jury Trial Transferred to the Eastern District of Virginia.

[SIGNATURE ON NEXT PAGE]

Dated: June 3, 2022                                  Respectfully submitted,


                                                     _____/s/ Stanley E. Woodward, Jr._____

                                                     Stanley E. Woodward, Jr.
                                                     (D.C. Bar No. 997320)
                                                     BRAND WOODWARD, ATTORNEYS AT LAW
                                                     1808 Park Road NW
                                                     Washington, DC  20010
                                                     202-996-7447 (telephone)
                                                     202-996-0113 (facsimile)
                                                     Stanley@BrandWoodwardLaw.com

                                                     *Counsel for Defendant Frederico Guillermo Klein*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) Criminal No. 1:21-CR-00040-TNM |
| v. | ) |
| | ) |
| **FEDERICO GUILLERMO KLEIN,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**CERTIFICATE OF SERVICE**

On June 3, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which will automatically send electronic notification of such filing to the following registered parties:

                                          */s/ Stanley E. Woodward, Jr.*
                                    Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                    BRAND WOODWARD, ATTORNEYS AT LAW
                                    1808 Park Road NW
                                    Washington, DC  20010
                                    202-996-7447 (telephone)
                                    202-996-0113 (facsimile)
                                    Stanley@BrandWoodwardLaw.com

                                    *Counsel for Defendant Frederico Guillermo Klein*