UNITED STATES DISTRICT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-00040-TNM |
| | ) | |
| PATRICK EDWARD MCCAUGHEY, | ) | |
| III, et. al., | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**DEFENDANTS MEHAFFIE, MCCAUGHEY, CAPPUCCIO,
STEVENS, AND KLEIN'S MOTION TO CONTINUE TRIAL**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant David Mehaffie*

1

Defendants David Mehaffie, Patrick Edward McCaughey, III, Steven Cappuccio, Tristian Stevens, and Federico Guillermo Klein, through their respective counsel of record hereby move this Court to continue the trial dates in this matter, currently set for August 29, 2022 (Group 1) and September 26, 2022 (Group 2).[1]

### I. The Defendants Fair Trial Rights Under the Fifth And Sixth Amendments Are Being Denied To Them By The Conduct of The United States.

The question of what public spectacle might arise from the hearings of the January 6 Select Committee of the House of Representatives remained a matter of speculation until June 9, 2022, when the Select Committee held its first public hearing. As of June 28, the Select Committee has now held six public hearings, and has indicated that several more hearings are likely, culminating in the release of a public report of its findings in early September, 2022.

When trial was scheduled in this matter, neither the Court nor the parties were aware of the media extravaganza deliberately planned by the Committee for its June and July hearings to gain maximum public exposure – right down to employing an experienced television producer to format and tightly script the televised presentation. The Select Committee scheduled its initial public hearing during "prime time" for the very purpose of maximizing impact the proceedings would have on viewers when presenting purported

---

[1] This Motion borrows extensively from the arguments and citations in the Motion to Continue Trial filed by the Defendant in United States v. Bannon, 21-cr-670 CJN, ECF Doc. No. 88, filed June 29, 2022. The arguments in that motion regarding prejudice attributed to the actions of the United States House of Representatives, and the impact on the Defendants' right to a fair trial before an impartial jury in that case apply equally in this case and numerous others now pending in this Court.

2

investigative "findings" and "evidence" regarding the events of January 6 at the Capitol.  As described by one media outlet, the Select Committee hearings "have a lot in common with scripted TV mini-series: narrative, editing — even surprise reveals" and "their attention to substance and style, combining their prosecutorial case with a consciousness of what piques viewers' curiosity and keeps people talking afterward."[2]

After the trial date was set in this case, the Select Committee scheduled numerous televised and streamed public hearings in June.[3]  The purpose of the hearings, according to the Select Committee website, was to "provide the American people an initial summary of its findings." Televised and streamed Select Committee hearings took place on June 9, 13, 16, 21, 23, and 28.

To add to the prejudicial pretrial publicity, the Select Committee has publicly announced that it has just obtained new "evidence" and will sift through this "mountain of new evidence" and "incorporate it" into the televised hearings planned for July.[4]

The Committee has stated publicly that it intends to release more than 1000 transcripts of recorded interviews/depositions taken of witnesses during the course of the Committee's investigation.

---

[2] James Poniewozik, The Jan. 6 Committee Produces a Very Special Episode, The New York Times, June 28, 2022, https://www.nytimes.com/2022/06/28/arts/television/cassidy-hutchinson-jan-6-committee.html?campaign_id=9&emc=edit_nn_20220629&instance_id=65309&nl=the-morning&regi_id=91720949&segment_id=97102&te=1&user_id=72f3b91818d2fd66a86ba9af4c101bb1.

[3] See Select Committee website at https://january6th.house.gov/legislation/hearings.

[4] Brett Wilkins, Hit with a "deluge of new evidence," House Jan. 6 committee will delay hearings to July, Salon, June 23, 2022, https://www.salon.com/2022/06/23/citing-a-deluge-of-new-evidence-jan-6-committee-delays-hearings-to-july_partner/.

Members of the Committee have described their efforts as a parallel investigation to that being conducted by the Department of Justice. On June 29, 2022, Committee Member Rep. Adam Kinzinger said on a national television broadcast that the Select Committee's investigation "feeds together" with DOJ's investigation. "[W]e have these two investigations – and again, I don't know what Justice is doing or not doing, but assuming they're investigating, we have our investigation that's very public. This all kinds of feeds together…. Obviously, the investigation will continue."[5]

The Government has represented to defense counsel in other cases that the Congress has thus far declined to provide relevant material, including potential Jencks material in the form of witness statements and transcribed interviews, so that they can be produced as discovery or as Brady/Giglio material.

On June 21, 2022, in United States v. Nordean, 21-cr-175 (TMK), the Government filed a response to a joint Defense motion to continue the August 8 trial due to the recent public hearings of the January 6 Committee. In that response the Government stated:

> [O]n April 20, 2022, and again on June 15, 2022, the government requested by letter that the Committee provide the Department of Justice with copies of the transcripts of its witness interviews, which public reporting estimates to number at least 1,000. [Defendants] have highlighted the need to review the Committee's deposition and interview transcripts before trial—not during or after…. The government agrees with this position. The release of these transcripts after jeopardy has attached in this case would be detrimental to all parties and to the public interest.

---

[5] Susan Jones, CNS News (June 30, 2022), https://www.cnsnews.com/article/national/susan-jones/kinzinger-investigation-january-6-committee-and-doj-all-kind-feeds (last visited June 30, 2022).

<u>United States v. Nordean</u>, et. al., 21-cr-175 (TJK) ECF Doc. No. 414, p. 3-4.

In addition to the existence of a significant amount of potential Rule 16 and/or <u>Brady/Giglio</u> material not yet available, the public comments of members of the Committee as well as the public testimony of witnesses before the Committee has created a new dynamic in the milieu of the community from which potential jurors for this case will be drawn.  The Government conceded in its filing in the <u>Nordean</u> case that the current atmosphere following the actions of the Committee and the attendant publicity is such that extensive *voir dire* focusing on the impact of the Committee will be necessary <u>after</u> the Committee has concluded its work.  "The timing and prominence of the Committee's hearings and conclusions … heighten the need for a rigorous *voir dire* process." <u>Id</u>.

In <u>United States v. Delaney</u>, 199 F.2d 107 (1st Cir. 1952), the First Circuit reversed the defendant's conviction based on a refusal by the district court to grant a continuance to avoid his trial – <u>in the District of Massachusetts</u> – beginning only 74 days after the conclusion of congressional hearings in Washington D.C. regarding his misconduct as an IRS Official.  The hearings took place before the Subcommittee on Administration of the Internal Revenue Laws (the "King Committee") set up by the Committee on Ways and Means of the House of Representatives.  The hearings received widespread publicity in the Boston media market, including extensive coverage of testimony by individuals who would be witnesses in the trial less than three months after the hearings ended.

The First Circuit held that it made no difference that the prejudicial conduct was not the fault of the prosecutors or others in the Executive Branch. For purposes of the defendant's fair trial rights, the actions of Congress was viewed as being no different than if they had been committed by the Executive.

> Here the United States, through its legislative department, by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nationwide scale. Some of this evidence was indicative of Delaney's guilt of the offenses charged in the indictment. Some of the damaging evidence would not be admissible at the forthcoming trial, because it related to alleged criminal derelictions and official misconduct outside the scope of the charges in the indictment. None of the testimony of witnesses heard at the committee hearing ran the gauntlet of defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused.
> Id., at 113.

The atmosphere created by the January 6 Committee should be considered as if it was the Attorney General or United States Attorney for the District of Columbia engaging in the same conduct from the steps to the courthouse:

> If all this material had been fed to the press by the prosecuting officials of the Department of Justice, we think that an appellate court would have had to say that the denial of a longer continuance was an abuse of discretion…. [¶] But the prejudicial effect upon Delaney, in being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.
> Id., 199 F.2d at 113-14.

The Delaney Court continued:

> One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental

6

> processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity. This is particularly true in the determination of issues involving the credibility of witnesses.
> Delaney, 199 F.2d at 112-113.

These are "impolitic" observations to speak out loud or commit to writing. That does not make them untrue. The Defendants cannot get a fair trial in the District of Columbia at this particular moment in history given the allegations against them, the conduct by the Department of Justice and the Congress in publicizing their efforts in response, and the crush of relentless media coverage of not just the event itself, but all the machinations of the entirety of the federal government that have been ongoing for nearly 18 continuous months.

Pervasive pretrial publicity threatens these fair trial rights. Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976); see also Bridges v. State of California, 314 U.S. 252, 271 (1941) ("legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper"). Trial courts have a duty to protect a criminal defendant's constitutional right to a fair trial from the impact of negative pretrial publicity. Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).

In Sheppard there was extensive local and nationwide media coverage about a prominent doctor in Ohio charged with murdering his pregnant wife. After the trial, a federal judge reviewing the case described members of the media as having played the roles of "accuser, judge, and jury" in its coverage of the investigation and trial. Media accounts purported to present to the public "evidence" and investigative findings. Id. at 340-41. The Supreme Court held that due to the "pervasiveness of modern communications and the difficulty of

effacing prejudicial publicity from the minds of the jurors...where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, <u>the judge should continue the case until the threat abates or transfer it to another county not so permeated with publicity</u>." <u>Id</u>. at 362-363. (Emphasis added).

The defense requests one or both of these remedies in response to the unilateral conduct of the United States.

## II.  **The Crush Of Prejudicial Media Coverage of the Special Committee is Undeniable**.

The Motion for Continuance filed in <u>U.S. v. Bannon,</u> 21-cr-680 CJN, Doc. No. 88, provides a multi-page litany of the pervasive – and from the defense view uniformly negative – media coverage of the Special Committee hearings:

> Potential jurors in the District of Columbia have been bombarded with coverage of the Select Committee hearing, as demonstrated by the statistics below:
>
> • On June 9, 2022, approximately 20 million people watched the Select Committee's first hearing investigating the events of January 6, 2021, across broadcast and cable news.[6]
>
> • Over 4.6 million viewers tuned in online to that first hearing, as PBS, NBC, the Washington Post, AP News, C-SPAN, the Wall Street Journal, CNBC, and ABC streamed the hearing live and posted recordings on YouTube.[7]

---

[6] John Koblin, At Least 20 Million Watched Jan. 6 Hearing, N.Y TIMES, https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html (last updated June 21, 2022).

[7] Available at https://www.youtube.com/watch?v=UiL2inz487U,
https://www.youtube.com/watch?v=1GS2uybciaU,
https://www.youtube.com/watch?v=AAYUj3iwqLY,
https://www.youtube.com/watch?v=Jz9TS_lCt-g.
https://www.youtube.com/watch?v=lZJ56cXSI-o,
https://www.youtube.com/watch?v=qr3z2ObaWQM,
https://www.youtube.com/watch?v=9tSNJ_6XudM,
https://www.youtube.com/watch?v=1Y64FGPW28g

- On June 9, 2022, "Jan. 6 hearings" was the second highest trending search term on Google, generating 22,200 separate news results on Google on that single day. GOOGLE, https://www.google.com/search?q=jan.+6+hearings&biw=1920&bih=969&source=lnt&tbs=cdr%3A1%2Ccd_min%3A6%2F9%2F2022%2Ccd_max%3A6%2F9%2F2022&tbm=nws (last visited June 22, 2022).

- Massive numbers of articles regarding the Select Committee hearings are directed through local news outlets to Washington, DC, residents. For instance, a June 22, 2022, Google search of the local NBC4 Washington website for the term "Jan. 6 hearings" generated 1,850 results that are dated within the past month alone.[8]

- Local Washington, DC, news coverage of the Select Committee hearings is also pushed out to residents via social media. For instance, in addition to broadcasting on television, NBC4 Washington has 872,609 followers on Facebook, approximately 341,200 followers on Twitter, and approximately 129,000 followers on Instagram.[9]

- For local radio (and Internet) station Washington Top News (WTOP), a search of the term "Jan. 6 hearings" generated 545 results from the past month alone.[10] WTOP distributes news by radio broadcast, website, and app, and has 194,406 followers on Facebook, approximately 229,200 followers on Twitter, and approximately 27,200 followers on Instagram.[11]

---

[8] https://www.google.com/search?q=jan.+6+hearings+site%3Ahttps%3A%2F%2Fwww.nbcwashington.com%2F&biw=1920&bih=969&source=lnt&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm=nws

[9] NBC Washington, https://www.nbcwashington.com/ (last visited June 22, 2022); NBC Washington, Facebook, https://www.facebook.com/nbcwashington/ (last visited June 22, 2022); NBC4 Washington (@nbcwashington), Twitter, https://twitter.com/nbcwashington (last visited June 22, 2022); NBC4 Washington (@nbcwashington), Instagram, https://www.instagram.com/nbcwashington/?hl=en (last visited June 22, 2022).

[10] https://www.google.com/search?q=%22jan.+6+hearings%22+site%3Awtop.com%2F&biw=1920&bih=969&source=lnt&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm=nws

[11] WTOP News, https://wtop.com/about-wtop-news/ (last visited June 22, 2022); WTOP News, Facebook, https://www.facebook.com/wtopnews/ (last visited June 22, 2022); WTOP News (@WTOP), Twitter, https://twitter.com/WTOP (last visited June 22, 2022); WTOP News (@wtopnews) https://www.instagram.com/wtopnews/?hl=en (last visited June 22, 2022).

• A Google search of the FOX 5 DC website for the term "Jan. 6 hearings" generated 379 results from the past month.[12] FOX 5 DC distributes news on television and online, and has approximately 1.3 million followers on Facebook, approximately 327,600 followers on Twitter, and approximately 197,000 followers on Instagram.[13]

• A Google search of the website for the Washington Post for the term "Jan. 6 hearings" generated 3,110 results from the past month.[14] The print version of that newspaper has made the Select Committee hearings either a headline story, or an A-section story, nearly every day since the hearings began.

• The Washington Times distributes news by print and online, and has approximately 723,929 followers on Facebook, approximately 425,200 followers on Twitter, and approximately 64,600 followers on Instagram.[15] A Google search of the website for the Washington Times for the term "Jan. 6 hearings" generated 1,510 results from the past month.[16]

• WAMU, Washington D.C.'s NPR radio (and Internet) affiliate, is the most listened to radio station in the city. A Google search of the WAMU

---

[12] https://www.google.com/search?q=jan.+6+hearings+site%3Awww.fox5dc.com&biw=1920&bih=969&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm=nws&ei=1XizYsQvlebk2g_LtoqgCA&ved=0ahUKEwiE7oC08MH4AhUVM1kFHUubAoQQ4dUDCA0&uact=5&oq=jan.+6+hearings+site%3Awww.fox5dc.com&gs_lcp=Cgxnd3Mtd2l6LW5ld3MQA1DqEViUPWD1QmgAcAB4AIABMogB5ASSAQIxNJgBAKABAcABAQ&sclient=gws-wiz-news (last visited June 22, 2022).

[13] FOX 5 Washington DC, https://www.fox5dc.com/ (last visited June 22, 2022); FOX 5 DC, Facebook, https://www.facebook.com/fox5dc (last visited June 22, 2022); FOX 5 DC (@fox5dc), Twitter, https://twitter.com/fox5dc (last visited June 22, 2022); FOX 5 DC (@fox5dc) https://www.instagram.com/fox5dc/?hl=en (last visited June 22, 2022).

[14] Googlehttps://www.google.com/search?q=jan.+6+hearings+site%3Ahttps%3A%2F%2Fwww.washingtonpost.com&biw=1920&bih=969&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm=nws&ei=03KzYujNGq_n5NoPu5ym4A8&ved=0ahUKEwiog-vW6sH4AhWvM1kFHTuOCfwQ4dUDCA0&uact=5&oq=jan.+6+hearings+site%3Ahttps%3A%2F%2Fwww.washingtonpost.com&gs_lcp=Cgxnd3Mtd2l6LW5ld3MQA1DLA1icG2CtHmgCcAB4AIABNYgBzweSAQIyMZgBAKABAcABAQ&sclient=gws-wiz-news (last visited June 22, 2022).

[15] Washington Times, https://www.washingtontimes.com/about/ (last visited June 27, 2022); Washington Times, Facebook, https://www.facebook.com/TheWashingtonTimes/ (last visited June 27, 2022); Washington Times (@WashTimes), Twitter, https://twitter.com/WashTimes (last visited June 27, 2022); Washington Times (@washtimes), Instagram, https://www.instagram.com/washtimes/?hl=en (last visited June 27, 2022).

[16] https://www.google.com/search?q=jan.+6+hearings+search%3Ahttps%3A%2F%2Fwww.washingtontimes.com%2F&rlz=1C1GCEU_enUS1009US1009&source=lnt&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm= (last visited June 27, 2022).

website for the term "Jan. 6 hearings" generated 372 results from the past month alone.[17] The Select Committee hearings has been a top news story broadcast nearly every day since the hearings began.

- On June 27, 2022, a person conducting a Google search of the term "Jan. 6 hearings" would receive approximately 26,300,000 results under the category "news."[18]

The Government's statement in United States v. Nordean is a concession that it recognizes there is unfair prejudice in the District of Columbia juror pool at this time, and that can only be addressed after the January 6 Committee hearings have been concluded, the Report and supporting materials are released, and with a "rigorous *voir dire* process" that focuses on the impact. The current environment is such that the Government agrees a fair verdict from a trial jury is not possible without *voir dire* that specifically addresses the prejudicial publicity caused by the January 6 Committee.

In granting the joint motion of the parties, Judge Kelly found:

> Given all the above, the Court finds that there is good cause to continue the trial of all Defendants until December 12, 2022, at least because of (1) the prejudicial publicity stemming from the ongoing congressional hearings and (2) the chaos that would be caused if, as the Government expects, the Committee releases a thousand potentially relevant interview transcripts to the public in early September, in the middle of the currently scheduled trial.

---

[17] Radio Online, https://ratings.radio-online.com/content/arb015 (June 14, 2022); GOOGLE, https://www.google.com/search?q=jan.+6+hearings+site%3Ahttps%3A%2F%2Fwamu.org%2F&biw=1920&bih=969&tbs=cdr%3A1%2Ccd_min%3A5%2F21%2F2022%2Ccd_max%3A6%2F22%2F2022&tbm=nws&ei=kHyzYoDYK4Ln5NoPh_OgqAc&ved=0ahUKEwiA4Nz788H4AhWCM1kFHYc5CHUQ4dUDCA0&uact=5&oq=jan.+6+hearings+site%3Ahttps%3A%2F%2Fwamu.org%2F&gs_lcp=Cgxnd3Mtd2l6LW5ld3MQA1CTDFiTDGCrD2gBcAB4AIABLYgBVpIBATKYAQCgAQKgAQHAAQE&sclient=gws-wiz-news (last visited June 22, 2022).

[18] https://www.google.com/search?q=jan.+6+hearings&rlz=1C1GCEU_enUS1009US1009&source=lnms&tbm=nws&sa=X&ved=2ahUKEwjild_h_c34AhU3GVkFHdBrDR4Q_AUoAXoECAIQAw&biw=1920&bih=969&dpr=1 (last visited June 27, 2022).

11

Memorandum Order, J. Kelly, 21-cr-175 (TJK) ECF Doc. No. 419 at p. 4.

It is quite possible that the release of the Committee's Report and supporting materials – including potentially discoverable material – will occur while the first trial in this matter is under way.  The Defendants do not believe that even the best possible *voir dire* that could be conducted by this or any other Court can effectively anticipate and inoculate potential jurors from how that event and press coverage surrounding it will land in the public arena. There is no meaningful way to accurately predict what might be done ahead of the Special Committee's actions as preventative steps, nor what steps might be taken as curative measures after the Special Committee acts.  It is well within the realm of possibilities that nothing less than a mistrial would be the only appropriate remedy.

As noted by the Supreme Court in Nebraska Press Ass'n v. Stuart,

> "[t]he capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and extent of the publicity, which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage."
> Id. 427 U.S. at 554-55.

Here the Select Committee have taken deliberate steps to ensure that its hearings, "evidence" and findings gain the widest possible publication both nationally and locally.  Under Delaney, this conduct should be viewed as no different than if the Department of Justice were engaged in the conduct itself. Obviously, this Court would never tolerate such actions by the prosecuting authorities.  Under a parity of reasoning, this Court should not tolerate the actions of Congress to the same effect.

Whether by design or not – and the Defendants believe it is clearly by design – the actions of the Government in the form of its legislative branch are actively working to influence the pool of prospective jurors for this and every other trial of defendants charged with crimes on January 6. These circumstances require this Court to recognize the inherent prejudice stemming from the ongoing Select Committee hearings almost simultaneous with the lead up to trial, and first trial in this matter.

Based on the foregoing, the Defendants request that the Court vacate the current trial dates, and set an immediate status conference with all parties to set a new trial date at a time well beyond the planned early September, 2022, release date of the Committee Report and supporting materials.

Date: July 1, 2022                               Respectfully Submitted,

/s/ William L. Shipley
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

/s/ Lindy R. Urso
Lindy R. Urso
LINDY R. URSO, ATTORNEY AT LAW
810 Bedford Street
Suite 3
Stamford, CT 06901
203-325-4487
Email: lindy@lindyursolaw.com

/s/ Lauren Cobb
Lauren Cobb
OFFICE OF THE FEDERAL DEFENDER
NDFL

3 W. Garden Street
Suite 200
Pensacola, FL 32502
850-432-1418
Email: lauren_cobb@fd.org

/s/ Edgar H, Holguin
Edgar H. Holguin
FEDERAL PUBLIC DEFENDER, TXW
700 E. San Antonio
Suite D-401
El Paso, TX 79901
915-534-6525
Fax: 915-534-6534
Email: edgar_holguin@fd.org

/s/ Marina Thais Douenat
Marina Thais Douenat
FEDERAL PUBLIC DEFENDER'S OFFICE
Western District of Texas
727 ECesar E.Chavez Boulevard
Suite B-207
San Antonio, TX 78206
210-472-6700

/s/ Stanley Edmund Woodward, Jr.
Stanley Edmund Woodward, Jr.
BRAND WOODWARD LAW
1808 Park Road NW
Washington, DC 20010
202-996-7447
Fax: 202-996-0113
Email:
stanley@brandwoodwardlaw.com