# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-40-9 (TNM)** |
| **FEDERICO GUILLERMO KLEIN,** | |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Federico Klein to 120 months of incarceration – near the midpoint of the Guidelines range – to be followed by three years of supervised release, $2,000 in restitution, a fine in the amount $47,187, and an $870 special assessment.

## I.     INTRODUCTION

The defendant, Federico Klein, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On the afternoon of January 6, Klein, a 42-year-old former member of the U.S. Marine Corps and presidential appointee to the State Department, joined the large mob fighting against the police on the West Plaza. While there, he shoved police officers who were trying to control the crowd and protect the building, including U.S. Capitol Police Officer Harvell. During that assault, Klein called out, "You can't stop this!" He also called to rioters behind him for help in pushing against the police. When the mob broke through the police line on the West Plaza, Klein and others surged forward to the Lower West Terrace tunnel. After entering the tunnel, he forcibly pushed against officers with his body and stolen police riot shields. At one point, when it appeared the police were going to be able to finally close one set of doors between them and rioters, creating an advantageous barrier, Klein wedged a police riot shield in between the doors, helping to force the doors back open and allowing rioters to continue their assaults on police. In total, Klein was in or around the tunnel for approximately 90 minutes.

Klein was convicted of eight felonies – including six assaults, civil disorder and obstruction of an official proceeding – and four misdemeanors following a bench trial. The government recommends that the Court sentence Klein to 120 months of incarceration, near the midpoint of the advisory Guidelines' range of 108-135 months, which the government submits is the correct Guidelines calculation. A Guidelines sentence of 120 months reflects the severity of Klein's actions on January 6, promotes just punishment, and achieves specific and general deterrence.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government refers the court to the PSR filed in this case, ECF 716 at ¶¶ 16-22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Klein's Role in the January 6, 2021, Attack on the Capitol

Klein strongly believed that the 2020 presidential election was "stolen" from former President Trump. So much so that in the weeks after the election, Klein took time off from work at the State Department to volunteer to travel to Las Vegas, Nevada, where he investigated claims of voter fraud. Because of this strong belief and his participation in the volunteer effort, he was also keenly aware of the options available to challenge the election results. For example, when on December 28, 2020, an acquaintance texted Klein asking, "Do we have any other chance of winning [the election]." Klein responded, "Sure. Jan 6." The acquaintance responded, "What happens then?" He replied, "Pence will refuse to certify the election, so it will get kicked into the house where each state gets one vote determined by its legislature. We would win that by a lot." Similarly, on January 4, 2021 when another acquaintance asked him over text messages, "What's the path [to overturn the election results]?" he responded, "VP can certify the deep state, and his political life is over, or he can either certify the true electors and trump wins, or he can kick it to the house, where state legislatures can vote 32-18 and trump wins." In fact, on the evening of January 5, 2021, Klein gathered with friends and acquaintances at a bar in Virginia and discussed the event scheduled for the following day. Specifically, Klein told others at the bar that "Vice

3

President Pence was going to not certify the election." *See* Trial Transcript at 895:3-11.

And so, with full knowledge of the proceedings going on at the U.S. Capitol that day, Klein traveled from his home in Alexandria, Virginia to the Stop the Steal Rally on the morning of January 6. From the rally, he marched to the Capitol with other rioters and, by about 2:32 p.m., Klein had reached the front of the mob of rioters directly facing the police line on the Upper West Plaza. Klein was dressed in an olive-green jacket, a light blue collared shirt, a bright red baseball cap with white lettering that read "Make America Great Again," and wore, at times, a white cloth face mask.   As Klein stood at the front of the police line, officers yelled, "Move back!" to the rioters as they attempted to push the rioters back. Klein ignored the orders and pushed hard against the police officers. Klein told the officers, "You can't stop this!"   As Klein continued to push forward, Officer Harvell attempted to push Klein back with his baton, but Klein pressed back against him, driving his left shoulder into Officer Harvell repeatedly. At one point, Klein also

turned around to other rioters and called out, "We need some more, let's go!"



*Image 1: Still Image from Government Trial Exhibit 410 Showing Klein Pushing Officers*

At trial, Officer Harvell testified that:

> The line was breaking down, and we were trying to fall back and regroup. The gentleman in front of me that had on the green jacket, what happened was he started leaning his shoulder in and pushing – pushing on me, hitting on my chest.

> So that's why you can see the body cam – where you see it was so close, because he was leaning in. You could hear him when he said – one point he said, "Fight with us." Then another point you hear him – him say, "Let's go. I need support." And like I said, the line started breaking down. He started, you know, pushing even more, pushing –

Trial Transcript, at 114:2-13.

At approximately 2:42 p.m., as the crowd surged past the police lines on the West Plaza and moved closer to the building, Klein climbed onto the Lower West Terrace from the West Plaza below.

At 2:43 p.m., Klein entered the tunnel in the first wave of rioters. Right before Klein entered the tunnel, he paused on the steps, turned toward the rest of the mob as it swarmed toward the

tunnel, and waved his arm, beckoning others to enter the tunnel with him.



*Image 2: Still Image from Government Trial Exhibit 505 at Timestamp 21:35*

Klein then rushed into the tunnel where dozens of other rioters were confronting police. With the alarm to the building blaring overhead and, as rioters screamed at the police, Klein pushed forward in the crowd and quickly maneuvered closer to the police officers, all while ignoring their commands to leave. By this time, one of the glass doors, which read "Members' Entrance Only," had been shattered and both doors were open, exposing the very center of the Capitol building. A group of officers barricaded the tunnel doors with their bodies and were the only barrier between the rioters in the tunnel and the interior of the Capitol building. In the tunnel, Klein yelled at officers, ignored commands to leave, and maintained his ground at the forefront of the mob of rioters. At approximately 2:55 p.m., Klein, who was near the police line, reached out and tried to grab the handle of a police riot shield.



*Image 3: Still Image from Government Trial Exhibit 409*

By approximately 2:56 p.m., Klein had been directly in front of the police line for more than ten minutes. At this point, Klein was on the front line of a mob that had become increasingly aggressive and were actively throwing items at the police line. Klein used both of his arms and his body to forcefully push against officers, including Officer Gonell. As a result of Klein's and other rioters' pushing, one officer fell to the ground.

At approximately 3:00 p.m., while Klein was still facing off with the police line inside the tunnel, Sergeant Bogner repeatedly ordered the crowd, including Klein, to "BACK UP!," but Klein ignored his commands. Moments after officers deployed chemical irritant sprays, rioters briefly stopped actively attacking the officers. At that point, there was enough space between the rioters and the police officers to close the metal doors. That would have been immensely advantageous for the officers because it would have created a hard barrier between them and the mob. But just as officers attempted to pull the doors closed, Klein quickly grabbed a stolen USCP riot shield. With the help of another rioter, Klein successfully wedged the riot shield in between the two doors

7

so the officers could not shut them.



*Image 4: Still Image from Government Trial Exhibit 429 Showing Klein on the Far Right*

Sergeant Bogner testified about the importance to the police in the tunnel of getting the

doors closed at this time stating:

> But if we could get those outer doors closed, they had the ability to lock. But they
> also had handles where you could maybe even put handcuffs on them or something.
> But if we get those closed and can lock them, it would create like – it would create
> a funnel where the rioters would have to come through a funnel, which is much
> easier to defend than, you know, a 15- or 20-foot hallway, if you're only dealing
> with a 2-foot door. It's much easier to defend.

Trial Transcript, at 351:11-18.

With the shield as a wedge, Klein and other rioters pried the doors open again and

continued their attacks on the police in the tunnel, which lasted for close to two more hours. After

Klein battled the officers at the front of the tunnel for several more minutes, he turned towards the

mouth of the tunnel and yelled to the rioters, "We need fresh people!" Klein exited the tunnel for

the first time at about 3:05 p.m. to rinse his eyes from chemical irritant after being at or near the

front lines for nearly twenty minutes.

At approximately 3:08 p.m., after Klein had rinsed the chemical irritant out of his eyes while outside the tunnel, he started to push his way back into the tunnel for a second time. This time he was carrying several bottles of water, which he handed out to other rioters. After he distributed the water bottles, Klein joined the rioters aggressively pushing in unison against the police line and chanted, "HEAVE! HO!" At the front of the line, officers were crushed as they bore the brunt of the collective force.

At about 3:10 p.m., a number of rioters started to cycle out of the tunnel. As a result, the police officers gained some momentum and pushed rioters – including Klein – back towards the mouth of the tunnel. Klein forcefully pushed his way back to the front of the line, face-to-face with police officers. Klein then joined in a second concerted pushing effort with other rioters, once again calling out "HEAVE! HO!" as they violently thrust into the police line.

At approximately 3:14 p.m., another rioter handed Klein a stolen U.S. Capitol Police riot shield. One minute later, Klein used the shield to forcibly push against the police officers in the tunnel. As Klein pushed into the officers with the shield, rioters next to and behind him chanted, "Heave! Ho!" and repeatedly hit the police line in coordinated movements. Klein continued to hold the shield, forcibly pressing it against the officers, amplifying the weight of the rioters' pushes behind him.



*Image 5: Still Image from Government Trial Exhibit 430*

Klein pushed so forcefully against the officers – pressing his entire face and body against the riot

shields – that Officer Foulds, whom Klein was pushing up against, called out during the assault,

"I'm exhausted!" *See* Government Trial Exhibit 403.1 at timestamp 15:16:12; Trial Transcript at

157:3-10. Officer Foulds described his time spent defending attacks by Klein and other rioters at

trial as follows:

> I was trying to push back against a group of rioters but was kind of on my side so I
> didn't have the best way of doing that. And they had the police shields and were
> using them against us.
>
> And the benefit the shield gives for the person who has it is they have two handles
> around the center of the mass of the shield, and they can push straight into you and
> exert as much force as they can from the – from those handles. But someone on the
> other side just has the slick plastic face. So they're trying to push on it, their hands
> are going to deflect up and down. And they're wasting a lot of force because they
> were not able to get a good grip on the shield.

Trial Transcript, at 158:5-16.

At approximately 3:18 p.m., the police in the tunnel again gained ground and pushed the rioters toward the mouth of the tunnel. Klein actively resisted the police officers' efforts to move him out of the tunnel by aggressively pushing the stolen riot shield against the police line and using the weight of his body to press forward. As USCP Officer Moore tried to push Klein back, Klein adjusted the shield, allowing another rioter to join Klein pushing the officer.



*Image 6: Still Image from Government Trial Exhibit 501 at Timestamp 27:07*

Officer Moore testified at trial about his experience pushing back against Klein who was using the shield against him. He said:

> It was a – it was a struggle. Absolutely a struggle; a, you know, terrifying situation because the fact that if this group had gained control of that tunnel, I mean, no matter – no telling what could happen.

Trial Transcript, at 538:16-23.

While Klein continued to push into Officer Moore with the riot shield, another rioter grabbed Officer Moore's baton by reaching over Klein's riot shield. The rioter who grabbed the

baton held on and dragged Officer Moore away from the police line and into the mob, while Klein continued to apply pressure on Officer Moore's shield, preventing him from defending himself against the other rioters. At this same time, MPD Officer Fanone had also become separated from the police line. Another rioter had his arm around Officer Fanone's neck and dragged him out of the tunnel. As Klein repeatedly pushed against Officer Moore, Klein turned his head towards the crowd of rioters and shouted, "I need support!" *See* Government Trial Exhibit 501 at timestamp 27:22.

Officers finally managed to push Klein out of the tunnel at approximately 3:19 p.m. Klein did not leave the area, which was still engulfed in chaos. Instead, he stood on the steps directly outside the tunnel while officers tried to rescue Officer Fanone who had been dragged into the crowd. As an officer approached Klein on his way to help Officer Fanone, he directed Klein to "move, move!" Klein turned toward the officer, shook his head, said, "no way." Another officer joined the first and told Klein, "Let me get my friend." *See* Government Trial Exhibit 415 at timestamp 15:21:00. The officers were able to get past Klein and rescue Officer Fanone from the rioters who were attacking him.

Klein remained at the front of the mob near the police line – which was now at the entrance to the tunnel – until approximately 4:10 p.m. From about 3:42 p.m. to 4:07 p.m., Klein stood at the front of the line of police officers and constantly pushed into them, at times using a stolen police shield, as the officers continued to defend against the attacks and maintain the police line.



*Image 7: Still Image from Government Trial Exhibit 535 at Timestamp 00:38*

Despite Klein's and other rioters' considerable and coordinated efforts, the police line at the tunnel did not fail.

## III.   THE CHARGES AND TRIAL VERDICT

On December 1, 2021, a federal grand jury returned the Fifth Superseding Indictment charging Klein and his eight co-defendants with a total of fifty-three counts. Klein was charged in twelve counts:

Count Nine: Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. § 111(a)(1);

Count Seventeen: Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1);

Count Nineteen: Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. §§ 111(a)(1), 2;

Count Twenty-Seven: Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. § 111(a)(1);

Count Thirty-One: Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b);

Count Thirty-Two: Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1);

Count Thirty-Four: Obstruction of an Official Proceeding, Aiding and Abetting, 18 U.S.C. § 1512(c)(2), § 2;

Count Thirty-Five: Interfering with Law Enforcement Officers During a Civil Disorder, Aiding and Abetting 18 U.S.C. § 231(a)(3);

Count Forty-Three: Disorderly or Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

Count Fifty-One: Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

Count Fifty-Two: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

Count Fifty-Three: Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

On July 20, 2023, this Court convicted Klein of each of these offenses following a bench trial. The Court found Klein not guilty on the dangerous weapon enhancements in Counts Thirty-

One, Thirty-Two, Forty-Three, and Fifty-One.

## IV.    STATUTORY PENALTIES

Klein now faces sentencing on the above convictions. As noted by the Presentence Report issued by the U.S. Probation Office, Klein faces up to: (1) 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Thirty-Four; (2) 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Counts Nine, Seventeen, Nineteen, Twenty-Seven, Thirty-One, and Thirty-Two; (3) 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Thirty-Five; (4) 1 year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, restitution, and a mandatory special assessment of $25 on Counts Forty-Three and Fifty-One; and (5) 6 months of imprisonment, a fine up to $5,000 and a mandatory special assessment of $10 on Counts Fifty-Two and Fifty-Three.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.    Guidelines Analysis

The Guidelines analysis follows:

Count Nine: 18 U.S.C. §111(a)(1)
| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

|  |  | **Total** | **20** |
|---|---|---|---|

Count Seventeen: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
|  |  | **Total** | **20** |

Count Nineteen: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.4 | Base Offense Level | | 10 |
|---|---|---|---|
|  |  | **Total** | **10** |

Count Twenty-Seven: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
|  |  | **Total** | **20** |

Count Thirty-One: 18 U.S.C. §§ 111(a)(1)

| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | | +6 |
|  |  | **Total** | **20** |

Count Thirty-One: 18 U.S.C. §§ 111(a)(1)

| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | | +6 |
|  |  | **Total** | **20** |

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Count Thirty-Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **20** |

Count Thirty-Four: 18 U.S.C. § 1512(c)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Physical Injury | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with Administration of Justice | +3 |
| U.S.S.G. § 3A1.2 (c) | Official Victim | +6 |
| | **Total** | **31** |

Count Thirty-Five: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Injury | +4 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **28** |

Count Forty-Three: 18 U.S.C. §§ 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **20** |

Count Fifty-One: 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **20** |

---

[7] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Counts Fifty-Two and Fifty-Three are Class B misdemeanors. As such, the U.S. Sentencing Guidelines do not apply to these counts of conviction.

### B.   Grouping Analysis

Counts Nine, Thirty-Four and Forty-Three group together (Group One) because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts. *See* U.S.S.G. § 3D1.2(c). Count Thirty-Four has the highest offense level of the counts in Group One, so Group One's offense level is 31.

Counts Twenty-Seven, Thirty-Five and Fifty-One are grouped together (Group Two) because the offenses involve the same victim (officers). All Counts have the same offense level and so the offense level for Group Two is 20.

Counts Seventeen, Nineteen, Thirty-One and Thirty-Two involve separate harms and are therefore not grouped.

Therefore, counts are grouped in the following manner:

Group One

| Count 9 – 18 U.S.C. § 111(a)(1) | (Officer Harvell) | (OL: 20) |
| Count 34 – 18 U.S.C. § 1512(c)(2) | (Congress) | (OL: 31) |
| Count 43 – 18 U.S.C. § 1752(a)(2) | (Congress) | (OL: 20) |

Group Two
| Count 27 – 18 U.S.C. § 111(a)(1) | (Various Officers) | (OL: 20) |
| Count 35 – 18 U.S.C. § 231(a)(1) | (Officers) | (OL: 20) |
| Count 51 – 18 U.S.C. § 1752(a)(4) | (Various MPD and USCP officers) | (OL: 20) |

Group Three
| Count 17 – 18 U.S.C. § 111(a)(1) | (Officer Gonnell) | (OL:20) |

Group Four
| Count 19 – 18 U.S.C. § 111(a)(1) | (Officer Wilhoit) | (OL: 10) |

<u>Group Five</u>
Count 31 – 18 U.S.C. § 111(a)(1)                    (Officer Foulds)                    (OL: 20)

<u>Group Six</u>
Count 32 – 18 U.S.C. § 111(a)(1)                    (Officer Morris)                    (OL:20)

**Multiple Count Adjustment:** Units are assigned pursuant to U.S.S.G. § 3D1.4(a), (b), and (c). One unit is assigned to the group with the highest offense level. "[A]ny Group that is 9 or more levels less serious than the Group with the highest offense level" shall be "disregard[ed]." U.S.S.G. § 3D1.4(c).

| **Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|
| Group 1 | 31 | 1 |
| Group 2 | 20 | 0 |
| Group 3 | 20 | 0 |
| Group 4 | 20 | 0 |
| Group 5 | 20 | 0 |
| Group 6 | 20 | 0 |

**Total Number of Units:**                                              1

Greater of the Adjusted Offense Levels Above:          31

Increase in Offense Level: the offense level is
increased pursuant to the number of units
assigned by the amount indicated in the
table at U.S.S.G. § 3D1.4:                                        +0 levels

**Combined Adjusted Offense Level:**                    <u>**30**</u>

The government acknowledges that this Court has concluded in other January 6 cases that the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) and the three-level enhancement under § 2J1.2(b)(2) do not apply to the 18 U.S.C. § 1512(c)(2) convictions in those cases. *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022) ("the Court finds that Seefried did not obstruct, impede, or interfere with the 'administration of justice' and that the enhancements in § 2J1.2(b)(1)(B) and (b)(2) are inapplicable."). But this Court also noted that it "may still consider

the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *Id.*

If the Court declines to impose the enhancements under 2J1.2(b)(1)(B) and (b)(2) for Klein's Count Thirty-Four conviction for obstructing a Congressional proceeding, in violation of § 1512(c)(2), then the offense level for that count would be 20 rather than 31. In that event, the grouping analysis would change. Groups Two through Six (the assault counts), each with offense levels of 20, would have the same offense level as that for Group One (the obstruction count). In that even, the total number of units would be 6, and the combined offense level would be 25. *See* U.S.S.G. § 3D1.4 (add five offense levels in a case with from five or more units). The recommended Guidelines range would then be 57 to 71 months. U.S.S.G. Ch. 5, Pt. A (Sentencing Table). In that event, the government would request that this Court vary upward to the range that would have applied had this Court applied the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *Seefried*, 639 F. Supp. at 20. Such a variance would be warranted under 18 U.S.C. § 3553(a)(1) regarding the "nature and circumstances   of the offense," and more specifically, § 3553(a)(2)((A), "the need for the sentence imposed to reflect "the serious of the offense, to promote respect for the law, and to provide just punishment for the offense."

First, as virtually every judge of this Court has stated when sentencing defendants in the January 6 cases, the violent riot that engulfed Capitol building in response to the Congressional certification vote was a mass crime of the utmost seriousness. *E.g., United States v. Hatchet*, 22-cr-244 (TNM), Sent. Hrg. Tr. March 7, 2023, at p. 34 ("On January 6th, 2021, you participated in

a national embarrassment."); *United States v. Rhodes*, 22-cr-15 (APM) Sent. Hrg. Tr. May 25, 2023 at p. 121 ("American democracy doesn't work, Mr. Rhodes, if when you think the Constitution has not been complied with, it puts you in a bad place, because from what I'm hearing, when you find yourself in a bad place, the rest of us ought to."); *United States v. Languerand*, 21-cr-353 (JDB), Sent. Hrg. Tr. January 26, 2022 at pp. 33-34 ("the effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part.") That's because Klein's prolonged and violent attack against officers protecting the Capitol on January 6 in order to prevent the peaceful transition of Presidential power to reflect the results of free and fair election was every bit as serious, if not more so, than any obstruction of any judicial proceeding to which those enhancements would have applied. Indeed, this Court implicitly acknowledged as much when it stated that, had "the Sentencing Commission … foreseen the Capitol breach, it may well have included 'official proceeding' in the text of § 2J1.2." *Seefried*, 639 F. Supp. 3d at 20

Second, Klein and his fellow rioters who violently attacked uniformed police officers protecting the Capitol and the Constitutional command for the peaceful transition of Presidential power—engaged in open and notorious criminal conduct, knowing that their actions would be

extensively recorded and widely disseminated (and indeed those actions have been disseminated across the world)—did not merely undermine respect for the law, but engaged in conduct that was the epitome of contempt for the law.

Finally, because of the seriousness of his crimes and contempt for the rule of law on January 6, a substantial prison sentence within the Guideline range recommended by the government and the Probation Office here would "provide just punishment for the offense."

Additionally, because the passions that ignited the January 6 riot have not cooled since then, an upward variance would also support the need for "adequate deterrence," 18 U.S.C. § 3553(a)(2)(B), as explained above.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

Klein's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Klein, with full knowledge of the Congressional proceeding going on inside the building, waged a relentless siege on police officers for over 90 minutes as he tried to get into the U.S. Capitol building to stop the certification of the electoral college vote. Klein committed at least five separate physical assaults against officers during those 90 minutes. He also encouraged other rioters to join the fight against the police and, in an important moment for the battle in the tunnel, he worked with other rioters to ensure that the battle would continue by thwarting officers' attempts to shut

the doors on the rioters. As explained above, the nature and circumstances of Klein's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 120 months' incarceration.

### B.  Klein's History and Characteristics

Klein's history and characteristics are largely aggravating and support a sentence in the middle of the Guidelines range. Klein was 42 years old on January 6, 2021. He grew up in a safe home where his needs were met. He did not suffer from abuse, neglect or poverty. He also appears to have supportive family, including his mother and brother. And Klein is well-educated; he received a B.A. in political science from George Mason University. This upbringing demonstrates that Klein's crimes were not motivated by poverty, abuse, or lack of education. Klein had many advantages and choices but actively chose to involve himself in a violent riot aimed at stopping a vital component of our democracy.

While Klein has minimal adult convictions, he has had numerous interactions with the criminal justice system suggesting a lack of respect for the law. Klein has one adult criminal conviction from 2002 for driving while intoxicated, that does not result in any criminal history points. Klein has numerous traffic infractions, three prior arrests that appear to relate to possession of alcohol or marijuana and one prior arrest for assault in 2013. Klein's criminal history suggests that he may not have been honest with U.S. Probation when he stated that his alcohol consumption has "never been excessive or problematic." PSR at ¶ 151.

After college graduation, Klein enlisted with the United States Marine Corps where he served for approximately nine years. Klein refused to provide U.S. Probation with information regarding his employment after he was discharged from the Marines. From January 2017 to

January 2021 (including on January 6, 2021), Klein was employed with the Department of State.

Klein's service with the Marines is both mitigating and aggravating. Klein served this country in the Marine Corps for 9 years, a laudable achievement to be sure. However, his service is tainted by the direct attack he waged against his country on January 6. *See United States v. Joseph Padilla*, 21-cr-214 (JDB), Sept. 13, 2023 Sent. Hrg. Tr. at 71-72 ("But there's always another side to the military history issue, and that is that as a member of our military, you took an oath to the Constitution, to uphold the Constitution, and in my assessment the conduct that you engaged in on January 6 was not consistent with that oath that you had taken as a member of the military. So it cuts both ways."); *United States v. Creek*, 21-cr-645 (DLF), Sent. Hrg. Tr. at p. 62 ("you know that your actions that day were inconsistent with the oath you took as a Marine, inconsistent with those values. And as a Marine, you defended the ideals of democracy, and you know that in our country elections are governed by the rule of law. Assaults against the police officers who honorably defended our Capitol building that day are inconsistent with all of those values.").

What's more, Klein's involvement in the riot and assault of police officers is made even more aggravating by his then-current employment with the State Department. As an employee of the federal government, Klein was endowed with the trust of the American people and to uphold the law. He violated that trust on January 6 when he attacked the very country for which he was paid to work. His federal employment also means that Klein was likely motivated by a personal benefit - namely, continued employment as a political appointee – when he attacked the U.S. Capitol. In fact, in one text message, he said as much: when an acquaintance asked him if he was going to the rally, Klein responded, in a series of messages, "Hell yea I'm going. I'm a Trump

appointee. I'd better be there. It IS my job. Government Trial Exhibit 623.6. Finally, Klein's participation in the attack was made all the more dangerous by his federal employment, as well, as he presumably had access to sensitive government information through his employment with the State Department.

For all of these reasons, Klein's history and characteristics support a sentence of 120 months' incarceration.

## C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Klein's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

## D.     The Need for the Sentence to Afford Adequate Deterrence

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

25

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, through his service in the U.S. Marine Corps and his employment with the State Department, Klein knew the illegality of his conduct on January 6, but he did it anyway. This apparent belief that he is above the law evidences a greater need for specific deterrence.

Second, Klein has not shown any remorse for his conduct on January 6 or even acknowledged that what he did was wrong.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Klein was one of nine individuals charged in this case, each of whom committed crimes during the same approximate time in the Lower West Terrace tunnel. To aid the Court in sentencing Klein, and to address this § 3553(a) factor, the government provides the following table summarizing the sentences entered for each of Klein's co-defendants to-date:

| Defendant | Gov. Guidelines Calculation | Gov. Recommendation | Court Guidelines Calculation | Sentence |
|---|---|---|---|---|
| Robert Morss | 97-121 months | 109 months | 57-71 months | 66 months |
| David Lee Judd | 87-108 months | 90 months | 37-46 months | 32 months |
| Geoffrey Sills | 97-121 months | 108 months | 57-71 months | 52 months |
| David Mehaffie | 57-71 months | 64 months | 6-12 months | 14 months |
| Tristan Stevens | 70-87 months | 78 months | 41-51 months | 60 months |
| Patrick McCaughey | 151-188 months | 188 months | 151-188 months | 90 months |

With the exception of Christopher Quaglin, Klein has been convicted of more assaults than any of his co-defendants, Klein participated in the fight in the Lower West Terrace tunnel for the longest amount of time, and the evidence that he intentionally interfered with the joint session of Congress is arguably the strongest of the nine defendants. Thus, a comparison with his co-defendants supports a sentence at the midpoint of the Guidelines range.

While no case is a perfect comparison for the specific facts and circumstances present here, the government has identified the following additional cases that share some of the aggravating and mitigating circumstances with Klein's case and serve as apt comparators:

***United States v. Vincent J. Gillespie*, 22-cr-60 (BAH).** Gillespie entered the Lower West Terrace tunnel at approximately 4:11 p.m. and remained for only a few minutes. During that time, he used two different stolen police riot shields to push against police defending the tunnel. He also grabbed an MPD sergeant defending the tunnel and screamed "traitor" and "treason" at the police while he was there. Gillespie was convicted after a jury trial of violating § 111(a), civil disorder

and two misdemeanors. Gillespie was not convicted of a violation of § 1512(c)(2) and was only convicted of one assault. Gillespie was not a former member of the military or current federal employee. Judge Howell sentenced Gillespie to 68 months' incarceration.

*United States v. Craig Bingert and Isaac Sturgeon*, **21-cr-91 (RCL).** Bingert and Sturgeon, along with others behind them, pushed metal bike racks against the police at the top of the southwest stairs leading to the Upper West Terrace. Bingert and Sturgeon were convicted by Judge Lamberth after a bench trial of violations of 18 U.S.C. §§ 1512(c)(2), 111(a)(1), 231, and misdemeanors. Like Klein, neither Bingert nor Sturgeon had criminal histories. Unlike Klein, they were only charged with and convicted of one assault, and that assault was shorter in duration than Klein's assaults on the West Plaza and in the tunnel. Judge Lamberth sentenced Bingert to 96 months' imprisonment (which included an enhancement for obstruction of justice for false testimony at trial) and sentenced to Isaac Sturgeon to 72 months' imprisonment.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Klein was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[12]

Because Klein engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Klein responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Klein to pay $2,000 in restitution for his convictions. This amount fairly reflects Klein's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Klein was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Klein's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, at one point, Klein had raised $47,187 in an online campaign styled as a "Freddie Klein Legal Defense Fund." PSR ¶ 166; *see also* Exhibit A, screenshot of Klein's GiveSendGo account. The government notes that January 6 defendants often raise a significant amount of money after their sentencing hearing in the wake of the publicity surrounding their punishment. For example, defendant Judd was fined $5,691, the amount of his total fundraising efforts.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 120 months of incarceration – near the midpoint of the Guidelines range – to be followed by three years of supervised release, $2,000 in restitution, a fine in the amount $47,187,

and an $870 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney

ASHLEY AKERS.
Trial Attorney, Detailed

LAURA HILL
Trial Attorney, Detailed