```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - x
     THE UNITED STATES OF AMERICA,
3                                     Criminal Action No.
                    Plaintiff,        1:21-cr-00040-TNM-8
4                                     1:21-cr-00040-TNM-9
                                      Thursday, July 13, 2023
5    vs.                              1:51 p.m.

6    STEVEN CAPPUCCIO and
     FEDERICO GUILLERMO KLEIN,
7
                    Defendant(s).
8    - - - - - - - - - - - - - - - x

9    _____

10          TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
           HELD BEFORE THE HONORABLE TREVOR N. McFADDEN
11                 UNITED STATES DISTRICT JUDGE
     _____

12   APPEARANCES:

13   For the United States:    ASHLEY AKERS, ESQ.
                               DOJ-CIV
14                             Commercial Litigation Branch
                               1100 L Street Northwest
15                             Washington, DC 20530
                               (202) 353-0521
16                             ashley.akers@usdoj.gov

17                             KAITLIN KLAMANN, ESQ.
                               DOJ-USAO
18                             601 D Street NW
                               Washington, DC 20530
19                             (202) 252-6778
                               kaitlin.klamann@usdoj.gov

20
                               LAURA ELIZABETH HILL, ESQ.
21                             DOJ-CIV
                               175 N Street, NE
22                             Room 9.1811
                               Washington, DC 20002
23                             (202) 598-3962
                               laura.e.hill@usdoj.gov

24

25   (CONTINUED ON NEXT PAGE)
```

```
 1     APPEARANCES (Continued)

 2     For Defendant Cappuccio:    EDGAR H. HOLGUIN, ESQ.
                                   FEDERAL PUBLIC DEFENDER, TXW
 3                                 700 E. San Antonio
                                   Suite D-401
 4                                 El Paso, TX 79901
                                   (915) 534-6525
 5                                 edgar_holguin@fd.org

 6                                 MARINA THAIS DOUENAT, ESQ.
                                   FEDERAL PUBLIC DEFENDER
 7                                 Western District of Texas
                                   727 ECesar E.Chavez Boulevard
 8                                 Suite B-207
                                   San Antonio, TX 78206
 9                                 (210) 472-6700
                                   Marina_Douenat@fd.org
10

11     For Defendant Klein:        STANLEY EDMUND WOODWARD, JR.
                                   BRAND WOODWARD LAW, LP
12                                 400 Fifth Street, Northwest
                                   Washington, DC 20001
13                                 (202) 996-7447
                                   stanley@brandwoodwardlaw.com
14

15     Court Reporter:             Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
16                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
17                                 Washington, DC  20001
                                   (202) 354-3187
18

19

20

21

22

23

24

25
```

1                            I N D E X

2

WITNESS                                                    PAGE

3

ALINA BANASYAK

4       (By Mr. Woodward)..................................930

5  MICHAEL INGERSOLL
        (By Mr. Holguin)..................................950

6

SPECIAL AGENT BENJAMIN FULP, Resumed

7       (By Ms. Akers)....................................957
        (By Mr. Woodward).................................965

8       (By Ms. Akers)....................................973

9  GENERAL STEPHEN N. XENAKIS, M.D.
        (By Ms. Douenat)..................................975

10      (By Ms. Akers)....................................993
        (By Ms. Douenat).................................1014

11

STEVEN PHILLIP CAPPUCCIO

12      (By Ms. Douenat).................................1018

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N
 2            THE COURT:  All right.  We've heard from
 3   Ms. Banasyak on direct testimony.
 4            Ma'am, I'll ask you to answer Mr. Woodward's
 5   questions, and I'll remind you you're still under oath.
 6                   ALINA BANASYAK, Resumed
 7                     CROSS-EXAMINATION
 8   BY MR. WOODWARD:
 9   Q.  Good afternoon, ma'am.
10   A.  Good afternoon.
11   Q.  My name is Stanley Woodward.  I represent Federico
12   Klein.
13            Now, you met Mr. Klein for the first time in
14   January of 2021, correct?
15   A.  Correct.
16   Q.  January 2nd?
17   A.  Yes.
18   Q.  You met him at a bar?
19   A.  Yes.
20   Q.  And then the two of you again went to a bar on the night
21   of January 5th?
22   A.  Correct.
23   Q.  And at that time you overheard discussions about what
24   was expected to happen the next day?
25   A.  Correct.
```

1    Q.  Was there any -- did you overhear any discussion

2    whatsoever about anticipated violence on January 6, 2021?

3    A.  No.

4    Q.  Did you have any reason to believe that Mr. Klein would

5    engage in violence on January 6, 2021?

6    A.  No.

7    Q.  In fact, your understanding in participating with the

8    folks that were there is that on January 6th Mike Pence was

9    going to stop the certification of the election?

10   A.  That is my understanding.

11   Q.  And that the Electoral College process would go back to

12   the individual states?

13   A.  Well, I'm not a legal expert, but I guess if that's what

14   normally would happen, then yes.

15   Q.  Okay.  And that was what you understood everyone with

16   you that night to believe?

17   A.  Correct.

18   Q.  Okay.  And you testified that you understood Mr. Klein

19   would be attending the events on January 6th because he felt

20   that he was obligated to do so?

21   A.  Yes.

22   Q.  Because he was an appointee of then President Donald

23   Trump?

24   A.  Correct.

25   Q.  Now, you didn't attend the events on January 6th,

1    correct?

2    A.  I did not.

3    Q.  Okay.  But you later did correspond or speak with

4    Mr. Klein on what happened on January 6th?

5    A.  I did.

6    Q.  Okay.  And did he ever -- well, let me rephrase that.

7            He never suggested to you that his or any other

8    one's actions in any way stopped the certification of the

9    Electoral College, did he?

10   A.  I don't understand the question.

11   Q.  He never suggested to you that, as a result of what

12   happened on January 6th, the certification of the Electoral

13   College vote had been stopped?

14   A.  No.

15           MR. WOODWARD:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           Ms. Douenat, any questions?

18           MS. DOUENAT:  No questions, Your Honor.

19           THE COURT:  All right.  Ms. Klamann, any redirect?

20           MS. KLAMANN:  No, Your Honor.

21           THE COURT:  All right.  Ma'am, thank you for your

22   testimony here today.  You may step down, and you're free to

23   go.

24           All right.  Ms. Akers?

25           MS. AKERS:  Thank you, Your Honor.  I just want to

1    move to admit some additional exhibits before we rest.

2            The first chunk is 115 through 118.  Those are

3    Safeway exhibits.  We filed 902.11 certification on the

4    record a couple -- a week or two ago, and those are the

5    underlying exhibits.  I believe there was no objection to

6    that.

7            THE COURT:  Mr. Woodward?

8            MR. WOODWARD:  Taking the government at its word

9    that those are all pursuant to a 902.11 certification, we do

10   not object.

11           THE COURT:  And Ms. Douenat?

12           MS. DOUENAT:  Correct.

13           THE COURT:  All right.  115 through 118 are in.

14           MS. AKERS:  And then we have Exhibits 120 and 121,

15   which are the curfew order from the mayor of D.C., which I

16   believe is self-authenticating as well.

17           THE COURT:  Any objection, Mr. Woodward?

18           MR. WOODWARD:  The Court's indulgence.  Those

19   exhibits again, Counsel?

20           MS. AKERS:  Sure.  120 and 121.

21           MS. DOUENAT:  I have no objections.

22           MR. WOODWARD:  No objection.

23           THE COURT:  All right.  120 and 121 are in.

24           MS. AKERS:  We have a number of maps.  I imagine

25   the Court doesn't need those, but I would move to admit 128

1    and 129.  I guess they're not maps; they're the pictures of

2    the Capitol building.

3              THE COURT:  I think they're already in.

4              MS. AKERS:  Okay.  The next chunk would be the 200

5    series, which is 201, 202, 203, 204, and those are the

6    Secret Service exhibits.  The parties have stipulated to the

7    testimony of Lanelle Hawa, who spoke about those during her

8    testimony.  And I believe counsel's already agreed to admit

9    the underlying exhibits.

10             THE COURT:  All right.  Ms. Douenat?

11             MS. DOUENAT:  That's correct, Your Honor.

12             THE COURT:  And Mr. Woodward?

13             MR. WOODWARD:  So the record is clear, 201 and 202

14   we did stipulate to by virtue of the stipulated testimony

15   for Ms. Hawa.

16             With respect to 203 and 204, those are CCTV

17   footage from the Capitol building, which we also have

18   stipulated to.

19             THE COURT:  Thank you.

20             All right.  Those are all in.

21             MS. AKERS:  The next chunk, Your Honor, is in the

22   900 series, and it's 903, 904, and 905.  These are

23   congressional documents that relate to Daniel Schwager's

24   testimony.  I believe we have a House certification, a

25   Senate certification, and the official proceeding video.  I

1    believe we've also stipulated to that testimony, and these

2    are the underlying exhibits.

3                THE COURT:  All right.  Ms. Douenat?

4                MS. DOUENAT:  That's correct, Your Honor.

5                THE COURT:  And Mr. Woodward?

6                MR. WOODWARD:  That was 901 --

7                THE COURT:  No, 903 through 905.

8                MR. WOODWARD:  That's correct, we stipulated.

9                THE COURT:  Okay.

10                MS. AKERS:  And then, Your Honor, 1006 and 1006.1

11    is the Hawa transcript and one of the exhibits for that

12    transcript, so we move to admit that as well.

13                THE COURT:  All right.  Ms. Douenat?

14                MS. DOUENAT:  I see 1006.  I don't see 1006.1.

15                I stipulate to 1006.

16                MS. AKERS:  Sure, give me just one moment.  We

17    have 1006.1 as the notification that Vice President Pence

18    was going to be at the Capitol on January 6th.

19                MR. WOODWARD:  I have 1006.1 as a map of the

20    restricted area on Jan 6th.

21                MS. AKERS:  The one that you have, Stanley, that

22    one is already in evidence.

23                1006.1, would counsel review it?  It's on the

24    screen here.  It was the email -- this was included as a

25    subexhibit for Mr. Schwager's testimony that was stipulated

1    to.

2              MS. DOUENAT:  Sure.

3              THE COURT:  Maybe Agent Hawa's testimony?

4              MS. DOUENAT:  I thought it was --

5              MS. AKERS:  Yes.  Is that not what I said?

6              MS. DOUENAT:  -- Agent Hawa.  No, Schwager.

7              MS. AKERS:  Yes, she's our Secret Service witness

8    who has stipulated testimony to.  Sorry for that mistake.

9              MR. WOODWARD:  I do have that.  It's just not

10   1006.1.  So as long as what the Court has is consistent with

11   what the government is --

12             THE COURT:  Yes.  I've got it on the screen there.

13   I don't know if you can see it, the email.

14             MR. WOODWARD:  We do have that as an exhibit.

15   It's just not marked 1006.1.

16             THE COURT:  Okay.  I will take this to be 1006.1.

17   And 1006.1 and 1006 will be admitted.

18             MS. AKERS:  And that's all, Your Honor.

19             THE COURT:  Okay.  And so the government is

20   resting?

21             MS. AKERS:  Yes, Your Honor.

22             THE COURT:  All right.  Ms. Douenat, do you have a

23   motion?

24             MS. DOUENAT:  Yes, Your Honor.  We have --

25             MS. AKERS:  Sorry, could we have one more

1       preliminary matter?

2                   THE COURT:  Okay.

3                   MS. AKERS:  I'm sorry.

4                   We do have Ms. Mancini here from yesterday, and

5       she actually has travel plans tomorrow.  So if the defense

6       counsel wants to cross-examine her, can we do that first

7       because she has travel arrangements?

8                   THE COURT:  Mr. Woodward, do you want to recall?

9                   MR. WOODWARD:  So, yes, we would not be calling

10      her or Agent Fulp in our case-in-chief.  It's a bench trial

11      so I don't have an objection to the government's resting,

12      and depending on what comes through in *Jencks* with respect

13      to Fulp tomorrow, as long as the Court is okay with that, we

14      would not want procedurally for their testimony to be

15      considered as part of our case-in-chief.

16                  THE COURT:  No, I agree.  You now have

17      Ms. Mancini's *Jencks*.  I'm asking you if you want to have

18      her recalled in the government's case-in-chief?

19                  MR. WOODWARD:  No.  And let me just -- if the

20      government would share for her benefit that the cross of

21      Agent Fulp covered what I wanted to cover with her.  He

22      answered all the questions that I had for her, so we don't

23      have any objection to releasing her.

24                  THE COURT:  Okay.

25                  MR. WOODWARD:  And we appreciate her being here.

1          THE COURT:  Okay.  Thank you.

2          All right.  Ms. Douenat?

3          MS. DOUENAT:  Yes, as to all the counts, Your

4    Honor, the nine counts against Mr. Cappuccio, we're asking

5    for a Rule 29 that the government hasn't met their burden.

6          THE COURT:  Okay.  And Mr. Woodward?

7          MR. WOODWARD:  Your Honor, we would also move

8    under Rule 29 for judgment of acquittal.  If the Court is

9    inclined to reserve until after the entire case is

10   concluded, that's fine.  We're also prepared to take each

11   count one by one, although we'd quite frankly rather do that

12   tomorrow.

13         THE COURT:  Me, too.

14         MS. DOUENAT:  Yes.

15         THE COURT:  Okay.  So I will take it under -- I

16   think what I do is take this under advisement.

17         MR. WOODWARD:  Yes.

18         MS. AKERS:  I just want to make one point clear

19   before we, I guess, officially rest.  If --

20         THE COURT:  I thought you'd done that.

21         MS. AKERS:  I had thought so, too, but I'm a

22   little confused as to the procedure.  If defense counsel

23   wants to cross-examine Special Agent Fulp, and it's not in

24   your case, but we've rested, what is the procedure that the

25   Court is proposing?  Should we keep our case open?

1           THE COURT:  No, I will sua sponte reopen your

2     case-in-chief if the defense wants to reopen -- or wants to

3     recross one of the two agents.

4           MS. AKERS:  Okay.  Thank you, Your Honor.

5           THE COURT:  So maybe this is a good opportunity,

6     though, ma'am.  I think your indictment mentions, as to 17,

7     Officer Gonell.  I'm not sure he was even named in your

8     case-in-chief, although perhaps I'm forgetting that.

9           I think there was also maybe an Officer CW.  Yes,

10    in Count 19.

11          So I guess I'm a little confused about what's

12    happening with those.

13          MS. AKERS:  Sure.  So Count 19 is Officer Wilhoit

14    whose body-worn camera footage was introduced.  He was not

15    called as a witness.  He's actually on a sabbatical in

16    Africa for several years so is completely unavailable to us,

17    but his body-worn camera footage was introduced as part of

18    our case-in-chief as being in the tunnel.

19          And as to Mr. Gonell, I had believed that Special

20    Agent Fulp identified him; but if he hasn't, then he needs

21    to.  It was in our longer outline that may have been cut

22    short to expedite today.  But Special Agent Fulp can

23    identify Mr. Gonell.  So if the Court would permit us to do

24    that, that's what our request would be.

25          THE COURT:  Okay.

1        All right.  Any objection to recalling Agent Fulp,

2   Mr. Woodward?

3        MR. WOODWARD:  Yes, Your Honor, and that's why I

4   offered to take the Rule 29 now if you'd like.

5        I mean, those are two names that we have been

6   very, very attuned to over the last two days.  Mr. Gonell's

7   name was spoken twice in this courtroom this week.  The

8   record will reflect that it was spoken actually by you this

9   morning, and then by government counsel.  Mr. Fulp was not

10  asked about Mr. Gonell, and neither were any of his

11  colleagues from the U.S. Capitol Police asked about him.

12       The indictment in the government's own discretion

13  specifically identifies Officer Gonell as a victim of

14  111(a)/(b), and the government's failure to prove up that

15  Officer Gonell was, in fact, a victim is fatal to that count

16  in the indictment.

17       The same is true of Officer CW, whom, as best we

18  could tell in the discovery received, is not, in fact,

19  identified.  I did hear the government counsel mention --

20  I'll mispronounce his name -- Wilhoit or "Wil-hoot," and I

21  did hear the government mention that we were reviewing body

22  camera from Officer Wilhoit, but I don't believe a

23  foundation was made to establish as part of the evidentiary

24  record that that was Officer Wilhoit or Wilhoot's bodycam

25  video or that that was the officer who was the victim of the

 1    111(a)/(b) count.  I'll put it up if --

 2            MS. AKERS:  Mr. Woodward, just for clarification,

 3    these are Counts 17 and 19, which are not (b)s.  They're

 4    just 111(a)s.

 5            MR. WOODWARD:  All the same, the government

 6    obviously knew that it didn't have to identify the specific

 7    officer, as it does not do so for one of the counts that's

 8    against Mr. Klein.  And of course the government knew that

 9    it could identify the officers in its case-in-chief, as it

10    did do so for Officer Moore, Officer Harvell, for example.

11    So --

12            THE COURT:  Yes, so I guess the question --

13    particular question is, is it proper for me to allow the

14    government to reopen at this point?

15            MR. WOODWARD:  No, Your Honor.  With respect -- if

16    you hadn't just asked that, this wouldn't have come up until

17    closing arguments; and at that point I can't imagine Your

18    Honor, having heard the government's closing argument and

19    then having heard our argument on these two counts, would

20    have paused the trial and said, "Wait a second.  Let's let

21    the government come up and prove those points up because I

22    know they can do it."

23            A foul's a foul, Your Honor.  And in this case

24    they haven't met their burden of proof.  And so with respect

25    to Rule 29, we'd ask that the Court enter judgments of

1    acquittal with respect to 17 and 19.

2            THE COURT:  All right.  So I'm not going to do

3    that right now.  I guess we'll give you an opportunity,

4    Ms. Akers, to explain to me why I should allow you to reopen

5    at this point because I'm kind of inclined to agree with

6    Mr. Woodward that that ship has sailed.

7            MS. AKERS:  Your Honor, could I have just a moment

8    to confer with my counsel?

9            THE COURT:  Sure.

10           MS. AKERS:  Thank you.

11           (Pause)

12           MS. AKERS:  Thank you, Your Honor.

13           The government asks the Court, as the person who

14   controls the mode and operations of trial, to permit the

15   government to reopen the case.  We just rested about a

16   couple of minutes ago, so it's not like there's prejudice

17   here to the defense.  We're not in their case.  They haven't

18   started presenting evidence.

19           I will tell you, Your Honor, that our plan was to

20   introduce that identification through Special Agent Fulp,

21   who has spoken, for example, with Officer Gonell,

22   interviewed him for this case.  I understand it's the

23   government's burden, but we did not replay a lot of evidence

24   for Your Honor today with Special Agent Fulp in order to be

25   efficient and quick, and so in that I skipped over the

1    footage that we've already watched where he can make an

2    identification.  And so it is my fault.

3          I think Your Honor has the discretion to reopen

4    the case sua sponte.  For example, we're going to do that

5    potentially for the defense's benefit in another matter.

6    And because we just rested a minute or two before this came

7    up, I would ask the Court to reopen it.  It's just -- you

8    know, it's an error on my fault for sure, on my behalf for

9    sure, but it's not something that can't be remedied without

10   prejudice given the timing of all of this.

11         MR. WOODWARD:  Briefly, Your Honor, if Mr. Klein

12   were the only defendant in this case, then the government's

13   having rested now would be significant because we don't

14   intend to put on a defense case-in-chief.  So we'd be giving

15   closing arguments.

16         The idea that after the government has rested it

17   can then come forward to you and admit error with respect to

18   a criminal proceeding of this nature is inappropriate.

19         We're not holding the record potentially open

20   tomorrow for our benefit, Your Honor.

21         THE COURT:  I agree.  I agree.  You don't need --

22   I get that.

23         MR. WOODWARD:  So -- and we also are aware of the

24   Court's findings with respect to Officer Gonell in the last

25   trial.  You did not find him credible, per se.  You found

1    him to be more akin to a victim than to a traditional law

2    enforcement officer.

3         The government made the strategic choice not to

4    call him in this case.  That's a choice that they're now

5    going to have to pay the consequence for.

6         So we again renew or ask that the record not be

7    reopened and that we proceed to conclude this case.

8         THE COURT:  All right.  So I think what I'm going

9    to do, I'm going to allow you to call Agent Fulp to very

10   briefly put on that evidence.  I'm actually not quite sure

11   what to do in terms of a legal matter, but I want to -- I

12   think the best thing to do is make the record.

13        I thought the government had rested.  Obviously

14   the defense thought that.  We can all do research overnight;

15   and obviously if it turns out that it's too late for the

16   government, I'm sure Mr. Woodward can present me with that

17   legal evidence tomorrow.

18        MR. WOODWARD:  We just briefed this issue across

19   the street actually.

20        THE COURT:  Great.  Well, it will be easier for

21   you and even easier for me because I can rely on you.

22        Ms. Akers, you can recall Agent Fulp.

23        MS. AKERS:  Sure, Your Honor.  It might be good to

24   take a brief recess.  Mr. Fulp is at the FBI sending us all

25   his emails pursuant to Mr. Woodward's request.

```
 1              But it's just down the street, so we've already
 2      asked him to be on the way back.  I apologize, Your Honor.
 3              MR. WOODWARD:  Your Honor, I appreciate what the
 4      Court is doing.  If we want to do this tomorrow -- our
 5      objection stands.  Your Honor is creating a record.  He has
 6      to come back tomorrow.  I appreciate what the Court is doing
 7      in wanting to make sure that however you rule ultimately
 8      there's a clear record on this.  I don't -- so to the extent
 9      I can be helpful here.
10              THE COURT:  Thank you.  So, Ms. Douenat, it sounds
11      like you have somebody -- do you have your -- you have a
12      case you wish to present; is that correct?
13              MS. DOUENAT:  I do, Your Honor, yes, and our
14      witness is here.
15              THE COURT:  So what I'm going to do is, we've
16      juggled things around a little bit already, and we will
17      continue to do so.
18              Ms. Douenat, I'll ask you to proceed.  As I say,
19      I'm going to at least tentatively allow the government to
20      reopen its case, and this is only actually as to Mr. Klein
21      and as to two very brief points, and I will then consider
22      whether it's -- that was the appropriate thing to do.  For
23      now -- yes.
24              MR. WOODWARD:  I'm sorry, Your Honor, to
25      interrupt.  You said two very brief points.
```

```
 1              THE COURT:  Well, I thought it was on the two --
 2    there's two victims who you at least say the government
 3    never mentioned.
 4              MR. WOODWARD:  The government -- I had not heard
 5    the government proffer just now that Agent Fulp will be able
 6    to identify the second victim.
 7              THE COURT:  All right.  We will find that out.
 8              MR. WOODWARD:  Well, now I do have some concern
 9    about what happens between now and tomorrow.
10              THE COURT:  Well, it's not going to be tomorrow
11    morning.  It's going to be this afternoon.
12              MR. WOODWARD:  Okay.
13              THE COURT:  Ms. Douenat, you can call your
14    witness.
15              MS. DOUENAT:  We call --
16              MR. HOLGUIN:  Your Honor, we're going to call Mike
17    Ingersoll.
18              THE COURT:  All right, sir.  If you can stand over
19    there for just a moment.
20              (Witness sworn)
21              MS. HILL:  Your Honor, if I may?  I understand
22    that Mr. Ingersoll was near the Capitol grounds on January
23    6th, so I think that may implicate his Fifth Amendment
24    rights.  We're not requesting anything, but I did want
25    to make the Court aware in case they would like to notify
```

1    Mr. Ingersoll of any rights.

2              THE COURT:  Okay.

3              MR. HOLGUIN:  Your Honor, my direct of

4    Mr. Ingersoll actually was going to relate back to actually

5    events prior to January the 6th.  But obviously, I mean, if

6    the government feels the need to --

7              THE COURT:  Why don't you just stand down for just

8    a moment, and could I ask you, Ms. Hill, and Mr. Holguin to

9    approach.

10              (The following is a conference held at the

11               bench outside the hearing of the gallery)

12              THE COURT:  All right.  So what's your

13    understanding of -- you think he was on the grounds?

14              MR. HOLGUIN:  Yes, sir, he was on the grounds.  I

15    was not indicating to that testimony because frankly he did

16    not see -- he did not actually witness Mr. Cappuccio do or

17    not do any of the actions that are alleged in the

18    indictment; however -- and I was not going to go into my

19    direct on what Mr. Ingersoll did on January 6th.

20              However, I can tell the Court he was on the

21    grounds on January the 6th.

22              THE COURT:  So what is the substance of your

23    direct?

24              MR. HOLGUIN:  The trip, which we already have had

25    testimony about, Judge.  I actually have raised this issue

1    to Ms. Akers, because I was not aware that it was going to

2    be covered by the FBI agent through the texts and the

3    motivations of the parties and stuff.  That's why we had

4    intended to call Mr. Ingersoll.

5              But that was going to be the -- I guess -- my --

6              THE COURT:  You're not hitting the day?

7              MR. HOLGUIN:  I'm not hitting January 6th at all.

8    But like I said, I'm not sure how much leeway the Court will

9    provide to the government in their proffer.

10             Mr. Ingersoll was on the grounds.  I can't say

11   whether he was in an area that the government would consider

12   to be restricted or not.  That I cannot.

13             THE COURT:  Okay.  So, Ms. Hill, I mean, if he's

14   not going up to -- if he's only discussing January 5th and

15   before...

16             MS. HILL:  It's all part of the same trip, Your

17   Honor.  It relates all to January 6th.  I think you'll see

18   that they're talking about the trip for January 6th, the

19   Stop the Steal rally, and then ultimately to go to the

20   actual rally and the Capitol as well.  So I think it would

21   be well within our cross to talk about that just based on

22   where we are thus far.

23             MR. HOLGUIN:  And I would plan to object to any

24   kind of testimony about that, Judge, because we were trying

25   to be very limited in our direct.

1          THE COURT:  Are you saying that he did not see --

2     your understanding is that this witness did not see your

3     client on January 6th?

4          MR. HOLGUIN:  He saw him, Judge, but he didn't see

5     him as in relation to the alleged crimes.  In other words,

6     he wasn't at the tunnel, for example.  He wasn't -- any of

7     that.

8          But they were together for portions of the day,

9     both before and after the events that are alleged in the

10    indictment.

11         MS. HILL:  I think they marched to the Capitol

12    together.

13         MR. HOLGUIN:  That is true.

14         MS. HILL:  And at or near or on potentially

15    Capitol grounds together.

16         MR. HOLGUIN:  That is true.

17         MS. HILL:  That obviously would go to some of the

18    crimes charged.

19         MR. HOLGUIN:  But I'm not going to get into that

20    with him.  That's what I'm saying.  That is correct, Your

21    Honor.

22         THE COURT:  All right.  And so you think I should

23    be warning him on his Fifth Amendment rights?

24         MS. HILL:  I wanted to raise it for the Court in

25    case the Court wanted to.  I think there is a potential for

```
 1    him to incriminate himself.  So we will defer to the Court.
 2              THE COURT:  All right.  You intend to just limit
 3    your direct to the trip there?
 4              MR. HOLGUIN:  Exactly.
 5              THE COURT:  All right.  I'm going to hold you to
 6    that.
 7              And, Ms. Hill, I'm not going to allow you to go
 8    beyond that.  I'm sorry.
 9              MS. HILL:  Okay.  Am I okay to re-raise it if I
10    think it does go beyond that?
11              THE COURT:  Sure.  If you think he's gone beyond
12    the scope that he's just discussed, we can talk about it.
13              MS. HILL:  All right.  Understood, Your Honor.
14              (This is the end of the bench conference)
15              THE COURT:  All right.  Thanks.
16              Sorry about that, sir.  I'll ask you to listen to
17    Ms. Chaclan now.  Did we already swear him in?
18              THE COURTROOM DEPUTY:  Yes.
19                        MICHAEL INGERSOLL, Sworn
20                           DIRECT EXAMINATION
21    BY MR. HOLGUIN:
22    Q.  Good afternoon, sir.
23    A.  Hi.
24    Q.  Could you please state and spell your name, your full
25    name, for the record.
```

1    A.  It's Michael Ingersoll, M-I-C-H-A-E-L, I-N-G-E-R-S-O-

2    L-L.

3    Q.  And where do you live, Mr. Ingersoll?

4    A.  San Antonio, Texas.

5    Q.  And what do you do for a living, sir?

6    A.  I'm an account manager with AT&T.

7    Q.  Mr. Ingersoll, I wanted to direct you to why we're here

8    today.  Do you know Mr. Cappuccio, Mr. Steven Cappuccio?

9    A.  I do.

10   Q.  And how long have you known Mr. Cappuccio?

11   A.  I met him in 1986 when I moved to San Antonio.  We went

12   to high school together, and he was one of the first people

13   I met when I moved to San Antonio.

14   Q.  And have you remained in contact with him since 1986?

15   A.  No.

16   Q.  And why was that, sir?

17   A.  I went to college, and he went to college, and we just

18   kind of parted ways and hadn't seen each other until we met

19   up probably six or seven years ago.

20   Q.  And how did you wind up meeting up again six or seven

21   years ago, sir?

22   A.  I happened to find one of my -- our other friends on

23   Facebook and connected with him, and he said, "Hey, why

24   don't you come to lunch?"

25            And I did, and Steve was there.  And we kind of

1    reconnected then and been in touch since then.

2    Q.  And so is it fair to say that you and Mr. Cappuccio have

3    some mutual friends?

4    A.  Uh-huh.

5    Q.  Was that a yes?

6          THE COURT:  I just need you to say yes.

7    A.  Yes, yes.

8    Q.  Thank you.

9          I want to direct you now to December of 2020 and

10   basically early January, January 1st through to the 5th of

11   2020, sir.

12   A.  Uh-huh.

13   Q.  Was there an occasion when you decided to make a trip up

14   to Washington, D.C.?

15   A.  Yes.

16   Q.  And why did you want to come to Washington, sir?

17   A.  I wanted to hear President Trump speak.  I never heard

18   him speak, and I read stuff about the rally and said, "Yeah,

19   I'm available."  And I was -- thought I would see if any of

20   my friends wanted to go with me.

21   Q.  Did you -- and to that end, did you invite some people

22   to go with you?

23   A.  All of our friends.  I said, "Anybody want to go with

24   me?"  And the only one who did was Steve.

25   Q.  And when you say all my friends, about how many people

1    are you talking about?

2    A.  Like five maybe.

3    Q.  And among those people that you invited to come with

4    you, how many took you up on your offer?

5    A.  Just Steve.

6    Q.  And your trip, was it going to be -- were you guys

7    driving or flying up here?

8    A.  We drove.

9    Q.  You didn't want to come -- you didn't want to drive up

10   to D.C. alone?

11   A.  Well, I would have, but I would rather not have.

12   Q.  And would you say it was your idea to come that day, or

13   was it Steven or Mr. Cappuccio's idea to come up?

14   A.  No, it was my idea.

15   Q.  And was it your plan to come up to storm the Capitol,

16   sir?

17   A.  No.

18   Q.  Was it Mr. Cappuccio's plan to come up and storm the

19   Capitol?

20   A.  No.

21   Q.  In the end, it was just the two of you that drove up

22   together?

23   A.  Correct.

24   Q.  As far as you know, does Mr. Cappuccio belong to any

25   political groups?

1    A.   No.

2    Q.   And was there a time prior to you leaving on this trip

3    that Mr. Cappuccio expressed concern regarding the expenses

4    of the trip?

5    A.   Yes.

6    Q.   Okay.  And what were those concerns?

7    A.   Just -- well, I don't know if he had concern.  I just

8    don't -- I had already rented hotels, and I'll pay for them.

9    Q.   So you were going to pay for the expenses of the trip?

10   A.   Yes, because I was already going to go.  And I just

11   said, "Don't worry about the hotel.  I already got them."

12   Q.   And this was the gas and hotel expenses?

13   A.   Uh-huh.  Yes, sir.

14   Q.   Whose car did you wind up taking?

15   A.   Mine.

16   Q.   And did you drive the entire trip?

17   A.   No.  We took turns.

18   Q.   Was it just the two of you that ultimately went?

19   A.   Yes, sir.

20   Q.   And when did you wind up leaving?

21   A.   Let's see, January 3rd.

22   Q.   Okay.  Do you recall that was a Sunday?

23   A.   I don't recall, actually, but it could have -- it

24   probably was.

25   Q.   Okay.  And on that first day, you went up to -- what

 1    point did you get on the map?

 2    A.  We drove to Texarkana our first night and stayed in a

 3    hotel there.

 4    Q.  And then on the next day, January 4th, where did you

 5    drive to?

 6    A.  We drove I think until Memphis.  We stayed in Memphis.

 7    Q.  Okay.  At some point while you were driving here did you

 8    wind up meeting with other people also coming to Washington?

 9    A.  I had found some like caravans that were heading --

10    tailgates or whatever you want to call them, and I read -- I

11    can't remember where we met up.  It was somewhere after

12    Memphis.  We loaded up and drove to where everyone was

13    meeting for this final trip into D.C.

14    Q.  Those caravans that you mentioned, how did you become

15    aware of them?

16    A.  They're on the Internet.  Just different websites and so

17    forth.

18    Q.  And was it you that came up -- aware of them or was it

19    something that was shared to you by Mr. Cappuccio?

20    A.  No, it was all me.

21    Q.  Was it your decision, then, to meet that caravan?

22    A.  Yes.  I thought it would be fun.

23    Q.  In what sense, sir?

24    A.  To kind of make it like a parade into, you know -- I

25    didn't know where I was going, for one thing, and just

```
1   thought it would be a good experience.

2   Q.  Okay.  And do you remember which date it was that you

3   met with this caravan?

4   A.  The 5th.

5   Q.  And for your visit in D.C., where did you actually wind

6   up staying?

7   A.  We stayed at a hotel in Arlington.

8   Q.  Is that Arlington, Virginia?

9   A.  Yes.

10  Q.  And when did you get to the hotel?

11  A.  It was pretty late at night, probably 9:30, 10:00,

12  because most of the restaurants were closed already.

13  Q.  And what date was that?

14  A.  On the 5th.

15           MR. WOODWARD:  Your Honor, I have no further

16  questions.  Pass the witness.

17           THE COURT:  All right.  Ms. Hill.

18           MS. HILL:  May I have a moment, Your Honor?

19           THE COURT:  Sure.

20           (Pause)

21           MS. HILL:  We have no questions for this witness,

22  Your Honor.

23           THE COURT:  Mr. Woodward, I take it you have no

24  questions?

25           MR. WOODWARD:  No, sir.
```

1           THE COURT:  Mr. Ingersoll, thank you for your

2    testimony.  You may step down.  You're free to go.

3           THE WITNESS:  Thank you.

4           THE COURT:  All right.  Who do you have up next,

5    Ms. Douenat?

6           MS. DOUENAT:  Dr. Xenakis, but he will be longer.

7           THE COURT:  All right.  So why don't we ask Agent

8    Fulp to retake the stand briefly.

9           Agent Fulp, I'll remind you you're still under

10   oath.

11          THE WITNESS:  Yes, sir.

12           SPECIAL AGENT BENJAMIN FULP, Resumed

13               FURTHER DIRECT EXAMINATION

14   BY MS. AKERS:

15   Q.  Hi, Agent Fulp.

16   A.  Hello.

17   Q.  As part of your investigation, did you have the

18   opportunity to interview police officers from the

19   Metropolitan Police Department and the United States Capitol

20   Police?

21   A.  Yes.

22   Q.  Did you have the opportunity to interview Mr. Aquilino

23   Gonell?

24   A.  I believe I interviewed him telephonically and received

25   an email from him.

```
 1    Q.  And did you have -- and have you ever seen him in
 2    person?
 3    A.  I've seen him, yes.
 4    Q.  Have you had an opportunity to interview Officer Carlton
 5    Wilhoit as part of your investigation into Mr. Klein?
 6    A.  Yes.
 7              MS. AKERS:  And if we could please pull up
 8    Government Exhibit 501.  And if we could please play from
 9    eight minutes to eight minutes and 17 seconds.
10              (Video playing)
11    Q.  Are you able to identify Mr. Klein in this video
12    footage?
13    A.  Lower left with the red hat and green jacket who I just
14    circled in green.
15    Q.  All right.
16              MS. AKERS:  Can we actually go back to six minutes
17    and 18 seconds and play for a few seconds.  I'll tell you
18    when to stop.
19              (Video playing)
20              MS. AKERS:  Pause.
21    Q.  Can you identify Mr. Klein at six minutes and 22
22    seconds?
23    A.  Red hat, green jacket, on the right portion of the
24    screen that I've just circled.
25    Q.  And you've also, in your circle, encompassed a person
```

1    with a black helmet on.  Do you see that person?

2    A.  Yes.

3    Q.  And is that person law enforcement?

4    A.  Yes.

5    Q.  And are you able to identify that person?

6    A.  I believe that person to be Officer Gonell.

7    Q.  And when you interviewed Officer Gonell, was he able to

8    identify himself in this video footage?

9    A.  He was.

10            MS. AKERS:  Can we please pull up Government

11   Exhibit 429 and go to 3:00 p.m., 1500.

12            And if we could play until 15:00:27.

13            (Video playing)

14            MS. AKERS:  Pause.

15   Q.  Special Agent Fulp, did you review this video footage

16   with Officer Carlton Wilhoit during your interview with him?

17   A.  I would have to look at my report to see exactly what

18   videos he was shown, but I did review body-worn camera

19   footage with him, yes.

20   Q.  You would need your report to refresh your recollection;

21   is that correct?

22   A.  I should have documented it in my report what videos he

23   was shown, I would think.  This appears like something I

24   would have shown him, but I just don't recall offhand what

25   specific -- I'm not sure whose video I'm watching right

1    here, and if that was the one that was shown to him.

2              MS. AKERS:  Your Honor, may I approach the witness

3    with a copy of his 302 to refresh his recollection?

4              THE COURT:  You may.

5    Q.  I'm going to leave this here with you and give you an

6    opportunity to refresh your recollection.

7              MR. WOODWARD:  Does the government have a copy for

8    defense counsel?

9              MS. AKERS:  I can give that to you.  It's in your

10   discovery.

11             THE COURT:  She'll give it to you after.

12   A.  So it says here that I showed him four different videos.

13             MR. WOODWARD:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   Q.  Just refresh your recollection, and then --

16   A.  Got it.

17   Q.  Are you refreshed?

18   A.  Yes, I'm refreshed.

19   Q.  Special Agent Fulp, when you met with Officer Wilhoit,

20   did you show him the Farina open source video?

21             MR. WOODWARD:  Objection, Your Honor; leading.

22             THE COURT:  Overruled.

23   A.  Yes.

24   Q.  And was Officer Wilhoit able to identify himself in that

25   video?

```
 1    A.  Yes.
 2              MR. WOODWARD:  Objection, Your Honor; hearsay.
 3              THE COURT:  I believe a statement of
 4    identification is not hearsay.  Is that correct?
 5              Yes, I am pretty confident I'm correct.  So I'm
 6    overruling that objection.  You may continue.
 7    A.  I believe -- I would -- again, I would want to consult
 8    my 302 to ensure that I documented that he did identify
 9    himself in that particular video.  It is my recollection
10    that he did, but I would defer to my written recount from
11    the time.
12              MS. AKERS:  Your Honor, may I approach the
13    witness?
14              THE COURT:  You may.
15              THE WITNESS:  Okay.
16    Q.  Special Agent Fulp, did Officer Wilhoit identify himself
17    also in Sergeant Bogner's body-worn camera footage?
18    A.  Yes.
19    Q.  And did we review Sergeant Bogner's body-worn camera
20    footage in this trial in open court during his testimony?
21    A.  Yes.
22    Q.  Did you hear him testify that it was his body-worn
23    camera footage?
24    A.  Yes.
25    Q.  Do you recall him actually taking his body-worn camera
```

1    off of his body and matching the numbers on the screen?

2    A.  I do.

3    Q.  And did Officer Wilhoit identify himself in Sergeant

4    Bogner's body-worn camera footage at 3:00:27 p.m.?

5    A.  If that's what's written, then he did, yes.

6    Q.  Is there something that would refresh your recollection?

7    A.  Yes.

8            MS. AKERS:  Your Honor, may I approach the

9    witness?

10           THE COURT:  You may.

11           (Pause)

12           THE WITNESS:  Okay.

13   Q.  Special Agent Fulp, when you interviewed Officer Wilhoit

14   and reviewed Sergeant Bogner's body-worn camera, did Officer

15   Wilhoit identify himself at approximately 3:00:27 p.m. in

16   Officer -- excuse me -- in Sergeant Bogner's body-worn

17   camera footage?

18   A.  Yes.

19   Q.  And did he recognize himself with his back to Sergeant

20   Bogner's camera?

21   A.  Yes.

22   Q.  And looking at the screen here, Government Exhibit 429,

23   is that consistent with his description of his own

24   identification to you?

25   A.  Yes.

 1              MS. AKERS:  Thank you, Special Agent Fulp.

 2              THE COURT:  All right.  So I'm doubting myself

 3      here.  I'm looking at the -- I think the exception is here,

 4      statements that are not hearsay.  A statement -- the

 5      declarant testifies and is subject to cross-examination

 6      about a prior statement, and the statement identifies a

 7      person as someone the declarant perceived earlier.

 8              So that feels to me like if it was Officer

 9      Wilhoit.  So I guess I wanted to hear from you why

10      Mr. Woodward is not correct that that was hearsay.

11              MS. AKERS:  Well, Your Honor, I think I can remedy

12      that by just not asking "Did he tell you this?"  I can ask

13      if he's been able to identify him and he was able to refresh

14      his recollection based on his interview with Officer

15      Wilhoit.  And so now he, having met with Officer Wilhoit and

16      having reviewed the camera, has testified that he can

17      identify him.

18              THE COURT:  Okay.

19              MS. AKERS:  I just didn't need to ask that

20      question.

21              THE COURT:  Okay.  All right.  So yes, why don't

22      you try that.

23              MS. AKERS:  Sure.

24      Q.  Special Agent Fulp, have you met Officer Wilhoit in

25      person?

```
 1   A.  Yes.

 2   Q.  Have you reviewed his body-worn camera footage?

 3   A.  Yes, I believe I have.

 4   Q.  And have you reviewed Sergeant Bogner's body-worn camera

 5   footage?

 6   A.  Yes.

 7   Q.  And are you able to identify Officer Wilhoit in Sergeant

 8   Bogner's body-worn camera footage?

 9   A.  I can.

10   Q.  And can you identify him in Government Exhibit 429 at

11   3 -- on and around 3:00 to 3:00:27 p.m.?

12   A.  Is that what exhibit this is?

13   Q.  This is 429.

14   A.  Yes.

15   Q.  Officer Wilhoit's body-worn camera.

16   A.  I can identify Officer Wilhoit in this video, yes.

17   Q.  Thank you.

18   A.  You're welcome.

19            THE COURT:  All right.  So I missed that.  Where?

20            THE WITNESS:  I'm sorry, sir, Officer Wilhoit.

21   Who I just circled in green, with no helmet on, with his

22   hair sticking out from underneath his gas mask --

23            THE COURT:  Okay.

24            THE WITNESS:  -- is Officer Wilhoit.

25            MS. AKERS:  And just to let the record reflect
```

1    that Special Agent Fulp has identified Officer Wilhoit at

2    3:00:27 p.m. in Government Exhibit 429.

3            And if we could please go back to Government

4    Exhibit 501 and go to six minutes and 21 seconds.

5    Q.  Special Agent Fulp, have you reviewed Government

6    Exhibit 501, the Farina video, in full during your

7    investigation?

8    A.  Throughout various points in the investigation, yes.

9    Q.  And you previously had identified Officer Gonell in this

10   video footage.  Can you do so here again?

11   A.  Yes.

12   Q.  Can you circle him on the screen, please.

13   A.  (Witness complies)

14           MS. AKERS:  And can the record reflect that

15   Special Agent Fulp has identified Officer Gonell in the

16   right-hand side of the screen next to Federico Klein's head

17   wearing a black helmet?

18           THE COURT:  It will so reflect.

19           MS. AKERS:  Thank you.

20           No further questions.

21           THE COURT:  Okay.  Mr. Woodward?

22                       CROSS-EXAMINATION

23   BY MR. WOODWARD:

24   Q.  Sir, you have met Officer Wilhoit in person?

25   A.  I have.

1    Q.  Did you interview him in preparation for this case?

2    A.  Several years ago.

3    Q.  Several years ago?

4    A.  He's since moved to Africa.

5    Q.  I'm sorry to talk over you.

6            Several years ago you interviewed Officer

7    Wilhoit?

8    A.  I believe I interviewed him, and there's a 302

9    reflecting that we had an interview.

10   Q.  And what was he wearing when you interviewed him?

11   A.  I think he was in his police uniform.  He had just come

12   from work.

13   Q.  Riot gear or...?

14   A.  No, it would have been standard patrol gear.

15   Q.  Standard -- is he a member of the Metropolitan Police

16   Department or the Capitol Police?

17   A.  I'm not sure what he is now.  I think he's on

18   sabbatical, but he was a Metropolitan Police Department

19   officer.

20   Q.  At the time that you interviewed him?

21   A.  Yes.

22   Q.  And on January 6th?

23   A.  Yes.

24   Q.  Okay.  And you expressed some trepidation when

25   government counsel asked you if you had identified him in

1    video; isn't that right?

2    A.  I don't think so.

3    Q.  You said you'd want to refer to your report.

4    A.  Because I like to refer to my reports when I'm making

5    declarative statements in court.

6    Q.  Because your report reflects most accurately what you

7    learned at the time of an interview?

8    A.  She was asking me if something occurred at a very

9    specific time or if I'd shown a very specific video.  And as

10   I'm sure you can appreciate, I write hundreds and hundreds

11   of reports, and I can't -- and I've seen thousands and

12   thousands of hours of video.

13        So in the interest of being accurate in my

14   statements, I wanted to review my report to ensure that I

15   wasn't just blindly agreeing to a time or a video.  I felt

16   it would be prudent to refresh my memory and make sure that

17   what I recorded at the time is what I was answering in

18   accordance with.

19   Q.  And so before she asked you whether Officer Wilhoit --

20   A.  Who?

21   Q.  Wil -- how do you pronounce his name, sir?

22   A.  Wilhoit.

23   Q.  Wilhoit.  Before she asked you if Officer Wilhoit had

24   identified himself, did you recall whether that happened or

25   not?

1    A.  Whether Officer Wilhoit had identified himself?

2    Q.  Correct, sir.

3    A.  I had a recollection that he had, but I wasn't sure that

4    that was something that I recorded in my report, so I wanted

5    to consult that to confirm my memory.

6    Q.  And in preparation for trial this week, you met with the

7    government, correct?

8    A.  Yes.

9    Q.  And you prepared your testimony, correct?

10   A.  I met with the government, yes, and went over exhibits

11   and things of that nature.

12   Q.  And without telling us anything that the government

13   counsel may have said to you, the general nature of the

14   questions that you would be asked was discussed?

15   A.  Sure.

16   Q.  Okay.  And yet today you had to refer back to your

17   report in order to recall whether you identified Officer

18   Wilhoit or not?

19   A.  Is there something wrong with referring to my report?

20   Q.  Yes or no, sir.

21   A.  Yes, I referred to my report.  I think that's an

22   entirely appropriate thing to do when you're discussing

23   events that occurred more than two years ago.

24   Q.  Okay.  Now, you didn't refer back to any report in

25   identifying Officer Gonell?

1    A.  No.

2    Q.  Okay.  In the picture in front of us, you still -- your

3    testimony today is that Officer Gonell is depicted?

4    A.  I have a recollection distinctly of having a phone

5    conversation with Officer Gonell and also being party to an

6    email that he sent identifying himself in those videos.  I

7    have memories of that.  So I didn't need to refresh myself

8    on that particular -- but those are also documented in my

9    case.

10   Q.  So in the phone conversation, he doesn't show you which

11   person he is in any video?

12   A.  In the phone conversation?

13   Q.  Yes.

14   A.  We could go back to my 302 and record -- and read what I

15   recorded contemporaneously to my conversation with him.

16   Q.  Well --

17   A.  I'm sure my notes that are attached to my 302 would

18   document the substance of our conversation.

19   Q.  If you could just answer the question that I'm asking.

20   A.  Could I review the report?

21   Q.  If you could answer the question that I'm asking you.

22   A.  What's the question?

23   Q.  In the phone conversation, he didn't show you which

24   person he was in the video he was reviewing, did he?

25   A.  That's physically impossible, but that is not necessary

1    because if you pull up my 302, I think the substance of that

2    302 would explain how he came to identify himself in that

3    video --

4    Q.  But he --

5    A.  -- which I'm happy to review right now.

6    Q.  But he didn't show you anything?

7              MS. AKERS:  Objection.

8              THE COURT:  So -- overruled.

9              Agent Fulp, I need you to answer his questions yes

10   or no.  I think a lot of these are yes or no questions.

11             THE WITNESS:  Okay.

12   A.  So if you would restate then.

13   Q.  You had a phone conversation with Officer Gonell?

14   A.  Yes.

15   Q.  At that time you did not show him any video; you're not

16   with him to show him video?

17   A.  He was sent the link to watch.

18   Q.  So was this a Zoom call?

19   A.  No, it was a phone call.

20   Q.  This was a telephone call?

21   A.  Correct.

22   Q.  Okay.  And so he did not show you on the video which

23   person was him?

24   A.  I would refer back to my notes of how exactly that went

25   down, but no, he did not physically show me because I was

1    not in the room with him and I was not on a video call with

2    him.

3    Q.  Okay.  And in the picture that we have right here, the

4    only thing you've identified is a riot helmet, correct?

5    A.  I'm familiar enough with the scene in the tunnel and the

6    events that I can -- I know where Officer Gonell was at that

7    period of time, and I can say that that is him based on my

8    review of the case, my knowledge of the facts.

9    Q.  Sir, yes or no.  The only part of Officer Gonell we see

10   in this photograph is his riot helmet?

11   A.  In this particular frame we see a riot helmet, but I

12   know who was wearing that riot helmet.

13   Q.  Yes or no.

14   A.  To...?

15          MS. AKERS:  Objection; misstates the evidence.

16   This isn't a frame.  It's a video.

17          THE COURT:  Overruled.

18   Q.  Do we see anything more than Officer Gonell's riot

19   helmet in this media?

20   A.  In this particular freeze frame taken from 29 minutes

21   and 22 seconds of video we see a helmet.  If watched in its

22   totality, you can see a lot more than that, and then that

23   can be a basis of my opinion.

24          MR. WOODWARD:  Thank you, Your Honor.

25          THE COURT:  I've got a question, Agent Fulp.

1           So are you identifying him based on what Officer

2    Gonell told you or based on your recognition of him?

3           THE WITNESS:  It's kind of all of the above,

4    sir.

5           THE COURT:  Okay.  I guess I'm having a hard time

6    understanding how you would -- I can understand how he might

7    have told you where he is.  I'm having a harder time

8    understanding how you would know who he is.

9           THE WITNESS:  Well, once it was made aware to me

10   who that individual was, and I'm able to watch the length of

11   the video, I can pick that person out based on knowing where

12   we were at a certain period in time.

13           If you watch the video forward and backwards, you

14   can see where that person goes, where they came from

15   ultimately.

16           So I guess the foundation of the knowledge is

17   that individual was identified as Officer Gonell, and I can

18   then --

19           THE COURT:  By Officer Gonell?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Okay.  Did you have any questions

22   based on my questions, Mr. Woodward?

23           MR. WOODWARD:  No, Your Honor.

24           THE COURT:  All right.  Ms. Akers, do you have any

25   redirect?

REDIRECT EXAMINATION

BY MS. AKERS:

Q.  Special Agent Fulp, did you see Officer Gonell in trial in this courtroom on Monday morning?

A.  He was here for the opening, I believe.

Q.  You saw him with your own eyes Monday morning in this trial in this courtroom?

A.  Yes.  I think he was in the second or third row on the right-hand side.

Q.  And have you watched a lot of video footage from January 6th that depicts the person who you believe to be the same person you actually saw just a few days ago in this courtroom?

A.  I have seen him in various videos from January 6th.

Q.  And is one of those videos the Farina video, Government Exhibit 501 that's on the screen right now?

A.  Yes, this is one of those videos.

Q.  And I know that this is a video so we're just stopped at a particular second, but if we were to watch the whole 29-minute video, which I won't do, can you personally identify Officer Gonell?

A.  Yes.  I think if I was given enough time to watch this video, I could trace him throughout the crowd for wherever he was visible on the camera.

        MS. AKERS:  Thank you.

```
 1                THE COURT:  All right.  Thank you, Agent Fulp.
 2     You may step down.
 3                THE WITNESS:  Yes, sir.
 4                THE COURT:  We will return now to the defense.
 5                MS. AKERS:  Just one question, Your Honor.
 6                THE COURT:  Okay.
 7                MS. AKERS:  I don't know -- were you going to give
 8     us an opportunity to brief this issue tonight?
 9                THE COURT:  Yes.
10                MS. AKERS:  I think that the government's position
11     at this point is perhaps that it's not an element of the
12     offense to identify -- an element of the offense to identify
13     a victim, and so we don't actually believe this is our
14     burden, but we've proffered it just in case.
15                THE COURT:  So, yeah, I recognize those are two
16     different issues, and you may well be right, so you should
17     consider both points.
18                MS. AKERS:  Okay.  Thank you.
19                THE COURT:  And I'll certainly be interested in
20     hearing both points at closing.
21                All right.  We're returning to Mr. Cappuccio's
22     case.
23                MS. DOUENAT:  Thank you, Your Honor.  We call
24     General Xenakis to the stand, Your Honor.
25                THE COURT:  Good afternoon, sir.  If you could
```

```
 1    remain standing for just a moment.
 2              GENERAL STEPHEN N. XENAKIS, M.D., Sworn
 3                        DIRECT EXAMINATION
 4    BY MS. DOUENAT:
 5    Q.  Good afternoon, General.
 6    A.  Good afternoon.
 7    Q.  I'm going to ask you to state your name, and if you
 8    could spell it for the record.
 9    A.  Stephen Nicholas Xenakis.  Last name is spelled X-E-N-A-
10    K-I-S; first name -- I'm sorry?
11    Q.  No, no, go ahead.
12              I was going to ask where you lived.
13    A.  In Florida, Hallandale.
14    Q.  And what do you do for a living?
15    A.  I'm a psychiatrist.
16    Q.  Are you board-certified?
17    A.  Yes.
18    Q.  And what does it mean to be a psychiatrist?
19    A.  Pardon me?
20    Q.  What is the study of psychiatry?
21    A.  So it's a medical specialty.  After finishing medical
22    school and internship, physicians will train in an area of
23    specialty where they're going to practice, and psychiatry is
24    a specialty having to do with the mind and brain.
25    Q.  And within that field of psychiatry do you have a
```

1    specialization?

2    A.  I do.  I'm also board certified in child and adolescent

3    psychiatry.

4    Q.  Okay.  And have you studied in PTSD or work with

5    veterans?

6    A.  Yes, for many years.  I mean, I've trained -- I was in

7    the military during medical school.  I did my internship,

8    residency, and fellowship at military hospitals.

9          And throughout my entire career I've worked with

10   soldiers and veterans, and PTSD was -- in fact, when I

11   started, it was not even -- it wasn't even a diagnosis in

12   the nomenclature, but it's been obviously part of the -- a

13   big part of the practice.

14   Q.  And you've also served in the military; is that correct?

15   A.  I did.  I was on active duty from 1970 to 1998.  I

16   retired as a brigadier general.

17   Q.  And you have worked with veterans who have PTSD; is that

18   right?

19   A.  Yes, for many years.

20   Q.  And you've done a lot of research?

21   A.  I did.  In fact, over the years I've done a number of

22   different projects, but particularly from 1978 to '80 I was

23   a fellow at the University of California San Francisco, and

24   as a part of that fellowship I worked in the laboratory

25   where specifically we studied and worked with these patients

1    who had -- in those days we called it stress response

2    syndrome.  Now we call it PTSD.

3    Q.  And I was going to talk to you about that.  You

4    mentioned that it wasn't -- in the past PTSD was not --

5    A.  It wasn't an official diagnosis.  It was established in

6    what was then our -- the manual that we use as a reference

7    for being able to document diagnoses, and in those days we

8    had what we called brief psychotic episodes, brief stress

9    episodes, acute stress.  There was a whole constellation of

10   sort of different ways that we labeled these problems.

11   Q.  And the diagnostic manual you're referring to is the

12   *DSM*?

13   A.  Yes, the *Diagnostic Statistical Manual*.  It's gone

14   through various, you know, iterations.  It's now on the

15   fifth volume, fifth iteration.

16   Q.  So it's been recognized since?

17   A.  It's recognized by the profession, and it's recognized,

18   of course, by the governmental agencies and payors.

19   Q.  Do you remember since when it's been recognized in

20   the -- when was the *DSM* --

21   A.  Well, I mean, the first manual, I think, was published

22   in the '50s.

23   Q.  Okay.

24   A.  And when I started medical school, we were on the second

25   manual.

1    Q.  So let me ask you a little bit about your -- well, let

2    me ask you a little bit about PTSD.  If you can explain what

3    that is?

4    A.  Well, it's a diagnosis, and it really refers to a

5    syndrome that patients -- symptoms and impairments that

6    patients exhibit.  And those criteria are set up in the *DSM*

7    *5.*  And from there, based -- as a clinician, a practitioner,

8    evaluates a patient, then because of their -- the symptoms

9    that they show and the impairments and their problems, then

10   there's an agreement on this as a diagnosis.

11   Q.  And what factors give rise to PTSD?

12   A.  I'm sorry?

13   Q.  What factors give rise to PTSD?

14   A.  Well, by definition it's a -- it's a problem that arises

15   in people who have experienced extreme stress, including

16   threats to their life and their livelihood.

17   Q.  And you've worked with a lot of veterans who have

18   experienced that due to combat; is that right?

19   A.  Yes.  I mean, hundreds, maybe a thousand.

20   Q.  And does it do something to the brain?  Does it rewire

21   the brain?

22   A.  It does.  It changes fundamentally.  We see that there

23   are changes in the brain itself because of the stress that

24   these people were exposed to or experienced.  It's most

25   clearly demonstrated in a brain imaging and what we call

1    volumetric MRI.  That is, the MRI that we know of the brain

2    is then analyzed pixel by pixel, and the areas of the brain

3    are compared to age normals.

4         And we can see changes, particularly in certain

5    parts of the brain, that -- in those individuals who are

6    experiencing and we diagnose with PTSD.

7    Q.  And the individuals who suffer from PTSD, are they -- do

8    they -- are they normal, or do they go into an altered state

9    when they're triggered?

10        I mean, can you explain a little bit how that

11   process works.

12   A.  Well, I'm going to put aside this thing of normal, what

13   we call normal or not.  It's usual, right?  Because we all

14   have what we have.

15        So that individual -- one of the symptoms, one of

16   the problems that people have when they have PTSD is, if

17   exposed to some stimulus or a trigger, then their thinking

18   and their mood can shift significantly, and many times that

19   shift in their mood is a -- is linked and reminds them of

20   the stress that they had experienced or endured, and so

21   they'll get into a different state, into a different frame

22   of mind in their thinking.  And that is what we say

23   pathognomonic; that is in a way diagnostic and particularly

24   significant of individuals who are suffering with PTSD.

25   Q.  So lay people would call that a flashback?

1    A.   Some people call that a flashback, right.

2    Q.   Were you asked to do something in this particular case?

3    A.   I was asked to review the records and evaluate

4    Mr. Cappuccio to confirm the diagnosis -- establish or

5    confirm the diagnosis that he had PTSD.

6    Q.   And what did you examine as part of your review?

7    A.   I reviewed all his -- the medical records that were

8    provided.  Those were records from the VA.  They're military

9    medical records.

10         I interviewed him at least twice, and then, you

11   know -- as well as the military record to see if there was

12   what I would say was a basis for this diagnosis.

13   Q.   What was significant in those records that helped you

14   with your diagnosis?

15   A.   Well, it's been consistently confirmed, particularly by

16   the VA, since 2014.  And so each provider agreed with the

17   diagnosis, and he was provided treatment that was -- that

18   would be standard treatment for the problem.

19   Q.   Is there anything else in his military record that was

20   significant?

21   A.   Well, the significant piece, and I think the basis for

22   the diagnosis, were his three deployments.  He had a

23   deployment to Iraq, and he had two deployments to

24   Afghanistan.

25         And that was a time when very intense combat and a

1    lot of -- many casualties by our forces.  It's a prolonged

2    tour of duty, usually at least a year.  Some of them were

3    longer.  And clearly there were a number of incidents that

4    were life-threatening that he was exposed to.

5    Q.  And what kind of training was Steven in the military

6    for?

7    A.  He was an infantryman, and he would have gone through

8    the usual basic training and advanced individual training

9    and then other schools as he was going to qualify on the

10   weapons systems, and particularly as he became a sergeant E5

11   and was a tank commander, a Bradley commander, or like a

12   team leader.

13   Q.  And in looking at his records as well as interviewing

14   him, did he elaborate on his deployments and what he

15   observed?

16   A.  Yes.  They were extremely -- he clearly gave reports and

17   accounts of his combat tours that I had heard from many

18   other soldiers both that had been in Iraq and in Afghanistan

19   and the conditions not only when they're out on patrol, but

20   also back in their home stations or bases that were, you

21   know, very stressful for these men and women.  And many of

22   them, of course, ended up having the symptoms and problems

23   that come with PTSD.

24   Q.  So what did Mr. Cappuccio experience in those

25   deployments?

1          MS. AKERS:  Objection; hearsay.

2          He can rely on hearsay to render an opinion, but

3     he's just talking about the hearsay right now.

4          THE COURT:  All right.

5          MS. DOUENAT:  It's how he bases his diagnosis, on

6     the information gathered and whether it's accurate with

7     other veterans who have experienced the same thing.

8          THE COURT:  All right.  I think it's appropriate.

9     I'll allow it.  You may proceed.

10    A.  I'm not sure.  Could you repeat the question?

11    Q.  Yes.  So what experiences did he have in combat that

12    would cause him to have PTSD?

13    A.  He was in multiple fire fights in both Iraq and

14    Afghanistan, multiple engagements.  There were many times

15    where the -- either -- you know, it's hard to tell.  Part of

16    the problems with fighting in Iraq in Afghanistan, as we

17    also saw in Vietnam, it's hard to tell who is really a

18    threat and who is really an enemy and who is just an

19    individual living in the community.  But there were a number

20    of those circumstances that he encountered and that there

21    were dangers -- his soldiers and he were put in danger, and

22    that there were threats on their lives.

23    Q.  And he did receive and was awarded some medals while in

24    combat; is that right?

25    A.  Yes.

```
1   Q.  And that confirms that he was in combat?

2              MS. AKERS:  Objection.

3   A.  Yeah, when you read the citations that there were

4   citations for his actions and his conduct while in combat.

5              I'm sorry.

6   Q.  I'm sorry, when there's an objection, I think the Court

7   needs to rule.

8   A.  I didn't hear.

9   Q.  That's okay.

10             THE COURT:  So I'm going to overrule the

11  objection.  I think it goes to a very limited point here

12  that --

13             MS. DOUENAT:  That it's confirmed?

14             THE COURT:  Yes.

15             MS. DOUENAT:  That's all I was trying to

16  establish.  And I'm not going to go through all of it.  I

17  just wanted to make sure that he confirmed it with the

18  records.

19  Q.  Part of the VA process, do you know if Mr. Cappuccio is

20  on disability?

21  A.  Yes.  He has 100 percent disability from the VA for

22  PTSD.

23  Q.  Okay.  So what does the VA have to go through to make

24  that diagnosis to qualify somebody for disability?

25             MS. AKERS:  Objection; foundation.
```

```
1              THE COURT:  Do you know, sir?

2              THE WITNESS:  I do, yes.

3              THE COURT:  Okay.  You may answer.

4    A.  Yes, because I've helped with being able to revise the

5    disability process.

6              So they go through interviews, clinical

7    interviews.  They look at the military record.  And they

8    look at any other corroborating evidence that they can find

9    of what the actions were of the soldier in the particular

10   combat tours that they had.

11   Q.  So he was evaluated already, and since 2014 he's been

12   getting disability for PTSD; is that right?

13   A.  Yes.

14   Q.  And then you yourself examined Mr. Cappuccio?

15   A.  Yes.

16   Q.  And in your examination, did you come up with an opinion

17   on what his diagnosis is?

18   A.  Yes.  I think he has post-traumatic stress disorder.  I

19   think he has suffered with major depression.  And he has

20   what we call other comorbidities that occur often with these

21   soldiers.

22             He has chronic pain syndrome, which happens having

23   to do with many of them as they've been through combat and

24   injuries that they've suffered.  And he has sleep apnea.

25   Q.  And during your interview with Mr. Cappuccio, you found
```

1    what he told you was consistent with the records that you

2    had reviewed?

3    A.   Yes.

4    Q.   Okay.  Is Mr. Cappuccio on medication that -- I mean,

5    has he followed a regimen with --

6    A.   Yes, he's been treated for PTSD with medications that

7    are commonly prescribed for this problem.

8    Q.   And has he sought out help from the VA that you noticed

9    in the records?

10   A.   Has he what?

11   Q.   Sought help?

12   A.   Yes.  He's -- not only in that he's been -- seen a

13   psychiatrist to -- for the prescriptions and counseling, but

14   also he's asked for counseling in addition to that for him

15   to cope with his problems.

16   Q.   You were also asked to review part of some discovery in

17   this case; is that correct?

18   A.   Yes.

19   Q.   And I'm going to ask you specifically what you reviewed,

20   and if you don't remember -- what do you remember reviewing

21   specifically to this case, the discovery to this case?

22   A.   I remember reviewing some films, seeing some films and

23   videos of the incidents on the Capitol that day.  I remember

24   reviewing testimony by Mr. Hodges.

25   Q.   Officer Hodges?

 1    A.  Officer Hodges.  I think there were some statements or
 2    affidavits.  On that I'm not -- I'm not confirmed about.
 3    Q.  I'm going to show you Government's Exhibit 501 between
 4    2012 and 2131.  It's about a minute and 15 seconds.
 5            Do you recognize this video?
 6    A.  Yes.
 7    Q.  Is this one of the videos that you reviewed?
 8    A.  It's one of the videos that we reviewed.
 9            (Pause)
10            MS. DOUENAT:  Sorry about that, Your Honor.
11            (Video playing)
12            MS. DOUENAT:  Thank you.  And we've stopped at
13    2105.  So if you could go a little further to 21:31.
14            (Video playing)
15    Q.  And do you remember viewing this video?
16    A.  Yes.
17    Q.  And do you remember if there was an individual there
18    that you examined?
19    A.  Yes.
20    Q.  And who is it?
21    A.  That was Mr. Cappuccio.
22    Q.  And is Mr. Cappuccio the one who is trying to take the
23    mask off of Officer Hodges?
24    A.  It seems like to me, yes.
25    Q.  And you've viewed multiple other videos including --

```
1    A.  Yes.

2    Q.  I'm sorry?

3    A.  Yes.

4    Q.  Including Mr. Cappuccio's videos as well, right?

5    A.  Yes.

6    Q.  Do you remember one video that's -- that you hear a lot

7    of -- or would you like to review it to refresh your

8    recollection?

9    A.  I'm sorry?  What are you asking?

10   Q.  Do you remember reviewing a video --

11           MS. AKERS:  Objection; leading.

12           THE COURT:  Overruled.

13   Q.  Do you remember reviewing a video that Mr. Cappuccio had

14   that he actually made?

15   A.  Yes.

16   Q.  Okay.  About this particular incident?

17   A.  Yes.

18   Q.  Okay.  Do you remember it?

19   A.  Some, yes.

20   Q.  I don't know if you wanted me to play it back or if you

21   remember it.

22   A.  I mean, I don't remember it in detail.  It's not one of

23   the things that -- if we need to see it again and look at

24   it.

25   Q.  Sure.
```

```
 1    A.  I mean --

 2    Q.  I'll show it again.  It's short.  I'm going to go

 3    straight to it.

 4    A.  These are all confusing videos.

 5            MS. DOUENAT:  It's Government's Exhibit 612.21 at

 6    6:31.

 7            Actually, that's not it.  It is the one after

 8    that.

 9            PARALEGAL ALEXANDER:  The time, please?

10            MS. DOUENAT:  That would be 6 -- just leave it

11    running at 612.23.

12            (Video playing)

13            MS. DOUENAT:  Yes.  For the record, that's it.

14    Q.  In your discussions with Mr. Cappuccio and after

15    reviewing all of the medical records, do you have an opinion

16    regarding what happened at that moment?

17    A.  My opinion is that he slipped into a frame of mind of --

18    that we see with PTSD of just overcharge, sympathetic brain

19    overcharge, and that it is like a flashback.

20    Q.  And why do you say that?  Why do you think that that's

21    what happened here?

22    A.  Because I hear the kind of -- the distress in his voice

23    and the -- in this frenzied environment, and the sort of

24    just struggling that I've seen with other soldiers and other

25    patients who have been in these circumstances.
```

1    Q.  And what do you think his mental state was at that time?

2    A.  I think he was in a state of mind that you see with

3    PTSD, that it's what we call -- some call it an altered

4    state.  Some people call it a flashback.  Some people call

5    it a mildly dis -- the point is that he's not in a usual,

6    logical, controlled frame of mind when this activity is

7    occurring.

8    Q.  What is "combat focus"?

9    A.  What is "combat focus"?

10   Q.  Yes.

11   A.  So that's part of what he was trained in, and it would

12   be very likely that he slipped into that kind of way of

13   thinking about things and a way of acting and reacting.

14   That's how he saw this, and that he saw it as if he was in

15   another combat situation.

16   Q.  When you say "thinking," did you mean thinking, or do

17   you mean reactive?

18              MS. AKERS:  Objection; leading.

19              THE COURT:  Sustained.

20   Q.  Can you explain that a little bit?

21   A.  Well, I mean, I'm trying --

22   Q.  It's okay.

23   A.  I think that there are emotional processes going on.  I

24   think there are subcognitive processes going on.  I think

25   that there are some motor or behavioral processes going on,

1    all that are converging or occurring at the same time.

2            I'm saying -- I'm not -- I'm not using the word

3    "thinking" as if this is logical, deductive, and a specific

4    focused way that we would, you know, look and analyze a

5    problem.  I'm thinking -- when I'm using the term it's to

6    say there was some cognitive processes going on.  I mean,

7    he's not unconscious.

8    Q.  Right.

9    A.  So there's some cognitive processes going on, and I'm

10   calling those cognitive processes "thinking."

11   Q.  But he's in an altered state?

12   A.  He's in a frame of mind that you see -- so it's as if --

13   it's understanding what happens to individuals; to all of

14   us, for that matter, but particularly these men and women

15   who are really have this problem of PTSD.

16           Understand that the brain works as if it's a set

17   of slide shows.  And this slide show, this slide is -- this

18   reminds me of combat.  This reminds me of the combat

19   situation, and I need to act in a way that I know and was

20   trained in and had done before when I was in combat.

21   Q.  And soldiers are trained to basically react pretty

22   rapidly to combat situations?

23   A.  That's the whole purpose, right.

24   Q.  Right.

25   A.  That's what you want your soldiers to do.

1    Q.  Where it's more secondary nature than processing?

2    A.  It has to be -- there has to be a reflective secondary

3    automatic aspect to it.

4    Q.  And after they come back from combat, it's really hard

5    to -- I mean, how does -- you've done a lot of studies about

6    PTSD and treatment.  How effective is the treatment for

7    PTSD?

8    A.  It's mixed.  First of all, I mean, the most important

9    thing, and it's a big issue that we are struggling with, is

10   we don't deprogram people.  Right?  We've programmed them.

11           Here you've had many years.  You've had three

12   combat tours.  You've had intense training between those

13   combat tours, so this is now embedded in their brain.  This

14   becomes automatic behavior, and this is the way that these

15   individuals engage and cope with the world.

16           We do not systematically go about and deprogram

17   people, particularly after they've been in these intense

18   situations.

19           The failure to do that means that often they'll

20   have lingering actions, conduct.  They'll have lingering

21   thoughts and memories, and they'll have lingering feelings

22   for many years.

23           10, 15, 20, 30 years these people have been in,

24   and this is how they're -- how their mind and brain works

25   and their bodies work.  This is the somatic aspect to this.

1           And so there are treatments, and the VA has what

2    they recognize as treatments.  These treatments, even in

3    people most conscientious and trying very hard to do the

4    right thing, probably work in 30 to 50 percent of the

5    patients.

6           This is a hard situation that these -- and because

7    of that, of course, you've got many men and women, veterans,

8    that don't see daylight and commit suicide.  We have

9    somewhere between 20 to 40 suicides a day amongst our

10   veterans.

11   Q.  And in Mr. Cappuccio's records, you've seen that he's

12   been a conscientious person about -- as far as treatment

13   goes?

14   A.  He's been very conscientious.  It's clearly that this --

15   that this activity, this training, and these tours have

16   really been programmed in his head; and he has the kinds of

17   symptoms, including suicidal ideation, that we see with many

18   of these men and women.

19   Q.  And he was seeking those treatments way before 2021; is

20   that right?

21   A.  Treatments started at least at 2014 when he got

22   discharged, and of course with a diagnosis of disability.

23           MS. DOUENAT:  May I have a moment, Your Honor?

24           THE COURT:  You may.

25           MS. DOUENAT:  I'll pass the witness, Your Honor.

```
 1              THE COURT:  Ms. Akers.
 2                      CROSS-EXAMINATION
 3    BY MS. AKERS:
 4    Q.  Good afternoon, Doctor.
 5    A.  Good afternoon.
 6    Q.  My name is Ashley Akers.  I am a prosecutor in this
 7    case.  I'm going to be asking you some questions today.
 8            Doctor, you said you're a psychiatrist for a
 9    living, correct?
10    A.  Yes.
11    Q.  And you're not actually practicing psychiatry right now,
12    are you?
13    A.  I am.
14    Q.  You are.  It's not -- you don't have any work history
15    listed on your CV since 2007.  Is that just an oversight?
16    Or excuse me, Two-thousand -- yeah.
17    A.  I just didn't put my clinical practice on the CV.
18    Q.  It's an incomplete document, correct?
19    A.  I guess.
20    Q.  Okay.  Another thing that's incomplete is your testimony
21    history that you provided to counsel, right?
22    A.  I don't know.
23    Q.  You don't know?
24    A.  What are you referring to?
25    Q.  I'm just wondering if the list of testimony provided to
```

```
 1    counsel is complete?
 2    A.  I mean, the number of cases that I was involved in?
 3    Q.  Correct.
 4    A.  I didn't -- I provided that quickly.  I don't know if I
 5    checked, if it has all the cases that I've been involved in.
 6    Q.  Yes.
 7    A.  I wasn't clear either if you wanted just cases that I
 8    testified in or cases that I'd been -- just worked on.
 9    Q.  Doctor, you testify as an expert witness in courts
10    often, right?
11    A.  Yes.
12    Q.  Yes.  So you would think you'd be familiar with the
13    rules of testimony, right?
14    A.  It varies.  Yes.
15    Q.  Okay.
16    A.  I'm somewhat familiar.
17    Q.  In this case, though, you weren't familiar with the
18    rules and you actually didn't provide a complete list of all
19    your testimony, did you?
20    A.  I --
21               MS. DOUENAT:  Objection, Your Honor.
22    A.  I don't recall what the email was.  But I was asked --
23               THE COURT:  Sir -- sorry, Doctor.
24               MS. DOUENAT:  Objection, Your Honor.  I mean, he's
25    not a legal scholar.  He doesn't know what the rules of
```

1    evidence are, especially since they're just brand-new, too,

2    so -- and what the compliance requirements are.

3                 THE COURT:  Okay.  Overruled.  It's a direct

4    question that he can answer.

5    Q.  The answer is no, correct?

6    A.  I don't know what -- what was the question?

7    Q.  You didn't provide your full list of cases that you've

8    worked on in the recent history to the government, did you?

9    A.  I don't know.

10   Q.  Would it be surprising to you if you neglected to list

11   certain opinions where you were found not to be credible?

12   A.  No.  I mean, I don't know if I put that on the list or

13   not.  That case --

14   Q.  Is there a reason you wouldn't put that on the list?

15   A.  Pardon me?

16   Q.  Is there a reason you wouldn't put that on the list?

17   A.  No.  I mean, I wouldn't -- I just made that list very

18   quickly.  I got the note from the attorneys saying that the

19   Court wanted a list of the cases and examples or samples of

20   the cases, so I just quickly went to whatever list where I

21   compiled it, and I sent the list so that there was an idea

22   of what -- I didn't go into this.  I didn't -- I really,

23   frankly, had some other things that I was doing, and it was

24   in between other tasks that I had.

25   Q.  That's consistent with my review, Doctor.

1          Would it surprise you to know that many courts

2     have found your testimony to be not credible?

3     A.  I don't think "many courts."  I only had one case, and I

4     agreed with the judge on that case.

5     Q.  Was that the case where the appellate court in Alabama

6     said that -- this is in 2001 -- "Dr. Xenakis is much more of

7     an advocate than someone seeking to provide an objective

8     mental health assessment"?  Was that the one where you

9     agreed with the Court that you weren't credible?

10    A.  No, it was another case with --

11    Q.  There are multiple cases, aren't there?

12          MS. AKERS:  Sorry.

13    A.  I don't know if there's "multiple."  I don't -- in that

14    case, I don't -- I mean, I don't know if that -- that case

15    in 2001?  I don't remember which case that was.

16    Q.  There was also a case in D.C. in 2020 where a Court

17    found that you had unreliable testimony.  Do you remember

18    that one?

19    A.  I don't know which case you're talking about.

20    Q.  *Paracha v. Trump.*

21    A.  I don't remember that they said -- I didn't testify in

22    that case.  I gave expert opinion on that -- on the case.  I

23    don't -- and I just heard that the attorneys had submitted

24    it.

25          I don't -- I don't recall ever seeing what the

1    Court decided.

2    Q.  So would it surprise you to know that the Court decided

3    to exclude your testimony because it's not reliable?

4    A.  I don't -- I don't know what the reasoning was of the

5    Court.  I mean, these are, you know, very complicated cases,

6    and I just was told that the Court decided not to consider

7    that.

8    Q.  What about the case in the Southern District of New York

9    where the Court found that they afforded minimal weight to

10   your testimony because essentially you didn't do your

11   homework examining the person who you're testifying about?

12   Remember that one?

13   A.  I think that's a -- I don't think that's what the Court

14   said.  That's the one I just referred to with Judge Kaplan.

15   Q.  Well, let me --

16   A.  I was not -- I didn't interview the defendant in that

17   case, and that was by the decisions of the attorneys and

18   the Court.  And the judge felt that my opinion would not add

19   to -- was not particularly helpful there, and I think he was

20   probably right.

21   Q.  Well, you think he was right?

22   A.  Yes, I don't disagree.

23   Q.  This is actually what the Court said, so tell me if this

24   is what you agree with.

25              "He was" -- "He," referring to you, "was obviously

1    partisan and expressed opinions with little basis relying

2    predominantly on secondhand accounts and theoretical

3    possibilities."

4            Do you agree with that?

5    A.  I don't agree with his judgment that it was partisan.  I

6    do agree that I was relying on secondhand judgments because

7    it was not -- there wasn't -- the situation wasn't set up

8    for me to interview and do an extensive interview or

9    examination of the defendant.  So I agreed with that.

10           His judgment of me that I was partisan, I mean, of

11   course he can judge and say what he thinks or, you know,

12   feels like saying, but I don't agree with that.

13   Q.  And you agree with it because you didn't have an

14   opportunity to do an extensive interview, and you would

15   agree that extensive interviewing is important, right --

16   A.  I --

17   Q.  -- when you're diagnosing someone?

18   A.  If I'm going to make a diagnosis and I'm going to render

19   an opinion to the Court, attorneys, or whoever about a case,

20   I require that -- if it's going to be a particular kind of

21   opinion, I recommend and I've published that there would be

22   an extensive interview of the individual.

23   Q.  Would you consider an extensive interview to be one hour

24   over Zoom?

25   A.  Well, I mean --

1    Q.  Yes or no?

2    A.  Sometimes it is.  It depends on the case.

3    Q.  Because that's what you did in this case, right?  A one-

4    hour --

5    A.  I did an hour interview, I reviewed the records, and

6    then I also interviewed him again a couple of days ago.

7    Q.  Right.  But that was after the rendering of your

8    opinion, right, before the rendering --

9    A.  My testimony here is based on all that information.

10    Q.  Before the rendering of your opinion, you interviewed

11    Mr. Cappuccio for one hour, correct?

12    A.  Yes.

13    Q.  That's it, right?

14    A.  Yes.

15    Q.  And you also reviewed other things, and I actually want

16    to ask you about that.

17         Did you review all of his medical history?

18    A.  I reviewed all the medical records.  I went through the

19    whole VA record.  I went through a lot of it, yes.

20    Q.  How many pages was it, approximately?

21    A.  I don't recall.

22    Q.  Would it surprise you to know it was about seven of

23    these, like 6,000-and-some pages?

24    A.  I mean, it would not surprise me at all because I --

25    Q.  You reviewed all of it?

1    A.  I went -- I mean, I didn't read it and study it, but I

2    clearly reviewed it for what I thought was the most relevant

3    information.

4    Q.  What did you think was the most relevant information?

5    A.  Psych notes, sleep apnea notes, the notes about chronic

6    pain, any other medical illnesses, his medication records,

7    any significant lab findings, all that.  And a lot of it, by

8    the way, when you look at those records, there's a lot of

9    cut-and-paste stuff.

10            So there are extensive records that you get from

11    the VA, and there's a procedure or protocol that I use to go

12    through those records.

13    Q.  And so your testimony today is that you diagnosed

14    Mr. Cappuccio with PTSD, or were you only confirming his

15    diagnosis?

16    A.  I make my own diagnosis, and part of the diagnosis was

17    confirming what I had also seen that other clinicians had on

18    their evaluations, and then the course of treatment and any

19    other lab findings that I found that I -- so I'm giving --

20    as I put in that record, I'm giving my diagnosis.

21            I'm not confirming, yes -- I mean, which I can't

22    really make a distinction.  I don't know what that means

23    actually.  It's my diagnosis.

24    Q.  Well, you -- okay.  So if you made your own diagnosis,

25    you testified on your direct examination about the *DSM*,

1    right?

2    A.  Yes.

3    Q.  That's essential to diagnosing someone with PTSD, isn't

4    it?

5    A.  Yes.

6    Q.  And you actually didn't do that in this case, did you?

7    A.  I don't know what you're implying.  Of course I did.

8    Q.  You did?  Well, it's not listed in your report at all,

9    is it?

10   A.  What do you mean, listed in my report?

11   Q.  Is your analysis under the *DSM*, your diagnosis,

12   reflected in your expert report?

13   A.  Yes, I mean, it's right here.

14   Q.  Sure.  Show me in your --

15   A.  I gave you the -- I gave you the -- I mean, I don't

16   know -- you may have -- you might write a report differently

17   than I do, but this is the way I wrote this report for the

18   attorneys.  I listed the code, and I said this is the

19   diagnosis, manifested by, and those manifestations are the

20   criteria that are listed in the diagnostic manual.

21          I mean, that's typically the way that I write

22   these reports.

23   Q.  So you did list certain sections of the *DSM*, right?

24   Like 309.81, right?

25   A.  Right.

1    Q.   So you listed those?

2    A.   Yeah.

3    Q.   But you didn't actually analyze how Mr. Cappuccio has

4    those, did you?

5    A.   I don't know what you mean by "actually analyze" it.

6    I'm completely confused by what you're implying here.

7    Q.   Okay.  Sure.  So one of them says major depressive

8    episode, moderately severe, partially treated, partially

9    improved, manifested by suicide attempts, low mood, sleep

10   disturbance, difficulties in interpersonal relationships,

11   and irritability.

12         Those are generally the descriptors for what major

13   depressive episode is, right?

14   A.   Right.

15   Q.   But you never actually applied those to Mr. Cappuccio to

16   determine he had that, did you?

17   A.   Of course I applied them.  How else would I make the

18   diagnosis?

19   Q.   That's my question.  It's not reflected in your report

20   where you did that, is it?

21   A.   Look, I wrote this report in the cleanest, most succinct

22   way that I thought -- I mean, you can criticize my writing.

23   That's fine.  You may want reports to be written in a

24   different way, or you think that they need to be more

25   explicit and more detailed, but that's not what I felt; that

1    for this purpose, for this case, writing this report in this

2    way, giving the history and the background, and referring to

3    what I thought were the major symptoms, impairments, and

4    problems.

5              I could then take that description that I have

6    that you see in the formulation here, in the findings -- you

7    have a whole section of findings here and a whole section of

8    formulations.  You could take that, those findings and

9    formulations, and see how they map into the diagnosis.

10             So that's the way I write those reports.

11             If certain readers feel that that's not useful or

12   good for them, I will revise that as needed.  But meanwhile,

13   I feel that the way I've written this maps my findings and

14   formulations specifically into the diagnosis.

15   Q.  So I just want to break this down for a minute.  Your

16   findings -- and we can go through those in a moment -- are

17   just your recitation of your interview with Mr. Cappuccio,

18   right?

19   A.  No.  No, no, no.  I mean -- I mean, we seem to -- no.

20             Look, how many times do I have to say that I

21   reviewed the records as well?

22   Q.  I'm not asking about your review of the records.  I'm

23   asking --

24   A.  When I do a --

25   Q.  I haven't asked you a question, sir.

```
 1              THE COURT:  Folks.  Folks.  We can't have you
 2     talking over each other.
 3              THE WITNESS:  I'm sorry.
 4              THE COURT:  All right.  Ms. Akers, why don't you
 5     ask a question.
 6              MS. AKERS:  Sure.
 7              THE COURT:  And General Xenakis --
 8     A.  So what is the question?
 9     Q.  I'm asking --
10              THE COURT:  Go ahead, Ms. Akers.
11     Q.  In your report --
12     A.  Yes.
13     Q.  -- you did not analyze Mr. Cappuccio's symptoms and
14     conditions to explain how they amount to the diagnoses that
15     you listed in a cursory manner on the last page, did you?
16     A.  You know, one of the things I learned is that sometimes
17     attorneys like to put testimony of their own into the back-
18     and-forth here, and you've said that I didn't analyze.
19              If you want to assert that there's not an
20     analysis, that's fine.  Okay?  It's not true.
21     Q.  Sir, can you --
22     A.  It's absolutely, 100 percent not true.  And I really
23     would respect -- ask you to respectfully not say that again.
24     Q.  Can you show me in your report where your analysis is --
25              MS. DOUENAT:  Asked and answered, Your Honor.
```

1    Q.  -- that supports your diagnosis of PTSD, of major

2    depressive episode, of sleep disorder, of chronic pain

3    syndrome, of fatty liver disease, of hyperlipidemia?

4    Where's your analysis?

5    A.  In the formulation.

6    Q.  In the formulation.

7    A.  And if that formulation, for your purposes, needs to be

8    done differently so that I specifically pull out items in

9    that formulation and link them to the diagnosis, that's a

10   fair request.  But that was not the request at the time.

11        This is the way I decided to write this report,

12   like this, and this is -- and I can go through it, if you

13   want.  We can talk about that.  But in my view, this is --

14   this was an analysis, a review and an analysis of the

15   findings that I had, and the other -- which included the

16   review of the VA records and the clinical interview and the

17   other information that leads to these diagnoses.

18        Now, we can go through it.  If you want to go

19   through the criteria in the diagnostic manual and say, all

20   right, let's talk about this diagnosis, that's fine.

21   Q.  Well, it's a little too late for that, but I'm just

22   confirming --

23   A.  Wait, wait, it can't be too late if you're going to

24   assert things that are untrue.

25   Q.  All right.  Sir --

1    A.  All right, so I really like fairness.  I'm a retired

2    general.  I have spent time defending this country for 50

3    years.  And I'm mad.

4           But to assert something and then say we're not

5    going to talk about it is unfair and to my -- is a violation

6    of principles of this democracy.

7           Now, are we going to go through this and say why

8    did I make the diagnosis of PTSD?  I'm willing to do that.

9    Q.  Unfortunately you can't testify to things that aren't in

10   your report, so --

11   A.  It is in the report.  Did I not make the diagnosis of

12   PTSD?

13          THE COURT:  All right, folks.  Folks, that's

14   enough.

15          I need you to ask a question, Ms. Akers.

16          MS. AKERS:  Sure.

17          THE COURT:  And General, I need you to answer the

18   question.

19          THE WITNESS:  I'm sorry.  I apologize.

20   Q.  Sir, the diagnosis that you made relates to PTSD.  But

21   did you also opine on whether your diagnosis caused

22   Mr. Cappuccio to take certain actions?

23   A.  Not in this report.

24   Q.  Okay.  So your opinion here today, just to be clear, is

25   limited to diagnosing Mr. Cappuccio with PTSD, correct?

1    A.   Yes.

2    Q.   Nothing else?

3    A.   I don't know about "nothing else."  It's what I'm asked

4    for.

5              I mean, I've been asked to, in fact, render an

6    opinion:  Can his behavior there be explained by PTSD?

7              And yes, I have answered that his behavior can be

8    explained by PTSD.

9    Q.   And you reached that answer based solely on your

10   interview of Mr. Cappuccio?

11   A.   So you've again misstated what you know I have

12   repeatedly said to you; that it is not solely that.

13             And I really think it's unprofessional to misstate

14   things that I say.

15   Q.   I'm not trying to misstate what you are --

16   A.   But you are unprofessional.

17   Q.   Okay.  In your findings you explain all of the things

18   that Mr. Cappuccio told you in your interview, right?

19   A.   And other information, yes.

20   Q.   You explained that he denied any intent or purpose to

21   engage in political activities, right?

22   A.   Right, right.

23   Q.   And you described that he recalled listening to the

24   president speak on January 6th, right?

25   A.   Right.

1    Q.  And you described that he reported feeling shocked and

2    startled, right?

3    A.  Yes.

4    Q.  And you described that he didn't expect anything and he

5    was just caught up, right?

6    A.  Yes.

7    Q.  And so in your formulation, which is I think your

8    conclusion, correct?

9    A.  Where is the formulation?  There's a separate section

10   there that I -- that's the formulation.  I make a -- I do

11   have a separate section of opinion.

12   Q.  So your opinion is that he did not intend to inflict

13   harm and react after experiencing injury, right?

14   A.  Yes.

15   Q.  And that opinion is based at least substantially in part

16   on Mr. Cappuccio's statements that he told you, right?

17   A.  That is part of my assessment, his -- the interview with

18   him, what he says, and being able to understand that and --

19   yes.

20          So his interview is important, as well as all the

21   records that I've looked at.

22   Q.  But the records don't actually talk about the events of

23   January 6th, right?  So the only thing that you relied on

24   about the day of January 6th was actually his statement,

25   right?

1    A.  Well, I also looked at videos, and I looked at the

2    statements from -- and testimony from Mr. Hodges.  So I

3    looked at other information about January 6th.

4    Q.  And you'd agree that Mr. Cappuccio's statements are

5    self-serving, right?

6    A.  No, I don't agree with that.  I mean, if you want to

7    testify for me that it's self-serving, that's fine, but I am

8    not saying they're self-serving.

9    Q.  I'm just asking you a question.

10   A.  No, it wasn't.  You weren't.  You were making a

11   statement.

12            THE COURT:  Sir, that's how this works.

13            THE WITNESS:  I understand.

14            THE COURT:  You get to agree or disagree with it.

15            THE WITNESS:  All right.  All right.  I will

16   disagree, and I will not admonish this young lady.

17            THE COURT:  Thank you.

18   Q.  You disagree that a veteran's recounting of a PTSD

19   episode is self-serving?

20   A.  I disagree.

21   Q.  Okay.  Do you agree that it is highly subjective?

22   A.  No.

23   Q.  So you agree it's highly subjective?

24   A.  I do not agree that it's highly subjective.

25   Q.  You don't?

1    A.  No.

2    Q.  Do you recall writing an article for the *Washington Post*

3    titled "The U.S. Military Doesn't Know Who is Fit to Fight"?

4    A.  Yes.

5    Q.  And do you recall saying in your article that these

6    assessments are, "Highly subjective and have been criticized

7    for relying on self-reports"?

8    A.  Yes.  I wrote -- that's in the article.

9    Q.  But in Mr. Cappuccio's case it's different?

10   A.  No, because there's a lot of room between what I was

11   saying there in terms of the subjectivity of what's reported

12   and not reported and how the information is being looked at

13   respectively by the military medical personnel as well as

14   the commanders and the decisions to deploy a soldier or not,

15   and then what comes out of a clinical interview.

16        I mean, I -- clearly the clinical interview is a

17   self-report.  The clinical interview is what Mr. -- any

18   patient is saying and being able to disclose to a doctor for

19   any kind of medical problem.

20        Then there are ways that their questioning occurs

21   in which, you know, they're to check that and to look and

22   see:  Is there any information that might be for that matter

23   contradictory?  Is there any information that doesn't make

24   sense?  Is there summation -- some information that, in

25   fact, as the patient is telling you these things, really

1    there's another purpose and ulterior motive or something?

2              So, I mean, to go into the conversation of what's

3    subjective or objective of that -- about that is really kind

4    of I don't think very productive.

5    Q.  So you just mentioned verifying whether there are things

6    that make his statement not true, for example, that don't

7    corroborate it?

8    A.  I'm sorry?

9    Q.  Did you analyze whether there was any evidence that

10    disputed or called into question the statements that

11    Mr. Cappuccio told you?

12    A.  Yes, sure I did.

13    Q.  You did?

14    A.  I do it with every patient.

15    Q.  Did you find anything?

16    A.  Huh?

17    Q.  Did you find anything?

18    A.  That would be inconsistent?

19    Q.  Yes.

20    A.  Nothing that was glaring.

21    Q.  Did you rely on Mr. Cappuccio's statement that he was

22    attacked by a police officer in rendering your opinion?

23    A.  I interpreted that comment as he suffered a blow, and I

24    contextualized it, and at that point I did not establish one

25    way or another if he was attacked by a police officer.

1            I did think that in the mayhem that was going on

2    there, in the frenzy, that he and a number of other people

3    probably did suffer some injuries that there was clearly

4    some actions there that -- where people got hurt.  And you

5    could tell from the videos, there's bleeding in the hands.

6            That he was attacked by it?  I mean, that's a

7    whole different way of looking at the episode.  So I said:

8    Okay.  Did he suffer an injury?  Was he hit?

9            I don't know, but I'll have to take that; that in

10    this mayhem, that's a very likely occurrence.

11    Q.  So if he weren't hit or attacked prior to his episode,

12    would that change your opinion as to the reasonableness of

13    it?

14    A.  Not -- because there are other factors.  There was gas,

15    and the gas can also significantly -- can produce what we

16    think of, particularly in PTSD, as kindling.  It can spin

17    people up, more or less.

18    Q.  But you didn't --

19    A.  You have to make --

20    Q.  -- opine on that in this case, right?

21            THE COURT:  Let him finish.

22            MS. AKERS:  Sure.

23            THE COURT:  Go ahead, General.

24    A.  So there was a gas in which -- there was all the noise

25    that was going on.  There clearly was a lot of a tussle back

1    and forth.  All the screaming, screaming that I interpreted

2    as people actually getting -- being injured when they're

3    in -- in this activity.

4            So I thought that there were a number of things

5    that would have really set off in this case a particular

6    reaction triggered by PTSD, a reaction in him.

7    Q.  So it wasn't the alleged attack that rendered -- that

8    makes your opinion -- that's the basis of your opinion?

9    It's comprehensive?

10   A.  No, no, no.  I mean, what I'm saying is that he said he

11   had suffered a blow.

12           To call it an attack is your words.  I repeatedly

13   say it's a blow.  He suffered a bodily blow and was injured.

14           If he felt that he suffered a blow, then that

15   would have triggered furthermore a reaction in him.

16   Q.  And if he didn't suffer a blow, if you learned more

17   information or saw more video, that wouldn't change your

18   opinion at all?

19   A.  No, because of these other factors.  I mean, the whole

20   thing was just chaos.  It was a mess.

21           MS. AKERS:  One moment, please, Your Honor.

22           (Pause)

23           MS. AKERS:  No further questions, Your Honor.

24           THE COURT:  All right.  Ms. Douenat, any redirect?

25           MS. DOUENAT:  Yes, Your Honor.

```
 1                     REDIRECT EXAMINATION

 2    BY MS. DOUENAT:

 3    Q.  General Xenakis, I did request a list of cases for the

 4    last four years; is that correct?

 5    A.  You requested cases for the last four years?

 6    Q.  Yes.

 7    A.  Yes, I think you did.

 8    Q.  And you actually tendered over a hundred cases; is that

 9    right?

10    A.  Yes.

11    Q.  And they spanned even further than four years?

12    A.  Yes.  I mean, I just compiled the list.  I don't keep a

13    very good running list of the cases.  I just -- you wanted

14    something; I sent it to you as quickly as I could.

15    Q.  And part of your diagnosis included confirming

16    information given to you by Mr. Cappuccio through medical

17    records?

18    A.  Yes.

19    Q.  And VA records?

20    A.  Yes.

21    Q.  And it is fair to say that you're an advocate for

22    veterans who have PTSD?

23    A.  Absolutely.

24    Q.  And you've worked really hard at trying to advocate for

25    them in the VA?
```

```
 1   A.  Yes.

 2   Q.  And to make sure that they do get the treatment they

 3   need?

 4   A.  Absolutely.

 5   Q.  And you do that because you know how serious PTSD can

 6   be?

 7   A.  Absolutely.

 8   Q.  Part of your report does talk about how you've reviewed

 9   personnel records as well as the VA records as well as his

10   Army records?

11   A.  Yes.

12   Q.  And part of the Army records is to confirm his combat

13   experience?

14   A.  And his conduct as a soldier.  I mean, was this a good

15   soldier or not a good soldier?  Did he have other problems?

16        I was a commander as well as a doctor, and so I

17   look at these cases as -- from the eye of a commander at

18   times.  And, you know, I get a problem, I had other soldiers

19   who would come to me for disciplinary issues, and I had to

20   render judgments and take actions.

21        So I'm looking at this whole individual.  I'm

22   looking at this case of this soldier and saying:  All right,

23   what kind of soldier was he?  What did other soldiers think

24   about him?  What did his supervisors, officers, think about

25   him?  How did he perform?  Did he have other conduct
```

1  problems?  Was there any record in the -- I didn't see

2  anything.

3  Q.  Right.  There were no conduct problems at all?

4  A.  Nothing.

5  Q.  And, in fact, he was promoted several times?

6  A.  Yes.

7  Q.  And there was no disciplinary actions against him at

8  all?

9  A.  No.  He was not -- and he had some -- actually, he was

10 also selected for some very competitive Army schools, like

11 the Special Forces Q course.  So that's a big selection.

12 That's a tough cut to make.

13 Q.  As well as the SERE program?

14         MS. AKERS:  Objection.

15 A.  Yes.

16         THE COURT:  Sustained.

17 Q.  Part of your diagnosis is also to look at other

18 psychiatrists' records; is that right?

19 A.  Yes.

20 Q.  And the notes they wrote?

21 A.  Yes.

22 Q.  And part of psychiatry to diagnose someone is you go

23 through what you did?

24 A.  Yes.

25 Q.  So you're also reviewing other doctors' notes --

1    A.   Yes.

2    Q.   -- after visiting with Mr. Cappuccio and their review of

3    his records?

4    A.   Yes.

5    Q.   And the reason he went to those psychiatrists was

6    seeking help?

7    A.   Yes.

8    Q.   And this was even before 2014 --

9    A.   Yes.

10   Q.   -- when he was still enlisted?

11   A.   Yes.

12   Q.   And you do put that in your report, that you reviewed

13   those to confirm that he's not malingering?

14   A.   Yes.

15   Q.   And you have more than 50 years of experience?

16   A.   Yes.

17   Q.   And you've dealt with individuals who have been

18   malingering?

19   A.   Absolutely.

20   Q.   You've already testified for the government on multiple

21   occasions; is that right?

22   A.   Yes.

23   Q.   You've seen the video footage in this case?

24   A.   Yes.

25   Q.   Is it fair to say that those officers who were involved

```
1    will also probably suffer from PTSD in the future?
2              MS. AKERS:  Objection.
3              THE COURT:  Sustained.
4              MS. DOUENAT:  You don't have to answer.
5              No further questions.
6              THE WITNESS:  Okay.
7              THE COURT:  General Xenakis, thank you for your
8    presence here today.  You may step down.  You're free to go.
9              THE WITNESS:  All right.  Thank you.
10             THE COURT:  All right.  Let's take a ten-minute
11   break.
12             Ms. Douenat, what do you have left for me?
13             MS. DOUENAT:  Mr. Cappuccio.
14             THE COURT:  All right.  We'll hear from him at
15   4:00.  Thanks.
16             (Recess taken)
17             THE COURT:  All right.  Ms. Douenat.
18             MS. DOUENAT:  Your Honor, we call Mr. Steven
19   Cappuccio to the stand.
20                  STEVEN PHILLIP CAPPUCCIO, Sworn
21                       DIRECT EXAMINATION
22   BY MS. DOUENAT:
23   Q.  Good afternoon.
24   A.  Good afternoon.
25   Q.  Could you please state your name for the record, and
```

1    spell it for the court reporter.

2    A.  Yes.  It's Steven Phillip Cappuccio, C-A-P-P-U-C-C-I-O.

3    Q.  Thank you.  And Mr. Cappuccio, I know you talk very

4    fast, and I do, too, so we're going to try to slow down for

5    the court reporter.

6    A.  Yes.

7    Q.  So where do you live?

8    A.  I live in Universal City, Texas.

9    Q.  And how old are you?

10   A.  I am 54, just turned 54.

11   Q.  And are you married?

12   A.  Yes.

13   Q.  Okay.  And who is your spouse?

14   A.  Jennifer Cappuccio.

15   Q.  How long have you been married?

16   A.  22 years.

17   Q.  Do you have children?

18   A.  Yes, I do.

19   Q.  How many?

20   A.  I have seven total.  I have six with my wife.  One child

21   is off in the Marines right now.  I have five at home, and

22   then I have a granddaughter.

23   Q.  And how many live with you, I guess?

24   A.  That would be six.

25   Q.  Okay.

1    A.  Or five, excuse me.  Five.

2    Q.  And a granddaughter?

3    A.  And a granddaughter.

4    Q.  Right.

5    A.  Yes.

6    Q.  So six total, I guess.

7            And so let's talk about your military history.

8    so -- or let me ask you this.

9            You got married 22 years ago?

10   A.  Yes.

11   Q.  Did you go into the military after that?

12   A.  Yes.

13   Q.  Okay.  Where did you serve?

14   A.  I served in Afghanistan, Iraq, and then Afghanistan

15   again.

16   Q.  How many years were you in the military?

17   A.  About 13.  Almost 13.

18   Q.  In what branch?

19   A.  Army.

20   Q.  Okay.  What was your rank?

21   A.  Sergeant.

22   Q.  Sergeant what?

23   A.  E5.

24   Q.  Okay.  And what did you do for the Army?

25   A.  I was an infantryman, also airborne, and Bradley

1    qualified.  Basically -- infantryman is basically just

2    another tool that the Army uses to help protect the country

3    and fight for them, fight for the country.

4    Q.  When you say Bradley use, what does that mean?

5    A.  A Bradley is like a -- it's a --

6              THE COURT:  Armored personnel carrier?

7              THE WITNESS:  Right.

8    A.  Troop carrier, things like that.  And so I was the

9    Bradley commander for that when I was in Iraq.

10   Q.  In Iraq?

11   A.  Yes.

12   Q.  And what about Afghanistan?

13   A.  In Afghanistan, I was just your basic infantryman.  I

14   was a -- I carried the heavy machine gun, the 240.  I was in

15   the machine gun squad.

16   Q.  When you were deployed, did you have -- what did you

17   observe in your deployments?  What did you experience in

18   your deployments?

19   A.  We experienced ambushes, mortar attacks, explosions.  We

20   were QRF for a long time with -- which is quick reaction

21   force; and we did that for the longest time, almost six

22   months in Iraq, where we basically answer -- basically it's

23   like answering a phone call, basically.

24              So when troops get into contact, if it's too heavy

25   for them to handle, then they call in the QRF, and then we

1    go respond to it and basically give them support.  We do

2    that with -- when there's an IED that's gone off and

3    American troops have been hit.  We go out there and provide

4    security for them.

5           If there's contact going on, we engage.  If

6    there's -- well, bodies we have to pick up or something like

7    that.  We do provide medical aid if we have to because we do

8    have a medic, but we're all qualified to do first aid and

9    everything like that.

10          I saw civilians blown up, girls, women, children,

11   soldiers, stuff like that.

12   Q.  Were you a commander for your unit?

13   A.  I was not a commander.  I was a commander for my

14   Bradley.

15   Q.  For your Bradley?

16   A.  Yeah, yeah.  If they're -- for the Bradleys they kind of

17   break them -- like you have the platoon, and you have your

18   squads.  And I was in the squad that had the Bradleys.

19          And so there was two squads that had the Bradleys,

20   and there was four Bradleys total plus five with the first

21   sergeant or, excuse me, platoon sergeant.  And so I was --

22   in our squad, I was second Bradley commander for our

23   vehicle.

24   Q.  So one of the medals you received was just a combat

25   medal, meaning you were in squad, right?

1    A.  Yes, uh-huh.

2          MS. DOUENAT:  Let me ask Ms. Alexander to pull up

3    Government's Exhibit 611.36.

4    Q.  Do you recognize this photo?

5          MS. DOUENAT:  Oops.

6    A.  Yes.  Yes, I do.

7    Q.  What does that stand for?

8    A.  "Dirty Deuce."  All right, that's a -- well, my buddy

9    made that shirt.  He was one of my battle buddies that I

10   served with in Iraq when we were stationed at Fort Hood.

11         So the OIF is "Operation Iraqi Freedom," and those

12   are the dates that we were there.

13         The Dirty Deuce, when we first got to Iraq and we

14   got to the FOB that we were going to be in, when we were

15   moving into -- we called them the barracks, but it was

16   really like a shed.  Our -- one of our guys, I think it

17   might have been our platoon sergeant, found like a street

18   sign, and it said "Dirty Deuce" on it.  And so he was like,

19   "Hey, what -- do y'all want to have like our own little

20   thing?"  And we're like, "Dirty Deuce."  And so that's what

21   we call each other.  That's like -- we use it all the time.

22   Q.  So that's what you and your battle buddies called --

23   A.  Yeah, yeah, we all just -- we still say it to this day.

24   Q.  And it's fair to say that the people you're in combat

25   with are people you're close to?

1    A.  Yeah, yeah, you could say that.  Some of them, yeah.

2    Yes.

3    Q.  You call them battle buddies?

4    A.  Yeah, well, because basically you learn that when you're

5    in basic training.  You don't go anywhere without having

6    somebody else with you.  And so that carries on to when you

7    get into a combat zone.  You always want to have somebody

8    with you, so you call it a battle buddy so that if anything

9    happens or, you know, whatever, you can --

10    Q.  For accountability?

11    A.  Yeah, yeah, he gets hurt, I get hurt, we can help each

12    other.  Or, hey, we've got to go somewhere.  It's just if

13    something happens, you don't want to be alone all the time.

14    Q.  Can you tell me a little bit about the training,

15    specialized training that you've had in the military.

16    A.  Referring to just like the Army or all of it?

17    Q.  Well, so, I guess the most specialized training that

18    you've had.

19    A.  Well, the most specialized training that I received

20    was when I was going through the Q course.  I was working

21    with -- at first it was like basically like the gun side of

22    every special operations, working with different types of

23    ammunitions, guns, machine guns, every different type of

24    weapon that there is, I guess probably throughout the world.

25    Q.  So what's Q training?

1    A.  What's that?

2    Q.  What's Q training?

3    A.  Q training is a qualification that you go through

4    selection first, and then the Q training -- once you've been

5    selected, you go to the Q course, which is where you

6    basically start the process of going through all the

7    schools, all the lessons or indoctrination of special

8    training to become a special operator.

9    Q.  Did you also go into SERE training?

10    A.  Yes.

11    Q.  What does that stand for?

12    A.  SERE stands for Survival, Evasion, Resist, and Evade --

13    or, excuse me, Escape.

14    Q.  And how long is that training?

15    A.  That training, I do believe it was like two weeks.

16    Q.  And it's -- what's the purpose of the training for?

17    A.  The purpose of the training is basically like you have

18    the first couple of -- the first week is really where you're

19    learning a bunch of survival skills, trap-making, like if

20    you're -- if something happened and you had gotten separated

21    from your platoon or your squad or if you're a pilot and you

22    wreck and you're by yourself, pilots go through the same

23    type of training.

24                It's just so that you can be able to function by

25    yourself or in a small squad or in a little group, basically

1    be able to survive off the land and be able to have kind

2    of -- I'm trying to like say stuff that's not too divulging

3    about SERE school, but there's ways to be able to

4    communicate with people who might -- like, you know, your

5    command, if something happens.  And then if you're captured,

6    how to basically resist the torture or whatever they might

7    be doing to you, and then eventually like the escape or

8    getting away.

9    Q.  Was that difficult training as well?

10   A.  What's that?

11   Q.  Was that -- was that training -- I mean, I guess

12   "difficult" wouldn't be the question.

13           But that all helps you be a good infantryman; is

14   that right?

15   A.  Well, I mean, yeah basically because you learn a lot of

16   things, hand-to-hand combat, different stuff like that, so

17   you -- yeah, I mean, if you learn it, you'd be one of the

18   best.  You know what I mean?  So, yeah, you'd be top notch.

19   Q.  Were you -- why were you discharged in the military?

20   A.  I was discharged from the military because I have a

21   problem with height and weight.

22   Q.  And that was in 2014?

23   A.  Yes.

24   Q.  What were you -- were you trying to become -- what were

25   you trying to do and couldn't pass?

1    A.  Well, it wasn't that I couldn't pass.  It was just

2    basically the height and weight, which is a height and

3    weight standard that had Army has.  Basically it's a -- it's

4    a way that -- because in the Army, at least when I was in,

5    especially with infantry, there's a certain way they need

6    you to look and be able to perform, and the way you look in

7    your uniform kind of presents an image to the rest of the

8    people or soldiers.

9           And so my problem was I was an older guy, so it

10   was harder for me to lose weight, so I just -- I got, you

11   know, one percent over, and I just -- I just couldn't get

12   that one percent off my body, I guess, whatever you say.

13   And so that's why I was relieved.

14   Q.  And what training were you undergoing when that

15   happened?

16   A.  I was undergoing the -- basically the communication,

17   which would be the communications part of the Q course where

18   you're learning how to operate all kinds of different radio

19   systems and what have you.  And I had gone through the first

20   part of that training where you're kind of learning all that

21   stuff, and then I had -- I was getting ready to go through a

22   two-week, basically like in the field, where you actually --

23   all the stuff that you've learned, you put it in the

24   process.

25          And so I was getting ready -- prepared to do that.

1    And then right after that it would have been SERE school,

2    or -- yes, or --

3    Q.  Green Beret?

4    A.  Robin Sage.

5    Q.  What is Robin Sage?

6    A.  Robin Sage is basically the end of your training,

7    accumulation of your training, where you're with your squad

8    or -- yeah, you're with your squad, and basically what

9    happens is you could be dropped off at any location.  It

10   could be there at Fort Bragg.  You could get dropped off in

11   California.  You could be just dropped off wherever.  And

12   you're basically going through the process of being able to

13   survive and evade.

14        And then normally you have like -- I always call

15   it like an indigenous group, but you would run into like

16   foreign fighters or something like that, and then you would

17   go and assimilate in with them and then train them up to be

18   fighters.  Because that's really what a Special Forces

19   operator does, is he goes into countries and they help train

20   the people to fight and be effective, and then you kind of

21   support and all that.

22        And so that's what Robin Sage is, and then you go

23   through --

24        THE COURT:  Sorry.  You did not do this, though?

25        THE WITNESS:  No, no, right.  The only reason why

```
 1   I know so much about it --
 2              MS. DOUENAT:  Yes, I was going to stop him.
 3   Q.  That was for a promotion, you were trying to become a
 4   Sergeant E6?
 5   A.  Yes, uh-huh.
 6   Q.  And that is when they -- before you went to Robin Sage
 7   you had to meet the weight --
 8   A.  Yes.
 9   Q.  -- and height requirement, and you failed?
10   A.  Right.  Yes.  The weight and height standard, yeah.
11   Q.  So you were honorably discharged?
12   A.  Yes.
13              MS. DOUENAT:  That's where I was just trying to
14   get to, Your Honor.
15              THE DEFENDANT:  I'm sorry.
16   Q.  So that was in 2014?
17   A.  Yes.  When I was finally released, yes.
18   Q.  Yes.  And where were you when you were honorably
19   discharged?
20   A.  I was in Alaska, Fort Richardson.
21   Q.  Where did you go after that?
22   A.  I came home to Universal City.
23   Q.  And what did you do after that?
24   A.  Well, I basically became like a Mr. Mom.  My wife had
25   gotten a job working for a food chain there, and so I
```

1    basically stayed at home and tried to take care of all of

2    our kids.

3            I did work for a year at Amazon, and I left that

4    job to try to go to school.  And I was going to school, and

5    I was -- 2020 was when I was supposed to graduate from

6    school, but COVID hit and...

7    Q.  And what kind of degree were you trying to get?

8    A.  I was trying to get a kinesiology degree with -- I had a

9    minor in history.

10   Q.  Okay.

11   A.  And then I was trying to basically get a teaching

12   certificate.

13   Q.  Since 2014 have you suffered from medical issues?

14   A.  With medical issues?

15   Q.  Have you suffered with medical issues?

16   A.  Yes.

17   Q.  And what are they?

18   A.  I've suffered with anxiety, depression, pain.  I've

19   suffered with acid reflux, with sleep apnea, suicidal

20   thoughts, anger situations.  Just...

21   Q.  Have you been diagnosed?

22   A.  Yes.

23   Q.  And with what from the VA?

24   A.  With PTSD.

25   Q.  And are you on disability because of it?

1    A.   Yes.

2    Q.   And what's the -- how much disability do you get?

3    A.   100 percent disabled.

4    Q.   Have you sought help with the VA?

5    A.   Yes, yes.

6    Q.   Since when?

7    A.   Since I got out in 2014.  Well, a little bit before.

8    Like at Fort Richardson, before I got out I was receiving

9    help, and I continued it when I got out.

10   Q.   And when you say "I sought help," what have you done to

11   do that?

12   A.   I went to see basically -- well, I went to my physical

13   or my PA basically, got a referral so that they could put me

14   in to see a psychiatrist and a psychologist.  The

15   psychiatrist basically kind of reviews your records and then

16   goes through, you know, what type of medication they want to

17   start you off on.

18           And then I was trying to get, you know, therapy,

19   so I'd be able to talk to somebody.  I did an in/out patient

20   program where I went to the VA every day for I think it was

21   like two weeks, basically, and then an outpatient program so

22   I was able to go home.  But we got together and talked about

23   our issues and ways to get over those issues and not to be,

24   like, thinking about, like, suicide and anxiety problems and

25   trying to get away from that.

1           I did like a Star course.  I think it was also a
2      two-week program where they sent a guy out and we -- you
3      would sit down and then we would talk about some of the
4      battle situations, things that happened.  And then we kind
5      of go through the process and try to, like, break it down
6      and, you know, like -- you made it through and stuff like
7      that.
8      Q.  Have you also sought help from other places like your
9      faith?
10     A.  Yes.  I mean, going to church helps a lot.  I go to
11     church.  I do yoga.  And I go to -- well, I don't know if
12     you know how the VA works, but -- I was getting acupuncture
13     for a while, which was awesome.
14          But, yeah, I've done different things to help with
15     pain, with being able to help me relax.
16     Q.  So you're very well -- you are very much aware you have
17     PTSD?
18     A.  Yes.
19     Q.  And you try to make sure that you try to take care of
20     it?
21     A.  Yes.
22     Q.  Okay.  Let me ask you now about how you got invited to
23     go to D.C.
24     A.  Okay.  My friend Mike, he had put out -- we had like a
25     little group chat with my buddies that I graduated high

1    school with that I've known for years.  He put it out there

2    that he was looking for somebody or anybody who wanted to go

3    with him to hear Trump speak.

4         It had been a while, about a week, and then he put

5    it out there again.  And I was like -- talked to my wife a

6    little bit about it, and then I just -- she was like, "Yeah,

7    go for it," and so I said, "I'll go."

8    Q.  And how long have you known Mike?

9    A.  I met Mike back in 1986.  We were friends, you know,

10   through high school, graduated, kind of went our separate

11   ways.  And then when I got back into -- back to Universal

12   City, I got back in contact with him.

13   Q.  So did you even know that there was going to be a Trump

14   rally?

15   A.  I did not know personally until Mike had said something

16   about it.

17   Q.  Okay.  Who planned the route, how to get there, and how

18   to drive there and all of that?

19   A.  Mike planned the whole trip.

20   Q.  So you were going along for the ride?

21   A.  Yes, ma'am.

22   Q.  Who was paying for the trip?

23   A.  Mike was.  He was paying for fooding -- or food,

24   lodging, all that.

25   Q.  So I know that Mike -- I know you've heard Mike's

1    testimony, and you've heard the testimony, and I know --

2              MS. DOUENAT:  We can take this off.

3    Q.  You heard about, I guess, an attachment Mike sent you

4    about a cavalry?

5    A.  Yeah.  Yes.

6    Q.  And I'm trying to see, that would be -- well, we don't

7    need -- do you remember the attachment that was discussed

8    here in court?

9    A.  I actually don't remember the attachment, but when they

10   showed it I was like, oh, I don't even remember that.  But,

11   yeah, I guess, whatever.

12   Q.  But that's not something that you found?

13   A.  No, no, no, not at all.

14   Q.  And what did you think it was when you got it?

15             Well, you don't remember it?

16   A.  Yeah.

17   Q.  But at some point both you and Mike joined up with

18   people; is that right?

19   A.  That's correct.

20   Q.  And what did you think of that?

21   A.  I thought it was pretty cool.  Whatever.  Like, you

22   know, I didn't know what to expect.  There was a lot of

23   people.  Yeah, it was just really interesting.

24   Q.  Interesting in what way?

25   A.  Just really like a bunch of Trump fans, Trump

1   supporters, stuff like that.  And, you know, a lot of them

2   had their vehicles decorated and signs and stuff like that.

3   Q.  And so y'all drove with this caravan for how long?

4   A.  Yes, all the way until I think we got into Washington or

5   wherever we were staying.

6   Q.  But it was all the way from a different location?

7   A.  Yeah, yeah, yeah.  It was from -- like I said, he

8   planned the thing, so I don't remember where we met up with

9   the people.  But we all, like, caravan, car, whatever,

10   convoy.

11   Q.  And were you talking with these people while you were in

12   your car with Mike?

13   A.  I wasn't talking to them personally, but there was a guy

14   that had -- he was -- he kind of gathered everybody together

15   and kind of became like the -- like the route leader, I

16   guess you could say.

17            And he had told everybody or the drivers that

18   there was an app that you could get on your phone or

19   something, and that it would connect to your radio, and that

20   you would be able to -- like everybody would be able to talk

21   to each other on this thing while you were driving just so

22   that like, "Hey, we're getting ready to make a right turn on

23   this street here," or blah, blah, blah.  Or if somebody's

24   got car trouble, they can say, "Hey, I'm having car trouble.

25   I need help."  Or the guy said there might be people that

1    would be joining from other states or other areas, and it

2    was just so that they could get on and everybody could just

3    follow.

4    Q.  Did you communicate on that app?

5    A.  No.  I didn't know how to use it.

6    Q.  What did you pack to go to D.C.?

7    A.  I packed -- I packed some underwear.  I packed socks,

8    pants, change of shirts.  Let's see.  What else?

9    Q.  Did you pack any weapons?

10   A.  No.

11   Q.  What did you expect to happen in D.C.?  What did you

12   think you were going to do?

13   A.  I honestly just thought it was going to be to hear Trump

14   speak.

15   Q.  Had you ever been to D.C.?

16   A.  No.

17   Q.  Had Mike ever been to D.C.?

18   A.  No.

19   Q.  Did you pack your medicine?

20   A.  I did pack my medication.

21   Q.  Where did y'all arrive -- I guess before the 6th would

22   be the 5th is when you arrived to D.C.; is that correct?

23   A.  Yes.

24   Q.  It was later in the evening?

25   A.  Yes.

1    Q.  Okay.  Was it in D.C., or was it somewhere else?

2    A.  It was in --

3    Q.  You don't know?

4    A.  -- Arlington, I think.

5    Q.  Okay.  Who drove into the hotel area?

6    A.  Mike did.

7    Q.  Okay.  Because he had made the reservations?

8    A.  Yes.

9    Q.  Were y'all staying in the same room?

10   A.  Yes.

11   Q.  Let's talk about January 6th.  At what time did y'all

12   wake up?

13   A.  Like 5:00 in the morning.

14   Q.  And did you know how to get to where the speech was

15   going to be?

16   A.  No.

17   Q.  So how did y'all get there?

18   A.  Mike had made some friends at the hotel that we were

19   staying at, and I guess those guys had been to Washington,

20   D.C., for -- before, and they were telling us that -- they

21   were telling Mike that the -- I call it a train station,

22   whatever, that was really hard to figure out.

23            And I had never been on one.  Mike had never been

24   on one.  So we didn't know how to read it or what to do.  So

25   they said hey -- they told Mike that they would meet us in

1    the morning at the thing, whatever it's called, and we

2    would -- they would tell us -- get us on the train to where

3    we needed to be.

4    Q.  So it's an underground train?

5    A.  Yeah, yeah, the subway.

6    Q.  Okay.  So y'all never used a subway before?

7    A.  No.

8    Q.  Okay.  And so that was early in the morning.  Did y'all

9    check out of the hotel?

10   A.  That part I don't remember.  Part of me wants to say we

11   did, but I really don't remember if we did or not.

12   Q.  Did you -- what were you wearing that morning?

13   A.  I was wearing a pair of shorts, my tennis shoes, and I

14   had a sweatshirt on and a shirt underneath and my hat.

15   Q.  And we've seen photos?

16   A.  Yes.

17   Q.  Were you appropriately dressed?

18   A.  No, not at all.

19   Q.  And why is that?

20   A.  Well, one, I didn't know it was going to be raining, and

21   I'd never been to Washington, so it was pretty cold.  And I

22   thought that I was going to have an opportunity to change

23   into something more appropriate, but I didn't get a chance.

24   Q.  Were you able to take your medicine that morning?

25   A.  No.

1    Q.  Were you wearing any tactical gear?

2    A.  No.

3    Q.  Did you have any weapons on you?

4    A.  No.

5    Q.  Did you have a backpack?

6    A.  No.

7    Q.  And you said you were cold, so you had no gloves?

8    A.  Yeah, no, I didn't have any gloves.  Like I said, there

9    were like cargo shorts, I guess you could say.

10   Q.  Let me show you a video, Government's Exhibit Video

11   612.33.

12          MS. DOUENAT:  Stop right there.  Well, I guess

13   it's -- yes, we can stop right there.

14   Q.  Do you recognize this video?

15   A.  Yes.

16   Q.  Did you take this video?

17   A.  Yes.

18   Q.  Where was it taken?

19   A.  It was at -- where the Eclipse [sic] was going in.

20   Because there was a line and everything going into where the

21   speech rally was, and I was taking a picture because I had

22   found Waldo.

23   Q.  Fair enough.  That's Waldo.

24          So you had to wait in line for how long?

25   A.  It was a real long time.  I mean, we got in line

1    probably -- I want to say it was still dark out, so maybe

2    around 5:30.  And the line was stretched out from like where

3    you got in to see the speech all the way -- we got to like

4    right -- a little bit past the Eclipse.

5    Q.  The Ellipse?

6    A.  It was hours.  The Ellipse, yes.

7           THE COURT:  Sorry, Mr. Cappuccio, I have a

8    question.

9           THE WITNESS:  Yes.

10           THE COURT:  What impact does it have on you to not

11    take your medication?

12           THE WITNESS:  Well, if I don't take my medication,

13    I can get really irritable, and I -- anxiety starts to set

14    in, and I can become really hyper-diligent about where I'm

15    at and everything like that.

16           And the other medication helps with my depression

17    and so, you know -- but I can get pretty excited.

18           THE COURT:  What kind of medication were you

19    supposed to take that day?

20           THE WITNESS:  I was supposed to take my

21    venlafaxine and bupropion.

22           THE COURT:  What do those do?

23           THE WITNESS:  The venlafaxine helps with my

24    anxiety, and the bupropion is supposed to help with the

25    depression.

1    Q.  And you also take trazodone, but in the evenings?

2    A.  That's in the evenings.  That's to help me sleep.

3            THE COURT:  All right.  You may continue.

4    Q.  So -- and the reason is because you thought you could

5    get back to change --

6    A.  Right.

7    Q.  -- and take your medicine, right?

8    A.  Right.

9            THE COURT REPORTER:  Could you please let her

10   finish the question?

11           THE DEFENDANT:  Oh, I'm sorry.  I'm sorry.

12   Q.  You thought you could go back to your clothes and change

13   before going to the Ellipse, but you ended up going to the

14   Metro, is that right, instead?

15   A.  Yes.

16   Q.  And so you were going to take your medicine before going

17   to the rally?

18   A.  Yes.

19   Q.  Especially because you knew you were going to be in a

20   crowd, right?

21   A.  Yes.

22   Q.  And that sometimes affects you?

23   A.  Yes.

24   Q.  How?

25   A.  Just basically like when you -- well, basically, you

1  know, like close quarters type thing, I become really hyper-

2  diligent about my environment and where I'm at.  And so like

3  just being in a large area and just having people around you

4  can make me kind of get like "Oh, hell."  You know, kind of

5  get like, you know, fidgety about things.

6  Q.  So you mentioned that there was a long line?

7  A.  Uh-huh.

8  Q.  It look a while to get in.

9        Was there security?

10 A.  Yes, there was security at the front where the Trump

11 rally was supposed to be at.

12 Q.  Did you go through security?

13 A.  Yes.

14 Q.  Okay.  Were you with Mike when that happened?

15 A.  No, I was not.

16 Q.  What happened?

17 A.  Mike and I got separated while we were in the lines.

18 The line -- as you got closer to the checkpoint I guess to

19 get into the Trump speech thing, the line kind of broke off

20 into two sections, and I thought I was going in a faster

21 line.  And he went in another direction in the line, and I

22 ended up having to go through like a little serpentine-like

23 thing, and I think his line sort of made a straight line to

24 where he had to go in.

25 Q.  But were you communicating still by text through that

1   time?

2   A. Yes.

3   Q. And I know the Court has the texts, so I'm not going to

4   go through it.

5         But basically y'all agreed to meet after it was

6   over?

7   A. Yes.

8   Q. And where was that?

9   A. We decided to meet at the Porta Potties.

10   Q. Did you know how long this was going to take?

11   A. No.

12   Q. And why is that?

13   A. Are you talking about for the speech?

14   Q. The rally.

15   A. Yeah, no, I had no idea.

16   Q. Did you know there was going to be multiple speakers

17   or --

18   A. No, I thought it was just going to be Trump.

19   Q. So you didn't really have much information about the

20   rally itself?

21   A. That's correct.

22   Q. Do you remember approximately what time it was when the

23   speeches ended?

24   A. I want to say maybe around 12:00.

25   Q. At least that's what you remember maybe?

1    A.   Yeah.

2    Q.   Did you end up meeting Mike at the Porta Potties after

3    that?

4    A.   Yes.

5    Q.   Did you all have plans to do something after that?

6    A.   No.

7    Q.   Let me talk a little bit about the speeches.  I know

8    that we saw some video footage that you took of some of the

9    speeches.

10   A.   Uh-huh.

11   Q.   And were you really close to -- I guess -- I mean, how

12   many people were in this little -- it's not little -- in the

13   rally area?

14   A.   Yeah, because they had it blocked off, and then they had

15   like -- I guess I called it the VIP session.  I guess.  I

16   don't know if those people paid to get those seats or not,

17   but they were closer.

18            And I was in -- it was like gated off.  And so I

19   was like back -- well, I was just back away from there.  So

20   I wasn't like super close.  I was probably from here to

21   maybe the wall outside here, outside these doors.

22   Q.   Did you have to pay to get into this?

23   A.   No, uh-uh.

24   Q.   Okay.  But you said there was a VIP section?

25   A.   Yes.  I just called it that because I was like, damn,

1    how did these people get this close to the stage?  So I just
2    thought maybe they paid for tickets or something.  I don't
3    know.
4    Q.  Okay.  And it's fair to say it was pretty loud in there?
5    A.  Oh, yeah.
6    Q.  And there were multiple speeches?
7    A.  Yes.
8    Q.  Okay.  And did you hear every word and everything that
9    all the speeches were saying?
10    A.  No, no, not everything.
11    Q.  What were you doing?
12    A.  I was -- I was taking pictures of some of the stuff I
13    was seeing.  And I had people coming up to talk to me and
14    stuff so...
15    Q.  And what was the crowd atmosphere at the time?
16    A.  It was pretty jovial.  You know, everybody was, you
17    know, doing their little chants for Trump and all this other
18    stuff.  There was music playing.
19         I just thought it was kind of funny to see some of
20    the people that were kind of dressed up and some of the
21    signs that people had and stuff like that.  But it seemed
22    peaceful.
23    Q.  Had you ever been to another rally in the past, or any
24    rally for that matter?
25    A.  No.

1    Q.  Have you been to see a political candidate in the past?

2    A.  No.

3    Q.  So this is the first time you go to a political

4    appearance?

5    A.  Yes.

6    Q.  Okay.  So after the speeches, you met up at the Porta

7    Potties with Mike.  You were able to find him, right?

8    A.  Yes.

9    Q.  Okay.  And y'all both didn't have any plans, so how did

10   it come about that y'all decided to -- what did y'all decide

11   to do at that point?

12   A.  Well, Trump had talked about, like, people walking down

13   to the Capitol to protest.  And so Mike and I were like,

14   "What do you want to do?"

15          And I was kind of like, "Well, I'm, like, freezing

16   cold and wet."  And so I was like, "Well you're my ride,

17   dude, so whatever you want to do, I'm fine with.  If you

18   want to go to this, the rally thing, okay, I'm fine.  That's

19   cool.  Let's go."

20          And he was like, "All right.  Let's go."

21          And so we got in line, and we started walking with

22   everybody.

23   Q.  So as you were walking to the Capitol --

24          MS. DOUENAT:  Let me play actually Government's

25   Exhibit 612.5, a little bit of it at first.

1      (Video playing)

2           MS. DOUENAT:  Can you pause it for a second.

3    Q.  Do you recognize this video?

4    A.  Yes.

5    Q.  Who took it?

6    A.  I did.

7    Q.  Okay.  And is it fair to say this is what it was like to

8    walk to the Capitol?

9    A.  Yeah, yeah.  It was real slow.  I took this picture

10   because I thought it was pretty cool that guy playing that

11   drum, that snare drum, and it's always something you kind of

12   like -- you know, you see in the old-time movies and stuff.

13   Q.  And you were just taking little video clips everywhere?

14   A.  Yeah, yeah.  I was just taking little video clips of

15   just different stuff that I saw that I had never seen

16   before.

17           MS. DOUENAT:  And can we play it a little bit

18   longer.  I mean, we can play the whole thing.  It's not that

19   long.

20           (Video playing)

21   Q.  So how are people acting in this video?

22   A.  Normal, like just walking.  They're just -- people were

23   talking with each other, chatting each other up.  You know,

24   laughing.

25   Q.  So there's no screaming?

1    A.  No, no, there was no screaming.  I mean, people were

2    like, you know, "Trump, Trump," whatever, but there was no

3    like -- I didn't see -- I didn't feel like there was anybody

4    that was mad or anything.

5    Q.  Okay.  You didn't observe any violence?

6    A.  No.

7    Q.  Okay.  Let me show you what's been marked as

8    Government's Exhibit 611.10.  This is another one of your

9    videos, I believe.  There might be a picture.

10                PARALEGAL ALEXANDER:  611.10?

11                MS. DOUENAT:  611.10.

12    Q.  Do you remember taking this picture?

13    A.  Yes.

14    Q.  Okay.  Why did you take this picture?

15    A.  I was just wondering how, like, there were so many

16    people up there, and, like, why they were up there on

17    that -- I thought it was a statue or something.

18    Q.  Did you see any law enforcement around that area?

19    A.  No.

20    Q.  And were you curious where they were?

21    A.  Yes.

22    Q.  Were there any road signs, any areas being blocked

23    around that area?

24    A.  I did not see any.

25    Q.  Okay.  Was Mike with you at this time?

1    A.  Yes.

2    Q.  Now, let me show you a picture that was shown earlier,

3    and it's Government's Exhibit 612.9.  It's a little video,

4    maybe a couple of seconds long.

5                    (Video playing)

6    Q.  So remember this video?

7    A.  Yes.

8    Q.  You took it?

9    A.  Yes.

10   Q.  And an agent earlier had testified it was around 2:21.

11   Do you remember that?

12   A.  No.

13   Q.  Do you remember the agent testifying?

14   A.  Oh, yeah, yeah, I'm sorry.

15   Q.  That it was around that time?

16   A.  Yeah, yeah.

17   Q.  But you're at the Capitol -- on Capitol grounds at this

18   point; is that correct?

19   A.  Yes.

20   Q.  And you got there by just walking there with the crowd?

21   A.  Yes.

22   Q.  Was there any snow fencing anywhere around?

23   A.  I did not see any.

24   Q.  Any barricades that you saw or anything saying you

25   couldn't be on that -- on that lawn?

1    A.  I didn't see any.

2    Q.  What was the -- how was the -- how was the crowd acting

3    at that point when you were there?

4    A.  I mean, everybody around there at the time seemed,

5    like I said, pretty jovial.  Like everybody was talking

6    and laughing.  There was people -- there was a guy out

7    there preaching, and I gave him a high five.

8              Like everybody was -- like it seemed like

9    everybody was being, like, really cool with each other.

10   Q.  Have you ever been to a First Amendment march before?

11   A.  No.

12   Q.  Or a protest, is what you called it?

13   A.  Yeah, no.

14   Q.  So at some point you and Mike get separated?

15   A.  Yes.

16   Q.  Is it around this time?

17   A.  Yeah, I think, like a little bit after that.

18   Q.  And where do you go after you get separated?

19   A.  I get separated.  I just kind of just start moving in

20   the crowd.

21   Q.  And why are you in that?

22   A.  Well, one, I was just kind of -- there was some

23   scaffolding that I had seen from where I was -- excuse me.

24   Q.  It's okay.  Take your time.

25   A.  And I saw people up there, and I was like, "Ooh, I want

1    to get to that point right there because I'd like to just

2    sit there and videotape stuff, take pictures."  And so I was

3    kind of like just slowly meandering over there.

4    Q.  Was there a lot of people there?

5    A.  There was a lot of people.

6    Q.  So when you say "meandering," that means you had to

7    like -- was there a clear path to get to where you wanted to

8    go?

9    A.  No, there was no clear path.  You kind of like walked,

10   stopped, walked, stopped.  And, you know, I was like taking

11   pictures and videos and stuff, so I'd stop.

12   Q.  And how were you filming and taking pictures?

13   A.  I was just filming with my hand up in the air like this,

14   you know, moving it around.  (Indicating)

15   Q.  So up above your head?

16   A.  Yes, above my head.

17   Q.  So what you were seeing is different than what the

18   camera was seeing?

19   A.  Yes.

20   Q.  Technically speaking, different angles?

21   A.  Right, right, different angles, yes.

22   Q.  And there was a lot of people, so you saw a lot of --

23   meaning little heads and whatever is higher than the heads;

24   is that right?

25   A.  Yes.

```
1    Q.  Let me show you Government's Exhibit 612.11.
2            MS. DOUENAT:  Play from zero to ten seconds.
3            (Video playing)
4    Q.  You heard that comment you made?
5    A.  I think it was "gets real boys" or something.
6    Q.  Or "shit's getting real, boys"?
7    A.  "Shit's getting real."
8    Q.  I don't know.  You're the one that -- but that was you
9    talking on the phone?
10   A.  Yeah.
11   Q.  And why did you say that?
12   A.  Just because like the crowd atmosphere was -- definitely
13   seemed like it had changed a little.
14           MS. DOUENAT:  Can you play it a little bit
15   further.
16           (Video playing)
17           MS. DOUENAT:   Can you stop there.
18   Q.  What did you say there?
19   A.  Okay, so a lot of the videos --
20   Q.  First, what did you say?
21   A.  I said, "Nipper, don't you wish you could be here
22   kicking down doors?"  And that was it.
23   Q.  What does that mean?
24   A.  Nipper was a military buddy of mine.  We were stationed
25   together at Fort Hood.  We went to Iraq together.
```

```
 1              Because when I was with the Bradleys, he was with
 2      like a regular rifle squad, and they had the opportunity
 3      more than I did to go like kicking in doors and stuff like
 4      that.  So even though we've been out of the Army, he still
 5      acts like he kicks in doors.  He talks about it all the
 6      time.  He still kind of lives like his Army life type thing.
 7              And so I just was making a comment like, you know,
 8      like you still do that type thing.  He still thinks he's,
 9      like, in the infantry.
10      Q.  So did -- I mean, were you planning on kicking down
11      doors?
12      A.  No.
13      Q.  So it was a reference to a military friend?
14      A.  Yes.
15              MS. DOUENAT:  Let me show you what's been shown
16      before, but it's your video.  Government's Exhibit 612.13.
17              (Video playing)
18              MS. DOUENAT:  Can you stop right there.
19      Q.  So you've heard you made a couple of comments here?
20      A.  Uh-huh.
21      Q.  What are they?
22      A.  I was yelling out "Dirty Deuce," and "Storm the castle,
23      boys."
24      Q.  And what does that mean?
25      A.  Well, the Dirty Deuce is in reference to my friends
```

1    because I was sending them pictures and videos as I was

2    going through this.  And I had heard people yelling, you

3    know, "storm the castle, get up there," so that's what I

4    said.

5    Q.  What does "storm the castle" mean?

6    A.  Well, people were running up there to the Capitol, but I

7    was -- I think it's a movie reference personally.

8    Q.  You just said it because people were saying it?

9    A.  I just said it, yeah.

10   Q.  Because others were saying it as well?

11   A.  Yes.

12           MS. DOUENAT:  You can play further.  I think

13   there's another comment you make on this video.

14           (Video playing)

15           MS. DOUENAT:  Can you pause it.

16   Q.  So that was one of the chants you were chanting?

17   A.  Uh-huh.

18   Q.  Why were you chanting "Fight for Trump"?

19   A.  Same thing, "Fight for Trump."  It was the same type of

20   rally cry that was going out.

21   Q.  So there were a lot of rally cries that day?

22   A.  Oh, yeah.

23   Q.  And did they start at the rally?

24   A.  Yeah, yeah, some of them started at the rally, and they

25   picked up as you walked along and stuff, and then what was

1   there on the grounds.

2   Q.  After this area, where did you go?

3   A.  So I still tried to make it over to the -- to that

4   scaffolding, and so I just basically tried to keep moving in

5   that direction.

6   Q.  Were you going to climb up the scaffolding?

7   A.  I thought about it because I saw people doing it, but it

8   was raining, and I'm an old guy, so -- I didn't want to

9   fall, so I didn't.  I didn't go that route, no.

10  Q.  So what did you do when you got close to there?

11  A.  I saw people -- like the stairwell was like really

12  crowded.  So I saw people climbing on to the railing, and

13  so -- and they were just kind of going up the railing.  So I

14  was like, ah, there's a way.

15  Q.  And where were you trying to go again?

16  A.  To the scaffolding that was -- like if you're facing the

17  Capitol building, it was off to the right.

18  Q.  And you were trying to get to the scaffolding there?

19  A.  Yeah.

20  Q.  Were there any police officers when you were walking

21  around --

22  A.  No.

23  Q.  -- during that period?

24  A.  No.

25  Q.  Not that you could see in front of you?

1    A.  No.

2    Q.  Were there signs in front of you that said you couldn't

3    be there?

4    A.  No.

5    Q.  What was the crowd acting like at this point?

6    A.  The mood of the crowd had definitely changed.  Everybody

7    seemed like they were getting really agitated and angry.

8              So, yeah, they were kind of like agitated and

9    angry, and then they were really looking for, like, Antifa.

10   Q.  At least that's what you were hearing?

11   A.  Yes.

12   Q.  Do you know what Antifa is?

13   A.  I've heard about Antifa, but I didn't know what they

14   were or what they looked like.

15   Q.  Okay.  Let me show you what's been marked as Government

16   Exhibit 612.17.  This is your video as well.  Do you

17   remember this video?

18              (Video playing)

19   A.  Yes.

20   Q.  So you came to this location before you got to the

21   scaffolding, or did you already make it past the scaffolding

22   by this point?

23   A.  No.  I never made it to the scaffolding.

24   Q.  Okay.

25   A.  There were so many people that were coming down from

1    that area that I was, like, I don't think I'll be able to

2    make it because I didn't want to be, like, busting through

3    people.

4              So I got off the railing, and I stood there off

5    like the section, wherever it is.

6    Q.  And what were you thinking during this time that you're

7    there?

8    A.  Really I was just thinking of how crazy this was.  It

9    was -- you know, this -- like, what was going on?  I never

10   seen anything like this before.  So, like I said, I was just

11   taking pictures and videos and sending them to my friends.

12   Q.  Were you planning on breaking into the Capitol?

13   A.  No.

14   Q.  Let me show you what's been marked as Government's --

15   well, what's been admitted as Government's Exhibit 612.21.

16              MS. DOUENAT:  And if we could pause it when we

17   have it.  This is a six-minute-and-50-seconds video.

18              And I'm not trying to repeat these videos, Your

19   Honor.  I know the Court has seen them multiple times, but

20   since he's the videographer I just want --

21              THE COURT:  I understand.

22              MS. DOUENAT:  So I'm going to take it in three

23   parts.  So we're going to break it down first and play the

24   first four minutes.

25              (Video playing)

1            MS. DOUENAT:  Can you pause it right there for a

2      second.

3      Q.  So you can't see inside that little archway, can you?

4      A.  Right.

5      Q.  And you still have your phone up at this point?

6      A.  Uh-huh, yes.

7      Q.  And even when you're filming you can't see inside the

8      archway, right?

9      A.  Yes.

10     Q.  But you start seeing some shields being pulled out?

11     A.  Yes.

12     Q.  What are you thinking when that's happening?

13     A.  I was thinking, like, what the hell was going on,

14     and where did they get those things?  I was just thinking,

15     like, maybe they had gotten into a locker or something and

16     pulled -- and were pulling out shields.

17     Q.  Were -- at this point were you seeing people injured, or

18     no?

19     A.  Yes, yes, I was.  That was part of the reason why -- or

20     one of the reasons why I kind of changed my mind from going

21     up to the thing.  I saw people coming out of there, and

22     there were like -- I saw some people who were like all

23     bloody.  People -- like their faces were all red and stuff

24     like that.  So I was like whoa.

25     Q.  So you still think it was a locker that they were --

```
 1    A.  Yeah, as I said --

 2              THE COURT REPORTER:  Please let her finish the

 3    question.

 4              THE DEFENDANT:  Sorry.

 5              MS. DOUENAT:  Yes, I'm sorry.

 6    Q.  Let's wait until I finish.

 7              So you see shields, and you're thinking somebody

 8    took these shields?

 9    A.  Uh-huh.

10    Q.  You're not thinking there's police officers there at

11    this point?

12    A.  Yes.

13              MS. DOUENAT:  Okay.  And we're going to continue

14    playing.

15              (Video playing)

16              MS. DOUENAT:  We're going to pause it and move

17    straight to four minutes now.

18    Q.  You heard yourself say something?

19    A.  Yes.  I don't really think it sounds like me, but "Stomp

20    your feet."

21    Q.  You think it's you, or you don't think it's you?

22    A.  I really don't think that's me.

23    Q.  Okay.  All right.  And that's fair.

24              I know an agent had testified that it could have

25    been your voice.  But you're saying it wasn't you?
```

1    A.  Yes.

2    Q.  Okay.  And that's fair.

3            MS. DOUENAT:  And we're going to be playing now

4    from 4:00 to 4:20.

5            (Video playing)

6            MS. DOUENAT:  Please pause.

7    Q.  So there you just -- you just speak into the camera,

8    right?

9    A.  Uh-huh, yeah.

10   Q.  And what are you saying?

11   A.  I said, "We're going in.  We're going in."  And

12   there's -- they're using tear gas.

13   Q.  And who do you think they are?

14   A.  I don't -- I still haven't seen anybody.  I thought

15   perhaps they had gotten into it with Antifa because that's

16   what everybody was wanting to do.  And so I was like, "Oh,

17   dang, are they fighting with Antifa?"  And I was like,

18   "Where are these shields coming from?"

19   Q.  And what was the crowd's attitude at this point?  What

20   was -- how were you feeling at this point?

21   A.  I was excited, but, you know, I wasn't mad at anything

22   or anybody.  It was the people in there were -- seemed like

23   they were upset.

24   Q.  Now let me show you --

25           MS. DOUENAT:  I'm going to switch, I'm sorry, to

```
 1    Government's Exhibit 301.2, and it's at 3:07:58.  Actually,

 2    yes, 3:07:58.  And you can just pause it at that still.

 3              (Video playing)

 4              MS. DOUENAT:  Okay.  Stop it right there.

 5    Q.  Do you see yourself at all here?

 6    A.  I do believe so.

 7    Q.  Can you circle where you think you are.

 8    A.  Right there.

 9    Q.  Because of your cell phone?

10    A.  Yes.

11    Q.  Yes.  And you see the time stamp on this video?

12    A.  Yes.

13    Q.  And what does it say?

14    A.  It says 3:07 and 56 seconds.

15    Q.  Would it be fair to say that that's when you entered the

16    tunnel?

17    A.  Yes.

18    Q.  Okay.  Now I'm going to show you the same still from

19    this exhibit, 301.2, but it's going to be at 3:14:24.  Yes,

20    3:14:24.

21              (Video playing)

22              MS. DOUENAT:  3:14:24.

23    Q.  Do you see yourself at all in here?

24              MS. DOUENAT:  Go a little bit further.

25              (Video playing)
```

```
 1              MS. DOUENAT:  Stop it right there.

 2    Q.  Do you see yourself in here?

 3    A.  Oh, I think so.

 4    Q.  That would be you?

 5    A.  Yes.  Yes.

 6    Q.  And that's when you're exiting the tunnel?

 7    A.  Yes.

 8    Q.  And that's at what time?

 9    A.  At 3:14 and 24 seconds.

10    Q.  And when you entered the tunnel you had a hat and a

11    beanie?

12    A.  Yes.

13    Q.  And when you're exiting, you don't?

14    A.  Yes.

15    Q.  Okay.  So you were in the tunnel for six minutes?

16    A.  Yes.

17    Q.  Approximately five to six minutes?

18    A.  Yes.

19    Q.  Okay.  So those six minutes, do you remember them?

20    A.  Yes.

21    Q.  And did they feel like six minutes?

22    A.  No.

23    Q.  What did it feel like?

24    A.  It felt like forever.

25    Q.  What was it like in there?
```

1    A.  It was really chaotic.  Everybody was really upset.

2    Everybody was -- at the time I didn't know that -- I thought

3    it was security guards.  When I actually saw -- when I got

4    like to the back of that line and I saw what it was, I was

5    like, "Oh, shit, it's -- there's security guards they're

6    fighting against."

7            So I was like, "Oh, damn, these people are

8    stupid."  And so I was like, "Well, I'm just going to film

9    this stuff," you know, because I had never seen anything

10   like this before in my life.

11           MS. DOUENAT:  And let's play your film.  So

12   GX612.21 from 4:20 when you enter the tunnel to 6:59, which

13   is two minutes and 40 seconds.

14           PARALEGAL ALEXANDER:  612, I'm sorry, Marina?

15           MS. DOUENAT:  612 and you start at 4:20.

16           That's good.

17           (Video played)

18           MS. DOUENAT:  Actually, let's pause it for a

19   second.  I missed one part of this video.

20           If we could start at -- no, no, that's correct.

21   That was right.  I'm sorry.

22           (Video played)

23           MS. DOUENAT:  Stop it.

24   Q.  So did you hear what you said in the video?

25   A.  Yes.

1   Q.  What did you say?

2   A.  I said, "I can't handle it."

3   Q.  Why did you say that?

4   A.  Because somebody had like -- somebody had jumped over

5   the top from behind and like sprayed some -- whatever, some

6   eye irritant stuff, whatever.  And the cops were also

7   spraying stuff.

8           And so everybody just got like blasted with like a

9   huge cloud of that spray, and it was everywhere.  And so I

10  was -- I inhaled it, and it was in my eyes, and so I was

11  like I can't handle it.

12  Q.  And you were coughing?

13  A.  Yes.

14  Q.  And you're facing towards the exit at that point.

15  A.  Yes.

16  Q.  But you don't exit.

17  A.  No.

18          MS. DOUENAT:  And we're going to play the next

19  video, which is video GX612.23, and that is a one-minute-

20  19-second video.

21          (Video played)

22  Q.  There was a lot going on in this video.  When it starts

23  do you remember seeing a shield kind of in one of your

24  hands?

25  A.  Yes.

1    Q.  How did that happen?

2    A.  Well, they were all like passing shields back and forth,

3    and I was just standing there like kind of like close to

4    those doors, and a shield was coming, and it like -- I

5    didn't want to get hit in the head by it, so as it came down

6    I was like, "Oh, shit," and I kind of like -- it came down,

7    and I just kind of grabbed it, like the little handle, and I

8    was like, "Ah," and I just kind of pushed it away.

9    Q.  And within a few seconds after that, then your camera

10   goes red.  Can you tell us what happened.

11   A.  Yes.  So I was standing there like off to the side

12   because I didn't want to get into any of what was going on,

13   and I was -- had my phone, and I was like still recording.

14   And I kept kind of just going with my phone like this, and I

15   kept seeing that lady that was stuck in there.  And I was

16   like, "Why is she still there?  This is crazy."

17            So I was going back and forth.  And then all of a

18   sudden something just, bam, knocks my phone out of my hand.

19   And so I was like, "Oh, fuck."

20            I'm going to cuss because -- I don't want to, but

21   I'm just -- like that's what was going on at the time, and I

22   don't want to offend anybody.  So --

23            THE COURT:  All right.  Tell me what you thought.

24            THE WITNESS:  Okay.

25   A.  So I was like, "What the fuck?"  Like, "What just

1    happened?"  So I was like going down -- I was bending over

2    to pick up my phone, and that's kind of when I noticed my

3    hand.  I was like, "What the hell?"

4              And as I was picking up my phone, like going

5    bending over to pick up my phone, I was kind of like

6    squatting.  I was bending down like that.

7              Can you still hear me?

8              THE COURT:  Yes.

9              THE WITNESS:  Okay.

10   A.  And then all of a sudden I feel like this -- like this

11   arm and hand come over my back and, like, in between, like,

12   my shoulder blades, like a little past my shoulder blades,

13   and it hit me in the back, and then it -- it raked me

14   forward.

15             And so I -- when I was -- like I said, I was still

16   on the ground bending over.  I thought that I went forward,

17   and I was like, "What the fuck?"  And I just -- I looked up,

18   and I just saw, like, a black figure in front of me, and so

19   it was just, like, right then I just went from zero to 100,

20   like, in a snap.  And it's like -- it's like I went from

21   safe to -- from green to red, man.

22             And I put my phone in my mouth because, you know,

23   I was trying to eliminate a threat that I thought was

24   happening.  So I grabbed his face mask, and I started

25   shaking it, trying to remove it.

1    And, you know, I had the phone in my mouth, and I
2    saw like a baton come up, so I grabbed it, and I'm doing
3    this at the same time because I didn't know like what hit
4    me.  So I was grabbing back because I didn't want to get hit
5    again.  So I was grabbing.
6    We're going back and forth like this, and I was
7    cussing thinking, like -- you know, initializing this
8    threat, and I was trying to get the mask off so he could
9    feel the shit that I was feeling at the same time because
10   all that stuff was everywhere.  And so I was just -- I was
11   just -- I was just mad because I didn't know what happened
12   and why I got hit.  And I just -- that's -- I just -- I just
13   grabbed that stuff.
14   And I pulled his mask off, and I was still holding
15   on to the thing, the baton, and we were kind of going back
16   and forth.  And there was like a little metal strip there
17   from the door, and so I just put my foot on it and I jerked
18   it away, and that's -- and so I was standing there, and I
19   was like, "You motherfucker, I'm going to fucking" -- and I
20   was so pissed.
21   And all of a sudden, when I was saying that stuff,
22   I heard somebody say, "Don't hurt him.  Don't hurt him.
23   Don't hurt him.  He's one of us.  He's an American.  He's
24   just doing his job."
25   And I didn't know where the voice came from.  This

1    is going to sound weird, but at the time I thought that it

2    was like the Holy Ghost, like God.

3            And I was like, all of a sudden I was like, "Oh,

4    fuck, what happened?"  I was like -- I didn't want this to

5    happen.  I didn't -- I didn't -- I didn't want to hurt

6    anybody, and I wasn't there for that.

7            So I was like, "Fuck, like what just happened?"

8    Like I didn't know.

9            And so I was like, "Shit."

10           And so then I heard the voice again, like "Don't

11   hurt him.  Don't hurt him.  He's one of us.  He's an

12   American."

13           And I was like, "Shit."

14           And then he says -- and then I look and I see

15   somebody, and he's like, "Help me.  Help me.  He's stuck.

16   He needs help."

17           So I was like, "Shit."

18           So I reach over and I grab him, because the guy

19   was saying he's stuck.  He's getting pushed from his guys.

20   And I was like, "Shit."

21           So I grab him, and -- I still had that thing in my

22   hand, and I grab him, and I pulled him towards me kind of

23   like in an angle, and then I push him back.

24           And the other dude was there.  He was like -- he

25   was yelling to the cops, and he was like, "Hey, man, he

```
 1    needs help, he needs help.  He was getting smushed by y'all

 2    in the door."

 3            And I was like, "Holy shit."

 4            So I was like standing there watching, like --

 5    watching him as they grab him, and he walked back.

 6            And then I just -- I just like, "Fuck, I gotta get

 7    outta here," because I didn't expect this.  And so I just

 8    started walking out.

 9    Q.  And that's what you remember?

10    A.  Yes.

11    Q.  And you felt like it was a long time?

12    A.  Yeah, yeah.

13    Q.  I'm going to show you a different view of what happened

14    to Officer Hodges, and it's Government's Exhibit 501.9.

15            MS. DOUENAT:  Actually, let's play 501 first at

16    20:26 to 20:44, which is approximately 18 seconds really is

17    what it is.

18            (Video played)

19    Q.  Is that pretty accurate of what happened?

20    A.  Yes.

21    Q.  And you don't have your hat or your beanie at that

22    point?

23    A.  No.

24    Q.  Is that when it was knocked off, right before that?

25    A.  Yes.
```

```
 1    Q.  I'm going to show you some stills, 501.10, Government's
 2    Exhibit 501.10.
 3            Do you see Officer Hodges trying to remove your
 4    hand from his mask?
 5    A.  No.
 6    Q.  Do you see it on the video -- I mean, on the photo?
 7    A.  I see it now.
 8    Q.  I'm sorry?
 9    A.  I see it now, yes.
10    Q.  But you didn't realize that was happening then?
11    A.  No.
12    Q.  Because you were angry, and you went from zero to 100 --
13    A.  Yeah.
14    Q.  -- so quickly?
15    A.  Yeah.
16    Q.  You reacted, and it went fast, right?
17    A.  Yes.
18    Q.  Slow in your mind, but it was, if you look at the video,
19    seconds?
20    A.  Yes.
21            MS. DOUENAT:  Can we show 501.11.
22    Q.  Here Officer Hodges is still trying to pull you off of
23    him with his hand; is that right?
24    A.  Yes.
25    Q.  And then 511.12.
```

```
1                    And then 511.13.
2                    So he's trying to also stop this from happening,
3      right?
4      A.  Yes.
5      Q.  Okay.  But you don't remember any of that?
6      A.  No.
7      Q.  Okay.  You do remember, though, removing the baton?
8      A.  Yes.
9      Q.  But you didn't hit him with it?
10     A.  No.
11     Q.  Okay.  And you do remember that?
12     A.  Yes.
13     Q.  And you also remember pulling his gas mask off?
14     A.  Yes.
15     Q.  Okay.  How did that make you feel, when you realized
16     what was going on and what had happened?
17     A.  I felt like I fucked up, like I wasn't there to do
18     anything.
19                    I wasn't there to hurt anybody, do anything to
20     anybody.  I just wanted to film something that I had never
21     seen before and I never thought I'd see again.
22     Q.  Let me show you --
23     A.  Okay.
24     Q.  Sorry, I didn't mean to interrupt you.
25     A.  No.
```

```
 1    Q.  Let me show you leaving the tunnel.

 2              MS. DOUENAT:  It's Government Exhibit 301 at

 3    3:13:38.

 4              PARALEGAL ALEXANDER:  301?

 5              MS. DOUENAT:  301 at 3:13:38.  And pause it there.

 6    And we'll play it to 3:13:54 in a minute.

 7              PARALEGAL ALEXANDER:  3:13 -- I'm sorry?

 8              MS. DOUENAT:  3:13:38.

 9              (Video played)

10              MS. DOUENAT:  I'm sorry, it's 301.2.

11              MS. AKERS:  I'm sorry, what was it?

12              PARALEGAL ALEXANDER:  301.2.

13              MS. DOUENAT:  I appreciate that.  So it's a

14    different video.  301.2.

15              PARALEGAL ALEXANDER:  I'm sorry, Marina.

16              MS. DOUENAT:  No, no, it's me.  I told you the

17    wrong video.

18              At 3:13:38.

19              You can start it there.  That's good.

20              (Video played)

21              MS. DOUENAT:  Can you pause it for a second.

22    Q.  Do you see yourself here?

23    A.  Yes.

24    Q.  Okay.  Where are you?

25    A.  Right here.  (Indicating)
```

```
1   Q.  Do you see yourself carrying something?

2   A.  Yes.

3   Q.  We're going to follow you now.

4            (Video played)

5   Q.  What happens here?

6            MS. DOUENAT:  Can you pause it at 3:13:55.

7   Q.  Right before that, what happened?

8   A.  It looked like somebody grabbed the baton from me.

9   Q.  What were you thinking when you were walking out of

10  there?

11  A.  I was like, "I've got to get the hell out of here."

12  Q.  And you had a baton in your hand.  What did you think

13  was going on with that?

14  A.  I had no idea.  I was just like -- just walking out

15  like, "What the hell?"

16  Q.  So it's fair to say you were kind of out of it?

17  A.  Yeah.

18  Q.  And when you walked out --

19           MS. DOUENAT:  We're going to show Government's

20  Exhibit 533.1 at eight seconds.  And if we could pause at

21  eight seconds.

22           Is this the right one?  533?

23           PARALEGAL ALEXANDER:  533.1?

24           MS. DOUENAT:  Yes.

25           (Video played)
```

1    MS. DOUENAT:  Pause it, please.  Can you pause it

2    for a second.

3    Q.  Did you see yourself in the video?

4    A.  Yes.

5    Q.  Okay.  Where are you, if you can circle it?

6    A.  (Witness complies)  Right there, yeah.

7    Q.  You circled around yourself --

8    A.  Yes.

9    Q.  -- exiting from the archway?

10   A.  Yes.

11       MS. DOUENAT:  Thank you.

12       Can you continue playing it until 33.

13       (Video played)

14       MS. DOUENAT:  Stop right there.

15   Q.  What is going through your head when you're doing that?

16   A.  There was --

17   Q.  And what are you doing, first, for the record?

18   A.  I put my arm up like that because there were people

19   yelling "USA," and so it reminded me of my deployments when

20   we would come home and there would be a bunch of people that

21   would -- like it was a terminal, they would line up there, a

22   bunch of old people, and they would all cheer us as we came

23   back, and they would be, you know, singing the national

24   anthem and saying "USA" and "America" and all that, and it

25   just -- it reminded me of that.

```
 1                 MS. DOUENAT:  And let's play it a little bit more.
 2                 (Video played)
 3                 MS. DOUENAT:  Stop it.
 4      Q.  At this point you're trying -- where are you headed?
 5      A.  I'm heading down the stairs.
 6      Q.  And where do you go after that?
 7      A.  I leave the whole thing, the whole...
 8      Q.  Area?
 9      A.  Yeah, the whole area.  And I start walking down the
10      street.  And I thought I was on the street that we had
11      walked up, but I wasn't, I guess.  And I -- the only point
12      of reference that I had was the Ellipse, and so I went
13      there.
14      Q.  And did you look for Mike, or how did you -- because
15      Mike wasn't with you, right?
16      A.  No, Mike was not with me.
17      Q.  Okay.  So did you find Mike?
18      A.  Eventually.  Well, he found me.
19      Q.  Were you trying to communicate with him?
20      A.  Yes, I was sending him text messages letting him know
21      where I was, and like, you know, "Where are you at?  What's
22      going on?  Where are you at?"
23                 And eventually when he got to me he just told me
24      he had a bad phone, and it had died -- it kept dying on him,
25      and he was trying to find a way to charge it.
```

```
1              MS. DOUENAT:  And I know the Court has those

2     exhibits, which are 613 -- the text messages between

3     Mr. Mike Ingersoll and Mr. Cappuccio.  We're not going to

4     play them since it's admitted into the record.  Is that

5     okay?

6              THE COURT:  Yes.

7              MS. DOUENAT:  Thank you.

8              Your Honor, I have one -- a few more -- I promise

9     I'm wrapping it up.

10    Q.  Let me show you Government's Exhibit 612.25,

11    Mr. Cappuccio.

12              What is that?

13    A.  It's a picture of my left hand that I was holding my

14    phone in that I got -- it got hit.

15    Q.  So that's just what happened when you were there?

16    A.  Yes.

17    Q.  Okay.  And how long did you have to wait for Mike?

18    A.  It seemed like it was forever.  I really -- I don't know

19    how long it took, but it seemed like it was a long time.  I

20    mean, I was just running around in circles because it was so

21    cold, and I was doing push-ups and stuff just to try to stay

22    warm.

23    Q.  Did y'all leave after that?

24    A.  Yes.

25    Q.  How were you feeling?
```

1    A.  I was just upset that all that happened.

2    Q.  I know that you heard testimony about a BOLO that you --

3    so basically an attachment you sent to Mike Ingersoll in

4    February?

5    A.  Yes.

6    Q.  How did you get that attachment?

7    A.  My buddy Nipper sent it to me.

8    Q.  Okay.  And so you knew somebody was looking for you?

9    A.  Well, yes and no.

10    Q.  Okay.

11    A.  Like --

12    Q.  Well, let me ask you this:  You knew that -- it said

13    that they were looking for people to identify those

14    individuals; is that right?

15    A.  Yes.

16    Q.  Did you do something about that when you received that

17    attachment?

18    A.  Yes.

19    Q.  What did you do?

20    A.  We went to my bishop of our church, and he's an

21    immigration attorney.

22    Q.  So you asked for advice?

23    A.  Yes.

24    Q.  You can't say what he said, but you did ask him for

25    advice?

1    A.  Yes.

2    Q.  And what did you do after that?

3    A.  Just stayed home and did the same things I normally do,

4    taking the kids and picking them up and picking my wife up

5    taking her to work back and forth.

6    Q.  But you had sought a lawyer's advice about what to do

7    about that attachment; is that right?

8    A.  Yes.

9    Q.  But the individual does immigration law?

10   A.  Yes.

11   Q.  Okay.  Your bishop is an immigration attorney is what I

12   meant to say.

13            You were arrested at home; is that right?

14   A.  Yes.

15   Q.  Okay.  You didn't go anywhere else or went into hiding

16   or anything like that?

17   A.  No.

18   Q.  And the last thing I want to ask you is how do you feel

19   about what happened to Officer Hodges that day?

20   A.  I feel really sorry about what happened.  I never wanted

21   anything like that to ever happen.  I feel bad for him.

22            MS. DOUENAT:  Pass the witness, Your Honor.

23            THE COURT:  All right.  This is probably a good

24   point for us to stop for the day.

25            Sir, you can step down, and we'll have your cross-

1    examination in the morning.

2            Why don't we plan to start at 9:00 tomorrow

3    morning.

4            Ms. Douenat, that is your last witness?

5            MS. DOUENAT:  Absolutely, Your Honor.

6            THE COURT:  Okay.  And so I'll ask the government

7    to make sure you've provided any additional *Jencks* to

8    defense counsel by 8:00 a.m. and to have the two special

9    agents here should the defense wish to recross them.

10            I'll also ask, to the extent parties want to

11    brief, I think the two questions are whether it's

12    appropriate to allow for reopening for the limited purposes

13    that I did; and, two, whether these counts would stand as

14    Ms. Akers suggests even regardless of whether the victims

15    are identified.

16            I certainly welcome briefing.  I don't think this

17    relates to your client, Ms. Douenat, but as to Mr. Klein and

18    the government, any briefing on that I'd also ask to be

19    submitted by 8:00 a.m. tomorrow.

20            The parties should be ready for closings.  I'm

21    hoping that we're going to be going and expect that we'll be

22    going to closings tomorrow.  So you should be ready for

23    that.

24            Ms. Akers, anything further for the government?

25            MS. AKERS:  No, Your Honor.

1    THE COURT:  All right.  And Mr. Woodward?

2    MR. WOODWARD:  No, sir.

3    THE COURT:  And Ms. Douenat?

4    MS. DOUENAT:  No, Your Honor.

5    THE COURT:  Thanks, folks.  See you at 9:00 a.m.

6    tomorrow.

7    (Whereupon the hearing was

8    adjourned at 5:23 p.m.)

9

10    **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12    I, LISA A. MOREIRA, RDR, CRR, do hereby

13    certify that the above and foregoing constitutes a true and

14    accurate transcript of my stenographic notes and is a full,

15    true and complete transcript of the proceedings to the best

16    of my ability.

17    Dated this 17th day of August, 2023.

18

19                                    /s/Lisa A. Moreira, RDR, CRR
20                                    Official Court Reporter
                                     United States Courthouse
21                                    Room 6718
                                     333 Constitution Avenue, NW
22                                    Washington, DC 20001

23

24

25

**'**

**'50s** [1] - 977:22
**'80** [1] - 976:22

**/**

**/s/Lisa** [1] - 1080:19

**1**

**10** [1] - 991:23
**100** [5] - 983:21, 1004:22, 1031:3, 1066:19, 1070:12
**1006** [4] - 935:10, 935:14, 935:15, 936:17
**1006.1** [9] - 935:10, 935:14, 935:17, 935:19, 935:23, 936:10, 936:15, 936:16, 936:17
**10:00** [1] - 956:11
**1100** [1] - 927:14
**111(a)/(b** [2] - 940:14, 941:1
**111(a)s** [1] - 941:4
**115** [2] - 933:2, 933:13
**118** [2] - 933:2, 933:13
**120** [3] - 933:14, 933:20, 933:23
**121** [3] - 933:14, 933:20, 933:23
**128** [1] - 933:25
**129** [1] - 934:1
**12:00** [1] - 1043:24
**13** [3] - 927:4, 1020:17
**15** [2] - 986:4, 991:23
**1500** [1] - 959:11
**15:00:27** [1] - 959:12
**17** [4] - 939:6, 941:3, 942:1, 958:9
**175** [1] - 927:21
**17th** [1] - 1080:17
**18** [2] - 958:17, 1069:16
**19** [4] - 939:10, 939:13, 941:3, 942:1
**19-second** [1] - 1064:20
**1970** [1] - 976:15
**1978** [1] - 976:22
**1986** [3] - 951:11, 951:14, 1033:9
**1998** [1] - 976:15
**1:21-cr-00040-TNM-8** [1] - 927:3
**1:21-cr-00040-TNM-9** [1] - 927:4
**1:51** [1] - 927:5

**1st** [1] - 952:10

**2**

**20** [2] - 991:23, 992:9
**200** [1] - 934:4
**20001** [3] - 928:12, 928:17, 1080:22
**20002** [1] - 927:22
**2001** [2] - 996:6, 996:15
**2007** [1] - 993:15
**201** [2] - 934:5, 934:13
**2012** [1] - 986:4
**2014** [8] - 980:16, 984:11, 992:21, 1017:8, 1026:22, 1029:16, 1030:13, 1031:7
**202** [7] - 927:15, 927:19, 927:23, 928:13, 928:17, 934:5, 934:13
**2020** [4] - 952:9, 952:11, 996:16, 1030:5
**2021** [4] - 930:14, 931:2, 931:5, 992:19
**2023** [2] - 927:4, 1080:17
**203** [2] - 934:5, 934:16
**204** [2] - 934:5, 934:16
**20530** [2] - 927:15, 927:18
**20:26** [1] - 1069:16
**20:44** [1] - 1069:16
**21** [1] - 965:4
**210** [1] - 928:9
**2105** [1] - 986:13
**2131** [1] - 986:4
**21:31** [1] - 986:13
**22** [4] - 958:21, 971:21, 1019:16, 1020:9
**24** [1] - 1062:9
**240** [1] - 1021:14
**252-6778** [1] - 927:19
**29** [6] - 938:5, 938:8, 940:4, 941:25, 971:20, 973:19
**2:21** [1] - 1049:10
**2nd** [1] - 930:16

**3**

**3** [1] - 964:11
**30** [2] - 991:23, 992:4
**301** [3] - 1072:2, 1072:4, 1072:5
**301.2** [5] - 1061:1,

1061:19, 1072:10, 1072:12, 1072:14
**302** [7] - 960:3, 961:8, 966:8, 969:14, 969:17, 970:1, 970:2
**309.81** [1] - 1001:24
**33** [1] - 1074:12
**333** [2] - 928:16, 1080:21
**353-0521** [1] - 927:15
**354-3187** [1] - 928:17
**3:00** [2] - 959:11, 964:11
**3:00:27** [4] - 962:4, 962:15, 964:11, 965:2
**3:07** [1] - 1061:14
**3:07:58** [2] - 1061:1, 1061:2
**3:13** [1] - 1072:7
**3:13:38** [4] - 1072:3, 1072:5, 1072:8, 1072:18
**3:13:54** [1] - 1072:6
**3:13:55** [1] - 1073:6
**3:14** [1] - 1062:9
**3:14:24** [3] - 1061:19, 1061:20, 1061:22
**3rd** [1] - 954:21

**4**

**40** [2] - 992:9, 1063:13
**400** [1] - 928:12
**429** [5] - 959:11, 962:22, 964:10, 964:13, 965:2
**472-6700** [1] - 928:9
**4:00** [2] - 1018:15, 1060:4
**4:20** [3] - 1060:4, 1063:12, 1063:15
**4th** [1] - 955:4

**5**

**5** [1] - 978:7
**50** [3] - 992:4, 1006:2, 1017:15
**501** [6] - 958:8, 965:4, 965:6, 973:16, 986:3, 1069:15
**501.10** [2] - 1070:1, 1070:2
**501.11** [1] - 1070:21
**501.9** [1] - 1069:14
**511.12** [1] - 1070:25
**511.13** [1] - 1071:1
**533** [1] - 1073:22
**533.1** [2] - 1073:20,

1073:23
**534-6525** [1] - 928:4
**54** [2] - 1019:10
**56** [1] - 1061:14
**598-3962** [1] - 927:23
**5:00** [1] - 1037:13
**5:23** [1] - 1080:8
**5:30** [1] - 1040:2
**5th** [6] - 930:21, 948:14, 952:10, 956:4, 956:14, 1036:22

**6**

**6** [3] - 931:2, 931:5, 988:10
**6,000-and-some** [1] - 999:23
**601** [1] - 927:18
**611.10** [3] - 1048:8, 1048:10, 1048:11
**611.36** [1] - 1023:3
**612** [2] - 1063:14, 1063:15
**612.11** [1] - 1052:1
**612.13** [1] - 1053:16
**612.17** [1] - 1056:16
**612.21** [2] - 988:5, 1057:15
**612.23** [1] - 988:11
**612.25** [1] - 1076:10
**612.33** [1] - 1039:11
**612.5** [1] - 1046:25
**612.9** [1] - 1049:3
**613** [1] - 1076:2
**6718** [2] - 928:16, 1080:21
**6:31** [1] - 988:6
**6:59** [1] - 1063:12
**6th** [24] - 931:8, 931:19, 931:25, 932:4, 932:12, 935:18, 935:20, 946:23, 947:5, 947:19, 947:21, 948:7, 948:17, 948:18, 949:3, 966:22, 973:11, 973:14, 1007:24, 1008:23, 1008:24, 1009:3, 1036:21, 1037:11

**7**

**700** [1] - 928:3
**727** [1] - 928:7
**78206** [1] - 928:8
**79901** [1] - 928:4

**8**

**8:00** [2] - 1079:8, 1079:19

**9**

**9.1811** [1] - 927:22
**900** [1] - 934:22
**901** [1] - 935:6
**902.11** [2] - 933:3, 933:9
**903** [2] - 934:22, 935:7
**904** [1] - 934:22
**905** [2] - 934:22, 935:7
**915** [1] - 928:4
**996-7447** [1] - 928:13
**9:00** [2] - 1079:2, 1080:5
**9:30** [1] - 956:11

**A**

**a.m** [3] - 1079:8, 1079:19, 1080:5
**ability** [1] - 1080:16
**able** [27] - 946:5, 958:11, 959:5, 959:7, 960:24, 963:13, 964:7, 972:10, 977:7, 984:4, 1008:18, 1010:18, 1025:24, 1026:1, 1026:3, 1027:6, 1028:12, 1031:19, 1031:22, 1032:15, 1035:20, 1038:24, 1046:7, 1057:1
**absolutely** [6] - 1004:22, 1014:23, 1015:4, 1015:7, 1017:19, 1079:5
**accordance** [1] - 967:18
**account** [1] - 951:6
**accountability** [1] - 1024:10
**accounts** [2] - 981:17, 998:2
**accumulation** [1] - 1028:7
**accurate** [4] - 967:13, 982:6, 1069:19, 1080:14
**accurately** [1] - 967:6
**acid** [1] - 1030:19
**acquittal** [2] - 938:8, 942:1
**act** [1] - 990:19
**acting** [4] - 989:13,

1047:21, 1050:2, 1056:5
**Action** [1] - 927:3
**actions** [9] - 932:8, 947:17, 983:4, 984:9, 991:20, 1006:22, 1012:4, 1015:20, 1016:7
**active** [1] - 976:15
**activities** [1] - 1007:21
**activity** [3] - 989:6, 992:15, 1013:3
**acts** [1] - 1053:5
**actual** [1] - 948:20
**acupuncture** [1] - 1032:12
**acute** [1] - 977:9
**add** [1] - 997:18
**addition** [1] - 985:14
**additional** [2] - 933:1, 1079:7
**adjourned** [1] - 1080:8
**admit** [5] - 933:1, 933:25, 934:8, 935:12, 943:17
**admitted** [3] - 936:17, 1057:15, 1076:4
**admonish** [1] - 1009:16
**adolescent** [1] - 976:2
**advanced** [1] - 981:8
**advice** [3] - 1077:22, 1077:25, 1078:6
**advisement** [1] - 938:16
**advocate** [3] - 996:7, 1014:21, 1014:24
**affects** [1] - 1041:22
**affidavits** [1] - 986:2
**afforded** [1] - 997:9
**Afghanistan** [8] - 980:24, 981:18, 982:14, 982:16, 1020:14, 1021:12, 1021:13
**Africa** [2] - 939:16, 966:4
**AFTERNOON** [1] - 927:9
**afternoon** [11] - 930:9, 930:10, 946:11, 950:22, 974:25, 975:5, 975:6, 993:4, 993:5, 1018:23, 1018:24
**age** [1] - 979:3
**agencies** [1] - 977:18
**Agent** [2] - 936:3, 936:6, 937:10, 937:21, 938:23,

939:20, 939:22, 940:1, 942:20, 942:24, 944:9, 944:22, 946:5, 957:7, 957:9, 957:15, 959:15, 960:19, 961:16, 962:13, 963:1, 963:24, 965:1, 965:5, 965:15, 970:9, 971:25, 973:3, 974:1
**AGENT** [2] - 929:6, 957:12
**agent** [4] - 948:2, 1049:10, 1049:13, 1059:24
**agents** [2] - 939:3, 1079:9
**agitated** [2] - 1056:7, 1056:8
**ago** [11] - 933:4, 942:16, 951:19, 951:21, 966:2, 966:3, 966:6, 968:23, 973:12, 999:6, 1020:9
**agree** [17] - 937:16, 942:5, 943:21, 997:24, 998:4, 998:5, 998:6, 998:12, 998:13, 998:15, 1009:4, 1009:6, 1009:14, 1009:21, 1009:23, 1009:24
**agreed** [6] - 934:8, 980:16, 996:4, 996:9, 998:9, 1043:5
**agreeing** [1] - 967:15
**agreement** [1] - 978:10
**ahead** [3] - 975:11, 1004:10, 1012:23
**aid** [2] - 1022:7, 1022:8
**air** [1] - 1051:13
**airborne** [1] - 1020:25
**Akers** [12] - 932:24, 942:4, 944:22, 948:1, 972:24, 993:1, 993:6, 1004:4, 1004:10, 1006:15, 1079:14, 1079:24
**AKERS** [66] - 927:13, 932:25, 933:14, 933:20, 933:24, 934:4, 934:21, 935:10, 935:16,

935:21, 936:5, 936:7, 936:18, 936:21, 936:25, 937:3, 938:18, 938:21, 939:4, 939:13, 941:2, 942:7, 942:10, 942:12, 944:23, 957:14, 958:7, 958:16, 958:20, 959:10, 959:14, 960:2, 960:9, 961:12, 962:8, 963:1, 963:11, 963:19, 963:23, 964:25, 965:14, 965:19, 970:7, 971:15, 973:2, 973:25, 974:5, 974:7, 974:10, 974:18, 982:1, 983:2, 983:25, 987:11, 989:18, 993:3, 996:12, 1004:6, 1006:16, 1012:22, 1013:21, 1013:23, 1016:14, 1018:2, 1072:11, 1079:25
**Akers)**.....................
..............**957** [1] -
929:7
**akers)**.......................
..............**973** [1] -
929:8
**Akers)**.......................
..............**993** [1] -
929:10
**akin** [1] - 944:1
**Alabama** [1] - 996:5
**Alaska** [1] - 1029:20
**ALEXANDER** [8] - 988:9, 1048:10, 1063:14, 1072:4, 1072:7, 1072:12, 1072:15, 1073:23
**Alexander** [1] - 1023:2
**ALINA** [2] - 929:3, 930:6
**alleged** [4] - 947:17, 949:5, 949:9, 1013:7
**allow** [7] - 941:13, 942:4, 944:9, 945:19, 950:7, 982:9, 1079:12
**almost** [2] - 1020:17, 1021:21
**alone** [2] - 953:10, 1024:13
**altered** [3] - 979:8,

989:3, 990:11
**amazon** [1] - 1030:3
**ambushes** [1] - 1021:19
**Amendment** [3] - 946:23, 949:23, 1050:10
**America** [1] - 1074:24
**AMERICA** [1] - 927:2
**American** [3] - 1022:3, 1067:23, 1068:12
**ammunitions** [1] - 1024:23
**amount** [1] - 1004:14
**analysis** [6] - 1001:11, 1004:20, 1004:24, 1005:4, 1005:14
**analyze** [6] - 990:4, 1002:3, 1002:5, 1004:13, 1004:18, 1011:9
**analyzed** [1] - 979:2
**and-forth** [1] - 1004:18
**and..** [1] - 1030:6
**anger** [1] - 1030:20
**angle** [1] - 1068:23
**angles** [2] - 1051:20, 1051:21
**angry** [3] - 1056:7, 1056:9, 1070:12
**answer** [11] - 930:4, 969:19, 969:21, 970:9, 984:3, 995:4, 995:5, 1006:17, 1007:9, 1018:4, 1021:22
**answered** [3] - 937:22, 1004:25, 1007:7
**answering** [2] - 967:17, 1021:23
**anthem** [1] - 1074:24
**anticipated** [1] - 931:2
**Antifa** [5] - 1056:9, 1056:12, 1056:13, 1060:15, 1060:17
**Antonio** [5] - 928:3, 928:8, 951:4, 951:11, 951:13
**anxiety** [4] - 1030:18, 1031:24, 1040:13, 1040:24
**apnea** [3] - 984:24, 1000:5, 1030:19
**apologize** [2] - 945:2, 1006:19
**app** [2] - 1035:18, 1036:4
**appearance** [1] - 1046:4
**APPEARANCES** [2] -

927:12, 928:1
**appellate** [1] - 996:5
**applied** [2] - 1002:15, 1002:17
**appointee** [1] - 931:22
**appreciate** [5] - 937:25, 945:3, 945:6, 967:10, 1072:13
**approach** [4] - 947:9, 960:2, 961:12, 962:8
**appropriate** [5] - 945:22, 968:22, 982:8, 1038:23, 1079:12
**appropriately** [1] - 1038:17
**Aquilino** [1] - 957:22
**archway** [3] - 1058:3, 1058:8, 1074:9
**area** [12] - 935:20, 948:11, 975:22, 1037:5, 1042:3, 1044:13, 1048:18, 1048:23, 1055:2, 1057:1, 1075:8, 1075:9
**areas** [2] - 979:2, 1036:1, 1048:22
**argument** [2] - 941:18, 941:19
**arguments** [2] - 941:17, 943:15
**arises** [1] - 978:14
**Arlington** [3] - 956:7, 956:8, 1037:4
**arm** [2] - 1066:11, 1074:18
**armored** [1] - 1021:6
**Army** [11] - 1015:10, 1015:12, 1016:10, 1020:19, 1020:24, 1021:2, 1024:16, 1027:3, 1027:4, 1053:4, 1053:6
**arrangements** [1] - 937:7
**arrested** [1] - 1078:13
**arrive** [1] - 1036:21
**arrived** [1] - 1036:22
**article** [3] - 1010:2, 1010:5, 1010:8
**ASHLEY** [1] - 927:13
**Ashley** [1] - 993:6
**ashley.akers@usdoj.
gov** [1] - 927:16
**aside** [1] - 979:12
**aspect** [2] - 991:3, 991:25
**assert** [3] - 1004:19,

1083

1005:24, 1006:4
**assessment** [2] -
996:8, 1008:17
**assessments** [1] -
1010:6
**assimilate** [1] -
1028:17
**AT&T** [1] - 951:6
**atmosphere** [2] -
1045:15, 1052:12
**attached** [1] - 969:17
**attachment** [7] -
1034:3, 1034:7,
1034:9, 1077:3,
1077:6, 1077:17,
1078:7
**attack** [2] - 1013:7,
1013:12
**attacked** [4] - 1011:22,
1011:25, 1012:6,
1012:11
**attacks** [1] - 1021:19
**attempts** [1] - 1002:9
**attend** [1] - 931:25
**attending** [1] - 931:19
**attitude** [1] - 1060:19
**attorney** [2] - 1077:21,
1078:11
**attorneys** [6] - 995:18,
996:23, 997:17,
998:19, 1001:18,
1004:17
**attuned** [1] - 940:6
**August** [1] - 1080:17
**authenticating** [1] -
933:16
**automatic** [2] - 991:3,
991:14
**available** [1] - 952:19
**Avenue** [2] - 928:16,
1080:21
**awarded** [1] - 982:23
**aware** [7] - 943:23,
946:25, 948:1,
955:15, 955:18,
972:9, 1032:16
**awesome** [1] -
1032:13

## B

**b)s** [1] - 941:3
**B-207** [1] - 928:8
**background** [1] -
1003:2
**backpack** [1] - 1039:5
**backwards** [1] -
972:13
**bad** [2] - 1075:24,
1078:21

**bam** [1] - 1065:18
**BANASYAK** [2] -
929:3, 930:6
**Banasyak** [1] - 930:3
**bar** [2] - 930:18,
930:20
**barracks** [1] - 1023:15
**barricades** [1] -
1049:24
**based** [11] - 948:21,
963:14, 971:7,
972:1, 972:2,
972:11, 972:22,
978:7, 999:9,
1007:9, 1008:15
**bases** [2] - 981:20,
982:5
**basic** [3] - 981:8,
1021:13, 1024:5
**basis** [5] - 971:23,
980:12, 980:21,
998:1, 1013:8
**baton** [5] - 1067:2,
1067:15, 1071:7,
1073:8, 1073:12
**battle** [5] - 1023:9,
1023:22, 1024:3,
1024:8, 1032:4
**beanie** [2] - 1062:11,
1069:21
**became** [3] - 981:10,
1029:24, 1035:15
**become** [6] - 955:14,
1025:8, 1026:24,
1029:3, 1040:14,
1042:1
**becomes** [1] - 991:14
**BEFORE** [1] - 927:10
**before..** [1] - 948:15
**behalf** [1] - 943:8
**behavior** [3] - 991:14,
1007:6, 1007:7
**behavioral** [1] -
989:25
**behind** [1] - 1064:5
**belong** [1] - 953:24
**bench** [3] - 937:10,
947:11, 950:14
**bending** [4] - 1066:1,
1066:5, 1066:6,
1066:16
**benefit** [3] - 937:20,
943:5, 943:20
**BENJAMIN** [2] - 929:6,
957:12
**Beret** [1] - 1028:3
**best** [4] - 940:17,
944:12, 1026:18,
1080:15
**between** [8] - 946:9,

986:3, 991:12,
992:9, 995:24,
1010:10, 1066:11,
1076:2
**beyond** [3] - 950:8,
950:10, 950:11
**big** [3] - 976:13, 991:9,
1016:11
**bishop** [2] - 1077:20,
1078:11
**bit** [16] - 945:16,
978:1, 978:2,
979:10, 989:20,
1024:14, 1031:7,
1033:6, 1040:4,
1044:7, 1046:25,
1047:17, 1050:17,
1052:14, 1061:24,
1075:1
**black** [3] - 959:1,
965:17, 1066:18
**blades** [2] - 1066:12
**blah** [3] - 1035:23
**blasted** [1] - 1064:8
**bleeding** [1] - 1012:5
**blindly** [1] - 967:15
**blocked** [2] - 1044:14,
1048:22
**bloody** [1] - 1058:23
**blow** [6] - 1011:23,
1013:11, 1013:13,
1013:14, 1013:16
**blown** [1] - 1022:10
**board** [2] - 975:16,
976:2
**board-certified** [1] -
975:16
**bodies** [2] - 991:25,
1022:6
**bodily** [1] - 1013:13
**body** [17] - 939:14,
939:17, 940:21,
959:18, 961:17,
961:19, 961:22,
961:25, 962:1,
962:4, 962:14,
962:16, 962:4,
964:4, 964:8,
964:15, 1027:12
**body-worn** [14] -
939:14, 939:17,
959:18, 961:17,
961:19, 961:22,
961:25, 962:4,
962:14, 962:16,
964:2, 964:4, 964:8,
964:15
**bodycam** [1] - 940:24
**Bogner's** [8] - 961:17,
961:19, 962:4,

962:14, 962:16,
962:20, 964:4, 964:8
**BOLO** [1] - 1077:2
**Boulevard** [1] - 928:7
**boys** [3] - 1052:5,
1052:6, 1053:23
**Bradley** [8] - 981:11,
1020:25, 1021:4,
1021:5, 1021:9,
1022:14, 1022:15,
1022:22
**Bradleys** [5] -
1022:16, 1022:18,
1022:19, 1022:20,
1053:1
**Bragg** [1] - 1028:10
**brain** [12] - 975:24,
978:20, 978:21,
978:23, 978:25,
979:1, 979:2, 979:5,
988:18, 990:16,
991:13, 991:24
**Branch** [1] - 927:14
**branch** [1] - 1020:18
**brand** [1] - 995:1
**BRAND** [1] - 928:11
**brand-new** [1] - 995:1
**break** [5] - 1003:15,
1018:11, 1022:17,
1032:5, 1057:23
**breaking** [1] - 1057:12
**brief** [7] - 944:24,
945:21, 945:25,
974:8, 977:8,
1079:11
**briefed** [1] - 944:18
**briefing** [2] - 1079:16,
1079:18
**briefly** [3] - 943:11,
944:10, 957:8
**brigadier** [1] - 976:16
**broke** [1] - 1042:19
**buddies** [4] - 1023:9,
1023:22, 1024:3,
1032:25
**buddy** [4] - 1023:8,
1024:8, 1052:24,
1077:7
**building** [3] - 934:2,
934:17, 1055:17
**bunch** [4] - 1025:19,
1034:25, 1074:20,
1074:22
**bupropion** [2] -
1040:21, 1040:24
**burden** [4] - 938:5,
941:24, 942:23,
974:14
**busting** [1] - 1057:2
**BY** [9] - 930:8, 950:21,

957:14, 965:23,
973:2, 975:4, 993:3,
1014:2, 1018:22

## C

**C-A-P-P-U-C-C-I-O** [1]
- 1019:2
**California** [2] - 976:23,
1028:11
**camera** [21] - 939:14,
939:17, 940:22,
959:18, 961:17,
961:19, 961:23,
961:25, 962:4,
962:14, 962:17,
962:20, 963:16,
964:2, 964:4, 964:8,
964:15, 973:24,
1051:18, 1060:7,
1065:9
**candidate** [1] - 1046:1
**cannot** [1] - 948:12
**Capitol** [21] - 934:2,
934:17, 935:18,
940:11, 946:22,
948:20, 949:11,
949:15, 953:15,
953:19, 957:19,
966:16, 985:23,
1046:13, 1046:23,
1047:8, 1049:17,
1054:6, 1055:17,
1057:12
**CAPPUCCIO** [3] -
927:6, 929:11,
1018:20
**Cappuccio** [40] -
928:2, 938:4,
947:16, 951:8,
951:10, 952:2,
953:24, 954:3,
955:19, 980:4,
981:24, 983:19,
984:14, 984:25,
985:4, 986:21,
986:22, 987:13,
988:14, 999:11,
1000:14, 1002:3,
1002:15, 1003:17,
1006:22, 1006:25,
1007:10, 1007:18,
1011:11, 1014:16,
1017:2, 1018:13,
1018:19, 1019:2,
1019:3, 1019:6,
1040:7, 1076:3,
1076:11
**Cappuccio's** [10] -
953:13, 953:18,
974:21, 987:4,

992:11, 1004:13, 1008:16, 1009:4, 1010:9, 1011:21
**captured** [1] - 1026:5
**car** [5] - 954:14, 1035:9, 1035:12, 1035:24
**caravan** [4] - 955:21, 956:3, 1035:3, 1035:9
**caravans** [2] - 955:9, 955:14
**care** [2] - 1030:1, 1032:19
**career** [1] - 976:9
**cargo** [1] - 1039:9
**Carlton** [2] - 958:4, 959:16
**carried** [1] - 1021:14
**carrier** [2] - 1021:6, 1021:8
**carries** [1] - 1024:6
**carrying** [1] - 1073:1
**case** [58] - 937:10, 937:15, 937:18, 938:9, 938:24, 938:25, 939:2, 939:8, 939:18, 941:9, 941:23, 942:15, 942:17, 942:22, 943:4, 943:12, 943:14, 944:4, 944:7, 945:12, 945:20, 946:25, 949:25, 966:1, 969:9, 971:8, 974:14, 974:22, 980:2, 985:17, 985:21, 993:7, 994:17, 995:13, 996:3, 996:4, 996:5, 996:10, 996:14, 996:15, 996:16, 996:19, 996:22, 997:8, 997:17, 998:19, 999:2, 999:3, 1001:6, 1003:1, 1010:9, 1012:20, 1013:5, 1015:22, 1017:23
**case-in-chief** [8] - 937:10, 937:15, 937:18, 939:2, 939:8, 939:18, 941:9, 943:14
**cases** [14] - 994:2, 994:5, 994:7, 994:8, 995:7, 995:19, 995:20, 996:11, 997:5, 1014:3,

1014:5, 1014:8, 1014:13, 1015:17
**castle** [3] - 1053:22, 1054:3, 1054:5
**casualties** [1] - 981:1
**caught** [1] - 1008:5
**caused** [1] - 1006:21
**cavalry** [1] - 1034:4
**CCTV** [1] - 934:16
**cell** [1] - 1061:9
**certain** [7] - 972:12, 979:4, 995:11, 1001:23, 1003:11, 1006:22, 1027:5
**certainly** [2] - 974:19, 1079:16
**CERTIFICATE** [1] - 1080:10
**certificate** [1] - 1030:12
**certification** [7] - 931:9, 932:8, 932:12, 933:3, 933:9, 934:24, 934:25
**certified** [2] - 975:16, 976:2
**certify** [1] - 1080:13
**Chaclan** [1] - 950:17
**chain** [1] - 1029:25
**chance** [1] - 1038:23
**change** [6] - 1012:12, 1013:17, 1036:8, 1038:22, 1041:5, 1041:12
**changed** [3] - 1052:13, 1056:6, 1058:20
**changes** [3] - 978:22, 978:23, 979:4
**chanting** [2] - 1054:16, 1054:18
**chants** [2] - 1045:17, 1054:16
**chaos** [1] - 1013:20
**chaotic** [1] - 1063:1
**charge** [1] - 1075:25
**charged** [1] - 949:18
**chat** [1] - 1032:25
**chatting** [1] - 1047:23
**check** [2] - 1010:21, 1038:9
**checked** [1] - 994:5
**checkpoint** [1] - 1042:18
**cheer** [1] - 1074:22
**chief** [8] - 937:10, 937:15, 937:18, 939:2, 939:8, 939:18, 941:9, 943:14

**child** [2] - 976:2, 1019:20
**children** [2] - 1019:17, 1022:10
**choice** [2] - 944:3, 944:4
**chronic** [3] - 984:22, 1000:5, 1005:2
**chunk** [3] - 933:2, 934:4, 934:21
**church** [3] - 1032:10, 1032:11, 1077:20
**circle** [4] - 958:25, 965:12, 1061:7, 1074:5
**circled** [4] - 958:14, 958:24, 964:21, 1074:7
**circles** [1] - 1076:20
**circumstances** [2] - 982:20, 988:25
**citations** [2] - 983:3, 983:4
**City** [3] - 1019:8, 1029:22, 1033:12
**CIV** [2] - 927:13, 927:21
**civilians** [1] - 1022:10
**clarification** [1] - 941:2
**cleanest** [1] - 1002:21
**clear** [7] - 934:13, 938:18, 945:8, 994:7, 1006:24, 1051:7, 1051:9
**clearly** [8] - 978:25, 981:3, 981:16, 992:14, 1000:2, 1010:16, 1012:3, 1012:25
**client** [2] - 949:3, 1079:17
**climb** [1] - 1055:6
**climbing** [1] - 1055:12
**clinical** [6] - 984:6, 993:17, 1005:16, 1010:15, 1010:16, 1010:17
**clinician** [1] - 978:7
**clinicians** [1] - 1000:17
**clips** [2] - 1047:13, 1047:14
**close** [7] - 1023:25, 1042:1, 1044:11, 1044:20, 1045:1, 1055:10, 1065:3
**closed** [1] - 956:12
**closer** [2] - 1042:18, 1044:17

**closing** [4] - 941:17, 941:18, 943:15, 974:20
**closings** [2] - 1079:20, 1079:22
**clothes** [1] - 1041:12
**cloud** [1] - 1064:9
**code** [1] - 1001:18
**cognitive** [3] - 990:6, 990:9, 990:10
**cold** [4] - 1038:21, 1039:7, 1046:16, 1076:21
**colleagues** [1] - 940:11
**College** [3] - 931:11, 932:9, 932:13
**college** [2] - 951:17
**COLUMBIA** [1] - 927:1
**combat** [24] - 978:18, 980:25, 981:17, 982:11, 982:24, 983:1, 983:4, 984:10, 984:23, 989:8, 989:9, 989:15, 990:18, 990:20, 990:22, 991:4, 991:12, 991:13, 1015:12, 1022:24, 1023:24, 1024:7, 1026:16
**coming** [6] - 955:8, 1045:13, 1056:25, 1058:21, 1060:18, 1065:4
**command** [1] - 1026:5
**commander** [9] - 981:11, 1015:16, 1015:17, 1021:9, 1022:12, 1022:13, 1022:22
**commanders** [1] - 1010:14
**comment** [4] - 1011:23, 1052:4, 1053:7, 1054:13
**comments** [1] - 1053:19
**Commercial** [1] - 927:14
**commit** [1] - 992:8
**commonly** [1] - 985:7
**communicate** [3] - 1026:4, 1036:4, 1075:19
**communicating** [1] - 1042:25
**communication** [1] - 1027:16
**communications** [1] -

1027:17
**community** [1] - 982:19
**comorbidities** [1] - 984:20
**compared** [1] - 979:3
**competitive** [1] - 1016:10
**compiled** [2] - 995:21, 1014:12
**complete** [3] - 994:1, 994:18, 1080:15
**completely** [2] - 939:16, 1002:6
**compliance** [1] - 995:2
**complicated** [1] - 997:5
**complies** [2] - 965:13, 1074:6
**comprehensive** [1] - 1013:9
**concern** [3] - 946:8, 954:3, 954:7
**concerns** [1] - 954:6
**conclude** [1] - 944:7
**concluded** [1] - 938:10
**conclusion** [1] - 1008:8
**conditions** [2] - 981:19, 1004:14
**conduct** [5] - 983:4, 991:20, 1015:14, 1015:25, 1016:3
**confer** [1] - 942:8
**conference** [2] - 947:10, 950:14
**confident** [1] - 961:5
**confirm** [5] - 968:5, 980:4, 980:5, 1015:12, 1017:13
**confirmed** [4] - 980:15, 983:13, 983:17, 986:2
**confirming** [5] - 1000:14, 1000:17, 1000:21, 1005:22, 1014:15
**confirms** [1] - 983:1
**confused** [3] - 938:22, 939:11, 1002:6
**confusing** [1] - 988:4
**congressional** [1] - 934:23
**connect** [1] - 1035:19
**connected** [1] - 951:23
**conscientious** [3] - 992:3, 992:12, 992:14

**consequence** [1] - 944:5

**consider** [5] - 945:21, 948:11, 974:17, 997:6, 998:23

**considered** [1] - 937:15

**consistent** [4] - 936:10, 962:23, 985:1, 995:25

**consistently** [1] - 980:15

**constellation** [1] - 977:9

**constitutes** [1] - 1080:13

**Constitution** [2] - 928:16, 1080:21

**consult** [2] - 961:7, 968:5

**contact** [4] - 951:14, 1021:24, 1022:5, 1033:12

**contemporaneously** [1] - 969:15

**contextualized** [1] - 1011:24

**continue** [5] - 945:17, 961:6, 1041:3, 1059:13, 1074:12

**continued** [2] - 927:25, 1031:9

**Continued** [1] - 928:1

**contradictory** [1] - 1010:23

**controlled** [1] - 989:6

**controls** [1] - 942:14

**converging** [1] - 990:1

**conversation** [8] - 969:5, 969:10, 969:12, 969:15, 969:18, 969:23, 970:13, 1011:2

**convoy** [1] - 1035:10

**cool** [4] - 1034:21, 1046:19, 1047:10, 1050:9

**cope** [2] - 985:15, 991:15

**cops** [2] - 1064:6, 1068:25

**copy** [2] - 960:3, 960:7

**correct** [38] - 930:14, 930:15, 930:22, 930:25, 931:17, 931:24, 932:1, 933:12, 934:11, 935:4, 935:8, 945:12, 949:20, 953:23, 959:21,

961:4, 961:5, 963:10, 968:2, 968:7, 968:9, 970:21, 971:4, 976:14, 985:17, 993:9, 993:18, 994:3, 995:5, 999:11, 1006:25, 1008:8, 1014:4, 1034:19, 1036:22, 1043:21, 1049:18, 1063:20

**correspond** [1] - 932:3

**corroborate** [1] - 1011:7

**corroborating** [1] - 984:8

**coughing** [1] - 1064:12

**counsel** [12] - 935:23, 937:6, 938:22, 940:9, 940:19, 942:8, 960:8, 966:25, 968:13, 993:21, 994:1, 1079:8

**Counsel** [1] - 933:19

**counsel's** [1] - 934:8

**counseling** [2] - 985:13, 985:14

**Count** [2] - 939:10, 939:13

**count** [3] - 938:11, 940:15, 941:1

**countries** [1] - 1028:19

**country** [3] - 1006:2, 1021:2, 1021:3

**counts** [5] - 938:3, 938:4, 941:7, 941:19, 1079:13

**Counts** [1] - 941:3

**couple** [6] - 933:4, 942:16, 999:6, 1025:18, 1049:4, 1053:19

**course** [14] - 941:8, 977:18, 981:22, 992:7, 992:22, 998:11, 1000:18, 1001:7, 1002:17, 1016:11, 1024:20, 1025:5, 1027:17, 1032:1

**court** [7] - 961:20, 967:5, 996:5, 997:18, 1019:1, 1019:5, 1034:8

**Court** [35] - 928:15, 928:15, 933:25,

936:10, 937:13, 938:8, 938:25, 939:23, 941:25, 942:13, 943:7, 945:4, 945:6, 946:25, 947:20, 948:8, 949:24, 949:25, 950:1, 983:6, 995:19, 996:9, 996:16, 997:1, 997:2, 997:5, 997:6, 997:9, 997:13, 997:23, 998:19, 1043:3, 1057:19, 1076:1, 1080:20

**COURT** [145] - 927:1, 930:2, 932:16, 932:19, 932:21, 933:7, 933:11, 933:13, 933:17, 933:23, 934:3, 934:10, 934:12, 934:19, 935:3, 935:5, 935:7, 935:9, 935:13, 936:3, 936:12, 936:16, 936:19, 936:22, 937:2, 937:8, 937:16, 937:24, 938:1, 938:6, 938:13, 938:15, 938:20, 939:1, 939:5, 939:25, 941:12, 942:2, 942:9, 943:21, 944:8, 944:20, 945:10, 945:15, 946:1, 946:7, 946:10, 946:13, 946:18, 947:2, 947:7, 947:12, 947:22, 948:6, 948:13, 949:1, 949:22, 950:2, 950:5, 950:11, 950:15, 952:6, 956:17, 956:19, 956:23, 957:1, 957:4, 957:7, 960:4, 960:11, 960:14, 960:22, 961:3, 961:14, 962:10, 963:2, 963:18, 963:21, 964:19, 964:23, 965:18, 965:21, 970:8, 971:17, 971:25, 972:5, 972:19, 972:21, 972:24, 974:1, 974:4, 974:6,

974:9, 974:15, 974:19, 974:25, 982:4, 982:8, 983:10, 983:14, 984:1, 984:3, 987:12, 989:19, 992:24, 993:1, 994:23, 995:3, 1004:1, 1004:4, 1004:7, 1004:10, 1006:13, 1006:17, 1009:12, 1009:14, 1009:17, 1012:21, 1012:23, 1013:24, 1016:16, 1018:3, 1018:7, 1018:10, 1018:14, 1018:17, 1021:6, 1028:24, 1040:7, 1040:10, 1040:18, 1040:22, 1041:3, 1041:9, 1057:21, 1059:2, 1065:23, 1066:8, 1076:6, 1078:23, 1079:6, 1080:1, 1080:3, 1080:5, 1080:10

**Court's** [2] - 933:18, 943:24

**Courthouse** [2] - 928:16, 1080:20

**COURTROOM** [1] - 950:18

**courtroom** [4] - 940:7, 973:4, 973:7, 973:13

**courts** [3] - 994:9, 996:1, 996:3

**cover** [1] - 937:21

**covered** [2] - 937:21, 948:2

**COVID** [1] - 1030:6

**crazy** [2] - 1057:8, 1065:16

**creating** [1] - 945:5

**credible** [4] - 943:25, 995:11, 996:2, 996:9

**cries** [1] - 1054:21

**crimes** [2] - 949:5, 949:18

**Criminal** [1] - 927:3

**criminal** [1] - 943:18

**criteria** [3] - 978:6, 1001:20, 1005:19

**criticize** [1] - 1002:22

**criticized** [1] - 1010:6

**CROSS** [3] - 930:7, 965:22, 993:2

**cross** [6] - 937:6, 937:20, 938:23, 948:21, 963:5,

1078:25

**cross-examination** [1] - 963:5

**CROSS-EXAMINATION** [3] - 930:7, 965:22, 993:2

**cross-examine** [2] - 937:6, 938:23

**crowd** [9] - 973:23, 1041:20, 1045:15, 1049:20, 1050:2, 1050:20, 1052:12, 1056:5, 1056:6

**crowd's** [1] - 1060:19

**crowded** [1] - 1055:12

**CRR** [3] - 928:15, 1080:12, 1080:19

**cry** [1] - 1054:20

**curfew** [1] - 933:15

**curious** [1] - 1048:20

**cursory** [1] - 1004:15

**cuss** [1] - 1065:20

**cussing** [1] - 1067:7

**cut** [3] - 939:21, 1000:9, 1016:12

**cut-and-paste** [1] - 1000:9

**CV** [2] - 993:15, 993:17

**CW** [2] - 939:9, 940:17

## D

**D-401** [1] - 928:3

**D.C** [14] - 933:15, 952:14, 953:10, 955:13, 956:5, 996:16, 1032:23, 1036:6, 1036:11, 1036:15, 1036:17, 1036:22, 1037:1, 1037:20

**damn** [2] - 1044:25, 1063:7

**dang** [1] - 1060:17

**danger** [1] - 982:21

**dangers** [1] - 982:21

**Daniel** [1] - 934:23

**dark** [1] - 1040:1

**date** [2] - 956:2, 956:13

**Dated** [1] - 1080:17

**dates** [1] - 1023:12

**daylight** [1] - 992:8

**days** [5] - 940:6, 973:12, 977:1, 977:7, 999:6

**DC** [8] - 927:15, 927:18, 927:22, 928:12, 928:17,

1080:22

**dealt** [1] - 1017:17
**December** [1] - 952:9
**decide** [1] - 1046:10
**decided** [7] - 952:13,
997:1, 997:2, 997:6,
1005:11, 1043:9,
1046:10
**decision** [1] - 955:21
**decisions** [2] - 997:17,
1010:14
**declarant** [2] - 963:5,
963:7
**declarative** [1] - 967:5
**decorated** [1] - 1035:2
**deductive** [1] - 990:3
**DEFENDANT** [3] -
1029:15, 1041:11,
1059:4
**defendant** [3] -
943:12, 997:16,
998:9
**Defendant** [2] - 928:2,
928:11
**Defendant(s)** [1] -
927:7
**DEFENDER** [2] -
928:2, 928:6
**defending** [1] - 1006:2
**defense** [10] - 937:5,
938:22, 939:2,
942:17, 943:14,
944:14, 960:8,
974:4, 1079:8,
1079:9
**defense's** [1] - 943:5
**defer** [2] - 950:1,
961:10
**definitely** [2] -
1052:12, 1056:6
**definition** [1] - 978:14
**degree** [2] - 1030:7,
1030:8
**democracy** [1] -
1006:6
**demonstrated** [1] -
978:25
**denied** [1] - 1007:20
**Department** [3] -
957:19, 966:16,
966:18
**depicted** [1] - 969:3
**depicts** [1] - 973:11
**deploy** [1] - 1010:14
**deployed** [1] - 1021:16
**deployment** [1] -
980:23
**deployments** [7] -
980:22, 980:23,
981:14, 981:25,

1021:17, 1021:18,
1074:19
**depression** [4] -
984:19, 1030:18,
1040:16, 1040:25
**depressive** [3] -
1002:7, 1002:13,
1005:2
**deprogram** [2] -
991:10, 991:16
**DEPUTY** [1] - 950:18
**described** [3] -
1007:23, 1008:1,
1008:4
**description** [2] -
962:23, 1003:5
**descriptors** [1] -
1002:12
**detail** [1] - 987:22
**detailed** [1] - 1002:25
**determine** [1] -
1002:16
**Deuce** [5] - 1023:8,
1023:13, 1023:18,
1023:20, 1053:22,
1053:25
**diagnose** [2] - 979:6,
1016:22
**diagnosed** [2] -
1000:13, 1030:21
**diagnoses** [3] - 977:7,
1004:14, 1005:17
**diagnosing** [3] -
998:17, 1001:3,
1006:25
**diagnosis** [35] -
976:11, 977:5,
978:4, 978:10,
980:4, 980:5,
980:12, 980:14,
980:17, 980:22,
982:5, 983:24,
984:17, 992:22,
998:18, 1000:15,
1000:16, 1000:20,
1000:23, 1000:24,
1001:11, 1001:19,
1002:18, 1003:9,
1003:14, 1005:1,
1005:9, 1005:20,
1006:8, 1006:11,
1006:20, 1006:21,
1014:15, 1016:17
**diagnostic** [4] -
977:11, 979:23,
1001:20, 1005:19
**Diagnostic** [1] -
977:13
**died** [1] - 1075:24
**different** [22] - 955:16,

960:12, 974:16,
976:22, 977:10,
979:21, 1002:24,
1010:9, 1012:7,
1024:22, 1024:23,
1026:16, 1027:18,
1032:14, 1035:6,
1047:15, 1051:17,
1051:20, 1051:21,
1069:13, 1072:14
**differently** [2] -
1001:16, 1005:8
**difficult** [2] - 1026:9,
1026:12
**difficulties** [1] -
1002:10
**diligent** [2] - 1040:14,
1042:2
**direct** [10] - 930:3,
947:3, 947:19,
947:23, 948:25,
950:3, 951:7, 952:9,
995:3, 1000:25
**DIRECT** [4] - 950:20,
957:13, 975:3,
1018:21
**direction** [2] -
1042:21, 1055:5
**Dirty** [6] - 1023:8,
1023:13, 1023:18,
1023:20, 1053:22,
1053:25
**dis** [1] - 989:5
**disability** [8] - 983:20,
983:21, 983:24,
984:5, 984:12,
992:22, 1030:25,
1031:2
**disabled** [1] - 1031:3
**disagree** [5] - 997:22,
1009:14, 1009:16,
1009:18, 1009:20
**discharged** [5] -
992:22, 1026:19,
1026:20, 1029:11,
1029:19
**disciplinary** [2] -
1015:19, 1016:7
**disclose** [1] - 1010:18
**discovery** [4] - 940:18,
960:10, 985:16,
985:21
**discretion** [2] -
940:12, 943:3
**discussed** [3] -
950:12, 968:14,
1034:7
**discussing** [2] -
948:14, 968:22
**discussion** [1] - 931:1

**discussions** [2] -
930:23, 988:14
**disease** [1] - 1005:3
**disorder** [2] - 984:18,
1005:2
**disputed** [1] - 1011:10
**distinction** [1] -
1000:22
**distinctly** [1] - 969:4
**distress** [1] - 988:22
**District** [2] - 928:7,
997:8
**DISTRICT** [3] - 927:1,
927:1, 927:10
**disturbance** [1] -
1002:10
**divulging** [1] - 1026:2
**Doctor** [3] - 993:4,
994:23, 995:25
**doctor** [4] - 993:8,
994:9, 1010:18,
1015:16
**doctors'** [1] - 1016:25
**document** [3] -
969:18, 977:7,
993:18
**documented** [3] -
959:22, 961:8, 969:8
**documents** [1] -
934:23
**DOJ** [3] - 927:13,
927:17, 927:21
**DOJ-CIV** [2] - 927:13,
927:21
**DOJ-USAO** [1] -
927:17
**Donald** [1] - 931:22
**done** [8] - 938:20,
976:20, 976:21,
990:20, 991:5,
1005:8, 1031:10,
1032:14
**door** [2] - 1067:17,
1069:2
**doors** [6] - 1044:21,
1052:22, 1053:3,
1053:5, 1053:11,
1065:4
**doubting** [1] - 963:2
**douenat** [1] - 934:10
**Douenat** [16] - 932:17,
933:11, 935:3,
935:13, 936:22,
938:2, 945:10,
945:18, 946:13,
957:5, 1013:24,
1018:12, 1018:17,
1079:4, 1079:17,
1080:3
**DOUENAT** [94] -

928:6, 932:18,
933:12, 933:21,
934:11, 935:4,
935:14, 936:2,
936:4, 936:6,
936:24, 938:3,
938:14, 945:13,
946:15, 957:6,
974:23, 975:4,
982:5, 983:13,
983:15, 986:10,
986:12, 988:5,
988:10, 988:13,
992:23, 992:25,
994:21, 994:24,
1004:25, 1013:25,
1014:2, 1018:4,
1018:13, 1018:18,
1018:22, 1023:2,
1023:5, 1029:2,
1029:13, 1034:2,
1039:12, 1046:24,
1047:2, 1047:17,
1048:11, 1052:2,
1052:14, 1052:17,
1053:15, 1053:18,
1054:12, 1054:15,
1057:16, 1057:22,
1058:1, 1059:5,
1059:13, 1059:16,
1060:3, 1060:6,
1060:25, 1061:4,
1061:22, 1061:24,
1062:1, 1063:11,
1063:15, 1063:18,
1063:23, 1064:18,
1069:15, 1070:21,
1072:2, 1072:5,
1072:8, 1072:10,
1072:13, 1072:16,
1072:21, 1073:6,
1073:19, 1073:24,
1074:1, 1074:11,
1074:14, 1075:1,
1075:3, 1076:1,
1076:7, 1078:22,
1079:5, 1080:4
**Douenat)**...................
................**975** [1] -
929:9
**Douenat)**...................
................**1014** [1] -
929:10
**Douenat)**...................
................**1018** [1] -
929:12
**down** [23] - 932:22,
945:1, 947:7, 957:2,
970:25, 974:2,
1003:15, 1018:8,

1019:4, 1032:3,
1032:5, 1046:12,
1052:22, 1053:10,
1056:25, 1057:23,
1065:5, 1065:6,
1066:1, 1066:6,
1075:5, 1075:9,
1078:25
**Dr** [2] - 957:6, 996:6
**dressed** [2] - 1038:17,
1045:20
**drive** [4] - 953:9,
954:16, 955:5,
1033:18
**drivers** [1] - 1035:17
**driving** [3] - 953:7,
955:7, 1035:21
**dropped** [3] - 1028:9,
1028:10, 1028:11
**drove** [7] - 953:8,
953:21, 955:2,
955:6, 955:12,
1035:3, 1037:5
**drum** [2] - 1047:11
**DSM** [6] - 977:12,
977:20, 978:6,
1000:25, 1001:11,
1001:23
**dude** [2] - 1046:17,
1068:24
**due** [1] - 978:18
**during** [8] - 934:7,
959:16, 961:20,
965:6, 976:7,
984:25, 1055:23,
1057:6
**duty** [2] - 976:15,
981:2
**dying** [1] - 1075:24

## E

**E.Chavez** [1] - 928:7
**E5** [2] - 981:10,
1020:23
**E6** [1] - 1029:4
**early** [2] - 952:10,
1038:8
**easier** [2] - 944:20,
944:21
**ECesar** [1] - 928:7
**Eclipse** [2] - 1039:19,
1040:4
**EDGAR** [1] - 928:2
**edgar_holguin@fd.
org** [1] - 928:5
**EDMUND** [1] - 928:11
**effective** [2] - 991:6,
1028:20
**efficient** [1] - 942:25

**eight** [4] - 958:9,
1073:20, 1073:21
**either** [2] - 982:15,
994:7
**EI** [1] - 928:4
**elaborate** [1] - 981:14
**election** [1] - 931:9
**Electoral** [3] - 931:11,
932:9, 932:12
**element** [2] - 974:11,
974:12
**eliminate** [1] - 1066:23
**ELIZABETH** [1] -
927:20
**Ellipse** [4] - 1040:5,
1040:6, 1041:13,
1075:12
**email** [5] - 935:24,
936:13, 957:25,
969:6, 994:22
**emails** [1] - 944:25
**embedded** [1] -
991:13
**emotional** [1] - 989:23
**encompassed** [1] -
958:25
**encountered** [1] -
982:20
**end** [5] - 950:14,
952:21, 953:21,
1028:6, 1044:2
**ended** [4] - 981:22,
1041:13, 1042:22,
1043:23
**endured** [1] - 979:20
**enemy** [1] - 982:18
**enforcement** [3] -
944:2, 959:3,
1048:18
**engage** [4] - 931:5,
991:15, 1007:21,
1022:5
**engagements** [1] -
982:14
**enlisted** [1] - 1017:10
**ensure** [2] - 961:8,
967:14
**enter** [2] - 941:25,
1063:12
**entered** [2] - 1061:15,
1062:10
**entire** [3] - 938:9,
954:16, 976:9
**entirely** [1] - 968:22
**environment** [2] -
988:23, 1042:2
**episode** [6] - 1002:8,
1002:13, 1005:2,
1009:19, 1012:7,
1012:11

**episodes** [2] - 977:8,
977:9
**error** [2] - 943:8,
943:17
**escape** [1] - 1026:7
**Escape** [1] - 1025:13
**especially** [3] - 995:1,
1027:5, 1041:19
**ESQ** [5] - 927:13,
927:17, 927:20,
928:2, 928:6
**essential** [1] - 1001:3
**essentially** [1] -
997:10
**establish** [4] - 940:23,
980:4, 983:16,
1011:24
**established** [1] - 977:5
**Evade** [1] - 1025:12
**evade** [1] - 1028:13
**evaluate** [1] - 980:3
**evaluated** [1] - 984:11
**evaluates** [1] - 978:8
**evaluations** [1] -
1000:18
**Evasion** [1] - 1025:12
**evening** [1] - 1036:24
**evenings** [2] - 1041:1,
1041:2
**events** [7] - 931:19,
931:25, 947:5,
949:9, 968:23,
971:6, 1008:22
**eventually** [3] -
1026:7, 1075:18,
1075:23
**everywhere** [3] -
1047:13, 1064:9,
1067:10
**evidence** [9] - 935:22,
942:18, 942:23,
944:10, 944:17,
971:15, 984:8,
995:1, 1011:9
**evidentiary** [1] -
940:23
**exactly** [3] - 950:4,
959:17, 970:24
**examination** [5] -
963:5, 984:16,
998:9, 1000:25,
1079:1
**EXAMINATION** [9] -
930:7, 950:20,
957:13, 965:22,
973:1, 975:3, 993:2,
1014:1, 1018:21
**examine** [2] - 937:6,
938:23, 980:6
**examined** [2] - 984:14,

986:18
**examining** [1] - 997:11
**example** [5] - 941:10,
942:21, 943:4,
949:6, 1011:6
**examples** [1] - 995:19
**exception** [1] - 963:3
**excited** [2] - 1040:17,
1060:21
**exclude** [1] - 997:3
**excuse** [6] - 962:16,
993:16, 1020:1,
1022:21, 1025:13,
1050:23
**exhibit** [4] - 936:14,
964:12, 978:6,
1061:19
**Exhibit** [25] - 958:8,
959:11, 962:22,
964:10, 965:2,
965:4, 965:6,
973:16, 986:3,
988:5, 1023:3,
1039:10, 1046:25,
1048:8, 1049:3,
1052:1, 1053:16,
1056:16, 1057:15,
1061:1, 1069:14,
1070:2, 1072:2,
1073:20, 1076:10
**exhibits** [10] - 933:1,
933:3, 933:5,
933:19, 934:6,
934:9, 935:2,
935:11, 968:10,
1076:2
**Exhibits** [1] - 933:14
**exit** [2] - 1064:14,
1064:16
**exiting** [3] - 1062:6,
1062:13, 1074:9
**expect** [5] - 1008:4,
1034:22, 1036:11,
1069:7, 1079:21
**expected** [1] - 930:24
**expedite** [1] - 939:22
**expenses** [3] - 954:3,
954:9, 954:12
**experience** [5] - 956:1,
981:24, 1015:13,
1017:15, 1021:17
**experienced** [6] -
978:15, 978:18,
978:24, 979:20,
982:7, 1021:19
**experiences** [1] -
982:11
**experiencing** [2] -
979:6, 1008:13
**expert** [4] - 931:13,

994:9, 996:22,
1001:12
**explain** [7] - 942:4,
970:2, 978:2,
979:10, 989:20,
1004:14, 1007:17
**explained** [1] - 1007:6,
1007:8, 1007:20
**explicit** [1] - 1002:25
**explosions** [1] -
1021:19
**exposed** [3] - 978:24,
979:17, 981:4
**expressed** [3] - 954:3,
966:24, 998:1
**extensive** [6] - 998:8,
998:14, 998:15,
998:22, 998:23,
1000:10
**extent** [2] - 945:8,
1079:10
**extreme** [1] - 978:15
**extremely** [1] - 981:16
**eye** [2] - 1015:17,
1064:6
**eyes** [2] - 973:6,
1064:10

## F

**face** [1] - 1066:24
**Facebook** [1] - 951:23
**faces** [1] - 1058:23
**facing** [2] - 1055:16,
1064:14
**fact** [8] - 931:7,
940:15, 940:18,
976:10, 976:21,
1007:5, 1010:25,
1016:5
**factors** [4] - 978:11,
978:13, 1012:14,
1013:19
**facts** [1] - 971:8
**failed** [1] - 1029:9
**failure** [2] - 940:14,
991:19
**fair** [12] - 952:2,
1005:10, 1014:21,
1017:25, 1023:24,
1039:23, 1045:4,
1047:7, 1059:23,
1060:2, 1061:15,
1073:16
**fairness** [1] - 1006:1
**faith** [1] - 1032:9
**fall** [1] - 1055:9
**familiar** [4] - 971:5,
994:12, 994:16,
994:17

1088

**fans** [1] - 1034:25
**far** [3] - 948:22, 953:24, 992:12
**Farina** [3] - 960:20, 965:6, 973:15
**fast** [2] - 1019:4, 1070:16
**faster** [1] - 1042:20
**fatal** [1] - 940:15
**fatty** [1] - 1005:3
**fault** [2] - 943:2, 943:8
**FBI** [2] - 944:24, 948:2
**February** [1] - 1077:4
**FEDERAL** [2] - 928:2, 928:6
**FEDERICO** [1] - 927:6
**Federico** [2] - 930:11, 965:16
**feelings** [1] - 991:21
**feet** [1] - 1059:20
**fellow** [1] - 976:23
**fellowship** [2] - 976:8, 976:24
**felt** [8] - 931:19, 967:15, 997:18, 1002:25, 1013:14, 1062:24, 1069:11, 1071:17
**fencing** [1] - 1049:22
**few** [4] - 958:17, 973:12, 1065:9, 1076:8
**fidgety** [1] - 1042:5
**field** [2] - 975:25, 1027:22
**Fifth** [3] - 928:12, 946:23, 949:23
**fifth** [2] - 977:15
**fight** [6] - 1010:3, 1021:3, 1028:20, 1054:18, 1054:19
**fighters** [2] - 1028:16, 1028:18
**fighting** [3] - 982:16, 1060:17, 1063:6
**fights** [1] - 982:13
**figure** [2] - 1037:22, 1066:18
**filed** [1] - 933:3
**film** [3] - 1063:8, 1063:11, 1071:20
**filming** [3] - 1051:12, 1051:13, 1058:7
**films** [2] - 985:22
**final** [1] - 955:13
**finally** [1] - 1029:17
**findings** [10] - 943:24, 1000:7, 1000:19, 1003:6, 1003:7, 1003:8, 1003:13,

1003:16, 1005:15, 1007:17
**fine** [7] - 938:10, 1002:23, 1004:20, 1005:20, 1009:7, 1046:17, 1046:18
**finish** [4] - 1012:21, 1041:10, 1059:2, 1059:6
**finishing** [1] - 975:21
**fire** [1] - 982:13
**first** [24] - 930:13, 933:2, 937:6, 951:12, 954:25, 955:2, 975:10, 977:21, 991:8, 1022:8, 1022:20, 1023:13, 1024:21, 1025:4, 1025:18, 1027:19, 1046:3, 1046:25, 1052:20, 1057:23, 1057:24, 1069:15, 1074:17
**First** [1] - 1050:10
**fit** [1] - 1010:3
**five** [7] - 953:2, 1019:21, 1020:1, 1022:20, 1050:7, 1062:17
**flashback** [4] - 979:25, 980:1, 988:19, 989:4
**Florida** [1] - 975:13
**flying** [1] - 953:7
**FOB** [1] - 1023:14
**focus** [2] - 989:8, 989:9
**focused** [1] - 990:4
**folks** [6] - 931:8, 1004:1, 1006:13, 1080:5
**follow** [1] - 1036:3, 1073:3
**followed** [1] - 985:5
**following** [1] - 947:10
**food** [2] - 1029:25, 1033:23
**fooding** [1] - 1033:23
**foot** [1] - 1067:17
**footage** [20] - 934:17, 939:14, 939:17, 943:1, 958:12, 959:8, 959:15, 959:19, 961:17, 961:20, 961:23, 962:4, 962:17, 964:2, 964:5, 964:8, 965:10, 973:10, 1017:23, 1044:8
**FOR** [1] - 927:1
**force** [1] - 1021:21

**forces** [3] - 981:1, 1016:11, 1028:18
**foregoing** [1] - 1080:13
**foreign** [1] - 1028:16
**forever** [2] - 1062:24, 1076:18
**forgetting** [1] - 939:8
**formulation** [8] - 1003:6, 1005:5, 1005:6, 1005:7, 1005:9, 1008:7, 1008:9, 1008:10
**formulations** [3] - 1003:8, 1003:9, 1003:14
**Fort** [5] - 1023:10, 1028:10, 1029:20, 1031:8, 1052:25
**forth** [8] - 955:17, 1004:18, 1013:1, 1065:2, 1065:17, 1067:6, 1067:16, 1078:5
**forward** [4] - 943:17, 972:13, 1066:14, 1066:16
**foul** [1] - 941:23
**foul's** [1] - 941:23
**foundation** [3] - 940:23, 972:16, 983:25
**four** [7] - 960:12, 1014:4, 1014:5, 1014:11, 1022:20, 1057:24, 1059:17
**frame** [7] - 971:11, 971:16, 971:20, 979:21, 988:17, 989:6, 990:12
**Francisco** [1] - 976:23
**frankly** [3] - 938:11, 947:15, 995:23
**free** [3] - 932:22, 957:2, 1018:8
**freedom** [1] - 1023:11
**freeze** [1] - 971:20
**freezing** [1] - 1046:15
**frenzied** [1] - 988:23
**frenzy** [1] - 1012:2
**friend** [2] - 1032:24, 1053:13
**friends** [9] - 951:22, 952:3, 952:20, 952:23, 952:25, 1033:9, 1037:18, 1053:25, 1057:11
**front** [5] - 969:2, 1042:10, 1055:25, 1056:2, 1066:18

**fuck** [6] - 1065:19, 1065:25, 1066:17, 1068:4, 1068:7, 1069:6
**fucked** [1] - 1071:17
**fucking** [1] - 1067:19
**full** [4] - 950:24, 965:6, 995:7, 1080:14
**Fulp** [30] - 937:10, 937:13, 937:21, 938:23, 939:20, 939:22, 940:1, 940:9, 942:20, 942:24, 944:9, 944:22, 944:24, 946:5, 957:8, 957:9, 957:15, 959:15, 960:19, 961:16, 962:13, 963:1, 963:24, 965:1, 965:5, 965:15, 970:9, 971:25, 973:3, 974:1
**FULP** [2] - 929:6, 957:12
**fun** [1] - 955:22
**function** [1] - 1025:24
**fundamentally** [1] - 978:22
**funny** [1] - 1045:19
**FURTHER** [1] - 957:13
**furthermore** [1] - 1013:15
**future** [1] - 1018:1

## G

**gallery** [1] - 947:11
**gas** [7] - 954:12, 964:22, 1012:14, 1012:15, 1012:24, 1060:12, 1071:13
**gated** [1] - 1044:18
**gathered** [2] - 982:6, 1035:14
**gear** [3] - 966:13, 966:14, 1039:1
**general** [5] - 968:13, 976:16, 1006:2, 1006:17, 1012:23
**General** [5] - 974:24, 975:5, 1004:7, 1014:3, 1018:7
**GENERAL** [2] - 929:9, 975:2
**generally** [1] - 1002:13
**ghost** [1] - 1068:2
**girls** [1] - 1022:10
**given** [3] - 943:10, 973:22, 1014:16

**glaring** [1] - 1011:20
**gloves** [2] - 1039:7, 1039:8
**God** [1] - 1068:2
**Gonell** [24] - 939:7, 939:19, 939:23, 940:10, 940:13, 940:15, 942:21, 943:24, 957:23, 959:6, 959:7, 965:9, 965:15, 968:25, 969:3, 969:5, 970:13, 971:6, 971:9, 972:2, 972:17, 972:19, 973:3, 973:21
**Gonell's** [2] - 940:6, 971:18
**gotta** [1] - 1069:6
**Government** [9] - 958:8, 959:10, 962:22, 964:10, 965:2, 965:3, 973:15, 1056:15, 1072:2
**government** [36] - 933:8, 936:11, 936:19, 937:20, 938:5, 940:9, 940:19, 940:21, 940:25, 941:8, 941:14, 941:21, 942:13, 942:15, 943:16, 944:3, 944:13, 944:16, 945:19, 946:2, 946:4, 946:5, 946:6, 948:9, 948:11, 960:7, 965:5, 966:25, 968:7, 968:10, 968:12, 995:8, 1017:20, 1079:6, 1079:18, 1079:24
**Government's** [16] - 986:3, 988:5, 1023:3, 1039:10, 1046:24, 1048:8, 1049:3, 1052:1, 1053:16, 1057:14, 1057:15, 1061:1, 1069:14, 1070:1, 1073:19, 1076:10
**government's** [8] - 937:11, 937:18, 940:12, 940:14, 941:18, 942:23, 943:12, 974:10
**governmental** [1] - 977:18

grab [4] - 1068:18,
1068:21, 1068:22,
1069:5
grabbed [5] - 1065:7,
1066:24, 1067:2,
1067:13, 1073:8
grabbing [2] - 1067:4,
1067:5
graduate [1] - 1030:5
graduated [2] -
1032:25, 1033:10
granddaughter [3] -
1019:22, 1020:2,
1020:3
great [1] - 944:20
green [5] - 958:13,
958:14, 958:23,
964:21, 1066:21
Green [1] - 1028:3
ground [1] - 1066:16
grounds [8] - 946:22,
947:13, 947:14,
947:21, 948:10,
949:15, 1049:17,
1055:1
group [3] - 1025:25,
1028:15, 1032:25
groups [1] - 953:25
guards [2] - 1063:3,
1063:5
guess [29] - 931:13,
934:1, 938:19,
939:11, 941:12,
942:3, 948:5, 963:9,
972:5, 972:16,
993:19, 1019:23,
1020:6, 1024:17,
1024:24, 1026:11,
1027:12, 1034:3,
1034:11, 1035:16,
1036:21, 1037:19,
1039:9, 1039:12,
1042:18, 1044:11,
1044:15, 1075:11
GUILLERMO [1] -
927:6
gun [3] - 1021:14,
1021:15, 1024:21
guns [2] - 1024:23
guy [8] - 1027:9,
1032:2, 1035:13,
1035:25, 1047:10,
1050:6, 1055:8,
1068:18
guys [4] - 953:6,
1023:16, 1037:19,
1068:19
GX612.21 [1] -
1063:12
GX612.23 [1] -

1064:19

# H

hair [1] - 964:22
Hallandale [1] -
975:13
hand [13] - 965:16,
973:9, 1026:16,
1051:13, 1065:18,
1066:3, 1066:11,
1068:22, 1070:4,
1070:23, 1073:12,
1076:13
hand-to-hand [1] -
1026:16
handle [4] - 1021:25,
1064:2, 1064:11,
1065:7
hands [2] - 1012:5,
1064:24
happy [1] - 970:5
hard [8] - 972:5,
982:15, 982:17,
991:4, 992:3, 992:6,
1014:24, 1037:22
harder [2] - 972:7,
1027:10
harm [1] - 1008:13
Harvell [1] - 941:10
hat [5] - 958:13,
958:23, 1038:14,
1062:10, 1069:21
Hawa [4] - 934:7,
934:15, 935:11,
936:6
Hawa's [1] - 936:3
head [6] - 965:16,
992:16, 1051:15,
1051:16, 1065:5,
1074:15
headed [1] - 1075:4
heading [2] - 955:9,
1075:5
heads [2] - 1051:23
health [1] - 996:8
hear [14] - 940:19,
940:21, 952:17,
961:22, 963:9,
983:8, 987:6,
988:22, 1018:14,
1033:3, 1036:13,
1045:8, 1063:24,
1066:7
heard [18] - 930:2,
941:18, 941:19,
946:4, 952:17,
981:17, 996:23,
1033:25, 1034:1,
1034:3, 1052:4,

1053:19, 1054:2,
1056:13, 1059:18,
1067:22, 1068:10,
1077:2
hearing [4] - 947:11,
974:20, 1056:10,
1080:7
hearsay [7] - 961:2,
961:4, 963:4,
963:10, 982:1,
982:2, 982:3
heavy [2] - 1021:14,
1021:24
height [5] - 1026:21,
1027:2, 1029:9,
1032:10
HELD [1] - 927:10
held [1] - 947:10
hell [5] - 1042:4,
1058:13, 1066:3,
1073:11, 1073:15
hello [1] - 957:16
helmet [9] - 959:1,
964:21, 965:17,
971:4, 971:10,
971:11, 971:12,
971:19, 971:21
help [20] - 985:8,
985:11, 1017:6,
1021:2, 1024:11,
1028:19, 1031:4,
1031:9, 1031:10,
1032:8, 1032:14,
1032:15, 1035:25,
1040:24, 1041:2,
1068:15, 1068:16,
1069:1
helped [2] - 980:13,
984:4
helpful [2] - 945:9,
997:19
helps [4] - 1026:13,
1032:10, 1040:16,
1040:23
hereby [1] - 1080:12
hi [2] - 950:23, 957:15
hiding [1] - 1078:15
high [4] - 951:12,
1032:25, 1033:10,
1050:7
higher [1] - 1051:23
highly [4] - 1009:21,
1009:23, 1009:24,
1010:6
HILL [11] - 927:20,
946:21, 948:16,
949:11, 949:14,
949:17, 949:24,
950:9, 950:13,
956:18, 956:21

hill [3] - 947:8, 948:13,
950:7
Hill [1] - 956:17
himself [12] - 950:1,
959:8, 960:24,
961:9, 961:16,
962:3, 962:15,
962:19, 967:24,
968:1, 969:6, 970:2
history [7] - 993:14,
993:21, 995:8,
999:17, 1003:2,
1020:7, 1030:9
hit [11] - 1012:8,
1012:11, 1022:3,
1030:6, 1065:5,
1066:13, 1067:3,
1067:4, 1067:12,
1071:9, 1076:14
hitting [2] - 948:6,
948:7
Hodges [9] - 985:24,
985:25, 986:1,
986:23, 1009:2,
1069:14, 1070:3,
1070:22, 1078:19
hold [1] - 950:5
holding [3] - 943:19,
1067:14, 1076:13
HOLGUIN [13] - 928:2,
946:16, 947:3,
947:14, 947:24,
948:7, 948:23,
949:4, 949:13,
949:16, 949:19,
950:4, 950:21
Holguin [1] - 947:8
Holguin)...................
................950 [1] -
929:5
holy [2] - 1068:2,
1069:3
home [8] - 981:20,
1019:21, 1029:22,
1030:1, 1031:22,
1074:20, 1078:3,
1078:13
homework [1] -
997:11
honestly [1] - 1036:13
Honor [69] - 932:15,
932:18, 932:20,
932:25, 934:11,
934:21, 935:4,
935:10, 936:18,
936:21, 936:24,
938:4, 938:7, 939:4,
940:3, 941:15,
941:18, 941:23,
942:7, 942:12,

942:19, 942:24,
943:3, 943:11,
943:20, 944:23,
945:2, 945:3, 945:5,
945:13, 945:24,
946:16, 946:21,
947:3, 948:17,
949:21, 950:13,
956:15, 956:18,
956:22, 960:2,
960:13, 960:21,
961:2, 961:12,
962:8, 963:11,
971:24, 972:23,
974:5, 974:23,
974:24, 986:10,
992:23, 992:25,
994:21, 994:24,
1004:25, 1013:21,
1013:23, 1013:25,
1018:18, 1029:14,
1057:19, 1076:8,
1078:22, 1079:5,
1079:25, 1080:4
HONORABLE [1] -
927:10
honorably [2] -
1029:11, 1029:18
Hood [2] - 1023:10,
1052:25
hoot [1] - 940:20
hoping [1] - 1079:21
hospitals [1] - 976:8
hotel [8] - 954:11,
954:12, 955:3,
956:7, 956:10,
1037:5, 1037:18,
1038:9
hotels [1] - 954:8
hour [4] - 998:23,
999:4, 999:5, 999:11
hours [2] - 967:12,
1040:6
house [1] - 934:24
huge [1] - 1064:9
hundred [1] - 1014:8
hundreds [3] - 967:10,
978:19
hurt [10] - 1012:4,
1024:11, 1067:22,
1067:23, 1068:5,
1068:11, 1071:19
hyper [2] - 1040:14,
1042:1
hyper-diligent [1] -
1040:14
hyperlipidemia [1] -
1005:3

1090

**I**

idea [7] - 943:16,
953:12, 953:13,
953:14, 995:21,
1043:15, 1073:14
ideation [1] - 992:17
identification [4] -
942:20, 943:2,
961:4, 962:24
identified [12] -
939:20, 940:19,
965:1, 965:9,
965:15, 966:25,
967:24, 968:1,
968:17, 971:4,
972:17, 1079:15
identifies [2] - 940:13,
963:6
identify [23] - 939:23,
941:6, 941:9, 946:6,
958:11, 958:21,
959:5, 959:8,
960:24, 961:8,
961:16, 962:3,
962:15, 963:13,
963:17, 964:7,
964:10, 964:16,
970:2, 973:20,
974:12, 1077:13
identifying [3] -
968:25, 969:6, 972:1
IED [1] - 1022:2
illnesses [1] - 1000:6
image [1] - 1027:7
imagine [2] - 933:24,
941:17
imaging [1] - 978:25
immigration [3] -
1077:21, 1078:9,
1078:11
impact [1] - 1040:10
impairments [3] -
978:5, 978:9, 1003:3
implicate [1] - 946:23
implying [2] - 1001:7,
1002:6
important [3] - 991:8,
998:15, 1008:20
impossible [1] -
969:25
improved [1] - 1002:9
IN [1] - 927:1
in/out [1] - 1031:19
inappropriate [1] -
943:18
incident [1] - 987:16
incidents [2] - 981:3,
985:23
inclined [2] - 938:9,

942:5
included [3] - 935:24,
1005:15, 1014:15
including [4] - 978:15,
986:25, 987:4,
992:17
incomplete [2] -
993:18, 993:20
inconsistent [1] -
1011:18
incriminate [1] - 950:1
Indicating [1] -
1051:14
indicating [2] -
947:15, 1072:25
indictment [5] - 939:6,
940:12, 940:16,
947:18, 949:10
indigenous [1] -
1028:15
individual [10] -
931:12, 972:10,
972:17, 979:15,
981:8, 982:19,
986:17, 998:22,
1015:21, 1078:9
individuals [7] - 979:5,
979:7, 979:24,
990:13, 991:15,
1017:17, 1077:14
indoctrination [1] -
1025:7
indulgence [1] -
933:18
infantry [2] - 1027:5,
1053:9
infantryman [5] -
981:7, 1020:25,
1021:1, 1021:13,
1026:13
inflict [1] - 1008:12
information [14] -
982:6, 999:9,
1000:3, 1000:4,
1005:17, 1007:19,
1009:3, 1010:12,
1010:22, 1010:23,
1010:24, 1013:17,
1014:16, 1043:19
INGERSO [1] - 951:1
INGERSOLL [2] -
929:5, 950:19
Ingersoll [13] - 946:17,
946:22, 947:1,
947:4, 947:19,
948:4, 948:10,
951:1, 951:3, 951:7,
957:1, 1076:3,
1077:3
inhaled [1] - 1064:10

initializing [1] - 1067:7
injured [3] - 1013:2,
1013:13, 1058:17
injuries [2] - 984:24,
1012:3
injury [2] - 1008:13,
1012:8
inside [2] - 1058:3,
1058:7
instead [1] - 1041:14
intend [3] - 943:14,
950:2, 1008:12
intended [1] - 948:4
intense [3] - 980:25,
991:12, 991:17
intent [1] - 1007:20
interest [1] - 967:13
interested [1] - 974:19
interesting [2] -
1034:23, 1034:24
Internet [1] - 955:16
internship [2] -
975:22, 976:7
interpersonal [1] -
1002:10
interpreted [2] -
1011:23, 1013:1
interrupt [2] - 945:25,
1071:24
interview [25] -
957:18, 957:22,
958:4, 959:16,
963:14, 966:1,
966:9, 967:7,
984:25, 997:16,
998:8, 998:14,
998:22, 998:23,
999:5, 1003:17,
1005:16, 1007:10,
1007:18, 1008:17,
1008:20, 1010:15,
1010:16, 1010:17
interviewed [11] -
942:22, 957:24,
959:7, 962:13,
966:6, 966:8,
966:10, 966:20,
980:10, 999:6,
999:10
interviewing [2] -
981:13, 998:15
interviews [2] - 984:6,
984:7
introduce [1] - 942:20
introduced [2] -
939:14, 939:17
investigation [4] -
957:17, 958:5,
965:7, 965:8
invite [1] - 952:21

invited [2] - 953:3,
1032:22
involved [3] - 994:2,
994:5, 1017:25
Iraq [11] - 980:23,
981:18, 982:13,
982:16, 1020:14,
1021:9, 1021:10,
1021:22, 1023:10,
1023:13, 1052:25
Iraqi [2] - 1023:11
Iraqi [1] - 1023:11
irritability [1] -
1002:11
irritable [1] - 1040:13
irritant [1] - 1064:6
issue [4] - 944:18,
947:25, 974:8, 991:9
issues [7] - 974:16,
1015:19, 1030:13,
1030:14, 1030:15,
1031:23
items [1] - 1005:8
iteration [1] - 977:15
iterations [1] - 977:14
itself [2] - 978:23,
1043:20

**J**

jacket [2] - 958:13,
958:23
Jan [1] - 935:20
January [32] - 930:14,
930:16, 930:21,
931:2, 931:5, 931:8,
931:19, 931:25,
932:4, 932:12,
935:18, 946:22,
947:5, 947:19,
947:21, 948:7,
948:14, 948:17,
948:18, 949:3,
952:10, 954:21,
955:4, 966:22,
973:10, 973:14,
1007:24, 1008:23,
1008:24, 1009:3,
1037:11
Jencks [3] - 937:12,
937:17, 1079:7
Jennifer [1] - 1019:14
jerked [1] - 1067:17
job [3] - 1029:25,
1030:4, 1067:24
joined [1] - 1034:17
joining [1] - 1036:1
jovial [2] - 1045:16,
1050:5
JR [1] - 928:11
Judge [2] - 947:25,

949:4
JUDGE [1] - 927:10
judge [5] - 948:24,
996:4, 997:14,
997:18, 998:11
judgment [3] - 938:8,
998:5, 998:10
judgments [3] -
941:25, 998:6,
1015:20
juggled [1] - 945:16
July [1] - 927:4
jumped [1] - 1064:4
JURY [1] - 927:9
just.. [1] - 1030:20

**K**

KAITLIN [1] - 927:17
kaitlin.klamann@
usdoj.gov [1] -
927:19
Kaplan [1] - 997:14
keep [3] - 938:25,
1014:12, 1055:4
kept [3] - 1065:14,
1065:15, 1075:24
kicking [3] - 1052:22,
1053:3, 1053:10
kicks [1] - 1053:5
kids [2] - 1030:2,
1078:4
kind [51] - 942:5,
948:24, 951:18,
951:25, 955:24,
972:3, 981:5,
988:22, 989:12,
998:20, 1010:19,
1011:3, 1015:23,
1022:16, 1026:1,
1027:7, 1027:20,
1028:20, 1030:7,
1031:15, 1032:4,
1033:10, 1035:14,
1035:15, 1040:18,
1042:4, 1042:19,
1045:19, 1045:20,
1046:15, 1047:11,
1050:19, 1050:22,
1051:3, 1051:9,
1053:6, 1055:13,
1056:8, 1058:20,
1064:23, 1065:3,
1065:6, 1065:7,
1065:8, 1065:14,
1066:2, 1066:5,
1067:15, 1068:22,
1073:16
kindling [1] - 1012:16
kinds [2] - 992:16,

1027:18
**kinesiology** [1] - 1030:8
**KIS** [1] - 975:10
**KLAMANN** [2] - 927:17, 932:20
**Klamann** [1] - 932:19
**Klein** [13] - 928:11, 930:12, 930:13, 931:4, 931:18, 932:4, 941:8, 943:11, 945:20, 958:5, 958:11, 958:21, 1079:17
**KLEIN** [1] - 927:6
**Klein's** [1] - 965:16
**knocked** [1] - 1069:24
**knocks** [1] - 1065:18
**knowing** [1] - 972:11
**knowledge** [2] - 971:8, 972:16
**known** [3] - 951:10, 1033:1, 1033:8

## L

**L-L** [1] - 951:2
**lab** [2] - 1000:7, 1000:19
**labeled** [1] - 977:10
**laboratory** [1] - 976:24
**lady** [2] - 1009:16, 1065:15
**land** [1] - 1026:1
**Lanelle** [1] - 934:7
**large** [1] - 1042:3
**last** [8] - 940:6, 943:24, 975:9, 1004:15, 1014:4, 1014:5, 1078:18, 1079:4
**late** [4] - 944:15, 956:11, 1005:21, 1005:23
**laughing** [2] - 1047:24, 1050:6
**LAURA** [1] - 927:20
**laura.e.hill@usdoj. gov** [1] - 927:23
**law** [4] - 944:1, 959:3, 1048:18, 1078:9
**LAW** [1] - 928:11
**lawn** [1] - 1049:25
**lawyer's** [1] - 1078:6
**lay** [1] - 979:25
**leader** [2] - 981:12, 1035:15
**leading** [3] - 960:21, 987:11, 989:18
**leads** [1] - 1005:17

**learn** [3] - 1024:4, 1026:15, 1026:17
**learned** [4] - 967:7, 1004:16, 1013:16, 1027:23
**learning** [3] - 1025:19, 1027:18, 1027:20
**least** [9] - 945:19, 946:2, 980:10, 981:2, 992:21, 1008:15, 1027:4, 1043:25, 1056:10
**leave** [4] - 960:5, 988:10, 1075:7, 1076:23
**leaving** [3] - 954:2, 954:20, 1072:1
**leeway** [1] - 948:8
**left** [4] - 958:13, 1018:12, 1030:3, 1076:13
**legal** [4] - 931:13, 944:11, 944:17, 994:25
**length** [1] - 972:10
**less** [1] - 1012:17
**lessons** [1] - 1025:7
**letting** [1] - 1075:20
**life** [4] - 978:16, 981:4, 1053:6, 1063:10
**life-threatening** [1] - 981:4
**likely** [2] - 989:12, 1012:10
**limit** [1] - 950:2
**limited** [4] - 948:25, 983:11, 1006:25, 1079:12
**line** [14] - 1039:20, 1039:24, 1039:25, 1040:2, 1042:6, 1042:18, 1042:19, 1042:21, 1042:23, 1046:21, 1063:4, 1074:21
**lines** [1] - 1042:17
**lingering** [3] - 991:20, 991:21
**link** [2] - 970:17, 1005:9
**linked** [1] - 979:19
**Lisa** [1] - 928:15
**LISA** [1] - 1080:12
**list** [15] - 993:25, 994:18, 995:7, 995:10, 995:12, 995:14, 995:16, 995:17, 995:19, 995:20, 995:21, 1001:23, 1014:3,

1014:12, 1014:13
**listed** [7] - 993:15, 1001:8, 1001:10, 1001:18, 1001:20, 1002:1, 1004:15
**listen** [1] - 950:16
**listening** [1] - 1007:23
**Litigation** [1] - 927:14
**live** [4] - 951:3, 1019:7, 1019:8, 1019:23
**lived** [1] - 975:12
**livelihood** [1] - 978:16
**liver** [1] - 1005:3
**lives** [2] - 982:22, 1053:6
**living** [4] - 951:5, 975:14, 982:19, 993:9
**loaded** [1] - 955:12
**location** [3] - 1028:9, 1035:6, 1056:20
**locker** [1] - 1058:15, 1058:25
**lodging** [1] - 1033:24
**logical** [2] - 989:6, 990:3
**longest** [1] - 1021:21
**look** [17] - 959:17, 984:7, 984:8, 987:23, 990:4, 1000:8, 1002:21, 1003:20, 1010:21, 1015:17, 1016:17, 1027:6, 1042:8, 1068:14, 1070:18, 1075:14
**looked** [8] - 1008:21, 1009:1, 1009:3, 1010:12, 1056:14, 1066:17, 1073:8
**looking** [10] - 962:22, 963:3, 981:13, 1012:7, 1015:21, 1015:22, 1033:2, 1056:9, 1077:8, 1077:13
**lose** [1] - 1027:10
**loud** [1] - 1045:4
**low** [1] - 1002:9
**lower** [1] - 958:13
**LP** [1] - 928:11
**lunch** [1] - 951:24

## M

**M.D** [2] - 929:9, 975:2
**ma'am** [5] - 930:4, 930:9, 932:21, 939:6, 1033:21

**machine** [3] - 1021:14, 1021:15, 1024:23
**mad** [4] - 1006:3, 1048:4, 1060:21, 1067:11
**major** [6] - 984:19, 1002:7, 1002:12, 1003:3, 1005:1
**malingering** [2] - 1017:13, 1017:18
**man** [2] - 1066:21, 1068:25
**manager** [1] - 951:6
**Mancini** [1] - 937:4
**Mancini's** [1] - 937:17
**manifestations** [1] - 1001:19
**manifested** [2] - 1001:19, 1002:9
**manner** [1] - 1004:15
**manual** [6] - 977:6, 977:11, 977:21, 977:25, 1001:20, 1005:19
**Manual** [1] - 977:13
**map** [3] - 935:19, 955:1, 1003:9
**maps** [3] - 933:24, 934:1, 1003:13
**march** [1] - 1050:10
**marched** [1] - 949:11
**MARINA** [1] - 928:6
**Marina** [2] - 1063:14, 1072:15
**Marina_Douenat@fd .org** [1] - 928:9
**marines** [1] - 1019:21
**marked** [4] - 936:15, 1048:7, 1056:15, 1057:14
**married** [3] - 1019:11, 1019:15, 1020:9
**mask** [7] - 964:22, 986:23, 1066:24, 1067:8, 1067:14, 1070:4, 1071:13
**matching** [1] - 962:1
**matter** [6] - 937:1, 943:5, 944:11, 990:14, 1010:22, 1045:24
**mayhem** [2] - 1012:1, 1012:10
**mayor** [1] - 933:15
**McFADDEN** [1] - 927:10
**mean** [63] - 940:5, 947:5, 948:13, 975:18, 976:6, 977:21, 978:19,

979:10, 985:4, 987:22, 988:1, 989:16, 989:17, 989:21, 990:6, 991:5, 991:8, 994:2, 994:24, 995:12, 995:17, 996:14, 997:5, 998:10, 998:25, 999:24, 1000:1, 1000:21, 1001:10, 1001:13, 1001:15, 1001:21, 1002:5, 1002:22, 1003:19, 1007:5, 1009:6, 1010:16, 1011:2, 1012:6, 1013:10, 1013:19, 1014:12, 1015:14, 1021:4, 1026:11, 1026:15, 1026:17, 1026:18, 1032:10, 1039:25, 1044:11, 1047:18, 1048:1, 1050:4, 1052:23, 1053:10, 1053:24, 1054:5, 1070:6, 1071:24, 1076:20
**meandering** [2] - 1051:3, 1051:6
**meaning** [2] - 1022:25, 1051:23
**means** [3] - 991:19, 1000:22, 1051:6
**meant** [1] - 1078:12
**meanwhile** [1] - 1003:12
**medal** [1] - 1022:25
**medals** [2] - 982:23, 1022:24
**media** [1] - 971:19
**medic** [1] - 1022:8
**medical** [17] - 975:21, 976:7, 977:24, 980:7, 980:9, 988:15, 999:17, 999:18, 1000:6, 1010:13, 1010:19, 1014:16, 1022:7, 1030:13, 1030:14, 1030:15
**medication** [8] - 985:4, 1000:6, 1031:16, 1036:20, 1040:11, 1040:12, 1040:16, 1040:18
**medications** [1] - 985:6
**medicine** [4] - 1036:19, 1038:24, 1041:7, 1041:16

**meet** [5] - 955:21, 1029:7, 1037:25, 1043:5, 1043:9
**meeting** [4] - 951:20, 955:8, 955:13, 1044:2
**member** [1] - 966:15
**memories** [2] - 969:7, 991:21
**memory** [2] - 967:16, 968:5
**Memphis** [3] - 955:6, 955:12
**men** [4] - 981:21, 990:14, 992:7, 992:18
**mental** [2] - 989:1, 996:8
**mention** [2] - 940:19, 940:21
**mentioned** [5] - 946:3, 955:14, 977:4, 1011:5, 1042:6
**mentions** [1] - 939:6
**mess** [1] - 1013:20
**messages** [2] - 1075:20, 1076:2
**met** [8] - 930:13, 930:18, 938:5, 941:24, 951:11, 951:13, 951:18, 955:11, 956:3, 960:19, 963:15, 963:24, 965:24, 968:6, 968:10, 1033:9, 1035:8, 1046:6
**metal** [1] - 1067:16
**Metro** [1] - 1041:14
**Metropolitan** [3] - 957:19, 966:15, 966:18
**MICHAEL** [3] - 929:5, 950:19, 951:1
**Michael** [1] - 951:1
**might** [9] - 944:23, 972:6, 1001:16, 1010:22, 1023:17, 1026:4, 1026:6, 1035:25, 1048:9
**Mike** [32] - 931:8, 946:16, 1032:24, 1033:8, 1033:9, 1033:15, 1033:19, 1033:23, 1033:25, 1034:3, 1034:17, 1035:12, 1036:17, 1037:6, 1037:18, 1037:21, 1037:23, 1037:25, 1042:14,

1042:17, 1044:2, 1046:7, 1046:13, 1048:25, 1050:14, 1075:14, 1075:15, 1075:16, 1075:17, 1076:3, 1076:17, 1077:3
**Mike's** [1] - 1033:25
**mildly** [1] - 989:5
**military** [18] - 976:7, 976:8, 976:14, 980:8, 980:11, 980:19, 981:5, 984:7, 1010:3, 1010:13, 1020:7, 1020:11, 1020:16, 1024:15, 1026:19, 1026:20, 1052:24, 1053:13
**mind** [9] - 975:24, 979:22, 988:17, 989:2, 989:6, 990:12, 991:24, 1058:20, 1070:18
**mine** [2] - 954:15, 1052:24
**minimal** [1] - 997:9
**minor** [1] - 1030:9
**minute** [7] - 943:6, 973:20, 986:4, 1003:15, 1018:10, 1064:19, 1072:6
**minutes** [14] - 942:16, 958:9, 958:16, 958:21, 965:4, 971:20, 1057:24, 1059:17, 1062:15, 1062:17, 1062:19, 1062:21, 1063:13
**mispronounce** [1] - 940:20
**missed** [2] - 964:19, 1063:19
**misstate** [2] - 1007:13, 1007:15
**misstated** [1] - 1007:11
**misstates** [1] - 971:15
**mistake** [1] - 936:8
**mixed** [1] - 991:8
**mode** [1] - 942:14
**moderately** [1] - 1002:8
**mom** [1] - 1029:24
**moment** [10] - 935:16, 942:7, 946:19, 947:8, 956:18, 975:1, 988:16, 992:23, 1003:16, 1013:21

**Monday** [2] - 973:4, 973:6
**months** [1] - 1021:22
**mood** [4] - 979:18, 979:19, 1002:9, 1056:6
**Moore** [1] - 941:10
**MOREIRA** [1] - 1080:12
**Moreira** [2] - 928:15, 1080:19
**morning** [11] - 940:9, 946:11, 973:4, 973:6, 1037:13, 1038:1, 1038:8, 1038:12, 1038:24, 1079:1, 1079:3
**mortar** [1] - 1021:19
**most** [10] - 956:12, 967:6, 978:24, 991:8, 992:3, 1000:2, 1000:4, 1002:21, 1024:17, 1024:19
**motherfucker** [1] - 1067:19
**motion** [1] - 936:23
**motivations** [1] - 948:3
**motive** [1] - 1011:1
**motor** [1] - 989:25
**mouth** [2] - 1066:22, 1067:1
**move** [5] - 933:1, 933:25, 935:12, 938:7, 1059:16
**moved** [3] - 951:11, 951:13, 966:4
**movie** [1] - 1054:7
**movies** [1] - 1047:12
**moving** [4] - 1023:15, 1050:19, 1051:14, 1055:4
**MR** [49] - 930:8, 932:15, 933:8, 933:18, 933:22, 934:13, 935:6, 935:8, 935:19, 936:9, 936:14, 937:9, 937:19, 937:25, 938:7, 938:17, 940:3, 941:5, 941:15, 943:11, 943:23, 944:18, 945:3, 945:24, 946:4, 946:8, 946:12, 946:16, 947:3, 947:14, 947:24, 948:7, 948:23,

949:4, 949:13, 949:16, 949:19, 950:4, 950:21, 956:15, 956:25, 960:7, 960:13, 960:21, 961:2, 965:23, 971:24, 972:23, 1080:2
**MRI** [2] - 979:1
**MS** [169] - 932:18, 932:20, 932:25, 933:12, 933:14, 933:20, 933:21, 933:24, 934:4, 934:11, 934:21, 935:4, 935:10, 935:14, 935:16, 935:21, 936:2, 936:4, 936:5, 936:6, 936:7, 936:18, 936:21, 936:24, 936:25, 937:3, 938:3, 938:14, 938:18, 938:21, 939:4, 939:13, 941:2, 942:7, 942:10, 942:12, 944:23, 945:13, 946:15, 946:21, 948:16, 949:11, 949:14, 949:17, 949:24, 950:9, 950:13, 956:18, 956:21, 957:6, 957:14, 958:7, 958:16, 958:20, 959:10, 959:14, 960:2, 960:9, 961:12, 962:8, 963:1, 963:11, 963:19, 963:23, 964:25, 965:14, 965:19, 970:7, 971:15, 973:2, 973:25, 974:5, 974:7, 974:10, 974:18, 974:23, 975:4, 982:1, 982:5, 983:2, 983:13, 983:15, 983:25, 986:10, 986:12, 987:11, 988:5, 988:10, 988:13, 989:18, 992:23, 992:25, 993:3, 994:21, 994:24, 996:12, 1004:6, 1004:25, 1006:16, 1012:22, 1013:21, 1013:23, 1013:25, 1014:2, 1016:14,

1018:2, 1018:4, 1018:13, 1018:18, 1018:22, 1023:2, 1023:5, 1029:2, 1029:13, 1034:2, 1039:12, 1046:24, 1047:2, 1047:17, 1048:11, 1052:2, 1052:14, 1052:17, 1053:15, 1053:18, 1054:12, 1054:15, 1057:16, 1057:22, 1058:1, 1059:5, 1059:13, 1059:16, 1060:3, 1060:6, 1060:25, 1061:4, 1061:22, 1061:24, 1062:1, 1063:11, 1063:15, 1063:18, 1063:23, 1064:18, 1069:15, 1070:21, 1072:2, 1072:5, 1072:8, 1072:10, 1072:11, 1072:13, 1072:16, 1072:21, 1073:6, 1073:19, 1073:24, 1074:1, 1074:11, 1074:14, 1075:1, 1075:3, 1076:1, 1076:7, 1078:22, 1079:5, 1079:25, 1080:4
**multiple** [9] - 982:13, 982:14, 986:25, 996:11, 996:13, 1017:20, 1043:16, 1045:6, 1057:19
**music** [1] - 1045:18
**mutual** [1] - 952:3

## N

**name** [11] - 930:11, 940:7, 940:20, 950:24, 950:25, 967:21, 975:7, 975:9, 975:10, 993:6, 1018:25
**named** [1] - 939:7
**names** [1] - 940:5
**national** [1] - 1074:23
**nature** [4] - 943:18, 968:11, 968:13, 991:1
**NE** [1] - 927:21
**near** [2] - 946:22, 949:14
**necessary** [1] - 969:25
**need** [17] - 933:25, 943:21, 947:6, 952:6, 959:20,

1093

963:19, 969:7,
970:9, 987:23,
990:19, 1002:24,
1006:15, 1006:17,
1015:3, 1027:5,
1034:7, 1035:25
**needed** [2] - 1003:12,
1038:3
**needs** [6] - 939:20,
983:7, 1005:7,
1068:16, 1069:1
**neglected** [1] - 995:10
**never** [1] - 932:7,
932:11, 946:3,
952:17, 1002:15,
1037:23, 1038:6,
1038:21, 1047:15,
1056:23, 1057:9,
1063:9, 1071:20,
1071:21, 1078:20
**New** [1] - 997:8
**new** [1] - 995:1
**NEXT** [1] - 927:25
**next** [7] - 930:24,
934:4, 934:21,
955:4, 957:4,
965:16, 1064:18
**Nicholas** [1] - 975:9
**night** [4] - 930:20,
931:16, 955:2,
956:11
**nine** [1] - 938:4
**Nipper** [1] - 1052:21
**nipper** [2] - 1052:24,
1077:7
**noise** [1] - 1012:24
**nomenclature** [1] -
976:12
**normal** [4] - 979:8,
979:12, 979:13,
1047:22
**normally** [3] - 931:14,
1028:14, 1078:3
**normals** [1] - 979:3
**Northwest** [2] -
927:14, 928:12
**notch** [1] - 1026:18
**note** [1] - 995:18
**notes** [8] - 969:17,
970:24, 1000:5,
1016:20, 1016:25,
1080:14
**nothing** [4] - 1007:2,
1007:3, 1011:20,
1016:4
**noticed** [2] - 985:8,
1066:2
**notification** [1] -
935:17
**notify** [1] - 946:25

**number** [7] - 933:24,
976:21, 981:3,
982:19, 994:2,
1012:2, 1013:4
**numbers** [1] - 962:1
**NW** [3] - 927:18,
928:16, 1080:21

### O

**oath** [2] - 930:5,
957:10
**object** [2] - 933:10,
948:23
**objection** [24] - 933:5,
933:17, 933:22,
937:11, 937:23,
940:1, 945:5,
960:13, 960:21,
961:2, 961:6, 970:7,
971:15, 982:1,
983:2, 983:6,
983:11, 983:25,
987:11, 989:18,
994:21, 994:24,
1016:14, 1018:2
**objections** [1] -
933:21
**objective** [2] - 996:7,
1011:3
**obligated** [1] - 931:20
**observe** [2] - 1021:17,
1048:5
**observed** [1] - 981:15
**obviously** [7] - 941:6,
944:13, 944:15,
947:5, 949:17,
976:12, 997:25
**occasion** [1] - 952:13
**occasions** [1] -
1017:21
**occur** [1] - 984:20
**occurred** [2] - 967:8,
968:23
**occurrence** [1] -
1012:10
**occurring** [2] - 989:7,
990:1
**occurs** [1] - 1010:20
**OF** [4] - 927:1, 927:2,
927:9, 1080:10
**offend** [1] - 1065:22
**offense** [2] - 974:12
**offer** [1] - 953:4
**offered** [1] - 940:4
**offhand** [1] - 959:24
**officer** [10] - 939:9,
940:17, 940:22,
940:25, 941:7,
944:2, 964:15,

966:19, 1011:22,
1011:25
**Officer** [56] - 939:7,
939:13, 940:13,
940:15, 940:24,
941:10, 942:21,
943:24, 958:4,
959:6, 959:7,
959:16, 960:19,
960:24, 961:16,
962:3, 962:13,
962:14, 962:16,
963:8, 963:14,
963:15, 963:24,
964:7, 964:16,
964:20, 964:24,
965:1, 965:9,
965:15, 965:24,
966:6, 967:19,
967:23, 968:1,
968:17, 968:25,
969:3, 969:5,
970:13, 971:6,
971:9, 971:18,
972:1, 972:17,
972:19, 973:3,
973:21, 985:25,
986:1, 986:23,
1069:14, 1070:3,
1070:22, 1078:19
**officers** [6] - 941:9,
957:18, 1015:24,
1017:25, 1055:20,
1059:10
**official** [3] - 934:25,
977:5, 1080:20
**Official** [1] - 928:15
**OFFICIAL** [1] -
1080:10
**officially** [1] - 938:19
**often** [3] - 984:20,
991:19, 994:10
**OIF** [1] - 1023:11
**old** [4] - 1019:9,
1047:12, 1055:8,
1074:22
**old-time** [1] - 1047:12
**older** [1] - 1027:9
**ON** [1] - 927:25
**once** [2] - 972:9,
1025:4
**one** [60] - 935:11,
935:16, 935:21,
935:22, 936:25,
938:11, 938:18,
939:3, 941:7,
951:12, 951:22,
952:24, 955:25,
960:1, 973:15,
973:17, 974:5,

979:15, 986:7,
986:8, 986:22,
987:6, 987:22,
988:7, 996:3, 996:8,
996:18, 997:12,
997:14, 998:23,
999:3, 999:11,
1002:7, 1004:16,
1011:24, 1013:21,
1019:20, 1022:24,
1023:9, 1023:16,
1026:17, 1027:11,
1027:12, 1037:23,
1037:24, 1038:20,
1048:8, 1050:22,
1052:8, 1054:16,
1058:20, 1063:19,
1064:19, 1064:23,
1067:23, 1068:11,
1073:22, 1076:8
**one's** [1] - 932:8
**one-minute** [1] -
1064:19
**Ooh** [1] - 1050:25
**oops** [1] - 1023:5
**open** [4] - 938:25,
943:19, 960:20,
961:20
**opening** [1] - 973:5
**operate** [1] - 1027:18
**operation** [1] -
1023:11
**operations** [2] -
942:14, 1024:22
**operator** [2] - 1025:8,
1028:19
**opine** [2] - 1006:21,
1012:20
**opinion** [21] - 971:23,
982:2, 984:16,
988:15, 988:17,
996:22, 997:18,
998:19, 998:21,
999:8, 999:10,
1006:24, 1007:6,
1008:11, 1008:12,
1008:15, 1011:22,
1012:12, 1013:8,
1013:18
**opinions** [2] - 995:11,
998:1
**opportunity** [10] -
939:5, 942:3,
957:18, 957:22,
958:4, 960:6, 974:8,
998:14, 1038:22,
1053:2
**or..** [1] - 966:13
**order** [3] - 933:15,
942:24, 968:17

**outline** [1] - 939:21
**outpatient** [1] -
1031:21
**outside** [3] - 947:11,
1044:21
**outta** [1] - 1069:7
**overcharge** [2] -
988:18, 988:19
**overhear** [1] - 931:1
**overheard** [1] - 930:23
**overnight** [1] - 944:14
**overrule** [1] - 983:10
**overruled** [5] - 960:22,
970:8, 971:17,
987:12, 995:3
**overruling** [1] - 961:6
**oversight** [1] - 993:15
**own** [7] - 940:12,
962:23, 973:6,
1000:16, 1000:24,
1004:17, 1023:19

### P

**p.m** [7] - 927:5,
959:11, 962:4,
962:15, 964:11,
965:2, 1080:8
**PA** [1] - 1031:13
**pack** [4] - 1036:6,
1036:9, 1036:19,
1036:20
**packed** [3] - 1036:7
**page** [1] - 1004:15
**PAGE** [2] - 927:25,
929:2
**pages** [2] - 999:20,
999:23
**paid** [2] - 1044:16,
1045:2
**pain** [5] - 984:22,
1000:6, 1005:2,
1030:18, 1032:15
**pair** [1] - 1038:13
**pants** [1] - 1036:8
**paracha** [1] - 996:20
**parade** [1] - 955:24
**PARALEGAL** [8] -
988:9, 1048:10,
1063:14, 1072:4,
1072:7, 1072:12,
1072:15, 1073:23
**pardon** [2] - 975:19,
995:15
**part** [29] - 937:15,
939:17, 940:23,
948:16, 957:17,
958:5, 971:9,
976:12, 976:13,
976:24, 980:6,

982:15, 983:19, 985:16, 989:11, 1000:16, 1008:15, 1008:17, 1014:15, 1015:8, 1015:12, 1016:17, 1016:22, 1027:17, 1027:20, 1038:10, 1058:19, 1063:19
**parted** [1] - 951:18
**partially** [2] - 1002:8
**participating** [1] - 931:7
**particular** [11] - 941:13, 961:9, 969:8, 971:11, 971:20, 973:19, 980:2, 984:9, 987:16, 998:20, 1013:5
**particularly** [9] - 976:22, 979:4, 979:23, 980:15, 981:10, 990:14, 991:17, 997:19, 1012:16
**parties** [4] - 934:6, 948:3, 1079:10, 1079:20
**partisan** [3] - 998:1, 998:5, 998:10
**parts** [2] - 979:5, 1057:23
**party** [1] - 969:5
**Paso** [1] - 928:4
**pass** [5] - 956:16, 992:25, 1026:25, 1027:1, 1078:22
**passing** [1] - 1065:2
**past** [6] - 977:4, 1040:4, 1045:23, 1046:1, 1056:21, 1066:12
**paste** [1] - 1000:9
**path** [2] - 1051:7, 1051:9
**pathognomonic** [1] - 979:23
**patient** [5] - 978:8, 1010:18, 1010:25, 1011:14, 1031:19
**patients** [5] - 976:25, 978:5, 978:6, 988:25, 992:5
**patrol** [2] - 966:14, 981:19
**Pause** [5] - 942:11, 956:20, 962:11, 986:9, 1013:22
**pause** [16] - 958:20,

959:14, 1047:2, 1054:15, 1057:16, 1058:1, 1059:16, 1060:6, 1061:2, 1063:18, 1072:5, 1072:21, 1073:6, 1073:20, 1074:1
**paused** [1] - 941:20
**pay** [4] - 944:5, 954:8, 954:9, 1044:22
**paying** [2] - 1033:22, 1033:23
**payors** [1] - 977:18
**peaceful** [1] - 1045:22
**Pence** [2] - 931:8, 935:17
**people** [65] - 951:12, 952:21, 952:25, 953:3, 955:8, 978:15, 978:24, 979:16, 979:25, 980:1, 989:4, 991:10, 991:17, 991:23, 992:3, 1012:2, 1012:4, 1012:17, 1013:2, 1023:24, 1023:25, 1026:4, 1027:8, 1028:20, 1034:18, 1034:23, 1035:9, 1035:11, 1035:25, 1042:3, 1044:12, 1044:16, 1045:1, 1045:13, 1045:20, 1045:21, 1046:12, 1047:21, 1047:22, 1048:1, 1048:16, 1050:6, 1050:25, 1051:4, 1051:5, 1051:22, 1054:2, 1054:6, 1054:8, 1055:7, 1055:11, 1055:12, 1056:25, 1057:3, 1058:17, 1058:21, 1058:22, 1058:23, 1060:22, 1063:7, 1074:18, 1074:20, 1074:22, 1077:13
**per** [1] - 943:25
**perceived** [1] - 963:7
**percent** [6] - 983:21, 992:4, 1004:22, 1027:11, 1027:12, 1031:3
**perform** [2] - 1015:25, 1027:6
**perhaps** [3] - 939:8, 974:11, 1060:15
**period** [3] - 971:7,

972:12, 1055:23
**permit** [2] - 939:23, 942:14
**person** [19] - 942:13, 958:2, 958:25, 959:1, 959:3, 959:5, 959:6, 963:7, 963:25, 965:24, 969:11, 969:24, 970:23, 972:11, 972:14, 973:11, 973:12, 992:12, 997:11
**personally** [4] - 973:20, 1033:15, 1035:13, 1054:7
**personnel** [3] - 1010:13, 1015:9, 1021:6
**Phillip** [1] - 1019:2
**PHILLIP** [2] - 929:11, 1018:20
**phone** [14] - 969:4, 969:10, 969:12, 969:23, 970:13, 970:19, 1021:23, 1035:18, 1052:9, 1058:5, 1061:9, 1065:13, 1065:14, 1065:18, 1066:2, 1066:4, 1066:5, 1066:22, 1067:1, 1075:24, 1076:14
**photo** [2] - 1023:4, 1070:6
**photograph** [1] - 971:10
**photos** [1] - 1038:15
**physical** [1] - 1031:12
**physically** [2] - 969:25, 970:25
**physicians** [1] - 975:22
**pick** [4] - 972:11, 1022:6, 1066:2, 1066:5
**picked** [1] - 1054:25
**picking** [3] - 1066:4, 1078:4
**picture** [9] - 969:2, 971:3, 1039:21, 1047:9, 1048:9, 1048:12, 1048:14, 1049:2, 1076:13
**pictures** [7] - 934:1, 1045:12, 1051:2, 1051:11, 1051:12, 1054:1, 1057:11
**piece** [1] - 980:21
**pilot** [1] - 1025:21

**pilots** [1] - 1025:22
**pissed** [1] - 1067:20
**pixel** [2] - 979:2
**places** [1] - 1032:8
**Plaintiff** [1] - 927:3
**plan** [5] - 942:19, 948:23, 953:15, 953:18, 1079:2
**planned** [3] - 1033:17, 1033:19, 1035:8
**planning** [2] - 1053:10, 1057:12
**plans** [3] - 937:5, 1044:5, 1046:9
**platoon** [4] - 1022:17, 1022:21, 1023:17, 1025:21
**play** [17] - 958:8, 958:17, 959:12, 987:20, 1046:24, 1047:17, 1047:18, 1052:2, 1052:14, 1054:12, 1057:23, 1063:11, 1064:18, 1069:15, 1072:6, 1075:1, 1076:4
**played** [10] - 1063:17, 1063:22, 1064:21, 1069:18, 1072:9, 1072:20, 1073:4, 1073:25, 1074:13, 1075:2
**playing** [25] - 958:10, 958:19, 959:13, 986:11, 986:14, 988:12, 1045:18, 1047:1, 1047:10, 1047:20, 1049:5, 1052:3, 1052:16, 1053:17, 1054:14, 1056:18, 1057:25, 1059:14, 1059:15, 1060:3, 1060:5, 1061:3, 1061:21, 1061:25, 1074:12
**plus** [1] - 1022:20
**point** [28] - 938:18, 941:14, 941:17, 942:5, 955:1, 955:7, 974:11, 983:11, 989:5, 1011:24, 1034:17, 1046:11, 1049:18, 1050:3, 1050:14, 1051:1, 1056:5, 1056:22, 1058:5, 1058:17, 1059:11, 1060:19, 1060:20, 1064:14, 1069:22, 1075:4, 1075:11, 1078:24

**points** [6] - 941:21, 945:21, 945:25, 965:8, 974:17, 974:20
**Police** [6] - 940:11, 957:19, 957:20, 966:15, 966:16, 966:18
**police** [6] - 957:18, 966:11, 1011:22, 1011:25, 1055:20, 1059:10
**political** [4] - 953:25, 1007:21, 1046:1, 1046:3
**porta** [1] - 1043:9
**Porta** [2] - 1044:2, 1046:6
**portion** [1] - 958:23
**portions** [1] - 949:8
**position** [1] - 974:10
**possibilities** [1] - 998:3
**Post** [1] - 1010:2
**post** [1] - 984:18
**post-traumatic** [1] - 984:18
**potential** [1] - 949:25
**potentially** [3] - 943:5, 943:19, 949:14
**potties** [1] - 1043:9
**Potties** [2] - 1044:2, 1046:7
**practice** [3] - 975:23, 976:13, 993:17
**practicing** [1] - 993:11
**practitioner** [1] - 978:7
**preaching** [1] - 1050:7
**predominantly** [1] - 998:2
**prejudice** [2] - 942:16, 943:10
**preliminary** [1] - 937:1
**preparation** [2] - 966:1, 968:6
**prepared** [3] - 938:10, 968:9, 1027:25
**prescribed** [1] - 985:7
**prescriptions** [1] - 985:13
**presence** [1] - 1018:8
**present** [2] - 944:16, 945:12
**presenting** [1] - 942:18
**presents** [1] - 1027:7
**president** [1] - 1007:24
**President** [3] - 931:22, 935:17, 952:17

**pretty** [11] - 956:11, 961:5, 990:21, 1034:21, 1038:21, 1040:17, 1045:4, 1045:16, 1047:10, 1050:5, 1069:19
**previously** [1] - 965:9
**principles** [1] - 1006:6
**problem** [9] - 978:14, 980:18, 985:7, 990:5, 990:15, 1010:19, 1015:18, 1026:21, 1027:9
**problems** [11] - 977:10, 978:9, 979:16, 981:22, 982:16, 985:15, 1003:4, 1015:15, 1016:1, 1016:3, 1031:24
**procedurally** [1] - 937:14
**procedure** [3] - 938:22, 938:24, 1000:11
**proceed** [3] - 944:7, 945:18, 982:9
**proceeding** [2] - 934:25, 943:18
**proceedings** [1] - 1080:15
**process** [8] - 931:11, 979:11, 983:19, 984:5, 1025:6, 1027:24, 1028:12, 1032:5
**processes** [6] - 989:23, 989:24, 989:25, 990:6, 990:9, 990:10
**processing** [1] - 991:1
**produce** [1] - 1012:15
**productive** [1] - 1011:4
**profession** [1] - 977:17
**proffer** [2] - 946:5, 948:9
**proffered** [1] - 974:14
**program** [4] - 1016:13, 1031:20, 1031:21, 1032:2
**programmed** [2] - 991:10, 992:16
**projects** [1] - 976:22
**prolonged** [1] - 981:1
**promise** [1] - 1076:8
**promoted** [1] - 1016:5
**promotion** [1] - 1029:3
**pronounce** [1] -

967:21
**proof** [1] - 941:24
**proper** [1] - 941:13
**proposing** [1] - 938:25
**prosecutor** [1] - 993:6
**protect** [1] - 1021:2
**protest** [1] - 1046:13, 1050:12
**protocol** [1] - 1000:11
**prove** [2] - 940:14, 941:21
**provide** [6] - 948:9, 994:18, 995:7, 996:7, 1022:3, 1022:7
**provided** [6] - 980:8, 980:17, 993:21, 993:25, 994:4, 1079:7
**provider** [1] - 980:16
**prudent** [1] - 967:16
**psych** [1] - 1000:5
**psychiatrist** [1] - 975:15, 975:18, 985:13, 993:8, 1031:14, 1031:15
**psychiatrists** [1] - 1017:5
**psychiatrists'** [1] - 1016:18
**psychiatry** [6] - 975:20, 975:23, 975:25, 976:3, 993:11, 1016:22
**psychologist** [1] - 1031:14
**psychotic** [1] - 977:8
**PTSD** [40] - 976:4, 976:10, 976:17, 977:2, 977:4, 978:2, 978:11, 978:13, 979:6, 979:7, 979:16, 979:24, 980:5, 981:23, 982:12, 983:22, 984:12, 985:6, 988:18, 989:3, 990:15, 991:6, 991:7, 1000:14, 1001:3, 1005:1, 1006:8, 1006:12, 1006:20, 1006:25, 1007:6, 1007:8, 1009:18, 1012:16, 1013:6, 1014:22, 1015:5, 1018:1, 1030:24, 1032:17
**PUBLIC** [2] - 928:2, 928:6
**published** [2] -

977:21, 998:21
**pull** [6] - 958:7, 959:10, 970:1, 1005:8, 1023:2, 1070:22
**pulled** [4] - 1058:10, 1058:16, 1067:14, 1068:22
**pulling** [1] - 1058:16, 1071:13
**purpose** [6] - 990:23, 1003:1, 1007:20, 1011:1, 1025:16, 1025:17
**purposes** [2] - 1005:7, 1079:12
**pursuant** [2] - 933:9, 944:25
**push** [2] - 1068:23, 1076:21
**push-ups** [1] - 1076:21
**pushed** [2] - 1065:8, 1068:19
**put** [20] - 941:1, 943:14, 944:10, 979:12, 982:21, 993:17, 995:12, 995:14, 995:16, 1000:20, 1004:17, 1017:12, 1027:23, 1031:13, 1032:24, 1033:1, 1033:4, 1066:22, 1067:17, 1074:18

## Q

**QRF** [2] - 1021:20, 1021:25
**qualification** [1] - 1025:3
**qualified** [2] - 1021:1, 1022:8
**qualify** [2] - 981:9, 983:24
**quarters** [1] - 1042:1
**questioning** [1] - 1010:20
**questions** [17] - 930:5, 932:17, 932:18, 937:22, 956:16, 956:21, 956:24, 965:20, 968:14, 970:9, 970:10, 972:21, 972:22, 993:7, 1013:23, 1018:5, 1079:11
**quick** [2] - 942:25, 1021:20

**quickly** [5] - 994:4, 995:18, 995:20, 1014:14, 1070:14
**quite** [2] - 938:11, 944:10

## R

**radio** [2] - 1027:18, 1035:19
**railing** [3] - 1055:12, 1055:13, 1057:4
**raining** [2] - 1038:20, 1055:8
**raise** [2] - 949:24, 950:9
**raised** [1] - 947:25
**raked** [1] - 1066:13
**rally** [17] - 948:19, 948:20, 952:18, 1033:14, 1039:21, 1041:17, 1042:11, 1043:14, 1043:20, 1044:13, 1045:23, 1045:24, 1046:18, 1054:20, 1054:21, 1054:23, 1054:24
**rank** [1] - 1020:20
**rapidly** [1] - 990:22
**rather** [2] - 938:11, 953:11
**RDR** [3] - 928:15, 1080:12, 1080:19
**re** [1] - 950:9
**re-raise** [1] - 950:9
**reach** [1] - 1068:18
**reached** [1] - 1007:9
**react** [2] - 990:21, 1008:13
**reacted** [1] - 1070:16
**reacting** [1] - 989:13
**reaction** [4] - 1013:6, 1013:15, 1021:20
**reactive** [1] - 989:17
**read** [6] - 952:18, 955:10, 969:14, 983:3, 1000:1, 1037:24
**readers** [1] - 1003:11
**ready** [5] - 1027:21, 1027:25, 1035:22, 1079:20, 1079:22
**real** [5] - 1039:25, 1047:9, 1052:5, 1052:6, 1052:7
**realize** [1] - 1070:10
**realized** [1] - 1071:15
**really** [39] - 978:4, 982:17, 982:18, 990:15, 991:4,

992:16, 995:22, 1000:22, 1004:22, 1006:1, 1007:13, 1010:25, 1011:3, 1013:5, 1014:24, 1023:16, 1025:18, 1028:18, 1034:23, 1034:25, 1037:22, 1038:11, 1040:13, 1040:14, 1042:1, 1043:19, 1044:11, 1050:9, 1055:11, 1056:7, 1056:9, 1057:8, 1059:19, 1059:22, 1063:1, 1069:16, 1076:18, 1078:20
**reason** [7] - 931:4, 995:14, 995:16, 1017:5, 1028:25, 1041:4, 1058:19
**reasonableness** [1] - 1012:12
**reasoning** [1] - 997:4
**reasons** [1] - 1058:20
**recalled** [2] - 937:18, 1007:23
**recalling** [1] - 940:1
**receive** [1] - 982:23
**received** [5] - 940:18, 957:24, 1022:24, 1024:19, 1077:16
**receiving** [1] - 1031:8
**recent** [1] - 995:8
**recess** [1] - 944:24
**Recess** [1] - 1018:16
**recitation** [1] - 1003:17
**recognition** [1] - 972:2
**recognize** [7] - 962:19, 974:15, 986:5, 992:2, 1023:4, 1039:14, 1047:3
**recognized** [4] - 977:16, 977:17, 977:19
**recollection** [10] - 959:20, 960:3, 960:6, 960:15, 961:9, 962:6, 963:14, 968:3, 969:4, 987:8
**recommend** [1] - 998:21
**reconnected** [1] - 952:1
**record** [24] - 933:4, 934:13, 940:8, 940:24, 943:19, 944:6, 944:12,

945:5, 945:8, 950:25, 964:25, 965:14, 969:14, 975:8, 980:11, 980:19, 984:7, 988:13, 999:19, 1000:20, 1016:1, 1018:25, 1074:17, 1076:4
**recorded** [3] - 967:17, 968:4, 969:15
**recording** [1] - 1065:13
**records** [31] - 980:3, 980:7, 980:8, 980:9, 980:13, 981:13, 983:18, 985:1, 985:9, 988:15, 992:11, 999:5, 999:18, 1000:6, 1000:8, 1000:10, 1000:12, 1003:21, 1003:22, 1005:16, 1008:21, 1008:22, 1014:17, 1014:19, 1015:9, 1015:10, 1015:12, 1016:18, 1017:3, 1031:15
**recount** [1] - 961:10
**recounting** [1] - 1009:18
**recross** [2] - 939:3, 1079:9
**red** [5] - 958:13, 958:23, 1058:23, 1065:10, 1066:21
**redirect** [3] - 932:19, 972:25, 1013:24
**REDIRECT** [2] - 973:1, 1014:1
**refer** [5] - 967:3, 967:4, 968:16, 968:24, 970:24
**reference** [5] - 977:6, 1053:13, 1053:25, 1054:7, 1075:12
**referral** [1] - 1031:13
**referred** [2] - 968:21, 997:14
**referring** [6] - 968:19, 977:11, 993:24, 997:25, 1003:2, 1024:16
**refers** [1] - 978:4
**reflect** [4] - 940:8, 964:25, 965:14, 965:18
**reflected** [2] - 1001:12, 1002:19
**reflecting** [1] - 966:9

**reflective** [1] - 991:2
**reflects** [1] - 967:6
**reflux** [1] - 1030:19
**refresh** [9] - 959:20, 960:3, 960:6, 960:15, 962:6, 963:13, 967:16, 969:7, 987:7
**refreshed** [2] - 960:17, 960:18
**regarding** [2] - 954:3, 988:16
**regardless** [1] - 1079:14
**regimen** [1] - 985:5
**regular** [1] - 1053:2
**relate** [2] - 934:23, 947:4
**relates** [3] - 948:17, 1006:20, 1079:17
**relation** [1] - 949:5
**relationships** [1] - 1002:10
**relax** [1] - 1032:15
**released** [1] - 1029:17
**releasing** [1] - 937:23
**relevant** [2] - 1000:2, 1000:4
**reliable** [1] - 997:3
**relied** [1] - 1008:23
**relieved** [1] - 1027:13
**rely** [3] - 944:21, 982:2, 1011:21
**relying** [3] - 998:1, 998:6, 1010:7
**remain** [1] - 975:1
**remained** [1] - 951:14
**remedied** [1] - 943:9
**remedy** [1] - 963:11
**remember** [40] - 955:11, 956:2, 977:19, 985:20, 985:22, 985:23, 986:15, 986:17, 987:6, 987:10, 987:13, 987:18, 987:21, 987:22, 996:15, 996:17, 996:21, 997:12, 1034:7, 1034:9, 1034:10, 1034:15, 1035:8, 1038:10, 1038:11, 1043:22, 1043:25, 1048:12, 1049:6, 1049:11, 1049:13, 1056:17, 1062:19, 1064:23, 1069:9, 1071:5, 1071:7, 1071:11, 1071:13

**remind** [2] - 930:5, 957:9
**reminded** [2] - 1074:19, 1074:25
**reminds** [3] - 979:19, 990:18
**remove** [2] - 1066:25, 1070:3
**removing** [1] - 1071:7
**render** [4] - 982:2, 998:18, 1007:5, 1015:20
**rendered** [1] - 1013:7
**rendering** [4] - 999:7, 999:8, 999:10, 1011:22
**renew** [1] - 944:6
**rented** [1] - 954:8
**reopen** [8] - 939:1, 939:2, 941:14, 942:4, 942:15, 943:3, 943:7, 945:20
**reopened** [1] - 944:7
**reopening** [1] - 1079:12
**repeat** [2] - 982:10, 1057:18
**repeatedly** [2] - 1007:12, 1013:12
**rephrase** [1] - 932:6
**replay** [1] - 942:23
**report** [29] - 959:17, 959:20, 959:22, 967:3, 967:6, 967:14, 968:4, 968:17, 968:19, 968:21, 968:24, 969:20, 1001:8, 1001:10, 1001:12, 1001:16, 1001:17, 1002:19, 1002:21, 1003:1, 1004:11, 1004:24, 1005:11, 1006:10, 1006:11, 1006:23, 1010:17, 1015:8, 1017:12
**reported** [3] - 1008:1, 1010:11, 1010:12
**REPORTER** [3] - 1041:9, 1059:2, 1080:10
**reporter** [2] - 1019:1, 1019:5
**Reporter** [3] - 928:15, 928:15, 1080:20
**reports** [7] - 967:4, 967:11, 981:16, 1001:22, 1002:23, 1003:10, 1010:7
**represent** [1] - 930:11

**request** [5] - 939:24, 944:25, 1005:10, 1014:3
**requested** [1] - 1014:5
**requesting** [1] - 946:24
**require** [1] - 998:20
**requirement** [1] - 1029:9
**requirements** [1] - 995:2
**research** [2] - 944:14, 976:20
**reservations** [1] - 1037:7
**reserve** [1] - 938:9
**residency** [1] - 976:8
**Resist** [1] - 1025:12
**resist** [1] - 1026:6
**respect** [8] - 934:16, 937:12, 941:15, 941:24, 942:1, 943:17, 943:24, 1004:23
**respectfully** [1] - 1004:23
**respectively** [1] - 1010:13
**respond** [1] - 1022:1
**response** [1] - 977:1
**rest** [3] - 933:1, 938:19, 1027:7
**restate** [1] - 970:12
**restaurants** [1] - 956:12
**rested** [6] - 938:24, 942:15, 943:6, 943:13, 943:16, 944:13
**resting** [2] - 936:20, 937:11
**restricted** [2] - 935:20, 948:12
**result** [1] - 932:11
**Resumed** [3] - 929:6, 930:6, 957:12
**retake** [1] - 957:8
**retired** [2] - 976:16, 1006:1
**return** [1] - 974:4
**returning** [1] - 974:21
**review** [18] - 935:23, 959:15, 959:18, 961:19, 967:14, 969:20, 970:5, 971:8, 980:3, 980:6, 985:16, 987:7, 995:25, 999:17, 1003:22, 1005:14, 1005:16, 1017:2

**reviewed** [18] - 962:14, 963:16, 964:2, 964:4, 965:5, 980:7, 985:2, 985:19, 986:7, 986:8, 999:5, 999:15, 999:18, 999:25, 1000:2, 1003:21, 1015:8, 1017:12
**reviewing** [9] - 940:21, 969:24, 985:20, 985:22, 985:24, 987:10, 987:13, 988:15, 1016:25
**reviews** [1] - 1031:15
**revise** [2] - 984:4, 1003:12
**rewire** [1] - 978:20
**Richardson** [2] - 1029:20, 1031:8
**ride** [2] - 1033:20, 1046:16
**rifle** [1] - 1053:2
**right-hand** [2] - 965:16, 973:9
**rights** [3] - 946:24, 947:1, 949:23
**riot** [6] - 966:13, 971:4, 971:10, 971:11, 971:12, 971:18
**rise** [2] - 978:11, 978:13
**road** [1] - 1048:22
**Robin** [5] - 1028:4, 1028:5, 1028:6, 1028:22, 1029:6
**room** [3] - 971:1, 1010:10, 1037:9
**Room** [3] - 927:22, 928:16, 1080:21
**route** [3] - 1033:17, 1035:15, 1055:9
**row** [1] - 973:8
**rule** [2] - 945:7, 983:7
**Rule** [4] - 938:5, 938:8, 940:4, 941:25
**rules** [3] - 994:13, 994:18, 994:25
**run** [1] - 1028:15
**running** [4] - 988:11, 1014:13, 1054:6, 1076:20

## S

**sabbatical** [2] - 939:15, 966:18
**safe** [1] - 1066:21
**Safeway** [1] - 933:3
**Sage** [5] - 1028:4,

1028:5, 1028:6,
1028:22, 1029:6
**sailed** [1] - 942:6
**samples** [1] - 995:19
**San** [6] - 928:3, 928:8,
951:4, 951:11,
951:13, 976:23
**saw** [22] - 949:4,
973:6, 973:12,
982:17, 989:14,
1013:17, 1022:10,
1044:8, 1047:15,
1049:24, 1050:25,
1051:22, 1055:7,
1055:11, 1055:12,
1058:21, 1058:22,
1063:3, 1063:4,
1066:18, 1067:2
**scaffolding** [8] -
1050:23, 1055:4,
1055:6, 1055:16,
1055:18, 1056:21,
1056:23
**scene** [1] - 971:5
**scholar** [1] - 994:25
**school** [11] - 951:12,
975:22, 976:7,
977:24, 1026:3,
1028:1, 1030:4,
1030:6, 1033:1,
1033:10
**schools** [3] - 981:9,
1016:10, 1025:7
**Schwager** [1] - 936:6
**Schwager's** [2] -
934:23, 935:25
**scope** [1] - 950:12
**screaming** [4] -
1013:1, 1047:25,
1048:1
**screen** [8] - 935:24,
936:12, 958:24,
962:1, 962:22,
965:12, 965:16,
973:16
**se** [1] - 943:25
**seats** [1] - 1044:16
**second** [11] - 941:20,
946:6, 973:8,
973:19, 977:24,
1022:22, 1047:2,
1058:2, 1063:19,
1072:21, 1074:2
**secondary** [2] - 991:1,
991:2
**secondhand** [2] -
998:2, 998:6
**seconds** [17] - 958:9,
958:17, 958:22,
965:4, 971:21,

986:4, 1049:4,
1052:2, 1061:14,
1062:9, 1063:13,
1065:9, 1069:16,
1070:19, 1073:20,
1073:21
**Secret** [2] - 934:6,
936:7
**section** [6] - 1003:7,
1008:9, 1008:11,
1044:24, 1057:5
**sections** [2] - 1001:23,
1042:20
**security** [6] - 1022:4,
1042:9, 1042:10,
1042:12, 1063:3,
1063:5
**see** [63] - 935:14,
936:13, 947:16,
948:17, 949:1,
949:2, 949:4,
952:19, 954:21,
959:1, 959:17,
971:9, 971:11,
971:18, 971:21,
971:22, 972:14,
973:3, 978:22,
979:4, 980:11,
987:23, 988:18,
989:2, 990:12,
992:8, 992:17,
1003:6, 1003:9,
1010:22, 1016:1,
1031:12, 1031:14,
1034:6, 1036:8,
1040:3, 1045:19,
1046:1, 1047:12,
1048:3, 1048:18,
1048:24, 1049:23,
1050:1, 1055:25,
1058:3, 1058:7,
1059:7, 1061:5,
1061:11, 1061:23,
1062:2, 1068:14,
1070:3, 1070:6,
1070:7, 1070:9,
1071:21, 1072:22,
1073:1, 1074:3,
1080:5
**seeing** [9] - 985:22,
996:25, 1045:13,
1051:17, 1051:18,
1058:10, 1058:17,
1064:23, 1065:15
**seeking** [3] - 992:19,
996:7, 1017:6
**seem** [1] - 1003:19
**selected** [1] - 1016:10,
1025:5
**selection** [2] -

1016:11, 1025:4
**self** [7] - 933:16,
1009:5, 1009:7,
1009:8, 1009:19,
1010:7, 1010:17
**self-authenticating** [1]
- 933:16
**self-report** [1] -
1010:17
**self-reports** [1] -
1010:7
**self-serving** [4] -
1009:5, 1009:7,
1009:8, 1009:19
**Senate** [1] - 934:25
**sending** [4] - 944:24,
1054:1, 1057:11,
1075:20
**sense** [2] - 955:23,
1010:24
**sent** [8] - 969:6,
970:17, 995:21,
1014:14, 1032:2,
1034:3, 1077:3,
1077:7
**separate** [3] - 1008:9,
1008:11, 1033:10
**separated** [5] -
1025:20, 1042:17,
1050:14, 1050:18,
1050:19
**SERE** [5] - 1016:13,
1025:9, 1025:12,
1026:3, 1028:1
**Sergeant** [9] - 961:17,
961:19, 962:3,
962:14, 962:16,
962:19, 964:4,
964:7, 1029:4
**sergeant** [6] - 981:10,
1020:21, 1020:22,
1022:21, 1023:17
**series** [2] - 934:5,
934:22
**serious** [1] - 1015:5
**serpentine** [1] -
1042:22
**serpentine-like** [1] -
1042:22
**serve** [1] - 1020:13
**served** [3] - 976:14,
1020:14, 1023:10
**Service** [2] - 934:6,
936:7
**serving** [4] - 1009:5,
1009:7, 1009:8,
1009:19
**session** [1] - 1044:15
**SESSION** [1] - 927:9
**set** [5] - 978:6, 990:16,

998:7, 1013:5,
1040:13
**seven** [4] - 951:19,
951:20, 999:22,
1019:20
**several** [4] - 939:16,
966:2, 966:3, 966:6,
1016:5
**severe** [1] - 1002:8
**shaking** [1] - 1066:25
**share** [1] - 937:20
**shared** [1] - 955:19
**shed** [1] - 1023:16
**shield** [2] - 1064:23,
1065:4
**shields** [6] - 1058:10,
1058:16, 1059:7,
1059:8, 1060:18,
1065:2
**shift** [2] - 979:18,
979:19
**ship** [1] - 942:6
**shirt** [2] - 1023:9,
1038:14
**shirts** [1] - 1036:8
**shit** [8] - 1063:5,
1065:6, 1067:9,
1068:9, 1068:13,
1068:17, 1068:20,
1069:3
**shit's** [2] - 1052:6,
1052:7
**shocked** [1] - 1008:1
**shoes** [1] - 1038:13
**short** [2] - 939:22,
988:2
**shorts** [2] - 1038:13,
1039:9
**shoulder** [1] - 1066:12
**show** [30] - 960:20,
969:10, 969:23,
970:6, 970:15,
970:16, 970:22,
970:25, 978:9,
986:3, 988:2,
990:17, 1001:14,
1004:24, 1039:10,
1048:7, 1049:2,
1052:1, 1053:15,
1056:15, 1057:14,
1060:24, 1061:18,
1069:13, 1070:1,
1070:21, 1071:22,
1072:1, 1073:19,
1076:10
**showed** [2] - 960:12,
1034:10
**shown** [7] - 959:18,
959:23, 959:24,
960:1, 967:9,

1049:2, 1053:15
**shows** [1] - 990:17
**sic** [1] - 1039:19
**side** [4] - 965:16,
973:9, 1024:21,
1065:11
**sign** [1] - 1023:18
**significant** [6] -
943:13, 979:24,
980:13, 980:20,
980:21, 1000:7
**significantly** [2] -
979:18, 1012:15
**signs** [4] - 1035:2,
1045:21, 1048:22,
1056:2
**singing** [1] - 1074:23
**sit** [2] - 1032:3, 1051:2
**situation** [4] - 989:15,
990:19, 992:6, 998:7
**situations** [4] -
990:22, 991:18,
1030:20, 1032:4
**six** [13] - 951:19,
951:20, 958:16,
958:21, 965:4,
1019:20, 1019:24,
1020:6, 1021:21,
1062:15, 1062:17,
1062:19, 1062:21
**six-minute-and-50-
seconds** [1] -
1057:17
**skills** [1] - 1025:19
**skipped** [1] - 942:25
**sleep** [6] - 984:24,
1000:5, 1002:9,
1005:2, 1030:19,
1041:2
**slide** [3] - 990:17
**slipped** [2] - 988:17,
989:12
**slow** [3] - 1019:4,
1047:9, 1070:18
**slowly** [1] - 1051:3
**small** [1] - 1025:25
**smushed** [1] - 1069:1
**snap** [1] - 1066:20
**snare** [1] - 1047:11
**snow** [1] - 1049:22
**so..** [1] - 1045:14
**socks** [1] - 1036:7
**soldier** [7] - 984:9,
1010:14, 1015:14,
1015:15, 1015:22,
1015:23
**soldiers** [11] - 976:10,
981:18, 982:21,
984:21, 988:24,
990:21, 990:25,

1015:18, 1015:23, 1022:11, 1027:8
**solely** [2] - 1007:9, 1007:12
**somatic** [1] - 991:25
**someone** [5] - 963:7, 996:7, 998:17, 1001:3, 1016:22
**sometimes** [3] - 999:2, 1004:16, 1041:22
**somewhat** [1] - 994:16
**somewhere** [4] - 955:11, 992:9, 1024:12, 1037:1
**sorry** [37] - 936:8, 936:25, 937:3, 945:24, 950:8, 950:16, 964:20, 966:5, 975:10, 978:12, 983:5, 983:6, 986:10, 987:2, 987:9, 994:23, 996:12, 1004:3, 1006:19, 1011:8, 1028:24, 1029:15, 1040:7, 1041:11, 1049:14, 1059:5, 1060:25, 1063:14, 1063:21, 1070:8, 1071:24, 1072:7, 1072:10, 1072:11, 1072:15, 1078:20
**Sorry** [1] - 1059:4
**sort** [3] - 977:10, 988:23, 1042:23
**sought** [6] - 985:8, 985:11, 1031:4, 1031:10, 1032:8, 1078:6
**sound** [1] - 1068:1
**sounds** [2] - 945:10, 1059:19
**source** [1] - 960:20
**Southern** [1] - 997:8
**spanned** [1] - 1014:11
**speakers** [1] - 1043:16
**speaking** [1] - 1051:20
**Special** [15] - 938:23, 939:19, 939:22, 942:20, 942:24, 959:15, 960:19, 961:16, 962:13, 963:1, 963:24, 965:1, 965:5, 965:15, 973:3
**special** [6] - 1016:11, 1024:22, 1025:7, 1025:8, 1028:18, 1079:8

**SPECIAL** [2] - 929:6, 957:12
**specialization** [1] - 976:1
**specialized** [3] - 1024:15, 1024:17, 1024:19
**specialty** [3] - 975:21, 975:23, 975:24
**specific** [5] - 941:6, 959:25, 967:9, 990:3
**specifically** [6] - 940:13, 976:25, 985:19, 985:21, 1003:14, 1005:8
**speech** [5] - 1037:14, 1039:21, 1040:3, 1042:19, 1043:13
**speeches** [6] - 1043:23, 1044:7, 1044:9, 1045:6, 1045:9, 1046:6
**spell** [3] - 950:24, 975:8, 1019:1
**spelled** [1] - 975:9
**spent** [1] - 1006:2
**spin** [1] - 1012:16
**spoken** [3] - 940:7, 940:8, 942:21
**sponte** [2] - 939:1, 943:4
**spouse** [1] - 1019:13
**spray** [1] - 1064:9
**sprayed** [1] - 1064:5
**spraying** [1] - 1064:7
**squad** [9] - 1021:15, 1022:18, 1022:22, 1022:25, 1025:21, 1025:25, 1028:7, 1028:8, 1053:2
**squads** [2] - 1022:18, 1022:19
**squatting** [1] - 1066:6
**stage** [1] - 1045:1
**stairs** [1] - 1075:5
**stairwell** [1] - 1055:11
**stamp** [1] - 1061:11
**stand** [8] - 946:18, 947:7, 957:8, 974:24, 1018:19, 1023:7, 1025:11, 1079:13
**standard** [5] - 966:14, 966:15, 980:18, 1027:3, 1029:10
**standing** [5] - 975:1, 1065:3, 1065:11, 1067:18, 1069:4
**stands** [2] - 945:5, 1025:12

**Stanley** [2] - 930:11, 935:21
**STANLEY** [1] - 928:11
**stanley@ brandwoodwardlaw .com** [1] - 928:13
**star** [1] - 1032:1
**start** [10] - 1025:6, 1031:17, 1050:19, 1054:23, 1058:10, 1063:15, 1063:20, 1072:19, 1075:9, 1079:2
**started** [8] - 942:18, 976:11, 977:24, 992:21, 1046:21, 1054:24, 1066:24, 1069:8
**startled** [1] - 1008:2
**starts** [2] - 1040:13, 1064:22
**state** [9] - 950:24, 975:7, 979:8, 979:21, 989:1, 989:2, 989:4, 990:11, 1018:25
**statement** [8] - 961:3, 963:4, 963:6, 1008:24, 1009:11, 1011:6, 1011:21
**statements** [8] - 963:4, 967:5, 967:14, 986:1, 1008:16, 1009:2, 1009:4, 1011:10
**STATES** [3] - 927:1, 927:2, 927:10
**states** [2] - 931:12, 1036:1
**States** [3] - 927:13, 957:19, 1080:20
**station** [1] - 1037:21
**stationed** [2] - 1023:10, 1052:24
**stations** [1] - 981:20
**Statistical** [1] - 977:13
**statue** [1] - 1048:17
**stay** [1] - 1076:21
**stayed** [5] - 955:2, 955:6, 956:7, 1030:1, 1078:3
**staying** [4] - 956:6, 1035:5, 1037:9, 1037:19
**Steal** [1] - 948:19
**stenographic** [1] - 1080:14
**step** [5] - 932:22, 957:2, 974:2, 1018:8, 1078:25

**Stephen** [1] - 975:9
**STEPHEN** [2] - 929:9, 975:2
**Steve** [3] - 951:25, 952:24, 953:5
**STEVEN** [3] - 927:6, 929:11, 1018:20
**Steven** [5] - 951:8, 953:13, 981:5, 1018:18, 1019:2
**sticking** [1] - 964:22
**still** [24] - 930:5, 957:9, 969:2, 1017:10, 1023:23, 1040:1, 1042:25, 1053:4, 1053:6, 1053:8, 1055:3, 1058:5, 1058:25, 1060:14, 1061:2, 1061:18, 1065:13, 1065:16, 1066:7, 1066:15, 1067:14, 1068:21, 1070:22
**stills** [1] - 1070:1
**stimulus** [1] - 979:17
**stipulate** [2] - 934:14, 935:15
**stipulated** [7] - 934:6, 934:14, 934:18, 935:1, 935:8, 935:25, 936:8
**stomp** [1] - 1059:19
**stood** [1] - 1057:4
**Stop** [1] - 948:19
**stop** [15] - 931:9, 958:18, 1029:2, 1039:12, 1039:13, 1051:11, 1052:17, 1053:18, 1061:4, 1062:1, 1063:23, 1071:2, 1074:14, 1075:3, 1078:24
**stopped** [6] - 932:8, 932:13, 973:18, 986:12, 1051:10
**storm** [5] - 953:15, 953:18, 1053:22, 1054:3, 1054:5
**straight** [3] - 988:3, 1042:23, 1059:17
**strategic** [1] - 944:3
**Street** [4] - 927:14, 927:18, 927:21, 928:12
**street** [6] - 944:19, 945:1, 1023:17, 1035:23, 1075:10
**stress** [7] - 977:1, 977:8, 977:9, 978:15, 978:23,

979:20, 984:18
**stressful** [1] - 981:21
**stretched** [1] - 1040:2
**strip** [1] - 1067:16
**struggling** [2] - 988:24, 991:9
**stuck** [3] - 1065:15, 1068:15, 1068:19
**studied** [2] - 976:4, 976:25
**studies** [1] - 991:5
**study** [2] - 975:20, 1000:1
**stuff** [29] - 948:3, 952:18, 1000:9, 1022:11, 1026:2, 1026:16, 1027:21, 1027:23, 1032:6, 1035:1, 1035:2, 1045:12, 1045:14, 1045:18, 1045:21, 1047:12, 1047:15, 1051:2, 1051:11, 1053:3, 1054:25, 1058:23, 1063:9, 1064:6, 1064:7, 1067:10, 1067:13, 1067:21, 1076:21
**stupid** [1] - 1063:8
**sua** [2] - 939:1, 943:4
**subcognitive** [1] - 989:24
**subexhibit** [1] - 935:25
**subject** [1] - 963:5
**subjective** [5] - 1009:21, 1009:23, 1009:24, 1010:6, 1011:3
**subjectivity** [1] - 1010:11
**submitted** [2] - 996:23, 1079:19
**substance** [3] - 947:22, 969:18, 970:1
**substantially** [1] - 1008:15
**subway** [2] - 1038:5, 1038:6
**succinct** [1] - 1002:21
**sudden** [4] - 1065:18, 1066:10, 1067:21, 1068:3
**suffer** [1] - 979:7, 1012:3, 1012:8, 1013:16, 1018:1
**suffered** [10] - 984:19, 984:24, 1011:23, 1013:11, 1013:13,

1013:14, 1030:13, 1030:15, 1030:18, 1030:19
**suffering** [1] - 979:24
**suggested** [2] - 932:7, 932:11
**suggests** [1] - 1079:14
**suicidal** [2] - 992:17, 1030:19
**suicide** [3] - 992:8, 1002:9, 1031:24
**suicides** [1] - 992:9
**Suite** [2] - 928:3, 928:8
**summation** [1] - 1010:24
**Sunday** [1] - 954:22
**super** [1] - 1044:20
**supervisors** [1] - 1015:24
**support** [2] - 1022:1, 1028:21
**supporters** [1] - 1035:1
**supports** [1] - 1005:1
**supposed** [5] - 1030:5, 1040:19, 1040:20, 1040:24, 1042:11
**surprise** [4] - 996:1, 997:2, 999:22, 999:24
**surprising** [1] - 995:10
**Survival** [1] - 1025:12
**survival** [1] - 1025:19
**survive** [2] - 1026:1, 1028:13
**sustained** [4] - 960:14, 989:19, 1016:16, 1018:3
**swear** [1] - 950:17
**sweatshirt** [1] - 1038:14
**switch** [1] - 1060:25
**sworn** [1] - 946:20
**Sworn** [3] - 950:19, 975:2, 1018:20
**sympathetic** [1] - 988:18
**symptoms** [7] - 978:5, 978:8, 979:15, 981:22, 992:17, 1003:3, 1004:13
**syndrome** [4] - 977:2, 978:5, 984:22, 1005:3
**systematically** [1] - 991:16
**systems** [2] - 981:10, 1027:19

## T

**tactical** [1] - 1039:1
**tailgates** [1] - 955:10
**talks** [1] - 1053:5
**tank** [1] - 981:11
**tasks** [1] - 995:24
**teaching** [1] - 1030:11
**team** [1] - 981:12
**tear** [1] - 1060:12
**technically** [1] - 1051:20
**telephone** [1] - 970:20
**telephonically** [1] - 957:24
**ten** [2] - 1018:10, 1052:2
**ten-minute** [1] - 1018:10
**tendered** [1] - 1014:8
**tennis** [1] - 1038:13
**tentatively** [1] - 945:19
**term** [1] - 990:5
**terminal** [1] - 1074:21
**terms** [2] - 944:11, 1010:11
**testified** [7] - 931:18, 963:16, 994:8, 1000:25, 1017:20, 1049:10, 1059:24
**testifies** [1] - 963:5
**testify** [5] - 961:22, 994:9, 996:21, 1006:9, 1009:7
**testifying** [2] - 997:11, 1049:13
**testimony** [34] - 930:3, 932:22, 934:7, 934:8, 934:14, 934:24, 935:1, 935:25, 936:3, 936:8, 937:14, 947:15, 947:25, 948:24, 957:2, 961:20, 968:9, 969:3, 985:24, 993:20, 993:25, 994:13, 994:19, 996:2, 996:17, 997:3, 997:10, 999:9, 1000:13, 1004:17, 1009:2, 1034:1, 1077:2
**Texarkana** [1] - 955:2
**Texas** [3] - 928:7, 951:4, 1019:8
**text** [3] - 1042:25, 1075:20, 1076:2
**texts** [2] - 948:2, 1043:3

**THAIS** [1] - 928:6
**THE** [176] - 927:1, 927:1, 927:10, 930:2, 932:16, 932:19, 932:21, 933:7, 933:11, 933:13, 933:17, 933:23, 934:3, 934:10, 934:12, 934:19, 935:3, 935:5, 935:7, 935:9, 935:13, 936:3, 936:12, 936:16, 936:19, 936:22, 937:2, 937:8, 937:16, 937:24, 938:1, 938:6, 938:13, 938:15, 938:20, 939:1, 939:5, 939:25, 941:12, 942:2, 942:9, 943:21, 944:8, 944:20, 945:10, 945:15, 946:1, 946:7, 946:10, 946:13, 946:18, 947:2, 947:7, 947:12, 947:22, 948:6, 948:13, 949:1, 949:22, 950:2, 950:5, 950:11, 950:15, 950:18, 952:6, 956:17, 956:19, 956:23, 957:1, 957:3, 957:4, 957:7, 957:11, 960:4, 960:11, 960:14, 960:22, 961:3, 961:14, 961:15, 962:10, 962:12, 963:2, 963:18, 963:21, 964:19, 964:20, 964:23, 964:24, 965:18, 965:21, 970:8, 970:11, 971:17, 971:25, 972:3, 972:5, 972:9, 972:19, 972:20, 972:21, 972:24, 974:1, 974:3, 974:4, 974:6, 974:9, 974:15, 974:19, 974:25, 982:4, 982:8, 983:10, 983:14, 984:1, 984:2, 984:3, 987:12, 989:19, 992:24, 993:1, 994:23, 995:3,

1004:1, 1004:3, 1004:4, 1004:7, 1004:10, 1006:13, 1006:17, 1006:19, 1009:12, 1009:13, 1009:14, 1009:15, 1009:17, 1012:21, 1012:23, 1013:24, 1016:16, 1018:3, 1018:6, 1018:7, 1018:9, 1018:10, 1018:14, 1018:17, 1021:6, 1021:7, 1028:24, 1028:25, 1029:15, 1040:7, 1040:9, 1040:10, 1040:12, 1040:18, 1040:20, 1040:22, 1040:23, 1041:3, 1041:9, 1041:11, 1057:21, 1059:2, 1059:4, 1065:23, 1065:24, 1066:8, 1066:9, 1076:6, 1078:23, 1079:6, 1080:1, 1080:3, 1080:5
**theoretical** [1] - 998:2
**therapy** [1] - 1031:18
**they've** [3] - 984:23, 984:24, 991:17
**thinking** [18] - 979:17, 979:22, 989:13, 989:16, 990:3, 990:5, 990:10, 1031:24, 1057:6, 1057:8, 1058:12, 1058:13, 1058:14, 1059:7, 1059:10, 1067:7, 1073:9
**thinks** [2] - 998:11, 1053:8
**third** [1] - 973:8
**thoughts** [2] - 991:21, 1030:20
**thousand** [2] - 978:19, 993:16
**thousands** [2] - 967:11, 967:12
**threat** [3] - 982:18, 1066:23, 1067:8
**threatening** [1] - 981:4
**threats** [2] - 978:16, 982:22
**three** [3] - 980:22, 991:11, 1057:22
**throughout** [4] - 965:8, 973:23, 976:9, 1024:24
**Thursday** [1] - 927:4

**tickets** [1] - 1045:2
**timing** [1] - 943:10
**titled** [1] - 1010:3
**to..** [1] - 971:14
**today** [10] - 932:22, 939:22, 942:24, 951:8, 968:16, 969:3, 993:7, 1000:13, 1006:24, 1018:8
**together** [9] - 949:8, 949:12, 949:15, 951:12, 953:22, 1031:22, 1035:14, 1052:25
**tomorrow** [13] - 937:5, 937:13, 938:12, 943:20, 944:17, 945:4, 945:6, 946:9, 946:10, 1079:2, 1079:19, 1079:22, 1080:6
**tonight** [1] - 974:8
**took** [8] - 953:4, 954:17, 1044:8, 1047:5, 1047:9, 1049:8, 1059:8, 1076:19
**tool** [1] - 1021:2
**top** [2] - 1026:18, 1064:5
**torture** [1] - 1026:6
**total** [3] - 1019:20, 1020:6, 1022:20
**totality** [1] - 971:22
**touch** [1] - 952:1
**tough** [1] - 1016:12
**tour** [1] - 981:2
**tours** [5] - 981:17, 984:10, 991:12, 991:13, 992:15
**towards** [2] - 1064:14, 1068:22
**trace** [1] - 973:23
**traditional** [1] - 944:1
**train** [6] - 975:22, 1028:17, 1028:19, 1037:21, 1038:2, 1038:4
**trained** [4] - 976:6, 989:11, 990:20, 990:21
**training** [27] - 981:5, 981:8, 991:12, 992:15, 1024:5, 1024:14, 1024:15, 1024:17, 1024:19, 1024:25, 1025:2, 1025:3, 1025:4, 1025:8, 1025:9,

1025:14, 1025:15, 1025:16, 1025:17, 1025:23, 1026:9, 1026:11, 1027:14, 1027:20, 1028:6, 1028:7
**transcript** [4] - 935:11, 935:12, 1080:14, 1080:15
**TRANSCRIPT** [1] - 927:9
**trap** [1] - 1025:19
**trap-making** [1] - 1025:19
**traumatic** [1] - 984:18
**travel** [2] - 937:5, 937:7
**trazodone** [1] - 1041:1
**treated** [2] - 985:6, 1002:8
**treatment** [7] - 980:17, 980:18, 991:6, 992:12, 1000:18, 1015:2
**treatments** [5] - 992:1, 992:2, 992:19, 992:21
**trepidation** [1] - 966:24
**TREVOR** [1] - 927:10
**trial** [8] - 937:10, 941:20, 942:14, 943:25, 961:20, 968:6, 973:3, 973:7
**TRIAL** [1] - 927:9
**tried** [3] - 1030:1, 1055:3, 1055:5
**trigger** [1] - 979:17
**triggered** [3] - 979:9, 1013:6, 1013:15
**trip** [13] - 947:24, 948:16, 948:18, 950:3, 952:13, 953:6, 954:2, 954:4, 954:9, 954:16, 955:13, 1033:19, 1033:22
**troop** [1] - 1021:8
**troops** [2] - 1021:24, 1022:3
**trouble** [2] - 1035:24
**true** [8] - 940:17, 949:13, 949:16, 1004:20, 1004:22, 1011:6, 1080:13, 1080:15
**Trump** [17] - 931:23, 952:17, 996:20, 1033:3, 1033:13, 1034:25, 1036:13,

1042:10, 1042:19, 1043:18, 1045:17, 1046:12, 1048:2, 1054:18, 1054:19
**try** [7] - 963:22, 1019:4, 1030:4, 1032:5, 1032:19, 1076:21
**trying** [30] - 948:24, 983:15, 986:22, 989:21, 992:3, 1007:15, 1014:24, 1026:2, 1026:24, 1026:25, 1029:3, 1029:13, 1030:7, 1030:8, 1030:11, 1031:18, 1031:25, 1034:6, 1055:15, 1055:18, 1057:18, 1066:23, 1066:25, 1067:8, 1070:3, 1070:22, 1071:2, 1075:4, 1075:19, 1075:25
**tunnel** [9] - 939:18, 949:6, 971:5, 1061:16, 1062:6, 1062:10, 1062:15, 1063:12, 1072:1
**turn** [1] - 1035:22
**turned** [1] - 1019:10
**turns** [2] - 944:15, 954:17
**tussle** [1] - 1012:25
**twice** [2] - 940:7, 980:10
**two** [26] - 930:20, 933:4, 939:3, 940:5, 940:6, 941:19, 943:6, 945:21, 945:25, 946:1, 946:2, 953:21, 954:18, 968:23, 974:15, 980:23, 1022:19, 1025:15, 1027:22, 1031:21, 1032:2, 1042:20, 1063:13, 1079:8, 1079:11, 1079:13
**Two** [1] - 993:16
**Two-thousand** [1] - 993:16
**two-week** [2] - 1027:22, 1032:2
**TX** [2] - 928:4, 928:8
**TXW** [1] - 928:2
**type** [7] - 1024:23, 1025:23, 1031:16, 1042:1, 1053:6, 1053:8, 1054:19

**types** [1] - 1024:22
**typically** [1] - 1001:21

## U

**U.S** [3] - 928:16, 940:11, 1010:3
**ulterior** [1] - 1011:1
**ultimately** [4] - 945:7, 948:19, 954:18, 972:15
**unavailable** [1] - 939:16
**unconscious** [1] - 990:7
**under** [6] - 930:5, 938:8, 938:15, 938:16, 957:9, 1001:11
**undergoing** [2] - 1027:14, 1027:16
**underground** [1] - 1038:4
**underlying** [3] - 933:5, 934:9, 935:2
**underneath** [2] - 964:22, 1038:14
**understood** [3] - 931:15, 931:18, 950:13
**underwear** [1] - 1036:7
**unfair** [1] - 1006:5
**unfortunately** [1] - 1006:9
**uniform** [2] - 966:11, 1027:7
**unit** [1] - 1022:12
**UNITED** [3] - 927:1, 927:2, 927:10
**United** [3] - 927:13, 957:19, 1080:20
**Universal** [3] - 1019:8, 1029:22, 1033:11
**University** [1] - 976:23
**unprofessional** [2] - 1007:13, 1007:16
**unreliable** [1] - 996:17
**untrue** [1] - 1005:24
**up** [74] - 940:14, 941:1, 941:16, 941:21, 943:7, 948:14, 951:19, 951:20, 952:13, 953:4, 953:7, 953:9, 953:13, 953:15, 953:18, 953:21, 954:14, 954:20, 954:25, 955:8, 955:11, 955:12,

955:18, 956:6, 957:4, 958:7, 959:10, 970:1, 978:6, 981:22, 984:16, 998:7, 1008:5, 1012:17, 1022:6, 1022:10, 1023:2, 1028:17, 1034:17, 1035:8, 1037:12, 1041:13, 1042:22, 1044:2, 1045:13, 1045:20, 1046:6, 1047:23, 1048:16, 1050:25, 1051:13, 1051:15, 1054:3, 1054:6, 1054:25, 1055:6, 1055:13, 1058:5, 1058:21, 1066:2, 1066:4, 1066:5, 1066:17, 1067:2, 1071:17, 1074:18, 1074:21, 1075:11, 1076:9, 1078:4
**ups** [1] - 1076:21
**upset** [3] - 1060:23, 1063:1, 1077:1
**USA** [2] - 1074:19, 1074:24
**USAO** [1] - 927:17
**useful** [1] - 1003:11
**uses** [1] - 1021:2
**usual** [2] - 979:13, 981:8, 989:5

## V

**VA** [17] - 980:8, 980:16, 983:19, 983:21, 983:23, 985:8, 992:1, 999:19, 1000:11, 1005:16, 1014:19, 1014:25, 1015:9, 1030:23, 1031:4, 1031:20, 1032:12
**varies** [1] - 994:14
**various** [3] - 965:8, 973:14, 977:14
**vehicle** [1] - 1022:23
**vehicles** [1] - 1035:2
**venlafaxine** [2] - 1040:21, 1040:23
**verifying** [1] - 1011:5
**veteran's** [1] - 1009:18
**veterans** [8] - 976:5, 976:10, 976:17, 978:17, 982:7, 992:7, 992:10, 1014:22
**Vice** [1] - 935:17

**victim** [6] - 940:13, 940:15, 940:25, 944:1, 946:6, 974:13
**victims** [2] - 946:2, 1079:14
**Video** [22] - 958:10, 958:19, 959:13, 986:11, 986:14, 988:12, 1039:10, 1047:1, 1047:20, 1049:5, 1052:3, 1052:16, 1053:17, 1054:14, 1057:25, 1059:15, 1060:5, 1061:3, 1061:21, 1072:9, 1072:20, 1073:25
**video** [75] - 934:25, 940:25, 958:11, 959:8, 959:15, 959:25, 960:20, 960:25, 961:9, 964:16, 965:6, 965:10, 967:1, 967:9, 967:12, 967:15, 969:11, 969:24, 970:3, 970:15, 970:16, 970:22, 971:1, 971:16, 971:21, 972:11, 972:13, 973:10, 973:15, 973:18, 973:20, 973:23, 986:5, 986:15, 987:6, 987:10, 987:13, 1013:17, 1017:23, 1039:10, 1039:14, 1039:16, 1044:8, 1047:3, 1047:13, 1047:14, 1047:21, 1049:3, 1049:6, 1053:16, 1054:13, 1056:16, 1056:17, 1056:18, 1057:17, 1061:11, 1061:25, 1063:17, 1063:19, 1063:22, 1063:24, 1064:19, 1064:20, 1064:21, 1064:22, 1069:18, 1070:6, 1070:18, 1072:14, 1072:17, 1073:4, 1074:3, 1074:13, 1075:2
**videographer** [1] - 1057:20
**videos** [21] - 959:18, 959:22, 960:12, 969:6, 973:14,

1101

973:15, 973:17,
985:23, 986:7,
986:8, 986:25,
987:4, 988:4,
1009:1, 1012:5,
1048:9, 1051:11,
1052:19, 1054:1,
1057:11, 1057:18
**videotape** - 1051:2
**Vietnam** [1] - 982:17
**view** [2] - 1005:13,
1069:13
**viewed** [1] - 986:25
**viewing** [1] - 986:15
**violation** [1] - 1006:5
**violence** [3] - 931:2,
931:5, 1048:5
**VIP** [2] - 1044:15,
1044:24
**Virginia** [1] - 956:8
**virtue** [1] - 934:14
**visible** [1] - 973:24
**visit** [1] - 956:5
**visiting** [1] - 1017:2
**voice** [4] - 988:22,
1059:25, 1067:25,
1068:10
**volume** [1] - 977:15
**volumetric** [1] - 979:1
**vote** [1] - 932:13
**vs** [1] - 927:5

## W

**wait** [6] - 941:20,
1005:23, 1039:24,
1059:6, 1076:17
**wake** [1] - 1037:12
**Waldo** [2] - 1039:22,
1039:23
**walk** [1] - 1047:8
**walked** [6] - 1051:9,
1051:10, 1054:25,
1069:5, 1073:18,
1075:11
**walking** [10] - 1046:12,
1046:21, 1046:23,
1047:22, 1049:20,
1055:20, 1069:8,
1073:9, 1073:14,
1075:9
**wall** [1] - 1044:21
**wants** [5] - 937:6,
938:23, 939:2,
1038:10
**warm** [1] - 1076:22
**warning** [1] - 949:23
**Washington** [13] -
927:15, 927:18,
927:22, 928:12,

928:17, 952:14,
952:16, 955:8,
1010:2, 1035:4,
1037:19, 1038:21,
1080:22
**watch** [5] - 970:17,
972:10, 972:13,
973:19, 973:22
**watched** [3] - 943:1,
971:21, 973:10
**watching** [3] - 959:25,
1069:4, 1069:5
**ways** [6] - 951:18,
977:10, 1010:20,
1026:3, 1031:23,
1033:11
**weapon** [1] - 1024:24
**weapons** [3] - 981:10,
1036:9, 1039:3
**wearing** [6] - 965:17,
966:10, 971:12,
1038:12, 1038:13,
1039:1
**websites** [1] - 955:16
**week** [7] - 933:4,
940:7, 968:6,
1025:18, 1027:22,
1032:2, 1033:4
**weeks** [2] - 1025:15,
1031:21
**weight** [7] - 997:9,
1026:21, 1027:2,
1027:3, 1027:10,
1029:7, 1029:10
**weird** [1] - 1068:1
**welcome** [2] - 964:18,
1079:16
**Western** [1] - 928:7
**wet** [1] - 1046:16
**whatsoever** [1] - 931:2
**whoa** [1] - 1058:24
**whole** [13] - 973:19,
977:9, 990:23,
999:19, 1003:7,
1012:7, 1013:19,
1015:21, 1033:19,
1047:18, 1075:7,
1075:9
**whole..** [1] - 1075:7
**wife** [4] - 1019:20,
1029:24, 1033:5,
1078:4
**Wil** [2] - 940:20,
967:21
**Wil-hoot** [1] - 940:20
**Wilhoit** [29] - 939:13,
940:20, 940:22,
940:24, 958:5,
959:16, 960:19,
960:24, 961:16,

962:3, 962:13,
962:15, 963:9,
963:15, 963:24,
964:7, 964:16,
964:20, 964:24,
965:1, 965:24,
966:7, 967:19,
967:22, 967:23,
968:1, 968:18
**Wilhoit's** [1] - 964:15
**Wilhoot's** [1] - 940:24
**willing** [1] - 1006:8
**wind** [5] - 951:20,
954:14, 954:20,
955:8, 956:5
**wish** [3] - 945:12,
1052:21, 1079:9
**WITNESS** [27] - 929:2,
957:3, 957:11,
961:15, 962:12,
964:20, 964:24,
970:11, 972:3,
972:9, 972:20,
974:3, 984:2,
1004:3, 1006:19,
1009:13, 1009:15,
1018:6, 1018:9,
1021:7, 1028:25,
1040:9, 1040:12,
1040:20, 1040:23,
1065:24, 1066:9
**witness** [16] - 936:7,
939:15, 945:14,
946:14, 946:20,
947:16, 949:2,
956:16, 956:21,
960:2, 961:13,
962:9, 992:25,
994:9, 1078:22,
1079:4
**Witness** [2] - 965:13,
1074:6
**women** [5] - 981:21,
990:14, 992:7,
992:18, 1022:10
**wondering** [2] -
993:25, 1048:15
**WOODWARD** [39] -
928:11, 928:11,
930:8, 932:15,
933:8, 933:18,
933:22, 934:13,
935:6, 935:8,
935:19, 936:9,
936:14, 937:9,
937:19, 937:25,
938:7, 938:17,
940:3, 941:5,
941:15, 943:11,
943:23, 944:18,

945:3, 945:24,
946:4, 946:8,
946:12, 956:15,
956:25, 960:7,
960:13, 960:21,
961:2, 965:23,
971:24, 972:23,
1080:2
**Woodward** [16] -
930:11, 933:7,
933:17, 934:12,
935:5, 937:8, 938:6,
940:2, 941:2, 942:6,
944:16, 956:23,
963:10, 965:21,
972:22, 1080:1
**Woodward's** [2] -
930:4, 944:25
**Woodward)**..............
.....................**930** [1] -
929:4
**Woodward)**..............
.....................**965** [1] -
929:7
**word** [3] - 933:8,
990:2, 1045:8
**words** [2] - 949:5,
1013:12
**works** [5] - 979:11,
990:16, 991:24,
1009:12, 1032:12
**world** [2] - 991:15,
1024:24
**worn** [14] - 939:14,
939:17, 959:18,
961:17, 961:19,
961:22, 961:25,
962:4, 962:14,
962:16, 962:4,
964:4, 964:8, 964:15
**worry** [1] - 954:11
**wrapping** [1] - 1076:9
**wreck** [1] - 1025:22
**write** [5] - 967:10,
1001:16, 1001:21,
1003:10, 1005:11
**writing** [3] - 1002:22,
1003:1, 1010:2
**written** [4] - 961:10,
962:5, 1002:23,
1003:13
**wrote** [4] - 1001:17,
1002:21, 1010:8,
1016:20

## X

**XENA** [1] - 975:9
**Xenakis** [7] - 957:6,
974:24, 975:9,

996:6, 1004:7,
1014:3, 1018:7
**XENAKIS** [2] - 929:9,
975:2

## Y

**y'all** [14] - 1023:19,
1035:3, 1036:21,
1037:9, 1037:11,
1037:17, 1038:6,
1038:8, 1043:5,
1046:9, 1046:10,
1069:1, 1076:23
**year** [2] - 981:2,
1030:3
**years** [22] - 939:16,
951:19, 951:21,
966:2, 966:3, 966:6,
968:23, 976:6,
976:19, 976:21,
991:11, 991:22,
991:23, 1006:3,
1014:4, 1014:5,
1014:11, 1017:15,
1019:16, 1020:9,
1020:16, 1033:1
**yelling** [4] - 1053:22,
1054:2, 1068:25,
1074:19
**yesterday** [1] - 937:4
**yoga** [1] - 1032:11
**York** [1] - 997:8
**young** [1] - 1009:16
**yourself** [11] - 984:14,
1025:22, 1025:25,
1059:18, 1061:5,
1061:23, 1062:2,
1072:22, 1073:1,
1074:3, 1074:7

## Z

**zero** [1] - 1052:2,
1066:19, 1070:12
**zone** [1] - 1024:7
**Zoom** [2] - 970:18,
998:24